```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4      CHANBOND LLC                    :    CA NO. 15-842

 5                                      :    June 13, 2018

 6                 Plaintiff,           :

 7                                      :    2:02 o'clock p.m.

 8      v.                              :

 9                                      :

10      ATLANTIC BROADBAND GROUP,       :

11      LLC                             :

12                                      :

13                 Defendants,          :

14      . . . . . . . . . . . . . . . . . . . . . . . . . .

15

16

17                    TRANSCRIPT OF DISCOVERY DISPUTE

18             BEFORE THE HONORABLE RICHARD G. ANDREWS

19                    UNITED STATES DISTRICT JUDGE

20

21

22      APPEARANCES:

23

24      For Plaintiff:      BAYARD, P.A.

25                          BY:  STEVEN B. BRAUERMAN, ESQ.
```

```
 1                              -and-

 2                   MISCHON DE REYA NEW YORK LLC.

 3                   BY:  MARK S. RASKIN, ESQ.

 4                   BY:  ROBERT A. WHITMAN, ESQ.

 5                   BY:  DOMINICK VITALIANO, ESQ

 6

 7

 8   For Defendants:    MORRIS, NICHOLS, ARSHT & TUNNELL.

 9                   BY:  JENNIFER YING, ESQ.

10                              -and-

11                   WINSTON & STRAWN LLP.

12                   BY:  KRISHNAN PADMANABHAN, ESQ

13

14

15

16

17

18

19

20

21

22

23

24   Court Reporter:        LEONARD A. DIBBS

25                          Official Court Reporter
```

P R O C E E D I N G S

THE COURT:  Good afternoon.  Please be seated.  All right.

14:02:04   This is the discovery conference in ChanBond vs Atlantic Broadband Group LLC, Civil Action No. 15-842.

We have the same set of lawyers that appeared before me earlier today on an earlier motion.

For the record, Mr. Brauerman, who do you have with

14:02:22   you?

MR. BRAUERMAN:  Good afternoon, Your Honor.

Steve Brauerman on behalf of defendant.  I'm with my co-counsel Mark Raskin, Robert Whitman and Dominick Vitaliano.

Come offhand and Robert when it of mish common.

14:02:37   THE COURT:  Ms. Ying.

MS. YING:  Good afternoon, Your Honor.  Jennifer Ying from Morris, Nichols, Arsht & Tunnel on behalf of the defendants.  And I have with me Krishnan Padmanabhan from Winston & Strawn.

14:02:49   THE COURT:  Good afternoon to you all.

So I have read all the letters, at least, I think, all the letters, which are three that came in May, docket items 253, 255, 257, and then two more that I got yesterday from Ms. Ying, 274 and 275.

14:03:16   Those are the relevant letters for me to have read for

1   this, right?

2          MS. YING:  Yes, Your Honor.

3          THE COURT:  There seemed to be three issues in the

4   original letter.  And I sort have asked essentially at the time

14:03:42   5   after reading the first three letters for the plaintiff to, for

6   lack of a better word, for them prove the privilege log.

7          So I gather then there was a second privilege log, a

8   copy of which was supplied with the letters from Ms. Ying.

9          Is that right?

14:04:04   10         MS. YING:  That's correct.

11         THE COURT:  Okay.

12         Why don't we go through them in the order in which they

13   are in the original letter which started with what ends up with

14   and I quote, Defendants ask the Court to reopen the deposition

14:04:25   15   of Mr. Keane regarding CBV's marketing efforts, close quote.

16         And I guess the last word that I have on it was

17   actually -- really, I think the second letter, that's the letter

18   from plaintiff, Mr. Padmanabhan.

19         Do you have in response among other things they say, it

14:04:59   20   wasn't ChanBond that was making the objection, it was Mr.

21   Keane's, I don't know, own lawyer.  And they also say defendants

22   gave up too easily.

23         MR. PADMANABHAN:  Yes, your Honor, I think we're really

24   asking about interaction with third parties.

14:05:21   25         There is some deposition testimony where Mr. Keane

1    essentially shuts down.  He can't answer basically without

2    reviewing privileged information.

3         THE COURT:  When you say there is some deposition

4    testimony.  I've got Page 73 and some lines on that page to page

14:05:46    5    78 and some lines on that page.  Page 82 and some lines on that

6    page.  And page 141.

7         Is that what you're talking about?

8         MR. PADMANABHAN:  Yes, Your Honor.  Those are among the

9    citations.  I think we're not asking for much, Your Honor.

14:06:10    10         It's really maybe an extra hour-and-a-half of

11    deposition testimony just to investigate his interaction with a

12    third party.

13         THE COURT:  So, one of things that I was trying to

14    figure out -- what is it that you are trying to find out?  If

14:06:26    15    things went according in the ideal world, what is it that Mr.

16    Keane would say that would help you prove some relevant fact?

17         MR. PADMANABHAN:  Your Honor, that's a excellent

18    question, Your Honor.

19         Here's the issue:  As of the date of the hypothetical

14:06:45    20    negotiation ChanBond actually offered its patents to Allied

21    Security Trust --

22         THE COURT:  Right.  In the high seven figures.

23         MR. PADMANABHAN:  Exactly, Your Honor.

24         Now, they are trying to walk away from that.  They

14:06:57    25    didn't authorize that offer for sale.  It wasn't a legitimate

1     offer for sale.

2             So the question that Mr. Keane really won't answer is,

3     did you do this because you were told or did you run off rogue,

4     and just list the value.

14:07:10    5             It seems unlikely that a lawyer would go off rogue and

6     offer his patents -- his clients' patents for sale.

7             That's the question that we're really trying to

8     confirm.

9             THE COURT:  Okay.

14:07:23   10             I'll give you all, Mr. Raskin, to address other issues.

11             In terms of that particular question as to whether or

12    not Mr. Keane would say that he was authorized to or not to have

13    made that statement, because I gather there is something that

14    was recited saying the inventors are claiming that was an

14:07:55   15    authorized offer, and particularly, if they are actually saying

16    it's an authorized offer, doesn't that actually, to the extent

17    there is any privilege here, waive it?

18             MR. RASKIN:  I don't think there would be a waiver,

19    Your Honor.

14:08:14   20             I think the situation that we have here is actually

21    kind of interesting.

22             If in Keane did do that without authorization, he has

23    issues of his own.

24             THE COURT:  But they are not issues over which he can

14:08:31   25    assert privilege.

1    MR. RASKIN:  We take no position with respect to the

2    privilege.  We merely asked at the deposition, obviously, with

3    respect to our client.

4         We attended and just reminded him of his obligation.

5    THE COURT:  So clear that up for me.

6         They said ChanBond, and then you said he had his own

7    attorney.  I figure that's actually something that should be an

8    argument over.

9         Were you representing him or was someone else

10   representing him?

11   MR. RASKIN:  Someone else was representing him.  We

12   attended the deposition.  Mr. Keane had his own attorney.  I

13   don't believe, and I might be misremembering this, but my

14   recollection is from the record that Mr. Keane's attorney did

15   not advise him not to answer those questions.  Mr. Keane did

16   that of his own accord.

17   THE COURT:  There wasn't any, don't answer that

18   question?  It was more as you say if it would reveal

19   attorney-client privilege, be mindful of that, right?

20   MR. RASKIN:  That was said, again, with respect to

21   ChanBond.

22   THE COURT:  I'm sorry, who is Mr. Pacelli?

23   MR. RASKIN:  He is one of our attorneys, Your Honor.

24   THE COURT:  Oh, I thought you were saying Mr. Pacelli

25   was his attorney.

1         Who is his attorney.

2         MR. PADMANABHAN:  Mr. Miller who really doesn't lodge

3    any objections.

4         THE COURT:  All right.  That put a slightly different

14:10:19    5    spin on things.

6         So you're saying if they had asked the question, were

7    you authorized to make this offer, you would have just sat there

8    and said nothing?

9         MR. RASKIN:  I think we would have provided the same

14:10:36    10   caution to Mr. Keane.

11        THE COURT:  What does the caution supposed to mean?

12   You said he's a lawyer.

13        MR. RASKIN:  Right.

14        As with everything else in depositions, sometimes we

14:10:47    15   get into a conversational mode.  Sometimes we get caught up with

16   one aspect of a matter that things slip through.

17        THE COURT:  I'm sorry, leaving that aside, it's hard to

18   go back and recreate history here.

19        The question of were you authorized by the inventors or

14:11:11    20   whatever the entity is to make this representation that its bid

21   should be in the high seven figures, or whatever exactly it was,

22   there was no privilege over that, right?

