UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CHANBOND, LLC, : CA NO. 15-842-RGA

:

Plaintiff, :

:

v. : August 9, 2018

:

ATLANTIC BROADBAND GROUP, :

LLC., :

:

Defendant, : 2:04 p.m.

..............................:

TRANSCRIPT OF DISCOVERY DISPUTE

BEFORE THE HONORABLE RICHARD G. ANDREWS

UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff: BAYARD, P.A.

BY: STEVEN B. BRAUERMAN, ESQ

-and-

MISHCON DE REYA NEW YORK LLP

BY: ROBERT A. WHITMAN, ESQ

BY: MARK S. RASKIN, ESQ

BY: DOMINICK VITALIANO, ESQ

For Defendant: MORRIS, NICHOLS, ARSHT & TUNNELL

BY: JENNIFER YING, ESQ

-and-

WINSTON & STRAWN

BY: KRISHNAN PADMANABHAN, ESQ.

Court Reporter: LEONARD A. DIBBS

Official Court Reporter

P R O C E E D I N G S

(The proceedings occurred at 2:04 p.m. as follows:)

THE COURT: Have a seat.

14:04:06 So, this is a discovery conference in ChanBond v. Atlantic Broadband Group, LLC, Civil Action No. 15-842.

Mr. Brauerman.

MR. BRAUERMAN: Good afternoon, Your Honor.

Steve Brauerman from Bayard.

14:04:22 I'm joined at counsel table by Mark Raskin, Robert Whitman, and Dominick Vitaliano of Mishcon De Reya.

And with Your Honor's permission, Mr. Raskin will address the Court today.

THE COURT: That's fine.

You're Mr. Raskin?

MR. RASKIN: I am.

THE COURT: All right.

I've been reading the transcript of where we chatted amiably the last time around.

And Ms. Ying?

MS. YING: Good afternoon, Your Honor.

Jennifer Ying from Morris, Nichols, Arsht & Tunnell on behalf of the defendants.

With me is Krishnan Padmanabhan from Winston & Strawn.

14:04:48 THE COURT: All right.

14:05:03 14:05:22 14:05:35 14:05:43 14:06:03

And good afternoon, Mr. Padmanabhan. Good to see you again.

So, I did read your letters.

I assume there's no reason why we shouldn't take them up in the order in which they are discussed in here in the letters.

But first off, just remind me, I think you might have had the dates in here.

When is expert discovery supposed to start?

MR. PADMANABHAN: September 10th we set for expert discovery, Your Honor.

THE COURT: All right.

And did I schedule some kind of hearing or conference at some point in the future when we're supposed to be sorting out when the trial date is, whether there's one trial, nine trials, or some other number of trials?

MR. RASKIN: Yes, Your Honor.

December --

MR. PADMANABHAN: The 4th.

MR. RASKIN: -- I want to say.

Yes, December 4th.

THE COURT: Okay. All right.

And in regards to the appeal of the PTAB decision -- you may have, again, have had it in here -- but when is the briefing on that supposed to be done?

MR. RASKIN: The briefing is done.

MR. WHITMAN: It's starting now.

It should be done -- we're expecting a hearing, I think, towards the end of this year, early next year.

14:06:24 If we're going to be Rule 36, we're anticipating February.

THE COURT: Okay.

I understand what you're saying.

MR. RASKIN: But, Your Honor, there was a topic that we

14:06:40 wanted to discuss in the context of everything today also.

THE COURT: Okay.

Thank you for that detail.

Are you suggesting that this is now the time to bring that up?

14:06:53 MR. RASKIN: We could.

THE COURT: Does Mr. Padmanabhan know what you're talking about?

MR. PADMANABHAN: No.

MR. RASKIN: Do you want to wait?

14:07:06 MR. WHITMAN: We'll wait.

THE COURT: Okay.

So, I have the impression from the briefing that the plaintiff is saying there's no extra effort to -- well, actually, let me go back.

14:07:30 Am I correct that you are down to 18 or less asserted

claims?

MR. WHITMAN: Eighteen is correct, Your Honor.

THE COURT: And how many of them are the five claims that I gather are at issue in the appeal to the Federal Circuit?

MR. WHITMAN: There are three patents in suit. One of the patents is the '822 patent. There were six asserted claims from the '822 currently in the case. Five of those six are the subject of that IPR.

THE COURT: Okay.

Thank you. That's exactly what I was asking.

And, so, I gather from what you said in your letter -- actually, this is what I gathered, but I probably gathered this incorrectly.

What you seem to be saying is, the eight -- the other two patents include -- and I may have this backwards -- but include radio frequency and that is what is at issue here.

The one that's subject to challenge may be broader and covers something else.

Is that right?

MR. WHITMAN: If I understand you correctly, in this particular case, we've always taken the position that the patents are of the same scope in that regard.

The one patent, the '822 patent, recites channel in the claims, and the other patents recite RF channel.

In this case, none of the parties have ever pointed to

a distinction in that regard. We've always taken the position that they all mean RF channel.

In the --

THE COURT: And, so, I take it then from the infringement perspective, it makes no difference to you. It's only on invalidity that it's even an issue --

MR. WHITMAN: Only --

THE COURT: -- because presumably if your thing covers twice as much in the word "channel," there's the possibility of some other art?

MR. WHITMAN: That's correct, Your Honor.

In this case, all the patents are only being read on RF channel products, and --

THE COURT: So that's an infringement issue.

MR. WHITMAN: That's an infringement issue.

In this case, it's always been consistent. Only RF channel products have been --

THE COURT: Okay.

So, just remind me.

