IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE CHANBOND, LLC<br>PATENT LITIGATION | C.A. No. 15-cv-00842-RGA<br><br>CONSOLIDATED |

ORDER

Presently before the Court is the issue of privilege regarding 29 documents submitted for *in camera* review from Plaintiff ChanBond's Seventh Amended Privilege Log.[1] (*See* D.I. 304). I have reviewed the parties' letters and the disputed documents. (D.I. 302, 305, 313, 314).

### I. BACKGROUND

The disputed documents relate to work done by IP Nav (a third party) prior to ChanBond's acquisition of the patents at issue. The relationship between IP Nav, ChanBond, and CBV (the original portfolio owner) is key to understanding ChanBond's privilege claims. The parties have represented that sometime in late 2013, CBV engaged IP Nav to help monetize its patents. With IP Nav's assistance, CBV sold its portfolio to ChanBond on April 9, 2015. (D.I. 279 at 32:1-21; D.I. 295 at 19:11-23:1). ChanBond then filed this action on September 21, 2015, for infringement of patents from the CBV portfolio. (D.I. 1). As I understand it, the disputed documents were prepared in relation to IP Nav's monetization efforts for CBV prior to the ChanBond acquisition. (D.I. 295 at 24:3-26:7).

IP Nav does not provide legal services. ChanBond posits, however, that it provides patent monetization services "with [an] eye towards litigation." (D.I. 279 at 35:17-23). ChanBond alleges, "The client, CBV, hired [IP Nav] to conduct the litigation monetization

---

[1] The parties originally submitted 30 documents, but Defendants no longer challenge entry 594. (D.I. 313 at 2).

program. [IP Nav] took the patents, [it] reviewed them, [it] analyzed them, [it] worked up infringement[,] validity[, and] damages, retained outside counsel, [and] worked with outside counsel to further those analyses. And then the litigation was brought." (*Id.* at 39:6-14). Thus, ChanBond asserts that the disputed documents are protected under the work product doctrine as prepared in anticipation of litigation. (*See* D.I. 314). ChanBond also argues that some disputed documents are protected under attorney-client privilege.

## II. LEGAL STANDARD

### A. Work Product Doctrine

The work product doctrine protects papers "prepared by or on behalf of attorneys in anticipation of litigation." *Westinghouse Elec. Corp. v. Phillippines*, 951 F.2d 1414, 1428 (3d Cir. 1991); *WebXchange Inc. v. Dell Inc.*, 264 F.R.D. 123, 128 (D. Del. 2010); Fed. R. Civ. P. 26(b)(3) (defining work product as "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)"). "A party claiming work-product immunity bears the burden of showing that the materials in question were prepared in the course of preparation for possible litigation." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000) (quoting *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 94 (3d. Cir. 1992) (quoting *Hickman v. Taylor*, 329 U.S. 495, 505 (1947))).

### B. Attorney-Client Privilege

For the attorney-client privilege to protect a communication, "it must be (1) a communication; (2) made between privileged persons; (3) in confidence; (4) for the purpose of obtaining or providing legal assistance for the client." *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011) (internal quotation marks and citations omitted). "'Privileged persons' include the

client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (citation omitted). "[T]he burden of proving that the attorney-client privilege applies is placed upon the party asserting the privilege." *In re Grand Jury*, 705 F.3d 133, 160 (3d. Cir. 2012).

### III. ANALYSIS

#### A. Documents Relating to Non-Litigation Business

##### 1. Preliminary Patent Information

Entries 2, 3, and 481 all date to the fall of 2013, when CBV first engaged IP Nav, over a year before the ChanBond acquisition. ChanBond has claimed privilege based on the work product doctrine. I am not convinced that IP Nav was working in anticipation of litigation at that time. Rather, I believe the documents were prepared for IP Nav's own business purposes as part of its initial vetting of CBV. Although ChanBond claims that IP Nav's efforts were done "with an eye towards litigation," this does not provide a wholesale privilege for IP Nav's work product. IP Nav is in the business of patent monetization, which may or may not include litigation.

Entries 2 and 3 are charts listing information related to several patents, including two of the patents at issue—U.S. Patent Nos. 7,941,822 and 8,341,679 ("the '822 patent" and "the '679 patent," respectively). The documents list basic facts such as the patent number, expiration date, and assignees. Entry 481 is a slide deck providing a high-level explanation of cable industry technology with specific reference to the '822 and '679 patents. These documents seem to be for IP Nav internal use, made to help IP Nav employees better understand CBV's portfolio. Thus, I find ChanBond has not met its burden to demonstrate that the work product doctrine applies.

### 2. Preliminary Financial Models

Entries 162-67 are emails and attached files regarding financial models for the '822 and '679 patents. The documents have dates ranging from February 2014 to April 2014. ChanBond claims work product privilege.

The documents pertain to a "Stage 1" model for CBV and include analyses based on the relevant market players, market shares, and revenues. There is no indication that CBV was anticipating litigation at the time. Rather, the content of the emails indicates that IP Nav was gathering general market information related to CBV's portfolio. This information appears to be relevant to an effort to sell the CBV portfolio. I do not believe these preliminary financial models, done long before ChanBond acquired the patents, qualify as work done in anticipation of litigation. Therefore, I find ChanBond has not met its burden to demonstrate that the work product doctrine applies.