23        MR. WHITMAN:  No, in fact, Mr. Hennenhoefer testified

24   about that during his deposition.

14:11:31    25        THE COURT:  Mr. Keane could testify about it, too,

1    right?

2         MR. WHITMAN:  But they never asked that question.

3         THE COURT:  Mr. Padmanabhan, what do you have to say

4    about that?

14:11:40    5         MR. PADMANABHAN:  We asked very basic questions.

6         THE COURT:  Okay.  Go on.

7         MR. PADMANABHAN:  I understand, Your Honor.

8         I get where you are going.

9         We asked, do you know if CBV worked with Allied

14:11:50   10    Security Trust?  He got a caution objection to that.  Don't go

11    into any privilege.  He was shut down on just the basic

12    question.  We're not asking for much.

13         MS. YING:  So here's an example.

14         THE COURT:  Thank you, Ms. Ying.  Were you a broker for

14:12:17   15    CBV -- were you a Broker or representing CBV?  And Mr. Pacelli

16    from Mishcon said, objection.  It calls for a legal conclusion.

17    I caution the witness not to disclose any privilege

18    communication.  And the witness responded, I don't feel I am

19    disclosing any privilege communication that may have existed on

14:12:35   20    behalf of our client.  I don't really understand what you mean

21    by broker.  He's listed on this piece of paper as CBV, the

22    patent entity broker dealing with this entity.  He wouldn't even

23    acknowledge they had that relationship after receiving this

24    objection -- what appeared to be an objection.

14:12:56   25         THE COURT:  What do you have to say about that?

1          MR. RASKIN:  Right after that in the record, the

2     witness was asked, did you understand what it means to represent

3     CBV.  Mr. Pacelli objects.  The witness says, I mean -- I'm not

4     sure I understand that question.  We did -- CBV was a client of

14:13:18   5     our firm.  With respect to CBV and whether or not it was a

6     client, the answer is in the affirmative.

7          With respect to follow up questions, I think it's

8     pretty clear that Mr. Keane had his reservations about answering

9     certain questions, but counsel never followed through.

14:13:35   10          He never asked, what exactly is your objection.  They

11     didn't probe the boundaries of the privilege is what I'm trying

12     to say.

13          THE COURT:  Okay, I understand that comment.

14          MR. PADMANABHAN:  Actually, let me cite some more

14:13:49   15     testimony.

16          THE COURT:  Before you start reading.  I suppose you

17     don't have an extra copy, if not, just read it, but don't read

18     it very quickly.

19          MR. PADMANABHAN:  It's Exhibit H.

14:14:01   20          THE COURT:  Thank you, Mr. Raskin.

21          MR. PADMANABHAN:  At page 82.  Our attorney asked the

22     question of Mr. Keane, when you represented CBV, did you make

23     decisions for CBV based on CBV's input?  And Mr. Pacelli from

24     Mishcon objected and said, again, it calls for a legal

14:14:18   25     conclusion, and I caution witness not to disclose any privilege

1   communication.

2          The witness said, Yeah, I don't think I can answer that

3   without --

4          We asked, it's a yes or no question.

14:14:28  5          The witness answered, I can't say answer without

6   waiving privilege of the client.  It's not my privilege to

7   waive.

8          THE COURT:  All right.

9          I don't know how much of a colloquy is required to find

14:14:57  10  out that the witness is being unhelpful, and claiming the

11  privilege without a basis for it.

12          Can we go off the record for a second?

13          (A discussion was held off the record.)

14          THE COURT:  All right.  Back on the record.

14:15:36  15          All right.  Here's what I think.  I think this is a

16  significant enough point so that it shouldn't go unanswered.

17          And I have generally seen when these kinds of issues

18  that have come before me more that it is attempt by the

19  questioner to get at the refusal -- the question of privilege

14:16:37  20  that is being claimed perhaps to make a better record for what

21  is eventually before a person like me.

22          Because there is -- the cited portion you just showed

23  to me shows the witness is being difficult.  And, as I believe,

24  Mr. Padmanabhan said, I think he describes them as basic

14:17:06  25  questions.  They are very broad questions, too.  And it is hard

1    to tell where it would have go had there been more specific

2    questions asked.

3          But it's my impression that there would have been a

4    refusal to answer based on the general level of uncooperation

14:17:32    5    that I see here.

6          So I'm going to -- I don't think it would take more

7    than an hour to redepose Mr. Keane.

8          I expect, Mr. Padmanabhan, that you will staff it with

9    somebody who has done this sometime before?

14:18:03   10          MR. PADMANABHAN:  Yes, Your Honor.

11          THE COURT:  And it's not a wide open deposition.

12          Maybe there is no reason other than to talk to Mr.

13    Keane other than this.  It's basically to -- you set the agenda

14    right now.  So you want to find out whether, as you said, going

14:18:25   15    rogue or somebody said that, or whether he was authorized to

16    make these representations.

17          Presumably, messages that are communicated to him to be

18    had, yes, somebody told me to do this, and who told him this is

19    fair game.

14:18:48   20          Was else is included in what you want to find out?

21          MR. PADMANABHAN:  I guess the meets and bounds of the

22    interaction with AST.

23          THE COURT:  AST is the third party.

24          So any conversations between Mr. Keane and the third

14:19:08   25    party are not privileged, period, right?

1          MR. PADMANABHAN:  Yes.

2          THE COURT:  Did you ask those questions during this

3     deposition?

4          MR. PADMANABHAN:  I think we did ask what the

14:19:17    5     relationship was with AST.

6          THE COURT:  Did he take any privilege in regards to any

7     of that?

8          MR. PADMANABHAN:  He said he couldn't answer without --

9     it was in the context of rendering legal services.  So he wasn't

14:19:32   10     in a position to waive the privilege.

11          THE COURT:  Show me precisely.

12          MR. PADMANABHAN:  Page 73, lines 11 to 21.

13          THE COURT:  You know, I read this beforehand.  Again,

14     it's a very -- it's not the best question in the world.  Your

14:19:58   15     question now is what did Allied Security Trust talk about,

16     right?

17          MR. PADMANABHAN:  I think there's continued testimony.

18          Question:  Do you know if CBV worked with Allied

19     Security Trust?  Yeah, I don't feel comfortable that I can

14:20:15   20     answer that.  Again, that is after Mr. Pacelli objected.

21          THE COURT:  Is there some place where you asked about

22     CBV and Allied Security Trust and he refused to answer it?

23          MR. PADMANABHAN:  We asked him about the document, for

24     example, which lists him as a broker.  If the document says

14:20:36   25     broker -- were you a broker representing CBV?  The witness said,

1   I don't feel comfortable disclosing any privileged

2   communications that may have existed on behalf of our client,

3   and I don't really understand what you mean by broker.  It says

4   broker and lists your name and the broker.  We are representing

14:20:47   5   CBV.  What does that mean to you?  I don't have anything to add

6   beyond what it says.

7          THE COURT:  It's not a complete do over.

8          You're not citing to me anyplace where there was a

9   privilege asserted where you asked a question about what did you

14:21:11   10   and Allied Security Trust talk about.  Who did you deal with

11   there and what you said to them and what they said to you.

12          If you can't point me to anything, I'm not going to let

13   you revisit that.

14          MR. PADMANABHAN:  I understand, Your Honor.

14:21:28   15          I've got unfortunately the transcript in front of me.

16   I'm trying to figure through this.

17          THE COURT:  Let's do this.

18          Rather than you and Ms. Ying spending 50 percent of

19   your energy right now trying to find out some place, unless you

14:21:48   20   can point me to some place, I'll be around to at least 5:00

21   o'clock today if we're finished here.  If you want to talk to

22   defendants and figure out if there is some place that gives you

23   a better argument, knock on my door and I will look at it.

24          Right now, you understand what my view is.  And my view

14:22:15   25   is unless you asked about it, it's too late to do it in the

1    second go-around.  Not only did you ask about it, not only did

2    you get improperly rebuffed and you're not pointing me to that.

3              MR. PADMANABHAN:  I understand what Your Honor is

4    saying.  The issue of whether he received authorization or not

14:22:34  5    is in bounds, but the full scope of his relationship with AST,

6    we need to demonstrate more?

7              THE COURT:  You need to demonstrate something, because

8    you had your opportunity to do so, and because you were, in my

9    opinion, getting stiff-armed on one -- on a collateral issue,

14:22:53  10   doesn't mean that you're forgiven for not asking something else.