Why is it that you actually -- what is the extra benefit you're getting from having the '822 patent, and its one non-invalidated claim, and it's five invalidated by the PTAB claim? What is it extra that you're getting out of them over the other two patents?

MR. WHITMAN: There's an incremental benefit.

14:10:34 Some patents talk about traffic in the case. Telecommunications traffic is going in both directions. Some patents are directed to one direction. Other patents are directed to the other direction. And some patent claims are directed bidirectional.

So, if I may, I think, for example, claim --

THE COURT: So, you're actually providing probably more information than I need.

14:10:52 But what you're telling me is, there is some strategic advantage, or some other kind of advantage to you having this '822 patent with its arguably broader reading of channel in the case?

MR. WHITMAN: There's an incremental benefit, but I think this ties back to what Mark Raskin mentioned before.

14:11:11 We would -- the case has been pending for almost three years. We would primarily like to get a trial date. We think that we were highly successful before the PTAB.

14:11:27 And if it comes down to the Court's opinion that we're not getting a trial date unless we do something with those claims, I think we would take that to heart and perhaps rely on the other claims in the case.

14:11:50 THE COURT: Well, I have this vague memory, even though at least reading the -- because in preparation for this, I reread the transcript of the last discovery dispute. I did not reread the transcript of the Motion to Stay.

But is this something that I kind of suggested that like in the Motion to Stay the last time around?

MR. WHITMAN: Yes. And we think, according to our papers, we don't think there's anything that the Federal Circuit could do that could influence the other claims in this case.

If the Federal Circuit invalidates the claims, they invalidate claims that recite channel. It doesn't have anything to do with the other patents.

On the other hand, if it's the reverse, then we're still applying the patent in the same exact way. It's still an RF channel.

With that in mind, we were suggesting perhaps that if your Honor would be kind enough --

THE COURT: No, I understand why you're being careful about how you say this, but I get the gist of what you're saying.

MR. WHITMAN: If the Federal Circuit came down with an opinion that somehow effected the other claims in this case, I think at that time we could consider perhaps postponing a trial, or dealing with it in that regard.

But we think it's really highly unlikely that the Federal Circuit comes down with an opinion that has nothing to do with the merits of this case and everything, and just proceed status quo.

But we would seriously consider, if it's the Court's

opinion we're not getting a trial date unless we do something today with those claims, I think we would take that to heart.

THE COURT: I'm not going to -- I mean, we're not here to get a trial date today.

14:13:24 I think I said, in the part of whatever I did reread, because I didn't look at the Motion to Stay, because somebody cited it for something, and I think I saw me saying pretty definitively the last time around, until the Federal Circuit rules, you're not getting a trial.

14:13:44 So, I think I understand where you're coming from.

Why don't you hold that thought. And maybe we can even actually hold the expert thought for a minute.

Mr. Padmanabhan, do you have any response to that last thing?

14:14:00 MR. PADMANABHAN: I'm not sure what the last thing is.

THE COURT: Just generally what Mr. Whitman said.

MR. PADMANABHAN: Yes, Your Honor.

So, the first thing, I disagree that they've always operated under the RF channel instructions.

14:14:17 If you look at their infringement contentions, they do --

THE COURT: But do your products not use RF?

MR. PADMANABHAN: They do not use RF channels for limitations under the claim. And we've identified that in our non-infringement contentions.

14:14:33

THE COURT: All right.

MR. PADMANABHAN: And, so, in order to navigate that, what they've done is they said, well, you can see that the defendants have conceded certain things in the IPR proceedings. And they cite to depositions and --

14:14:47

THE COURT: The defendants have conceded?

MR. PADMANABHAN: Your Honor, we weren't part of the IPR proceedings, but that's how they stated it.

If the defendants have conceded that the claimed demodulator is not limited to any specific demodulator structure -- it's not limited to analog demodulation -- that's the RF --

14:15:02

THE COURT: Yes, I don't think there's any defendant history estoppel at the PTAB.

So, if that's really what they said -- I find it actually hard to believe that's what they said.

14:15:13

But, in any event, let's skip that. That doesn't seem to be particularly important to me right now.

Anything else that you want to say in general?

MR. PADMANABHAN: Well, my point is, that's why the claim construction is important, because they are operating, when convenient, under the broader construction of channel.

14:15:28

THE COURT: And, so, in the one non-invalidated claim of this '822 patent, does that say channel as opposed to RF channel?

14:15:49

MR. PADMANABHAN: It depends from a claim that says channel. It's a dependent claim.

THE COURT: Yes, yes, now I remember, because somebody said something about claim 1.

14:16:01 I guess what I'm curious about is, do we know, is there an easy explanation as to why the PTAB said five of these claims are invalid for whatever reason, and this one has survived?

MR. PADMANABHAN: Yes, it doesn't have to do with the construction of the term "channel."

14:16:19 THE COURT: Okay.

MR. PADMANABHAN: It has to due with how the components in the prior part are set up.

MR. WHITMAN: Your Honor, I don't mean to interrupt, but I strenuously disagree with that. It absolutely had to do 14:16:29 with the word "channel."

THE COURT: Okay.

MR. WHITMAN: The PTAB split the patents in two.

So, the claims that recited channel and under the broadest reasonably construction, the Patent Office said this 14:16:41 prior art, and applied to these channel claims, because they interpreted channel broadly.

The defendants tried to apply that same prior art to the other patents, and the Patent Office said, because those claims recite RF channel, that prior art doesn't apply, because 14:16:59 the prior part does not use RF channel.

That was the key difference between the Patent Office splitting the two groups of patents up. It was because of the difference in the wording the claim.

One said channel and one said RF channel.

14:17:10 MR. PADMANABHAN: Bobby, I think we're speaking about the same thing.