### 3. Other Non-Litigation Business

ChanBond claims work product privilege for entries 804, 805, 822, 824, 825, 895, 899, 901, and 903. These documents are email communications relating to IP Nav's business. Entries 804 and 805 are January 2014 communications addressing IP Nav's efforts to sell CBV's patents. Nothing in the documents indicates that CBV was interested in filing suit. Entries 822, 824, and 825 are November 2013 communications having the subject line, "Recommendation: Let's sign up CBV ASAP." The documents appear focused on IP Nav's interest in CBV as a client. Entry 895 relates to the terms of the purchase agreement between CBV and ChanBond. Entries 899, 901, and 903 discuss IP Nav's potential fees. The possibility of settlement is mentioned briefly, but in the context of IP Nav's pricing strategy. I believe all these communications fall under IP Nav's non-litigation monetization work, rather than work done in

anticipation of litigation. Therefore, ChanBond has not met its burden to demonstrate that the work product doctrine applies.

ChanBond also claims attorney-client privilege for the same entries. The only attorney presence is by "CC" of an attorney email address. The actual communications are between non-attorneys. I am not persuaded that a silent "CC" alone is sufficient to show that the communications were made "for the purpose of obtaining or providing legal assistance."[2] *See In re Chevron Corp.*, 650 F.3d at 289. Thus, I find ChanBond has not met its burden to demonstrate that attorney-client privilege applies.

### B. Documents Relating to Patent Prosecution

Entries 51 and 588 are duplicates of the same draft amendment for a patent application prepared by Barnes & Thornburg LLP. ChanBond has claimed work product privilege. Defendants argue that the work product doctrine does not apply to patent prosecution documents. (D.I. 313 at 2).

Due to the non-adversarial, *ex parte* nature of patent prosecution, "work performed at the request of an attorney to prosecute a patent application does not, as a 'blanket rule,' fall within the scope of the work product doctrine." *Invista N.A. S.A.R.L. v. M&G USA Corp.*, 2013 WL 12171721, at *15 (D. Del. June 25, 2013) (citing *Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 151-52 (D. Del. 1977)). Contrary to Defendants' position, there is also no "blanket rule" that prosecution documents fall *outside* the scope of the work product doctrine. "Instead, such work product must be examined on a case-by-case basis, to determine whether the record reflects concerns more relevant to future litigation than the ongoing prosecution." *Id.*

---

[2] It appears that IP Nav copies emails to its general counsel for no other reason than to give the emails a veneer of attorney-client communication. (*See* D.I. 279 at 46:1-8, 50:21-51:6).

Here, the draft relates to a patent application in the '822 patent family. The draft is dated April 6, 2015, three days prior to ChanBond's acquisition of the portfolio. ChanBond has not provided support for its claim that the draft was prepared in anticipation of litigation, and it is not otherwise clear how the amendments "reflect[] concerns more relevant to future litigation than the ongoing prosecution." Thus, I find ChanBond has not met its burden to demonstrate that the work product doctrine applies.

### C. Documents Relating to Infringement Analyses

Entry 180 is a chart listing various players in the cable industry and individual findings of "Direct infringement," "Indirect infringement," "Requires further research," or "In progress," with respect to the '822 and '697 patents. The document dates to March 2015. ChanBond claims privilege under the work product doctrine. In light of the chart's temporal proximity to the ChanBond acquisition, and the fact that it lists several current defendants, I find the chart was likely prepared in anticipation of litigation.

Entry 266 is a slide deck from Perkins Coie LLP detailing a "Level I Analysis" of the CBV patent portfolio, including patent strengths and weaknesses, descriptions of the claimed technology, and representative claims from the '822 and '679 patents. The document dates to April 2014. ChanBond claims privilege under the work product doctrine. Although the document was prepared well before the ChanBond purchase, its analysis is clearly geared towards litigation. The summary and strengths and weaknesses slides suggest strategies for bringing infringement claims. Thus, I find the slide deck was likely prepared in anticipation of litigation.

Entries 290, 482, 483, 545, 794, 795, and 894 are claim charts for the '822 patent and related emails. The document dates range from January 2014 to November 2014. ChanBond

6

claims privilege under the work product doctrine.[3] Like entry 266, these documents appear geared towards litigation. The claim charts provide element-by-element mapping of specific technologies to a representative claim. These analyses are most naturally read as preparation for an impending infringement action.

Therefore, I find ChanBond has met its burden to demonstrate that the work product doctrine applies to entries 180, 266, 290, 482, 483, 545, 794, 795, and 894.

## IV. CONCLUSION

For the reasons above, ChanBond is DIRECTED to produce the following no later than the COB, October 11, 2018:

Entries 2, 3, 51, 162-67, 481, 588, 804, 805, 822, 824, 825, 895, 899, 901, 903.

IT IS SO ORDERED this 3 day of October 2018.

_Richard G. Andrews_
United States District Judge

---

[3] ChanBond also claims attorney-client privilege for entries 290, 545, 794, 795, and 894. I do not reach the issue of attorney-client privilege because I find the entries fall within the scope of the work product doctrine.