11             All right?

12             MR. PADMANABHAN:  Yes.

13             THE COURT:  In any event, let's move on, and I will

14   hand this back.

14:23:12  15             The second issue is, ChanBond and UOL's Materials are

16   not privileged.

17             It is the request of the defendants quote, to produce

18   valuation materials ChanBond provided to UOL/CB, which I guess

19   is the present owner of ChanBond CB Capital, which was this

14:23:42  20   sometimes a kind of valuation firm, right, and vice versa as

21   background?  The CB Capital's actual reports has been produced?

22             MR. PADMANABHAN:  Yes, Your Honor.

23             MR. RASKIN:  Yes, Your Honor.

24             THE COURT:  As I understand it, CB Capital was involved

14:24:17  25   two ways with IP Nav and Unified Online and ChanBond.

1         Unified Online sought an opinion from CB Capital to

2    kind of bless its purchase.

3         Did Unified Online gets fiduciary obligations?

4         MR. RASKIN:  It's a publicly traded company.

5         THE COURT:  They're going to make a purchase and they

6    want to make sure that they are paying a price so they won't get

7    screwed on by the kind of people Mr. Brauerman represents, and

8    that makes them a non-testifying expert under the rules.

9         MR. RASKIN:  No, your Honor.

10        There's like, I said, there are two parts to this

11   situation.

12        THE COURT:  Okay.

13        MR. RASKIN:  There is that, and there's also the work

14   that they were asked in order to confirm the value that Unified

15   Online was paying for ChanBond in conjunction.

16        Because of the related aspects of the work, there were

17   -- their work was very applicable to the damages analysis that

18   IP Nav and ChanBond were performing -- ChanBond were performing

19   for the case.

20        What we have is two kinds -- they were wearing two

21   different hats, if you will.

22        With respect to the non-testifying expert, that relates

23   to damages.

24        For the work they did for Unified Online, we produced

25   that report and we didn't think -- there is no issue there.

1  That work was done for the public company.

2       THE COURT:  But the materials that go into what they

3  did for the public company, that's producible, too, right?

4       MR. RASKIN:  Well, I think that kind of gets into this

5  gray area between the two types of work they were doing.

6       That work was considered in the analysis that was

7  applicable to the damages in the case, and because that's the

8  kind of work that an expert would do for damages.  We think it

9  falls under work product.

10       With respect to the report that was done.  It's not as

11  if there was any kind of waiver.

12       If you would, with respect to the underlining, it's the

13  document that was created.  It was produced to Unified Online.

14       THE COURT:  You think that if I one of Mr. Brauerman's

15  other clients sued unified on liable for some kind of breach of

16  fiduciary and they didn't pay fair value, they would be able to

17  withhold producing what they relied on for the valuation because

18  it could be for them in a mitigation -- it's a fair question.

19       What I'm saying is, there were documents that were

20  underlying this.  The universe of documents that were underlying

21  this, that report, for example, and Unified Online, anything

22  that was -- that wasn't relied on and used in the damages

23  analysis would be considered work product, would be producible.

24       I think that you can make the argument, and I am making

25  the argument that documents that were applicable to both should

14:26:08

14:26:28

14:26:43

14:27:23

14:27:40

1  be withheld or protected as work product, because it relates to

2  the damages analysis that our client was doing of.

3        I think I understand what you're saying.

4        So I think I was trying to summarize what I thought

5  your position was, which is, CB valuation does two things.

6        One of which is, it makes some kind of valuation in

7  connection with a fairness opinion or something for a public

8  company, and it has various inputs into that.

9        And, on the other hand, it's also doing some sort of

10  non-testifying expert work in anticipation of litigation of

11  valuing or estimating.  I guess valuing the patents based on

12  expected income streams or however they were doing that.

13        And that a lot of the -- and, so, that some of the

14  inputs into all this analysis in the first instance would

15  probably go into the damages calculation, but then the damages

16  calculation gets considered by the valuation.

17        Is that, more or less, what you're saying the factual

18  scenario is?

19        MR. RASKIN:  That's about the factual situation.  It's

20  probably instead of a hundred percent overlap, maybe more of a

21  50/50, or 60/40 kind of overlap of the two.

22        Because, for example, there are aspects of the searches

23  that CB Capital was doing that were useful for the preliminary

24  damages model that was being built, but not necessarily relevant

25  to the fairness opinion that they were going through with

1    Unified Online.

2         THE COURT:  Well, so, let's assume for the sake of

3    argument that the things that they did that don't go into the

4    fairness opinion, but that's a bucket that we're not talking

14:33:46    5    about -- maybe we are talking about it, but let's just assume

6    it's not -- is everything that's not in that bucket something

7    that you've already produced?

8         MR. RASKIN:  Yes.

9         THE COURT:  So what kind of things have you produced?

14:34:00    10    You've given them the big opinion, or the opinion, what

11    kind of things that go into it have you produced?

12         MR. RASKIN:  There are many -- I can't recall the

13    number of documents that we produced, but there were --

14         THE COURT:  But what kind of -- can you characterize

14:34:14    15    them?

16         MR. RASKIN:  Sure.  They were communications, for

17    example, between CB Capital and Unified Online with respect --

18    that had nothing to do with the litigation.  That had to do with

19    the fairness opinion.

14:34:26    20         There were non-work product, non-litigation related

21    documents, industry related documents, if you will, I believe we

22    produced.  I would have to go back and look at exactly what we

23    produced.

24         But we did a privilege review of the materials that we

14:34:48    25    collected that CB Capital provided to us.  There were only -- I

1  think there were 86 documents that we thought should be

2  applicable to work product protection.

3           THE COURT:  And that's in the last, I think, the last

4  Ms. Ying letter that I had gotten where she was talking about

14:35:12  5  producing a privilege log two days ago, or whenever exactly it

6  was.

7           That's what that was about, right?

8           MR. RASKIN:  Right.  So we had updated, as you

9  instructed us, both logs to identify any attorney or agent that

14:35:25  10  was involved with that specific document.

11           THE COURT:  All right.

12           So I'm guessing that Mr. Padmanabhan has a slightly

13  different take on what's been produced.

14           What is your take on what has been produced?

14:35:38  15           MR. PADMANABHAN:  Your Honor, we've gotten various

16  iterations of this presentation, essentially many copies of the

17  same, and some e-mails that have been exchanged.

18           We have not gotten underlying documents.

19           THE COURT:  The presentation, does it have financial

14:35:53  20  analysis in it?

21           MR. PADMANABHAN:  It has -- yeah.

22           (Pause)

23           MR. RASKIN:  So, Your Honor, this is one page of the

24  financial analysis.  This is the cover letter actually

14:36:07  25  associated with it.  And this is what they originally produced.

1   And then the subsequent production is just more copies of the

2   same.

3         But if you look at the letter, it says that they're

4   being retained to provide a valuation summary.

5         In the second page to the last paragraph it leads with,

6   "It's understood that this letter to the board of directors of

7   the company for use in considering various business objectives."

8         And then attached to this letter was this valuation.

9         THE COURT:  This two pages?

10        MR. PADMANABHAN:  No, Your Honor, we truncated it for

11  the benefit of the Court.

12        THE COURT:  I appreciate that.  No concern.

13        MR. PADMANABHAN:  It's a hundred and some odd pages.

14        But in that hundred and some odd pages is basically

15  random snapshots of information and they're summed up in this

16  lead page.  It says, "Comparison of Approaches," and that's --

17  and we expect that that's something that they'll be bandying

18  about in terms of damages discovery.

19        THE COURT:  Well, actually, they may be bandying it

20  about through their own experiment.

21        They're not going to be relying on this for that,

22  right?

23        MR. PADMANABHAN:  I'm sorry.  I don't follow the

24  question.

25        THE COURT:  The only person that's going to be trying

1    to use this is you, right?

2         MR. PADMANABHAN:  Oh, no I disagree.  I think they may

3    be trying to use it.  I don't think --

4         THE COURT:  I'd be surprised, because that will

14:37:31    5    certainly waive any claims of the underlying documents quicker

6    than you can say "waived."

7         MR. RASKIN:  Yes.  We have no plans on relying on this

8    report.

9         MR. PADMANABHAN:  Okay.

14:37:42    10        Well, either way the documents underlying that report

11   were exchanged between parties to an arms-length transaction,

12   right?