MR. WHITMAN: Oh, I'm sorry if I misunderstood. I didn't mean to --

MR. PADMANABHAN: I think we're talking about claim 14 of the '822 patent.

14:17:21

MR. WHITMAN: I apologize.

THE COURT: Anything else, Mr. Padmanabhan?

MR. PADMANABHAN: No, your Honor.

To speak very honestly, we tried to do this in the alternative with our expert. It has become very unwieldy.

14:17:34

That is the issue.

THE COURT: So, my inclination, given what somebody mentioned either in the letters or we said at the last -- well, I think somebody said in the letters that the odds are that the Federal Circuit decision is not going to impact this case.

14:18:20

And because most likely the invalidity is going to be affirmed, my thought was to just have you all do expert reports on the -- what I guess are the other 13 claims.

In any event, that was my inclination.

14:19:06 But let's put that aside for a second, because we also

have these other two issues here.

And, in particular, the privilege log issue.

I saw the Proposed Order from the defendants that then had a string of numbers saying, in order to produce those documents.

14:19:36

That certainly yelled out to me the fourth one, defendants' request for referral to a Special Master is granted, but not the sentence "ChanBond shall be responsible for all the Special Master's fees and costs."

14:20:00

My thought was, this is a perfect thing for whatever is in dispute in front the Special Master. And however the Special Master rules, that that's how you split the costs.

So, if ChanBond wins most of it, then defendants pay most of it. If the defendants win, then ChanBond pays most of it.

14:20:21

There's a lot of -- I don't think it's entirely ChanBond's responsibility that we're having this dispute. And, in particular, one of the things that I didn't really understand was, and part of the reason why I looked at the last discovery dispute, was the claim that the descriptions of what was legally especially insufficient as to what was discussed in these supposed privileged documents, because we didn't discuss that the last time around. And I kind of thought that the last time was the time to be raising it if there was a deficiency in the contents of a memo.

14:20:43

14:21:17

14:21:35

MR. PADMANABHAN: Your Honor, I think we raised it in our letters. And then once we all sat down and got together, there was so much content to get through that that sort of got eclipsed by going through individual documents, but it was in our letters.

THE COURT: Well, that's the beauty of a three-page letter, I guess.

Okay.

Well, in any event, that was my thought.

14:21:43

But my inclination is to just refer the privilege log to a Special Master. And let, as I said, let him or her sort it out.

And, so, I say that -- the last time I referred something to a Special Master, which was not that long along, we lined up one pretty quick. And I would expect that you can deal with these things.

14:22:07

Is there any comment on that?

MR. PADMANABHAN: I think, Your Honor, we didn't mean to be presumptuous as to who would pay. I think we just listed that from something that was said previously.

14:22:25

THE COURT: Okay.

I'm sorry. I wasn't accusing anyone of presumptuousness here. I'm just saying, it's not something that I'm going to do.

14:22:34

MR. PADMANABHAN: Fair enough.

Your Honor, I have a question to clarify.

THE COURT: Sure.

MR. RASKIN: The defendants identified an appendix to their letter a number of documents that they believe should not be subject to a claim of privilege or work product.

14:22:52

Are you saying that the Special Master's review would be limited to the documents identified in Appendix A or is this a review of the entire log?

THE COURT: Well, I wouldn't think there's any need to review the log, to the extent that there's no claim that the log needs to be reviewed. And that's part of the reason why I was saying, it makes sense to have the Special Master's division of fees reflected.

14:23:09

So, I guess in a way I was thinking, yes, if the defendants want to say, yes, all one thousand of these are bad, and they lose 950 of them, that's the way it goes.

14:23:27

But I was kind of hoping that, in fact, they were exercising some judgment, which though there's a long list of numbers on the proposed Order, there are obviously gaps from the fact that -- and I could not be bothered to try to figure out what percentage of the whole this is.

14:23:54

Like I can see that there's only one from 300 to 399, there's only one document at issue.

It looks to me like from 200 to 299, there's less than ten documents at issue.

14:24:13

There may be places like at eight hundred where there's a higher percentage. I can't tell.

MR. RASKIN: Okay.

And the other question I have for you was.

14:24:25 We noted in our letter that a significant number of the documents that are identified in the appendix, they had been identified for the first time as part of this discovery dispute.

When we through this back in June, a number of documents were identified, but we mostly dealt with this in

14:24:43 categories.

THE COURT: Well, we did. And my recollection of it in June was, they had a longer list. I told them to pick their ten best. And then I looked at the ten. And I was concerned -- not in like somebody was doing something wrong -- but that you would

14:25:04 kind of lead with your strength, so that the fact that the ten best turned out to be weighted, in my judgment pretty heavily in their favor, didn't really give a very good clue as to what happened with a deeper dive.

MR. RASKIN: And I think that --

14:25:17 THE COURT: Let me interrupt, Mr. Raskin, for one thing.

One of the things you said in your letter -- and I take it because the defendants didn't say anything different is -- there was some movement, based on what I said, where you

14:25:33 produced things, right, that's what you say in your letter?

And Mr. Padmanabhan is shaking his head yes.

So, there was something accomplished when we did this in June, right?

MR. RASKIN: Absolutely, Your Honor.

14:25:48 And I think that the guidance that we got from you was very helpful, in the sense that you gave us rulings as to communications between IPNav and the inventors before any agreement was entered into. And documents with respect to -- documents where Eric Spangenberg was identified as the lawyer supporting a claim of privilege. 14:26:08

So, those documents were produced.

Here we're having kind of another kind of a big picture disagreement as to whether or not privilege applies to certain groups of documents. And certainly we can go to the Special Master and he or she can look at all of them. 14:26:26

And I'm not asking you to spend anymore of your valuable time on this, but the categories that are identified here are of the sort where if we could get some guidance from you, it may also narrow the scope of disputes.