13        So ChanBond, owned by Ms. Deirdre Leane, was selling

14   the patents of ChanBond to Unified Online.  The documents that

14:38:01    15   were exchanged, though, were exchanged between two parties to a

16   transaction.

17        THE COURT:  Oh, okay.

18        So what you're saying is, CB valuation or -- is that

19   the name of this company?

14:38:14    20        MR. PADMANABHAN:  CB Capital.

21        THE COURT:  CB Capital.

22        This is before the sale takes place.  They're rendering

23   their fairness opinion that the buyer, Unified Online, or

24   whatever they are, is getting a fair deal.

14:38:37    25        And, so, to do that, they reviewed projections from

1  ChanBond, which are projections that they had prepared?

2  　　　　MR. PADMANABHAN:  Right.  They are taking -- CB Capital

3  is taking as inputs to its fairness opinion, documents prepared

4  by ChanBond.

14:38:57  5  　　　　THE COURT:  So what you're trying to get is the

6  documents that ChanBond prepared saying, here's what we expect

7  as income?

8  　　　　MR. PADMANABHAN:  Yeah.

9  　　　　THE COURT:  You haven't already... those are not things

14:39:12  10  that have been separately produced?

11  　　　　MR. PADMANABHAN:  They have not been produced.

12  　　　　THE COURT:  Are those privileged documents?

13  　　　　MR. RASKIN:  Well, so, this ties into the complicated

14  nature of all the parties involved here.

14:39:22  15  　　　　Unified Online was effectively purchasing the

16  litigation, right?

17  　　　　They're purchasing the patents.  And ChanBond has

18  affected the litigation, the major asset that ChanBond owns.

19  　　　　So there's a common interest between the two with

14:39:41  20  respect to all the legal issues that are at play in the

21  litigation, damages included.  So we would argue that any

22  communication between them, particularly with the relationship

23  to damages, would be protected under common interest.

24  　　　　THE COURT:  Okay.

14:39:57  25  　　　　MR. PADMANABHAN:  Your Honor, I would noted that the

1    letter that we handed you, Exhibit J to our opening letter, when

2    it talks about the valuation that's being done, this fairness

3    opinion, they talked about the things that they reviewed in

4    order to provide this opinion.  That includes internal operating

14:40:24   5    financial information, IP portfolio, the business prospects

6    provided to us by the company, income stream, cash flow, balance

7    sheet projections, all those things have not been produced.

8          THE COURT:  Mr. Raskin, in terms of Mr. Padmanabhan's

9    last statement, do you agree with him?

14:41:07   10          MR. RASKIN:  Again, Your Honor, I would have to -- I

11    don't recall off the top of my head exactly which documents were

12    produced.  I can certainly go back and double check.

13          THE COURT:  Well --

14          MR. RASKIN:  And if we have not produced those

14:41:20   15    documents, and obviously are underlying, there are documents

16    that are underlying the report, if you believe that, we can

17    produce those.

18          THE COURT:  Hold on a minute.

19          (Pause)

14:41:45   20          And, so, Mr. Padmanabhan, you said that the -- this

21    thing had hundreds of pages of documents attached to it.

22          When the report talks about IP licensing comparables

23    approach, or precedent transactions approach, don't they have

24    various tables that follow that explain the math of all of this?

14:42:11   25          MR. PADMANABHAN:  Not that explain the math.  What

1    they've got is random snapshots of information.  You would need

2    the underlining documents to understand the opinion.

3              THE COURT:  Do you agree with him on that?

4              MR. RASKIN:  Yes, I would probably agree with him on

5    that.

6              THE COURT:  And I'm sorry, Mr. Raskin, to be dense

7    here, but in terms of the things in this paragraph, the big full

8    paragraph of their July 24th, 2015, portfolio valuation, where

9    they have Romanettes i through vii, as things that they

10   reviewed, is there any of the things that they reviewed --

11   whatever it is they're describing here, is it your position some

12   of this is attorney work product that can't cannot be produced?

13             MR. RASKIN:  So we produced --

14             THE COURT:  I'm sorry.  Don't tell me what you did

15   produce.

16             Just look at what's here and tell me if there is

17   something here that you were looking at it intentionally not to

18   produce?

19             MR. RASKIN:  There are probably documents that fall

20   under these categories that we would tell them is work product.

21             THE COURT:  But what you're saying is, in general the

22   categories are producible?

23             MR. RASKIN:  Yes, and then where we identify documents

24   that were not work product, we produced them.

25             THE COURT:  Okay.

1          So here's what I think is that, as a practical matter,

2    it seems to me that there's a strong likelihood that there's a

3    lot of -- and, so -- and I'm sorry, before I say that -- so this

4    list of 86 things that's on the CB privilege log, they're things

14:44:39   5    that might fall into these categories that are being withheld?

6          MR. RASKIN:  Yes, Your Honor.

7          THE COURT:  Are some of them also things that do not

8    fall into these categories that are being withheld?

9          MR. RASKIN:  Yes, Your Honor.

14:44:56   10         THE COURT:  All right.

11         I think, as the first thing, it needs to be determined

12   whether plaintiff has produced basically everything in the

13   paragraph we're discussing, other than the items that's

14   intentionally withholding, which are listed on this privilege

14:45:20   15   log, right?

16         MR. RASKIN:  Correct, Your Honor.

17         THE COURT:  And in terms of being listed on the

18   privilege log, when -- I got the original set of letters -- was

19   it CB privilege log part of that?

14:45:43   20         I had the impression --

21         MR. PADMANABHAN:  Well, we asked for all the documents,

22   Your Honor, because they didn't tell us that there was a

23   supposed expert retention until their responsive letter, so our

24   issue initially was associated with that, so we --

14:45:55   25         THE COURT:  But I guess what I'm wondering is, was the

1    CB -- was there a CB privilege log?

2           I know there was a great long log of not -- because I

3    hadn't looked at the CB log when I saw Ms. Ying's letter.  I

4    thought this was kind of an add-on.

14:46:17   5           MS. YING:  Your Honor?

6           MR. PADMANABHAN:  No, Your Honor, there was the --

7           MS. YING:  Your Honor, Exhibit L to our original letter

8    from May was the original CB privilege log.

9           THE COURT:  Okay.

14:46:23   10          MS. YING:  Exhibit D to my letter of June 12th is the

11   revised log that we received on Monday evening.

12          THE COURT:  Okay.  All right.

13          My hesitation is, I had an opinion in a case about in

14   February or so, which had to do with the overlap of a

14:46:55   15   non-testifying expert who also was a testifying expert, so

16   that's different than what you have here, but the person wore

17   one hat at one time and one hat at the other time.

18          I said in the opinion, quoting -- or maybe not quoting

19   -- but referring to some authority what I recall to be something

14:47:25   20   like, when there's an overlap in the two roles, basically, it's

21   up to the person saying there's a privilege to show that they

22   were separate and distinct, or something like that.

23          That's not the same thing as what's here.  Though, it

24   strikes me as perhaps being an useful analogy.

14:48:03   25          In any event, so what I'd like to do is basically say

1 to produce everything other than the things that are on the 86

2 item CB -- the privilege log.  And we'll deal with the privilege

3 log down the road starting in a few minutes, okay, all right?

4    MR. RASKIN:  Yes, Your Honor.

14:48:31 5    THE COURT:  And, so, then in that case, then this

6 basically then just folds into the privilege log issue, right?

7    MR. PADMANABHAN:  I think so, Your Honor, if I

8 understand you correctly.

9    I think the one thing that's not clear to us is, I

14:48:47 10 believe that's from the Delaware Display Group case that we

11 cited in our letter.

12    THE COURT:  No, actually, I wasn't.  I was referring to

13 a different case --

14    MR. PADMANABHAN:  Oh, okay.

14:48:54 15    THE COURT:  -- which was.

16    MS. YING:  Was it the Acceleration Bay case?

17    THE COURT:  No, it was not.

18    It was either Ansell v. Reckitt Benckiser or Reckitt

19 Benckiser.  It had to do with prophylactic products.

14:49:17 20    In any event, I did issue some opinion shortly before

21 they settled.  And it may have been more of an order than an

22 opinion.

23    In any event, that's what I was thinking about.

24    MR. PADMANABHAN:  So I guess I just wanted to state my

14:49:32 25 confusion, which is that --

1          THE COURT:  So, basically, what I'm saying is, they

2     have to produce everything that's in here in this paragraph

3     unless it's listed on the 86 item CB privilege log, in which

4     case we'll deal with it in the context of a privilege log.

14:49:51      5          MR. PADMANABHAN:  Okay.