14:26:45 Because, for example, one of the issues that we're talking about is whether, what we consider work product, worked performed by IPNav on behalf of ChanBond, for example -- excuse me -- is done in anticipation of litigation.

Defendants, correct me if I misspeak, have taken the position that that work generally relates to their standard 14:27:05

business operations. We believe that that's -- that work would still be done for purposes of preparing for litigation.

So, that's the kind of, I think, big picture decision that might help obviate a lot of time, because if you -- excuse me -- for example, if we agree with defendants, then obviously we would produce the documents, and the Special Master probably doesn't have to look at those documents.

I'm just offering that as an option.

THE COURT: And, so --

MR. PADMANABHAN: If I may?

THE COURT: I'm sorry, Mr. Padmanabhan.

Mr. Raskin, just to make sure that I understand what you just said, because there's a reasonable chance I didn't.

What you're saying is ChanBond, at the time when I guess it was the three inventors trying to figure out how to monetize their patent, were engaged in some kind of transaction with IPNav to say, what do you think this is worth?

Is that what we're talking about?

MR. RASKIN: No.

So, there's multiple relationships. I know that we kind of touched on it last time.

There's the communications that the inventors had with IPNav initially -- and I'm not going to characterize it -- but that was the initial communication.

There was the sale of the inventors' patents to

ChanBond. There's work that ChanBond did with IPNav prior to filing the lawsuit, okay?

So, I'm specifically speaking about the work that IPNav was doing for ChanBond prior to the filing of the lawsuit.

14:29:25 THE COURT: And, so, the lawsuits were filed in the middle of 2015.

I mean, I understand before the middle of 2015 -- but when was this -- I guess ChanBond's got the patents on April 9th of 2015, so it was some time between April 9th and the middle of 2015? When was this work taking place?

14:29:54

MR. RASKIN: It would be thereabouts. I think that -- I wouldn't necessarily draw a black line on April 9th, because there was still work being done prior to the actual acquisition that still relates to litigation.

14:30:09 But, yes, I think that that would be the time period that I think would be relevant here.

THE COURT: And at that time, are you all involved?

MR. RASKIN: Yes.

THE COURT: Do you know anything about this activity as it's happening?

14:30:37

MR. RASKIN: Yes.

THE COURT: I'm trying to avoid asking some question.

I mean, are you saying this is your work product?

MR. RASKIN: No.

14:30:54 I'm not sure how I can answer.

THE COURT: Yes, yes, yes.

MR. PADMANABHAN: Your Honor, a lot of these facts are actually with us, so there's a Patent Purchase Agreement, as your Honor noted on April 9th, 2015. And attached to that, although not produced, it's identified as a line item, is Mishcon De Reya's Retention Agreement.

So, right around that time, they're getting retained. We know that.

The issue is between -- we can see in our letter what we've highlighted is -- between when first contact was made on October 23rd of 2013, and April 9th of 2015, the only operative agreement that we're aware of --

THE COURT: Well, let me just interrupt for a second.

So, are you saying to the extent that it's after April 9th, 2015, that's not the subject of the dispute here?

MR. PADMANABHAN: Not the substance of the dispute, Your Honor.

THE COURT: Okay.

Does that help?

MR. RASKIN: Yes, very much so.

THE COURT: See, it's not a ruling from me, but a ruling from Mr. Padmanabhan. That's good.

It certainly makes sense to me.

All right.

I'm sorry I interrupted.

MR. PADMANABHAN: So, your Honor, we noticed actually, when we were looking back at the letters, we mistakenly attached the wrong document. It's Exhibit 5 to our letter.

THE COURT: Yes, I had some trouble finding the exhibits. They didn't seem to correspond with the docket.

14:32:15

MR. PADMANABHAN: I apologize. This may be a little helpful, though.

So, this is actually the correct Exhibit 5, and I have additional copies.

14:32:24

This is the Non-Disclosure Agreement.

THE COURT: I'm sorry. This is a non-disclosure event of what date?

MR. PADMANABHAN: Between November 4th, 2013. This is right after they made contact. The inventors made contact with IP Navigation.

14:32:41

THE COURT: Well, I guess what I'm wondering is, I had the impression, based on what Mrs. Raskin said, that he was talking about IPNav's work post-April 9th, 2015.

Apparently everyone is in agreement. No, that's privileged.

14:33:04

So, based on the way you divided up the world, what are we -- what's at issue here?

MR. RASKIN: So, what Mr. Padmanabhan is describing are communications between the inventors and IPNav before any agreement is executed between them, correct?

14:33:23

MR. PADMANABHAN: Correct.

MR. RASKIN: Okay.

That was the subject of what we discussed at the last Discovery Conference.

14:33:32 And I'll double check, but I believe we produced all those documents -- all those communications definitely.

MS. YING: Your Honor, if I can help the Court?

So, we did attach appendix A that had specific entries. And if you look at Exhibit 2, just for example, we identified 14:33:50 159 as an issue. And the date --

THE COURT: I'm sorry, Ms. Ying.

Where are you saying, 159 is an issue?

MS. YING: Appendix A. The very line. The very first entry 159, is an entry that we were saying was improperly 14:34:08 withheld.

THE COURT: So, I see on your proposed order 159.

MS. YING: Yes, if you look at --

THE COURT: But I also see about 20 pages before you get to 159.

14:34:22 MR. PADMANABHAN: Your Honor, I think the reason that we're pointing to appendix A is because we've categorized the documents.

THE COURT: Okay.

I didn't look at that.