6          But I assume they've already done that, because they

7     had some access to the documents.  I would think they produced

8     except for what they withheld that's on the privilege log.

9          THE COURT:  Well, that seemed to be -- Mr. Raskin

14:50:06     10     wasn't too sure about what was produced, and you seem to be

11     indicating it hadn't been produced, because you were saying it

12     was a few pages here or there.  And just from the way it's

13     described there, it seems to me like even if there is a lot of

14     privilege being claimed, there should be a lot of pages left

14:50:17     15     over.

16          Basically, what I'm saying is, my understanding is

17     that's what maybe has happened, but you need to figure out

18     whether it has happened.  If it hasn't happened, then Mr. Raskin

19     knows what it is he has to do, okay?

14:50:33     20          MR. PADMANABHAN:  Okay.

21          THE COURT:  Let's go on to the privilege log.

22          So I guess as a general matter, I looked at the ten

23     items that were called out in Ms. Ying's letter, and I looked --

24     and I noticed Exhibit C where there's a list of categories of

14:50:59     25     things.  This is docket item 274-1.

1            No attorney identified, which includes five of the ten

2       things that are identified in Ms. Ying's letter.  No attorney

3       identified by name, IP Nav legal, and non-attorney Erich

4       Spangenberg identified.

5            I guess the first thing is, is it agreed that Mr.

6       Spangenberg is not an attorney?

7            MR. RASKIN:  No, Your Honor, Mr. Spangenberg is an

8       attorney.

9            THE COURT:  All right.

10           So what's -- apparently they think he's not a member of

11      the State Bar of Texas.

12           What bar he is a member of?

13           MR. RASKIN:  He is not a member in good standing.

14      However, although the report that they provided, obviously it

15      was dated 2018, but he has -- the situation has come up in a

16      couple of other cases, considering Mr. Spangenberg's profession.

17           THE COURT:  Okay.

18           MR. RASKIN:  He's been the president of IP Nav, which

19      is involved in the monetization of patent portfolios.

20           THE COURT:  Okay.

21           MR. RASKIN:  And in at least in a number of cases,

22      obviously the issue of privilege and work product has been

23      addressed in different courts, not this one.  And communications

24      between him and his client have been found to be privileged.

25      And the work product that they have done with respect to

14:51:22

14:51:32

14:51:46

14:52:04

14:52:19

1    litigation work has been found to be work product.

2           THE COURT:  And what is the theory behind that if he's

3    not an actual member of a bar?

4           MR. RASKIN:  So the way the Court analyzed it was, a

5    client generally doesn't ask the attorney or someone that they

6    perceive to be an attorney if their bar dues are current.  They

7    don't generally ask them if they are currently an active member.

8           THE COURT:  I thought this was kind of going the other

9    way that -- oh, wait.  I think I understand.  Keep going.

10          MR. RASKIN:  Okay.

11          So because the client generally doesn't ask those types

12   of questions, they -- there's -- they wouldn't have expected

13   that Mr. Spangenberg's attorney registration to have lapsed.

14          And, so, because the privilege is generally established

15   by how the client perceive the relationship, that is why the

16   Court found that the privilege existed.

17          If Your Honor would like, the decision was in Optimized

18   Technology v. Staples.  It was a Judge Gilstrap decision.  That

19   describes the issue again, just for your information.

20          THE COURT:  Okay.

21          I'm happy to hear what people have to say.  Judge

22   Gilstrap knows what he's talking about.

23          MR. PADMANABHAN:  Your Honor, I reviewed that opinion.

24   Actually, I believe there was an in-camera review of all the

25   documents at issue.  It wasn't a blanket sign-off, if you will.

1          THE COURT:  I guess what is different here is, I

2    thought that -- my impression was that it was being stated that

3    -- so wait -- IP Nav is not the owner of any of this?

4          I thought they were like the party.

14:54:39   5          MR. RASKIN:  Right.

6          So a second ago I said it was kind of a complicated set

7    of relationships.

8          CBV was the original owner of the patent.

9          THE COURT:  Right.  That's back in 2013.

14:54:50   10          MR. RASKIN:  The gentlemen who were in court this

11    morning, they're the inventors.

12          They engaged IP Nav to help them monetize their

13    portfolio.

14          THE COURT:  Okay.

14:54:59   15          MR. RASKIN:  So they engaged IP Nav and entered into

16    engagement agreements with respect to that.

17          Mr. Spangenberg was the President of IP Nav at that

18    time along with Deirdre Leane who was -- or maybe Mr.

19    Spangenberg was the CEO and Deirdre was the President.  Then CBV

14:55:18   20    sold the patents to ChanBond and ChanBond is currently the

21    plaintiff in the case.

22          After the case was filed, Unified Online purchased the

23    shares of ChanBond from Ms. Leane.  And, therefore, that's the

24    current relationship.

14:55:37   25          THE COURT:  And, so, IP Nav and Unified Online, they're

1    two completely separate unrelated companies?

2           MR. RASKIN:  They're unrelated.  They're individuals

3    who are involved in both commonly, but they are two different

4    companies.

14:55:51    5           IP Nav is a private company that was created to

6    monetize patent portfolios.  Unified Online has its own

7    business.

8           THE COURT:  So does this mean -- obviously, I haven't

9    read Judge Gilstrap's opinion here -- does Mr. Spangenberg tell

14:56:08   10    these people he's an attorney?

11           MR. RASKIN:  Generally not.  Usually -- the way it

12    works is --

13           THE COURT:  Well, I'm just curios.

14           If he didn't go around saying he's an attorney, why

14:56:19   15    would people -- you know, if you go talk to Mr. Dibbs about

16    court reporting, and you tell him stuff, the fact -- why -- you

17    wouldn't think he was an attorney, even though he might be

18    knowledgeable about legal things.

19           I guess what I'm wondering is, if I just go and talk to

14:56:37   20    the head of a business, why would I think he's an attorney

21    unless he's telling me he's an attorney?

22           MR. RASKIN:  I understand.  I believe the answer to

23    that is, Mr. Spangenberg has been in this business for, you

24    know, 25 years.  He was one of the first ones to get in.

14:56:58   25           And at the time, he was presumably in good standing.

He's an attorney.  He graduated from Case Western Law School.

So he does not advertise IP Nav is providing legal advice, but the work is in conjunction with the monetization of the portfolio, so he's not acting as --

THE COURT:  All right.

So you're saying he doesn't do anything to give people the impression that he's an attorney?

MR. RASKIN:  Not to my knowledge, no.

THE COURT:  Okay.

MR. PADMANABHAN:  I'm having difficulty finding it, Your Honor.

But Mr. Carter who was at IP Nav and owns Unified Online, he testified that IP Navigation was not in the business of providing legal advice.

THE COURT:  Well, that's what Mr. Raskin just said.

MR. PADMANABHAN:  Well, I probably should have listened.

THE COURT:  All right.

Well, so, I thought maybe that would be simple, but it's not.

So what about the things, just generally the privilege log, Mr. Raskin, where there is no attorney identified as stated in Exhibit C.  The few that I looked at, I could tell who the people were based on various things and they didn't appear to me to be attorneys, but there are a lot more citations here to

1    things.

2            What is the basis -- how come the response to my Order,

3    if there's a claim of attorney work product here, one couldn't

4    identify an attorney being involved?

14:58:41    5            MR. RASKIN:  That's an excellent question, Your Honor.

6    I appreciate the opportunity.

7            Because IP Nav is involved with monetization.  What

8    they do in-house is perform their own analysis, so they perform

9    -- they create damages models in anticipation of litigation.

14:58:57    10   They review the infringement analyses and they review validity

11   of the patents that they're going to assert.

12           There are a number of attorneys in IP Nav that have

13   been identified on the privilege log, like Matt Catrone and

14   Jennifer Watkins, as well as a couple others.

14:59:15    15           So they're kind of in -- they're in the mix and they're

16   involved.

17           THE COURT:  But if IP Nav is not providing legal

18   services, what difference does it make if these people are

19   attorneys?

14:59:27    20           MR. RASKIN:  Well, it goes to the work product issue, I

21   think.  They're providing support for and they're running the

22   monetization efforts with the eye towards litigation.  They know

23   that this is going to be resolved in litigation.

24           THE COURT:  In order to have attorney work product,

14:59:44    25   don't you have to have an attorney -- don't you have to have an

1    attorney?

2         Just because they're some people saying, hey, let's

3    make some money by monetizing patents, let's start figuring all

4    this out.