14:34:33 MR. PADMANABHAN: Yes.

MS. YING: That's what I was referring to.

MR. PADMANABHAN: I apologize.

THE COURT: Well, in any event, I didn't look at it.

MR. PADMANABHAN: Yes, so we've got the documents that are -- one is what we believe are just communications between the inventors and IP Navigation. Again, all filed before the date.

And the other is, again, we sort of categorized these documents that may not be communications between the two, but they appear to be before -- ChanBond didn't exist. The Patent Purchase Agreement isn't executed. We don't have any firm understanding that there is actually an indication of the litigation, or that the documents were prepared specifically for that purpose.

THE COURT: I'm sorry. I don't have Exhibit A.

MS. YING: To that point, Your Honor, if you were to look at --

THE COURT: Wait.

So, basically, this is everything that you were asking for in the Order you put into one of these two boxes?

MR. PADMANABHAN: Yes, Your Honor.

THE COURT: Okay.

Hold on a minute, Ms. Ying.

And, so, you expect that the things that are -- the numbers that are culled out here, all of them predate April 9th,

2015?

MR. PADMANABHAN: I believe so. That was our intention.

And the reason that they're broken in two categories is the first is, they should communications between the inventors and IPNav.

And the second should be all documents. They may be internal by IPNav, but they still wouldn't qualify as work product as far as we can understand.

14:36:17

THE COURT: Okay.

14:36:32

Mr. Raskin, do you want to say anything?

MR. RASKIN: Yes. The first is -- unless I start with the second one or I'll forget my thoughts -- but the first is that -- so, like a few minutes ago, document 159 was just identified to us in the first letter, so we didn't have time to double check it. Absolutely, I'll double check it and make sure that it's not something that we overlooked.

14:36:50

It's possible we've had issues with our vendors. We've spent a lot of time going through it, and if it is still on there, it's either a mistake, or there's a basis for it, and I will just have to double check.

14:37:13

With respect to the blanket position that any document prior to April 9th, 2015 wouldn't be covered by other work product or privilege, that simply is not the law, as I understand it.

14:37:35

You don't need an actual agreement in order to establish an factual relationship or a work product situation where there's still anticipation of litigation. There's no black line approach to this.

14:37:49 So, while I can understand why defendants might think that any documents that predate that agreement would not be covered by any such protection, that's simply not the case.

THE COURT: Mr. Raskin, thank you.

Let me make sure I understand from the defendants here.

14:38:10 The second category on your appendix A, they're things where there are communications that identify, for example inventors -- excuse me -- communicating with IPNav?

MR. PADMANABHAN: I think the top one was supposed to be back and forth between IPNav and ChanBond, or CVV, or whoever 14:38:31 the predecessor is.

And the bottom category could be internal to either organization, because at that point in time they're basically on opposite sides of the transaction.

THE COURT: Even though that doesn't sound to me -- I 14:38:53 mean, read what the description is of the second one.

MR. PADMANABHAN: I was going by the --

MS. YING: Your Honor, for example, the date on it was April 9th. If you were look at entry 993, we list it as having work product.

14:39:07 The problem is, they're sending it to the inventors who

were on the opposite side of the transaction at that time. They have not purchased the patents. They don't have an agreement at that time.

So, we're saying regardless of whether it's work product, whatever it is, it's waived with respect to the other side. They were on opposite sides of the transaction at that time. It can't be one-sided. And if there was one, it was waived.

MR. PADMANABHAN: It's not very clearly written.

THE COURT: Okay.

MS. YING: I'll take the drafting error on that.

THE COURT: All right. Okay.

So, I guess that if I were going to try to make a ruling right now, even give guidance, or whatever nice words that Mr. Raskin used, I wouldn't be confident that I was giving good guidance, because I'm never confident of that, but in this it would be an extra lack of confidence.

So, I'm going to resist the temptation.

And it is obvious, particularly defendants who have had some time to think about this, that you're very well versed on what all these numbers mean.

But notwithstanding that I spent more time on this before coming here than I usually do, I have -- I think there's too much here.

So, I'm going to refer it to a Special Master and hope

for the best.

MS. YING: Your Honor, if I can make one clarification about this description of the entry?

The issue that we're having for a number of these thousand plus entries is they literally say, documents reflecting attorney advice in anticipation of litigation.

There's no topic. And that's our problem. It's not that --

THE COURT: Well, what kind of topics do you want to have?

MS. YING: Well, for example, some of this says, related to infringement analysis. That's helpful for us, because that's probably going to be privileged.

It's the ones that don't have any sort of topical category that we can't test whether or not there would be a proper basis, because we simply don't know.

That's the complaint that we're having. We're not saying that the underlying document itself may or may not be privileged. We're simply saying, there's an insufficient description for us to be able to make any sort of determination.

THE COURT: Okay.

MS. YING: That's the issue that we're having.

And, so, I think the comment from Mr. Raskin about the last discovery hearing was, we thought that when they gave us the supplemental log, they were also going to fix that issue, so

that we wouldn't have to come back and say, there's descriptions that we don't understand.

That was the problem.

THE COURT: Okay.

14:42:02 I'm pretty sure that we didn't actually address at the conference whether they were going to fix it or not.

MS. YING: Correct.

THE COURT: You may have had your own understanding. They may have had their understanding.

14:42:11 But I didn't address it. And, therefore, I have no understanding.

MR. BRAUERMAN: Your Honor, I was just going to suggest we -- and I say this without suggesting anything as to anyone -- but we received this identification of documents they're

14:42:27 concerned on the log 48 hours ago, and we had 24 hours to put a letter to Your Honor.