5         Aren't they missing the key ingredient to claim

6    attorney work product?

7         MR. RASKIN:  I think that if work is being done -- I

8    don't think -- I haven't seen a case, Your Honor, I'll confess,

9    where a situation in which -- that found where if an attorney

10   was not directly involved in the ordering of a document to be

11   created, there's no work product.

12        Clearly, the documents, and we have the ten documents

13   that they identified for your review, if you would like?

14        THE COURT:  We'll get to that.

15        MR. RASKIN:  And, so, these documents clearly fall

16   under the umbrella of the work that IP Nav was doing in

17   anticipation of litigation.

18        THE COURT:  But what IP Nav is doing in anticipation of

19   litigation, they're not an attorney.  They're not providing

20   legal services.  And I'm gathering, though maybe you haven't

21   said this directly, so I may be inferring something that's not

22   true, it's not as though law firm X, Mischon Reya has said, hey,

23   IP Nav, we want to litigate on these patents, can you work them

24   up for us?  That might easily be a work product.  So it's not

25   like you have to be involved day-to-day or some other law firm,

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 15:01:38 | 5 |

1  but it can't be the case that a business can just say, we will

2  value and trade damages models.  And when down the line when we

3  find somebody who wants to do something with this, an attorney

4  wants to do something with this, it will be attorney work

5  product.

6          MR. RASKIN:  And that's not what I'm saying, Your

7  Honor.

8          What I'm saying is, IP Nav had a number of attorneys on

9  staff.  They are the ones who are running the litigation

10  programs -- the monetization programs.

11          So the way they did it was, they billed teams of kind

12  of a leader and two, maybe three, depending on the size of the

13  case, other employees at least some of whom are attorneys.

14          So, for example, in the privilege log that we provided,

15  we identified the IP Nav individuals who are attorneys with an

16  asterisk.

17          So even -- now, while this goes back to your point,

18  which is, well some entries don't have an individual with an

19  asterisk identified with them.

20          But the documents were still created in the same

21  environment.  I can't point to a specific attorney who said,

22  yes, you should do this, but there are attorneys on the team and

23  there are non-attorneys on the team.  And there are some

24  technical people, for example, who were preparing claim charts.

25  They're working together as a team in the context of preparation

1    for litigation.

2           That's the best explanation I can give you.  I can't --

3           THE COURT:  Okay.

4           I understand that explanation, I think.

5           And tell me if I'm being unfair in characterizing it

6    here -- what you're saying is, IP Nav, which is not in the

7    business of providing legal services, is in the business of

8    monetizing patents, finds the patent family and says, okay, you

9    four people, go work it up.  One of the four people is a lawyer

10   and they work it up.  And because one of the four people is a

11   lawyer, then the work they do is in anticipation of litigation?

12          MR. RASKIN:  Yes.  Well, let me perhaps give you

13   another analogy.

14          THE COURT:  Okay.

15          MR. RASKIN:  Okay.

16          And specifically here, because it's not IP Nav came out

17   of the blue with the patents.  They were retained by CBV in this

18   specific situation.

19          Let's say I'm IBM.  I have a tremendous patent

20   portfolio.  I go through it all time to identify what my assets

21   are.

22          THE COURT:  Sure.

23          MR. RASKIN:  We have a huge licensing program.

24          Although, IBM isn't in the business of providing legal

25   services, they have attorneys on staff.  They are the ones who

1    look at their portfolios, who manage their licensing program.

2         If they have to go out and prepare a case for

3    litigation that they then hand to their outside counsel, the

4    work that they do internally should still be considered work

5    product.

6         And that's the same scenario we have here with IP Nav.

7    The client, CBV, hired them to conduct the litigation

8    monetization program.  They took the patents, they reviewed

9    them, they analyzed them, they worked up infringement validity

10   damages, retained outside counsel, worked with outside counsel

11   to further those analyses.  And then the litigation was brought.

12        So all the work was done in the context of a client who

13   wanted to monetize the patents and with an eye towards

14   litigation.

15             THE COURT:  In anticipation of litigation?

16             MR. RASKIN:  Yes, sir.

17             THE COURT:  All right.

18             Mr. Padmanabhan.

19             MR. PADMANABHAN:  I'm pretty confused, Your Honor,

20   because there is no attorney involved, right?

21             So --

22             THE COURT:  They're saying -- I think they're saying

23   the attorney is on these teams of four or five, one of the

24   people is an actual licensed attorney.

25             That's what I think they're saying, right?

1      MR. RASKIN:  Yes, sir.

2      MR. PADMANABHAN:  If they can't identify the attorney

3  who's directing the work, it seems unclear to me, you know, how

4  there's work product protection.

5      THE COURT:  That's actually a good point is, I can't

6  believe -- I take it what you're saying, Mr. Raskin, is that

7  having set these groups off to do it the -- well, so, actually

8  that still is a fair question.

9      So, if you have somebody, if each of the groups has an

10  attorney involved in it, why isn't, if group A was the one doing

11  this, why isn't whoever that attorney is appear in each of these

12  entries?

13      MR. RASKIN:  That's a fair question.

14      The answer is, because when we prepared the chart we

15  tried to do it with certainty.  And where there was a lack of

16  certainty, I didn't feel comfortable.

17      THE COURT:  Well, I have no problem not making up

18  stuff.  That's a good practice to follow.  But --

19      MR. RASKIN:  For example, if I might, Your Honor?

20      Let's say you have a team of four, and each one has

21  their area of responsibility.

22      So I have two attorneys who are -- let's just say one

23  attorney and three people.  One is doing damages, one is doing

24  validity, and one is doing infringement.  They've been doing

25  this for 15 to 20 years, and don't need day-to-day oversight.

1          Now, if you are telling me that the fact that there's

2      an attorney in the team means that all that's being an oversight

3      and I can fill out the chart that way, I can certainly do that.

4          It wouldn't be fair --

15:07:03      5          THE COURT: Keep going.

6          MR. RASKIN:  It wouldn't fair to say that the work that

7      those other three people are doing in anticipation of litigation

8      wouldn't be protected by work product.

9          THE COURT:  Well, I don't think I have a problem with

15:07:12      10     the idea that you could have a non-attorney do work that's in

11     anticipation of litigation.  You can certainly have an economist

12     who's directed to figure this out and tell us, how much these

13     things are worth, because we're going to be suing on them.

14          And, you know, we'd like to make a pre-suit settlement

15:07:41      15     offer.  I don't know what.

16          But, yes, the work doesn't have to be done by an

17     attorney, but I'm not sure -- I'm having trouble with the idea

18     of, it goes on autopilot and everything that it does is then in

19     anticipation of litigation.  And, therefore -- and maybe the

15:08:03      20     thing of it is, is when you're saying this is in anticipation of

21     litigation, you're not saying it based on Mischon, you're not

22     saying it based on some other law firm.

23          You're saying it based on there being lawyers on each

24     of these internal teams of IP Nav?

15:08:26      25          MR. RASKIN:  Yes, sir.

1          THE COURT:  Okay.  All right.

2          I understand your position.

3          Yes?

4          MR. PADMANABHAN:  The other thing is, Your Honor, it's

15:08:32    5    got to be truly in anticipation of litigation.  That's why

6    there's this requirement of attorney oversight.

7          It's not clear whether this is for business objectives.

8    If they're wearing their business hat, do we invest in this?

9    How much money do we think we can make?  Things like that.

15:08:49   10          That's separate and apart from the fact that they may

11    have contemplated litigation.

12          The question of work product is, you know, at the

13    direction of an attorney -- an attorney -- was work being done

14    to actually prepare for the litigation, and not just how much

15:09:04   15    money can we make off this.

16          THE COURT:  Okay.

17          Unless there is something else that somebody else would

18    like to say, I wouldn't mind taking these ten exhibits and

19    having a look at them?

15:09:15   20          MR. RASKIN:  No, Your Honor.

21          THE COURT:  Okay.

22          I take it it's that's rather three-quarters of an inch

23    thick stack of paper?

24          MR. RASKIN:  Yes, Your Honor.

15:09:23   25          What we did was, because counsel identified ten

1    documents, where there were family members.  For example, if a

2    document was an attachment to an e-mail, we also included the

3    e-mail.

4            THE COURT:  Okay.

15:09:36    5            MR. RASKIN:  And that's identified on the tab.

6            THE COURT:  Okay.

7            MR. RASKIN:  We also have the three documents that they

8    identified from CB Capital log, if you would like to take a look

9    at those, too.