What might make more sense is with the specific identification of documents they are concerned about, for us to go back and look at them, confirm that they're aren't mistakes,

14:42:44 because as Mr. Raskin said, there is no dispute about these. It was just an oversight.

We can produce those, minimize that dispute, and perhaps try and meet-and-confer a bit more on descriptions if that's necessary to try and narrow the dispute.

14:42:58 And I say that without any issues, but we now have an

identification of the universe of the specific line items they're concerned about. I think there's more we can do without burdening Your Honor or a Special Master to resolve this.

THE COURT: Well, Mr. Brauerman, that sounds like a brilliant suggestion to me.

14:43:14

But how do you all react to that?

MS. YING: The problem, Your Honor is, the last time we were here, and we asked for documents, and you ordered to be produced, they produced them on the last day of fact discovery.

14:43:25

That's the trouble we have.

THE COURT: Well, so, that's the reason this kind of ties into what Mr. Whitman was saying earlier, because how soon we can get to trial depends partly on what claims are at issue, but also depends partly on how much -- when we can sort through this kind of stuff.

14:43:43

So, I think they're probably motivated to try to resolve this, because this could drag on for a while.

And for various reasons, I'm perfectly willing to give a certain amount of time that I will hear from you, particularly Mr. Brauerman, since it's your idea, how much -- but you may not know what their schedule is.

14:44:09

And I do think there is -- I mean, I'm guessing without trying to count -- but there's probably 150 pages, give or take 50, in this list of things here, or documents, which I guess would be more than on a page.

14:44:33

So, what I'm inclined to do on this is to give you a period of time to see if you can't figure this out between yourselves, and hold off on the Special Master until you report back.

14:44:49 How much time do you think, Mr. Brauerman?

MR. BRAUERMAN: I think if we can have two or three weeks to go through -- two weeks. Maybe if we could have two weeks, Your Honor, to go through --

THE COURT: All right.

14:44:58 And you're not going on vacation somewhere where you can meet-and-confer with them some time in the two weeks?

MR. PADMANABHAN: No more work. It doesn't work, Your Honor.

THE COURT: Okay. All right.

14:45:09 Then I'm going to give you two weeks. Today is August 9th, so 23rd.

Yes, Mr. Padmanabhan?

MR. PADMANABHAN: The only thing is, Your Honor, so we have sort of kind been at loggerheads whether discovery can close out, given the fact that we've been fighting over this now 14:45:25 for -- its got to be eight months.

And, you know, drips and drabs kind of make it difficult.

THE COURT: Okay.

14:45:41 Well, I'd like to say that I'm fully sympathetic, but I

probably am not, but I do kind of understand what you're saying.

So, I'm going to give you all until August 23rd.

I think I may be in trial on something else then, but if you could write me a letter on August 24th and just let me know where you stand and what you want to do. And it's kind of a test to see how much this has been narrowed down and how much of the issues have been resolved, okay?

MR. PADMANABHAN: Yes, Your Honor.

MR. RASKIN: Yes, your Honor.

THE COURT: So, then the third thing is the depositions of people who I believe Ms. Leane, Mr. Hennenhoefer, and Mr. Carter.

And Mr. Hennenhoefer I understand being one of the inventors. Ms. Leane and Mr. Carter I believe had some positions at IPNav?

MR. RASKIN: That's correct, Your Honor.

Ms. Leane was the President of IPNav and she also was the President of ChanBond when it purchased the patents from CVV.

Mr. Carter was involved with IPNav and he was also was one of the principals involved in the purchase of ChanBond by Unified Online.

THE COURT: Mr. Padmanabhan, do you have an uphill struggle here?

Why should I -- and perhaps it actually makes little

sense for me even to be talking about this until the privilege log things gets cleared up.

But what do you think?

MR. PADMANABHAN: Well, based on what we've received so far, and I would expect that they gave us what they didn't struggle too much about giving us, right?

I'm sure that the stuff that is being held back is probably better yet.

They're already excellent documents that we've received as a function of this process that we would have used during deposition with these people in the first instance.

THE COURT: Well, I mean, I take it you've deposed Mr. Hennenhoefer for two days?

MR. PADMANABHAN: Your Honor, actually, we agreed to break his deposition up over two days. It's not that we had two seven-hour sessions.

THE COURT: All right.

So you had two three-and-a-half hour sessions?

MR. PADMANABHAN: It was a total of seven -- less than seven hours, Your Honor.

MR. WHITMAN: I think they had five hours, because they elected to cut it short.

MR. PADMANABHAN: Right. I mean, we were being judicious. You made a big deal about the gentleman being elderly. We took only the time that we needed is what I'm

trying to say. And we broke it up over two days.

THE COURT: All right. All right.

In any event, he's been deposed for something less than seven hours over two days.

14:48:43 I did see the plaintiff trying to put his age in every available opportunity.

So, Ms. Leane and Mr. Carter, they were deposed for one day each?

MR. PADMANABHAN: Correct.

14:48:54 MR. RASKIN: No, Mr. Carter was for two days.

MR. PADMANABHAN: Two days?

MR. RASKIN: Yes.

MR. PADMANABHAN: Ms. Leane one day of less than seven hours.

14:49:02 THE COURT: So, the whole reason that you want to do more depositions has, I take it, has nothing to do with validity, invalidity, or infringement.

It's all about damages?

MR. PADMANABHAN: Mr. Hennenhoefer is one of the named

14:49:18 inventors on the patent and --

THE COURT: No, I understand he is.

But why could the production of documents now honestly give any justification for re-deposing him about the invention?

MR. PADMANABHAN: Your Honor, there are things that

14:49:31 they say that they believe fall within the scope of the

invention. They think the claims are broad enough so that they can --

THE COURT: So what if he says, it's this or it's that? He's not the one that gets to decide.