15:09:46   10            THE COURT:  I'm sorry.  Where did they do that?

11            MS. YING:  That was in our June 12th letter, Your

12    Honor.

13            MR. RASKIN:  Our last correspondence.

14            MS. YING:  Their last correspondence.  What we stated

15:09:58   15    was deficient in their log.

16            THE COURT:  Okay.

17            I guess I should have read the second page.

18            Okay.

19            I'll take those three also.

15:10:21   20            All right.

21            So it will probably take at least 15 minutes, so feel

22    free to move about.

23            (The Court exited the courtroom.)

24            (The Court entered the courtroom.)

15:55:36   25            THE COURT:  All right.

1          So I looked at the CB Capital Second Supplemental

2     Privilege Log, entries 1214 and 36, and also what I believe is

3     37.

4          And I did note in at least two of them, that being 12

15:56:24     5     and 36, the presence of the names of lawyers who are sitting on

6     the right-hand side of me here.  And that clearly -- and that

7     the document descriptions are generally accurate in terms of

8     discussing what the contents of the message are, or the message

9     of the documents.

15:57:08     10          But these are all things that are now that are in the

11     possession of CB Capital.  And I think they were all things that

12     I would take to be something that Mr. Raskin was talking about

13     earlier as being what was withheld from the CB Capital valuation

14     opinion, because they seem to have nothing to do really with

15:57:39     15     calculating damages.  And I can't say that any of the three of

16     them, in my opinion, throw a whole lot of light on the valuation

17     opinion.

18          But I think that as part of the valuation opinion file,

19     assuming that's what they are, and that whoever was doing the

15:58:13     20     valuation, which I assume is this Chris Baclawski?

21          MR. RASKIN:  Correct.

22          THE COURT:  I think they should be produced.

23          I don't think they're -- in his possession, they're not

24     prepared in anticipation of litigation.  They're just part of

15:58:33     25     documents he reviewed in terms of coming up with his valuation

1    opinion.

2              So I would order them to be produced.

3              To the extent that generally -- and I guess what I

4    would ask is, because I'm not going to go through 68 things or

15:58:53    5    however many are here, is to take another look at the -- and

6    that generally, if they're typical of the things that are in Mr.

7    Baclawski's possession as part of what he did for valuation,

8    that the other things that they're typical of, they should be

9    produced, too.

15:59:27   10              If you have things in here that are related to

11   production of damages opinions, which maybe you do, that are

12   things that were not produced to him in connection with the

13   valuation, maintain your claim of privilege on those.

14              I'm not expressing any opinion on that.

15:59:52   15              But in terms of what I can see here, I don't think the

16   claim of privilege on these items is a good claim.

17              So that's about all I can say about them right now.

18              On the other set -- let me just find -- hold on just a

19   minute.

16:01:13   20              (The Court exited and then reentered the conference

21   room.)

22              So on this claim chart for the ChanBond privilege log,

23   IP Nav, that's basically an e-mail address?

24              MR. RASKIN:  The IP Nav legal?

16:01:53   25              THE COURT:  Yes.

1      MR. RASKIN:  Yes, it's directed towards their general

2  counsel, Jennifer Watkins.

3      THE COURT:  Okay.

4      And yet you say it's directed, but yet you didn't put

16:02:12   5  her name down.  I take it it's just a --

6      MR. RASKIN:  She's the only member of IP Nav legal.

7      But, again, I don't know that she looked at it, so it's

8  kind of a --

9      THE COURT:  Okay.

16:02:25   10      I appreciate that.

11      So on the first one -- the first two actually -- I

12  believe this is an e-mail exchange between Mr. Whitman and Ms.

13  Leane?

14      MR. RASKIN:  That's correct, Your Honor.

16:02:48   15      That e-mail appears on our privilege log as entry

16  number 740.

17      THE COURT:  Okay.  All right.

18      I figured it was somewhere.

19      And it seemed to me that this -- these two -- 8 and 9,

16:03:19   20  notwithstanding the labeling on the privilege log, which makes

21  it difficult to figure out exactly what they are, are

22  communications with outside counsel about how to handle the

23  litigation are definitely done in anticipation of litigation,

24  perhaps even -- imminent -- I mean it's all over the documents.

16:03:50   25      So I would be inclined to say that those privileges are

1    properly claimed on those two.

2         So a lot of the rest of these, in general terms -- hold

3    on just a second.

4         (Pause)

5    Other than 89, I think the rest of these don't have any

6    apparent attorney involvement that I could see.  I'm not

7    persuaded that I can see how communications to or from Mr.

8    Spangenberg, when he's not an attorney and he's not holding

9    himself out as an attorney, can be done with some kind of

10   understanding that he's an attorney.

11        I don't think he stands in any different stead in these

12   things other than the other non-attorneys who are copied on

13   things back and forth.

14        And, so, just generally on the rest of them, there's a

15   problem, because there is no attorney identified.

16        And, so, based on what I would call a fairly quick

17   glance, I'm not real inclined to be upholding the claims of

18   privilege on any of these.

19        But I think -- I think actually the better thing to do

20   -- hold on a minute.

21        (Pause)

22        Okay.

23        Yes, so I think -- and tell me if you think this is an

24   unfair characterization, Mr. Raskin -- but, I mean, 13 basically

25   concern the inventors trying to hire someone to sell their

1    patents, right?

2           MR. RASKIN:  You're right, Your Honor.

3           And I think that we characterized that as covered by

4    the common interest privilege.

16:08:12  5           THE COURT:  And why is that?  This is in October of

6    2013.

7           MR. RASKIN:  Well, let me actually restate that.

8           They weren't looking for someone to sell their patents.

9    They were looking for someone to monetize them and they

16:08:27  10   contacted -- and, so, when Mr. Spangenberg and IP Nav were

11   contacted, it was in the context of monetization.

12          THE COURT:  Well, what difference does it make whether

13   they wanted to sell them or they contacted a licensing firm to

14   licenses them?

16:08:42  15          MR. RASKIN:  Well, I think that -- and at least in the

16   case -- in the context of the programs that IP Nav had runs,

17   which are effectively tied to litigation, there is a far greater

18   legal -- common legal interest between the two parties.

19          THE COURT:  But there's no lawyers.

16:09:08  20          MR. RASKIN:  Yes, but there's still a common legal

21   interest between the entities.

22          THE COURT:  But I'm pretty sure that for common legal

23   interest you have to have lawyers who are involved.  If there

24   are no lawyers, it's just two people doing business.

16:09:25  25          MR. RASKIN:  Well, I guess my understanding -- and

1    obviously it could be wrong -- but the common interest is an

2    exception to the waiver of the attorney-client privilege, right,

3    correct?

4              THE COURT:  Right.

16:09:36    5    But attorney-client, half of that is missing.

6    Actually, both halves are a missing when there's no attorney and

7    there's no client.

8              MR. RASKIN:  Well, I guess if your ruling is that Mr.

9    Spangenberg is not an attorney, then I would have to grant you

16:09:49   10    the point.

11             THE COURT:  Okay.  All right.

12             So I think number 13 is something that has to be

13   produced.

14             Numbers 22 and 23 are things that also do not seem to

16:10:11   15   involve an attorney.

16             Let me just check here.

17             (Pause)

18             Yes, 22 is Mr. Hennenhofer -- at least the cover e-mail

19   is Mr. Hennenhofer, you know, setting up the terms of

16:10:51   20   compensation with -- I mean it's business.  There's nothing --

21   there's no -- I don't think it's covered by any privilege.

22             So I think that you have to produce 22.

23             I think 23 is of the same ilk.

24             Let me see here.

16:11:32   25             (Pause)

1         Again, now, this is Mr. Leane answering Mr.

2   Hennenhofer's questions.  What their fee structure is.  Whether

3   they're going to sell patents or trying to monetize them.

4         This goes along with 22, but again, it's a business

16:11:55   5   transaction.

6         So I think that has to be produced.

7         I'm correct that Ms. Leane is not an attorney, right?

8         MR. RASKIN:  She is not, Your Honor.

9         THE COURT:  Billy Carter is not an attorney?

16:12:37   10   MR. RASKIN:  No.

11         THE COURT:  Other than this e-mail, Mr. Raskin, is

12   there any other document that ought to be considered in

13   connection with it to determine whether it reflects attorney

14   advice?

16:13:11   15   MR. RASKIN:  The only thing I can tell Your Honor is in

16   the body of -- I guess we should have printed it in color -- the

17   body of that second e-mail includes edits.