14:49:40 MR. PADMANABHAN: That's true. He doesn't get to decide.

I think it's a strong fact in our favor, though, if the inventor saw the scope of the claims a certain way.

THE COURT: But I'm not going to let you have him

14:49:56 testify to the jury that no, I think it only covers X, Y, or Z.

That's the reason we do claim construction. I'm the one who says what the scope is.

MR. PADMANABHAN: Right. I understand that.

I will give you an example.

14:50:12 The channel issue is front and center. We've been talking about it. There are certainly things that are in documents where they say, well, the patents cover this particular standard as well.

And, if that's the case, then our view of the world has

14:50:28 got to be right, is what I'm trying to say.

THE COURT: Okay.

Well, so, I'm not going to let you do any more with Mr. Hennenhoefer, because, in the end, your view of the world is so -- is of such tangential relevance that it just makes no sense

14:50:50 to me to have more, just because you've gotten some further

insight from some other document of his view of the world.

So, he's not going to be deposed any more.

Ms. Leane and Mr. Carter, I take it on them, it's based on things you're getting that were claimed as privileged before?

MR. PADMANABHAN: Correct. And there are damages models, for example. There are valuations of the patents. There are some valuations that are smaller than the valuations that they produced previously.

THE COURT: Well, let's assume they have damages model X. And meanwhile down the road the plaintiff's have some expert who uses damages model Y.

What is it -- and I guess when we're talking -- and maybe it's hard to do when you're just using letters.

Can you be more specific? What is it that -- are they busy saying it's reasonable to expect a royalty of one cent per unit or what?

MR. PADMANABHAN: Yes, it's reasonable to expect that these patents have X value to these companies.

It's reasonable that this company, which holds this patent, should be valued at a particular amount based on the technology that it covers.

It's similar -- so, for example --

THE COURT: And this is based on the fact that you have written documents from them saying these things?

So, basically, you want to say, do you really believe

this?

And probably why, but --

MR. PADMANABHAN: Sure, Your Honor.

And that's the reason. It's not like we asked for a full seven hours for any of these people. We wanted to cap it off in a limited time. We proposed a half day for that reason, assuming that we weren't going do be putting them through a full-day deposition.

And I assume that we will get more. While I don't want to -- I don't know what that will contain.

But assuming it's of a similar scope, we're willing to hold that at a half day. We're trying to be reasonable. We would have used, these documents if we had them the first time, including with Mr. Hennenhoefer who had discussed damages with expenses.

THE COURT: Okay.

You know, even then he's not a -- I don't think he's a business person, because I think he's an inventor. Maybe he is an inventor/business person.

But I'm not going to give you any more time with him.

Ms. Leane and Mr. Carter, is it your -- are you expecting your damages expert is going to use what you think it is or what you've gotten from this recent documents that have been produced?

MR. PADMANABHAN: Absolutely, your Honor.

THE COURT: Do you have anything to say?

MR. RASKIN: Yes, Your Honor.

We offered to coordinate Ms. Leane's deposition for an extra couple hours.

14:54:09 THE COURT: I did see that mentioned in one of the letters, yes.

MR. RASKIN: We would still make that offer. Obviously, we have to coordinate with her.

Mr. Carter, if we're talking about the documents that

14:54:21 were produced off the privilege log, and what are still at issue here that we're discussing, we're talking about documents that predate April 9th of 2015.

Mr. Carter -- Unified Online didn't purchase ChanBond until the fall of 2015.

14:54:36 So, it would seem to me that if we're still working with the same universe of documents, and the basis for deposing him is the documents are coming off the log, then it seems that there shouldn't be any reason to depose Mr. Carter, and we can make Ms. Leane available.

14:54:52 THE COURT: Are the documents -- was Mr. Carter writing documents before April 9th of 2015? Was he involved in these things?

MR. RASKIN: He was generally involved in IPNav as an operations guy. He wasn't involved in litigation strategy, or

14:55:13 claim charting, or damages analysis, or anything like that.

THE COURT: And let me ask this in a slightly different way.

He's been deposed.

If I understood what you said correctly, was he deposed about, why did you buy ChanBond, or why did you sell it, whatever it is he did, or how much did you pay for it, and why it was at the amount that you paid for it?

MR. RASKIN: Yes, he was deposed as 30(b)(6) witness for ChanBond and in his individual capacity. All those topics were covered.

MR. PADMANABHAN: I would note one thing, Your Honor.

We talked about the ChanBond privilege log. Our letter addressed one additional issue, which was a handful of documents which were withheld on the CB Capital privilege log. Those do post-date April 2015. And they were documents exchanged between counterparties when ChanBond was sold in the September-October, 2015 time frame.

THE COURT: Right. I did see some mention of six entries, but I, at least, could not figure out --

MR. PADMANABHAN: I don't believe, Your Honor, that we had identified those as numbers, because there's only six of them.

THE COURT: So, in any event, I saw that it was there, but it did not sufficiently give me a clue as to why I was being -- why they were there.

All right.

And, so, what about what Mr. Raskin said that Mr. Carter's primary involvement here is in the fall of 2015?

MR. PADMANABHAN: Maybe that's true, if we get the documents that we should get from the CB Capital privilege log. We expect that those will be of interest.

And he had access to a lot of the documents that were produced. A number of documents were produced off of that CB Capital privilege log already, all except for six. We didn't have them when we deposed Mr. Carter previously.

So, there is material regarding the value of these patents that these people considered in acquiring them that we'd like to ask him about.

THE COURT: All right. Okay.

So, I take it that if there is a deposition of Ms. Leane, that is something that probably both sides would like to do after the privilege log issue has been resolved.