18         THE COURT:  I do see that, yes.

19         MR. RASKIN:  Okay.

16:13:25   20   THE COURT:  That's edits by Mr. Carter?

21         MR. RASKIN:  Right.  And all I can suggest is that the

22   copy of IP Nav legal with Ms. Watkins, again, that was the basis

23   for the -- withholding the document.

24         THE COURT:  I don't think just copying the general

16:14:34   25   counsel's mailbox, which seems to be a mailbox I take it by Mr.

1    Raskin -- what he said before is at best a semi-monitored

2    mailbox -- somehow or other converts the discussion between Mr.

3    Carter and Ms. Leane into being either in anticipation of

4    litigation to assist an attorney in anticipation of litigation

16:15:15    5    or that it's protected by the attorney-client privilege.

6            So I would say you need to produce that.

7            And this is a series of e-mails between Mr. Carter, Mr.

8    Spangenberg, Ms. Leane.  And I guess this is claimed on the

9    basis of -- well, I take it there's actually no doubt that Mr.

16:16:17    10    Carter and Ms. Leane know that Mr. Spangenberg s not a

11    practicing attorney, right?

12           MR. RASKIN:  That's probably a fair assumption.  I do

13    not know positively.

14           THE COURT:  I'm not entirely sure what the relevance of

16:16:49    15    this particular document is, but I don't see that it's

16    privileged.  And to the extent it's basically discussing whether

17    or not they want CBV as a client.

18           So I would say that you have to produce that.

19           And, so, 305 is between Deirdre Leane, Mr. Hennenhofer,

16:17:25    20    and with a copy to Mr. Spangenberg, it seems to me to be a

21    complete nothing, but also seems not to be privileged.

22           So I think -- I mean, there is no advice here.  It's

23    basically a status e-mail.

24           It's not going to be at all useful to defendants, but I

16:18:03    25    think it should be produced.

1          And number 405, which is described on the log as being

2     between Deirdre Leane and Earl Hennenhofer... and it is between

3     Deirdre -- essentially, there's no attorney here.

4          So even though there's discussion of things that one

16:19:01    5     might discuss with an attorney, that's not what's happening

6     here.

7          So I believe this has to be disclosed.

8          And the last one that's listed is docket item -- not

9     docket item -- item number 479, which is basically, I think, a

16:19:40   10     fair characterization that this is -- that there is now an

11     agreement between IP Nav and Mr. Hennenhofer's outfit, but

12     there's no advice.  There's no -- there's really nothing.  And,

13     of course, there's no attorney.

14          So I believe that this, too, needs to be disclosed.

16:20:04   15          Based on the ten that they picked out, that's not a

16     terribly good batting average.  Well, 200, I don't know.

17          So I appreciate defendants saying, I'll just order

18     everything to be produced that doesn't have an attorney in it.

19          You can see it's taken a while to get this far just

16:20:39   20     going through ten items.  And it's difficult, because sometimes

21     the way you put things on a list, you have to look at the

22     letter, the e-mail that's before after something.

23          It strikes me -- this is what I'm going to suggest.

24     You don't have to do this, but this is what I'm going to

16:21:03   25     suggest.

1        Do your privilege log again, bearing in mind that I

2    think based on the sample of ten they picked, so they probably

3    picked what they thought were the low-hanging fruit, that I

4    thought 80 percent of it were things that should have been

16:21:28    5    produced.

6        Produce a lot of things that are on the list.  Claim

7    privilege as to what you really need to.  If you're going to

8    claim privilege, there's got to be an actual attorney who is a

9    known attorney involved.

16:21:48    10        I'm not saying that -- it's possible -- I'm not saying

11    it's impossible just because they're not copied on the specific

12    communication that they couldn't -- that it couldn't be in

13    anticipation of litigation, or done at an attorney's request, or

14    direction, though, that's usually a good indication that it

16:22:11    15    probably wasn't.

16        But what I would like is to give it another iteration

17    to try to get down to a manageable number -- to a manageable

18    amount.

19        Do you think you can work with what's happened here?

16:22:28    20        MR. RASKIN:  Yes, Your Honor.

21        THE COURT:  Okay.

22        So do that.  Discuss it amongst yourselves.

23        If there is a small amount of stuff, you'll bring it

24    back to me and I'll resolve it.  If there's a large amount of

16:22:45    25    stuff, I will send you off to a Special Master, because I,

1   unfortunately, can't really spend these kinds of blocks of time

2   doing this on a regular basis, because I have a lot of other

3   things that I'm supposed to be doing, okay?

4           Does that resolve things for today?

16:23:02   5           MR. PADMANABHAN:  I have a couple of things.

6           MS. YING:  Your Honor, if we could just ask, when they

7   do their next iteration of the logs, if you guys could identify

8   the attachments with the e-mails, so they're actually together.

9   I think that would help give us some context as well.

16:23:21   10          THE COURT:  I think that would be a good idea.

11          MR. RASKIN:  Yes, Your Honor.

12          THE COURT:  Anything else?

13          MR. PADMANABHAN:  One small thing, Your Honor.

14          We're expecting, based on the additional documents,

16:23:31   15  that we're going to need some additional deposition time with

16  the inventors, and Ms. Leane, and Mr. Carter, and the ChanBond

17  entity.

18          THE COURT:  Well, why don't you wait to see what you

19  actually get.

16:23:44   20          From what I could see in going through here,

21  notwithstanding the fact that I ordered most of this stuff

22  produced, I didn't actually see anything that looked to me like

23  I'm going, oh, if I were a defendant, I would be jumping up and

24  down that I got this.

16:23:58   25          It looked pretty mundane, you know, this business of,

1   how much you're going to charge us to sell your patents?  How

2   much you're going to charge -- that leads nowhere.

3         MR. Padmanabhan:  Sure.  I just wanted to flag it.

4         THE COURT:  Okay.

5         Well, what I would say is, why don't you first discuss

6   it with each other.  I'm certainly not inclined to be just

7   reopening discovery on three inventors and all the people out in

8   the IP Nav, Ms. Leane, Mr. Carter world based on -- unless

9   there's something -- to be colloquial -- something really good

10   there.

11         MR. PADMANABHAN:  Yes.

12         THE COURT:  Okay?

13         But I hear you.  And I think the first thing to do is

14   to see if you can't work things out between yourselves, okay?

15         MR. PADMANABHAN:  Okay.

16         And then another small thing is, we understand your

17   ruling regarding the CB Capital privilege log.  They were the

18   categories of documents in that letter that related to that

19   valuation.  Those will get produced.

20         And they can take another run at trying to protect

21   privilege on what supposedly remains.

22         Is that --

23         THE COURT:  Yes, that's pretty much it.

24         MR. PADMANABHAN:  Okay.

25         THE COURT:  If the things weren't produced to CB

1    Capital for the valuation opinion, I which I think we have the

2    advantage of knowing exactly what it is, and I'll bet somewhere

3    in the world it is stored that way.

4        If it really -- I'm pretty dubious of making them

5    produce anything if CB Capital also did some traditional damages

6    kind of model or analysis.

7        And to key off your word "dubious," Your Honor, we're a

8    little dubious of the moniker of them being an expert.

9        I mean, there's no indication of that in the record, in

10   their retention letter, their website.  We think it's a little

11   bit of revisionist history, so we expect we'll be challenging

12   that.

13       THE COURT:  Okay.  All right.

14       And then that reminds on this Ansell v. Reckitt

15   Benckiser thing.

16       One of the things that I did say was, or I did look at

17   was the retention letter, which made no reference to you have

18   this role and you have that role.  Maybe you looked it up while

19   I was out there, but, yeah, I do remember that now.

20       But, in any event, try -- you seem to have a decent

21   working relationship between -- try to work at it, but I will be

22   available if you can't figure it out, unless there's too much of

23   it, in which case I will give it to somebody else, okay?

24       All right.

25       So I will give you back your privilege log books.  I do

16:25:37

16:25:55

16:26:08

16:26:23

16:26:39

1    thank you for preparing then.

2              Is there anything else?

3              One more little thing, Mr. Padmanabhan?

4              MR. PADMANABHAN:  Thank you for your time, Your Honor.

16:26:51    5              THE COURT:  All right.

6              We'll be in recess.

7              The transcript will serve as the record of my rulings.

8              Okay.

9              (All counsel responded "Thank you, Your Honor.")

16:27:00    10              (The proceedings adjourned at 4:27 o'clock p.m.)

11                              *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25