MR. RASKIN: I think that makes sense, Your Honor.

MR. PADMANABHAN: Yes, Your Honor.

THE COURT: Okay.

Basically, since plaintiffs has been kind enough to offer Ms. Leane, can you put a time on your offer?

MR. RASKIN: You mean a deadline for acceptance?

THE COURT: No, no, no.

MR. RASKIN: We offered her for two hours, Your Honor.

THE COURT: Okay.

I think two hours is enough.

I'll give you two hours with Ms. Leane.

As far as Mr. Carter goes, right now I'm not going to give you anything.

If two weeks from now there's been some movement on the privilege log, and there's some compelling reasons why Mr. Carter ought to be deposed, you can put it in there, but I'm kind of inclined not to want to do that.

And Mr. Hennenhoefer, he's out, all right?

MR. PADMANABHAN: Thank you, Your Honor.

THE COURT: I'm going to ask you, Mr. Brauerman, since it was your bright idea, the six documents, whatever they might be -- actually, let me go back before I stick Mr. Brauerman with this.

Mr. Raskin, these six entries on the supplemental privilege log of CB Capital, have you had a chance to look at them? Do you know what --

MR. RASKIN: I know exactly what they are, yes.

Those are documents that -- we went back through the entire CB Capital log after our last stuff, and they are documents that our firm drafted that relate to -- they are not related to damages at all.

And there's some -- and I think there are one or two IPNav documents that also don't relate to damages. They relate

to litigation, just general litigation strategy.

THE COURT: So, there's six of them.

You say you drafted or your firm drafted how many of the six?

14:59:56 MR. RASKIN: I think four. I can double check, but I think it was four out of the six.

THE COURT: And without disclosing too much, you drafted -- and I take it they're not press releases?

MR. RASKIN: No, Your Honor.

15:00:08 THE COURT: What's the general nature? Can you give me just a little more as to what kind of things they are?

MR. RASKIN: Complaints.

THE COURT: Okay.

So, if I took what you're saying is, you sent them draft complaints and said comment?

15:00:23 MR. RASKIN: No.

THE COURT: Complaints, you mean like, you haven't paid us, that kind of complaint?

MR. RASKIN: No, no, no. I would never do that, not even with a client.

15:00:37 What we did was, the materials were provided to Ms. Leane and Mr. Carter kind of in a folder and they were transmitted.

THE COURT: So, in any event, you were providing some advice to them?

15:00:53

MR. RASKIN: No, no. We drafted the documents in the pre-filing. Gave them to the client to review, and the client passed them in bulk to CB Capital.

THE COURT: Okay.

15:01:09 So, the question might be -- so, sending it to the client. Yes, that's obviously covered by attorney-client privilege.

But the client giving it to CB Capital, does that break the privilege?

15:01:24 MR. RASKIN: I think it would still be work product, Your Honor. I don't think there would be a waiver there.

MR. PADMANABHAN: They're a counter-party to a transaction, Your Honor, and that was a fairness opinion being done.

15:01:33 MR. RASKIN: CB Capital was an agent. They're not a counter-party.

THE COURT: All right. All right.

I can't keep up with you here.

MR. RASKIN: Sorry, Your Honor.

15:01:41 THE COURT: So, I can't rule on the six right now. If for some reason you're able to resolve the rest of the privilege log issues, I'll be happy to have you come back. And I will look at these six things in-camera and I will rule on them.

I can't do much right now.

15:02:15 So that just leaves us -- and I this with all --

thinking that I can probably guess what Mr. Whitman's -- well, actually, it doesn't matter.

On the experts, I do think you ought to just write up the ones that the PTAB didn't invalidate, or have your experts do the infringement invalidity on the ones that are -- that are definitely in the case.

And I suspect part of the -- and, plaintiff, you can think about whether or not you want to keep those five at least, because what I would be inclined to do in December is, if you tell me, yes, we have an actual date before the Federal Circuit, I would probably schedule the trial on the basis of yes, it will be a Rule 36. And then if it's not, we can go from there.

And, of course, saying it's a February submission date, you could be off by a few months there, at least I think.

In any event, right now it just seems to me to be somewhat wasteful to write up the five claims, which I think are of marginal value, which I think even in the way that Mr. Whitman has described them, it seems like they're actually not that all important.

So, right now you can -- the 13 claims are what you should be having expert reports on.

MR. WHITMAN: Your Honor, one clarification.

Since there's one of those five claims is an independent claim to which the dependent claim depends, it's not part of the IPR, I assume that we have to address that to get to

the dependent claim?

THE COURT: Sure. You have to do what's necessary to address the claims you need to address.

MR. WHITMAN: Yes.

15:05:20 THE COURT: Right. Yes.

Okay.

We've got a game plan here?

MR. PADMANABHAN: Yes, Your Honor.

MR. RASKIN: Yes.

15:05:32 THE COURT: Thank you very much.

MR. BRAUERMAN: Your Honor, do you want an implementing Order --

THE COURT: What?

MR. BRAUERMAN: Did you want us to prepare an 15:05:37 implementing Order, or just provide a status report on August 24th?

THE COURT: Provide a status report on August 24th.

MR. RASKIN: Thank you, Your Honor.

MR. PADMANABHAN: Thank you.

15:05:48 THE COURT: I do appreciate the defendants' submission of a proposed Order, but I have the transcript here that's confused as it probably will be, that will serve as the Order of the Court here, okay?

Okay.

15:06:05 Thank you very much.

(All counsel responded "Thank you, Your Honor.")

THE COURT: Enjoy the rest of your summer.

(The proceedings adjourned at 3:06 p.m.)

* * * * *