# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **IN RE CHANBOND, LLC PATENT LITIGATION** | C.A. No. 15-842-RGA<br><br>CONSOLIDATED<br><br>**REDACTED** |

## OPENING BRIEF OF CHANBOND, LLC IN SUPPORT OF ITS DAUBERT MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DEFENDANTS' DAMAGES EXPERT

Date: April 5, 2019

*Of Counsel*:

Robert A. Whitman *(pro hac vice)*
Mark S. Raskin *(pro hac vice)*
John F. Petrsoric *(pro hac vice)*
**MISHCON DE REYA NEW YORK LLP**
156 Fifth Avenue, suite 904
New York, New York 10010
(212) 612-3270 (Telephone)
(212) 612-3297 (Facsimile)
robert.whitman@mishcon.com
mark.raskin@mishcon.com
john.petrsoric@mishcon.com

**BAYARD, P.A.**

Stephen Brauerman (sb4952)
Sara E. Bussiere (sb5725)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
(302) 655-5000 (Telephone)
(302) 658-6395 (Facsimile)
sbrauerman@bayardlaw.com
sbussiere@bayardlaw.com

*Counsel for Plaintiff*
*ChanBond, LLC*

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. LEGAL STANDARD ............................................................................................. 2

III. FACTUAL BACKGROUND ................................................................................ 3

    A.    Z-Band, ChanBond, and Ownership of the Patents-in-Suit ..................................... 3

    B.    Background Concerning Mr. Bakewell's Report ........................................................ 4

IV. MR. BAKEWELL'S "MARKET APPROACH" TO A REASONABLE ROYALTY IS
FUNDAMENTALLY FLAWED ............................................................................. 5

    A.    Mr. Bakewell Should Not Be Permitted to Testify that Z-Band's Investment
Solicitations Are Indicative of a Reasonable Royalty Rate ...................................... 8

    B.    Mr. Bakewell Should Not Be Permitted to Testify that a Purported AST "Offer to
Sell" Is a Comparable Transaction ......................................................................... 14

    C.    Mr. Bakewell Should Not Be Permitted to Testify that Purported
"Contemporaneous Evaluations" Reflect Comparable Transactions ..................... 16

V. CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple v. Motorola, Inc.*,
  757 F.3d 1286 (Fed Cir. 2014)................................................................3, 9, 12, 19

*Dataquill Ltd. v. High Tech Computer Corp.*,
  No. 08-CV-543, 2012 WL 1284381 (S.D. Cal. Apr. 16, 2012)....................11, 12, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)....................................................................................................2

*ePlus, Inc. v. Lawson Software, Inc.*,
  764 F. Supp. 2d 807 (E.D. Va. 2011) .......................................................................13

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970)................................................................. *passim*

*Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*,
  446 F.2d 295 (2d Cir. 1971).....................................................................................13

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)......................................................................16, 19, 20

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012).......................................................................................6

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).......................................................................... *passim*

*M2M Solutions LLC v. Enfora, Inc.*,
  167 F.Supp.3d 665 (Fed. Cir. 2016) ...........................................................................9

*Oracle Am., Inc. v. Google, Inc.*,
  847 F. Supp. 2d 1178 (N.D. Cal. 2012) .......................................................................6

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010).............................................................................3, 6, 7

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)........................................................................2, 11, 14

*Versata Software, Inc. v. SAP Am. Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013).....................................................................................5

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)............................................................................................9

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015)............................................................................................3

*Zimmer Surgical, Inc. v. Stryker Corp.*,
   No. 16-CV-679, 2019 WL 1082336 (D. Del. Mar. 7, 2019) ..........................................8, 9, 10

**Statutes**

35 U.S.C. § 284 ................................................................................................................................2

## I.    INTRODUCTION

In opining on a reasonable royalty in this action, Defendants' damages expert, W. Christopher Bakewell, relies on a "market approach" under which "assets are valued based on comparable arm's-length transactions between unrelated parties."  (Ex. 1,[1] Bakewell Rebuttal Expert Report Regarding Damages ("Bakewell Rpt."), ¶ 174.)  In applying the market approach, Mr. Bakewell considers three data points: 1) investment solicitations for a product company a decade before the issuance of the patents-in-suit; 2) a 2012 purported offer to sell; and 3) 2014-2015 e-mails that he frames as "contemporaneous valuations."  (*Id*. at ¶ 287.)  Yet, Mr. Bakewell fails to establish that these data points are technically and economically comparable transactions to a license to the patents-in-suit.  As demonstrated below, Mr. Bakewell relies on data points that are "radically different" from a hypothetical negotiation with an infringer for a license to practice the patents-in-suit, and therefore must be excluded from any damages analysis.  In other words, Mr. Bakewell's opinions regarding the "market approach" are not the product of reliable principles and methods tied to the facts of this case and should be excluded.

The Federal Circuit has made clear that before an expert may rely on an agreement to discern a reasonable royalty, such agreement must be shown to be comparable to a hypothetical license transaction for the patent-in-suit.  None of what Mr. Bakewell relies on for his three data points is a transaction at all, much less a comparable transaction.   For example, Mr. Bakewell relies on *no license agreements* concerning the patents-in-suit and *no settlement agreements* concerning the patents-in-suit, which themselves would be only relevant in limited circumstances.  Instead, Mr. Bakewell relies exclusively on communications that are not part of

---

[1] "Ex. _" refers to the exhibits attached to the Declaration of Michael S. DeVincenzo in Support of ChanBond's Daubert Motion to Exclude Certain Opinions and Testimony of Defendants' Damages Expert.

any transaction, including solicitations for business investment that predate the issuance of the patents-in-suit by as much as a decade.  Further, Mr. Bakewell's data points have nothing to do with a hypothetical negotiation concerning the patents-in-suit, as none of the discussions concerned potential licenses with entities practicing the patents-in-suit.  Accordingly, Mr. Bakewell's opinions regarding the "market approach" to assessing a reasonable royalty are flawed and unreliable and he should be precluded from testifying regarding such opinions.

## II.   LEGAL STANDARD

If Defendants are found liable for infringement of any of the patents-in-suit, Plaintiff would receive a reward of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284.  Assessing reasonable royalty damages to compensate for alleged patent infringement typically involves looking at a "hypothetical negotiation" in which a willing licensor (Plaintiff) and willing licensee (a Defendant) voluntarily enter into a license agreement for the patent-in-suit just before the date of first alleged infringement.  *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324–25 (Fed. Cir. 2009).  The hypothetical negotiators must assume the asserted patents are valid and infringed, and the reasonable royalty the parties would have negotiated can be determined by applying the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  *Id.*

As the proponents of Mr. Bakewell's testimony, Defendants must show that he complied with *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), binding cases applying *Daubert*, and the Federal Rules of Evidence.  *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).  A party "must sufficiently [tie the expert testimony on damages] to the facts of the case."  *Id.* at 1315.  To this end, the Federal Circuit has set forth

2

clear guidelines for using license agreements in a reasonable royalty analysis, reflecting its skepticism of their reliability.  District courts are required to "exercise vigilance when considering past licenses to technologies *other* than the patent in suit" when conducting a reasonable royalty analyses.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (emphasis in original).  Any "agreement" that an expert seeks to rely upon "to support a reasonable royalty analysis must be proven to be sufficiently comparable" to the hypothetical negotiation at issue "with respect to technology, economic terms, and time period."  *Apple v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).  And, expert opinions are inadmissible if based on agreements that are "radically different from the hypothetical negotiation under consideration."  *Lucent*, 580 F.3d at 1327.  The party proposing that an agreement should be admissible for purposes of a hypothetical negotiation bears the burden to prove that the agreement at issue is sufficiently comparable to a hypothetical negotiation.  *Id.*

## III.    FACTUAL BACKGROUND

### A.    Z-Band, ChanBond, and Ownership of the Patents-in-Suit

Z-Band, Inc. ("Z-Band") was founded in October 1999 as an electronics product company by the inventors of the patents-in-suit, Messrs. Earl Hennenhoefer, Richard V. Snyder, and Robert D. Stine.  (Ex. 2, Opening Expert Report Dr. David Teece ("Teece Rpt."), ¶¶ 26–27.) The inventors and Z-Band co-founders were all industry veterans that previously worked together at Aircraft Marine Products, Inc. (AMP).  (Ex. 1, Bakewell Rpt., ¶ 35.)  Shortly after Z-Band was founded, it sought venture capital investment of ████████████████ from a strategic partner.  (Ex. 2, Teece Rpt., ¶ 31.)  Around February 2003, Z-Band increased the investment amount it was seeking to ████████.  (*Id.* at ¶ 32.)  These activities preceded the

release, in 2006, of the DOCSIS 3.0 standard which underlies the Defendants' allegedly infringing systems.  (Ex. 1, Bakewell Rpt., ¶¶ 129, 181.)

In 2008, Z-Band formed CBV, Inc. ("CBV")  (*Id.* at ¶ 36.)  Years after the formation of CBV and more than a decade after Z-Band was founded, the patents-in-suit issued: 1) U.S. Pat. No. 7,941,822 (the "'822 Patent") issued on May 10, 2011; 2) U.S. Pat. No. 8,341,679 (the "'679 Patent") issued on December 25, 2012; and 3) U.S. Pat. No. 8,984,565 (the "'565 Patent") issued on March 17, 2015.  (Ex. 1, Bakewell Rpt., ¶ 24 (identifying issue date of each patent-in-suit).)

On August 15, 2014, ChanBond, LLC ("ChanBond"), the plaintiff in this action, was formed ▬▬▬▬▬▬▬▬▬▬▬, and CBV transferred the patents-in-suit to ChanBond.  (Ex. 2, Teece Rpt., ¶¶ 40–41.) ▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬  (*Id.* at ¶ 38.) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  (*Id.* at ¶ 43.)

**B.    Background Concerning Mr. Bakewell's Report**

Mr. Bakewell's rebuttal damages report both critiques the opinions offered by ChanBond's damages experts and offers affirmative opinions with respect to the appropriate amount of damages, in the form of a reasonable royalty, that should be awarded in this action.  In opining on the appropriate reasonable royalty, Mr. Bakewell prepared a "quantitative analysis phase" using three approaches: the cost approach, the income approach, and the market approach.  (Ex. 1, Bakewell Rpt. ¶ 171.)  The present motion concerns Mr. Bakewell's market approach analysis.

According to Mr. Bakewell, "[u]nder the market approach, assets are valued based on **comparable** arm's length **transactions** between unrelated parties." (*Id.* at ¶ 174 (emphasis added).)  In particular, "[i]n terms of a reasonable royalty determination, the market approach involves consideration of the terms of licenses and other transactions involving comparable technologies." (*Id.*)  As detailed herein, although he recognizes that the "market approach" only involves "comparable arm's length transactions," Mr. Bakewell improperly applies the market approach to three data points that are not comparable transactions, technically or economically. On their face, none of the three data points Mr. Bakewell relies on involve a transfer of any patent rights to an entity practicing the patents-in-suit (such as an accused infringer).  Two data points do not involve a transaction of any kind and predate the hypothetical negotiation by as much as a decade.  The third relies on numbers plucked from e-mails, not transaction terms.

## IV.    MR. BAKEWELL'S "MARKET APPROACH" TO A REASONABLE ROYALTY IS FUNDAMENTALLY FLAWED

The results of Mr. Bakewell's market approach are not based on any actual transactions. Instead of analyzing transactions and their terms, Mr. Bakewell determines his proposed royalty by relying on what he calls three "data points." (Ex. 1, Bakewell Rpt., ¶ 287.)  Specifically, Mr. Bakewell conjures up a proposed royalty by looking at: 1) solicitations for investment in the operation of a product company from a decade before the patents-in-suit issued; 2) an unauthorized offer to sell the patents-in-suit by a third party; and 3) numbers plucked from e-mails that are not part of any transaction and do not reflect the terms of any transaction.  *Id.* at ¶¶ 176-248, 287.  These "data points" are all radically different than a hypothetical negotiation to license the patents-in-suit, and are therefore improper to consider in determining a royalty.

"A reasonable royalty may be calculated using one of two baselines: [1] an established royalty, if there is one, or if not, [2] upon the supposed result of hypothetical negotiations

between the plaintiff and defendant." *Versata Software, Inc. v. SAP Am. Inc.*, 717 F.3d 1255, 1267 (Fed. Cir. 2013). There is no dispute that there is no established royalty for the patents-in-suit in this case. As such, Mr. Bakewell's opinions concern a hypothetical negotiation. (Ex. 1, Bakewell Rpt., ¶¶ 158–165.) Mr. Bakewell's "market approach," which purports to value intellectual property based on "the terms of licenses and other transactions involving comparable technologies," *id.* at ¶ 174, is a broader application of only the first two *Georgia-Pacific* factors in a hypothetical negotiation analysis, which concern [1] "[t]he royalties received by the patentee for the licensing of the patent in suit ..." and [2] "[t]he rates paid by the [infringer] for the use of other patents comparable to the patent in suit." *Georgia-Pacific*, 318 F. Supp. at 1120. As discussed further below, however, Mr. Bakewell's "market approach" is not tied to the specific facts of the case as required by *Georgia-Pacific*. Indeed, royalties have never been paid (or discussed) for the patents-in-suit and no rights in the patents-in-suit have ever been transferred to an entity that practices the patents. Yet, Mr. Bakewell attempts to shoehorn irrelevant "data points," including solicitations for passive investment in a product company from a decade before the patents-in-suit issued, and vague communications related to potential transactions that did not close, into a reasonable royalty analysis that requires technical and economic transactions that are comparable to a hypothetical patent licensing negotiation. The law simply does not permit Mr. Bakewell's flawed approach.

It is well settled that "[d]amages experts cannot use non-comparable licenses, with little relationship to the claimed invention or patents-in-suit, as a basis for calculating reasonable royalties." *Oracle Am., Inc. v. Google, Inc.*, 847 F. Supp. 2d 1178, 1187 (N.D. Cal. 2012) (citing *ResQNet.com*, 594 F.3d at 870). Here, Mr. Bakewell's "market approach" is based on nothing remotely resembling a license agreement of any kind, let alone a comparable license agreement

with respect to the patents-in-suit.  Instead, Mr. Bakewell relies on irrelevant data points that are radically different from anything that would be considered in a hypothetical licensing negotiation between a patent owner and an infringer.  Worse, Mr. Bakewell simply ignores any and all differences between his "data points" and the hypothetical negotiation in an attempt to artificially lower the reasonable royalty.

The Federal Circuit "has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit." *ResQNet.com*, 594 F.3d at 869 (emphasis in original).  When relying on such alleged comparable transactions to prove a reasonable royalty, "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).  The Federal Circuit's opinion in *ResQNet.com* is instructive.  There, the Federal Circuit rejected an expert's attempt to rely on a royalty rate in an agreement deemed a non-comparable license, finding the district court erred in considering expert testimony that "used licenses with no relationship to the claimed invention to drive the royalty rate up." *ResQNet.com*, 594 F.3d at 870.  The Federal Circuit noted that none of the licenses "even mentioned the patents in suit or showed any other discernible link to the claimed technology." *Id.*  Instead, the Federal Circuit instructed that experts "must consider licenses that are commensurate with what the defendant has appropriated." *Id.* at 872.

Similarly, in *Lucent*, the Federal Circuit rejected a patentee's reliance on a collection of licenses where "some of the license agreements [were] radically different from the hypothetical agreement under consideration" and the court was "unable to ascertain from the evidence presented the subject matter of the [other] agreements," and thereby could not "understand how the jury could have adequately evaluated the probative value of those agreements."  580 F.3d at

1327–28.  Vacating the jury's damages award, the Federal Circuit held that the award "cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, … particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here."  *Id*. at 1329.

Mr. Bakewell's opinions concerning the "market approach" must be excluded for similar reasons.  Under his "market approach," Mr. Bakewell arrives at three separate numbers that he misrepresents as "Lump-Sum-Royalties."  First, Mr. Bakewell opines that "Pre-DOCSIS 3.0 investment solicitations for technology disclosed in the patents-in-suit" yield a "lump-sum-royalty" of ▌▌▌▌▌▌ (Ex. 1, Bakewell Rpt., ¶ 287.)  Second, Mr. Bakewell opines that a "2012 AST offer to sell" resulted in a "lump-sum-royalty" in the ▌▌▌▌▌▌ (*Id*.)  Third, Mr. Bakewell opines that "2014-2015 contemporaneous evaluations" result in a "lump-sum-royalty" of ▌▌▌▌▌▌ (*Id*.)  As detailed herein, none of the information relied on by Mr. Bakewell arguably represents a "comparable transaction" to the hypothetical negotiation and, contrary to Mr. Bakewell's statements, none represents a "royalty rate" of any kind, let alone a "lump-sum-royalty."

A.   **Mr. Bakewell Should Not Be Permitted to Testify that Z-Band's Investment Solicitations Are Indicative of a Reasonable Royalty Rate**

The first radically different data point Mr. Bakewell considers in his market analysis is investment solicitations to fund the running of an operating product company, a decade before the patents-in-suit issued.  Mr. Bakewell relies on the following discussions:

1)  In December 2000, Z-Band sought investment of ▌▌▌▌▌▌ in venture capital funding for an unknown share of Z-Band, *see* Ex. 1, Bakewell Rpt., ¶ 178; and

2)  In 2001, an unidentified foreign company with no knowledge of the patent-pending technology, *id.* at ¶ 180, offered Z-Band ██████████ for an unknown "minority interest" in Z-Band, which was rejected by Z-Band.

After summarizing Z-Band's efforts to solicit investment, Mr. Bakewell simply states that these "Pre-DOCSIS 3.0 investment solicitations" result in a "lump-sum-royalty" of ██████ ██████████ (*Id.* at ¶ 287.)  None of these discussions are comparable to a hypothetical negotiation that could possibly reflect a ██████████ royalty for a license to the patents-in-suit.  As a threshold matter, these investment solicitations would not have transferred any patent rights to the potential investors.  (*See id.* ¶¶ 178–180.)  In order for Mr. Bakewell to rely on what he labels "Pre-DOCSIS 3.0 investment solicitations for technology disclosed in the patents-in-suit" in performing his market analysis, he must first establish that both "the technology and value" at issue in these solicitations "are comparable to the technology and value of the patents-in-suit," and that these solicitations are "economically comparable to the patents-in-suit."  *Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-CV-679, 2019 WL 1082336, at *16 (D. Del. Mar. 7, 2019); *see also Apple*, 757 F.3d at 1315 (Fed Cir. 2014).  He fails in both regards.

ChanBond's '822 Patent, the first to issue of the patents-in-suit, issued on May 10, 2011. (Ex. 1, Bakewell Rpt., ¶ 24.)  Ten years prior to the issuance of the '822 Patent, in the 2000-2002 timeframe, Z-Band sought ██████████████████ in passive investment capital for its business.  (*Id.* at ¶¶ 40–50.)  At no point in Mr. Bakewell's discussion of these investment solicitations does he opine that these investment solicitations are technically and economically comparable to a hypothetical negotiation with any Defendant for a license to the patents-in-suit. (*Id.* at ¶¶ 39–52, 178–181.)  They are not.

Instead of attempting to establish economic or technical comparability, Mr. Bakewell suggests that Z-Band's concept for a "GigaTwist" product (that never existed and never practiced the patents-in-suit) is related to the technology covered by the asserted claims that issued a decade or more later.  (*See, e.g., id*. at ¶ 40 (claiming Z-Band sought investment in part for "the GigaTwist product that the named inventors attempted to patent with the asserted claims"), ¶ 50 (claiming that of a ███████ investment Z-Band solicited, ███████ "was allocated to the patented technology" presumably because a marketing presentation allotted that amount to "Development of the GigaTwist Intelligent Device(s)"); Ex. 3, ZBAND_0005373 at -74 (identifying funds for development of GigaTwist Intelligent Device).)  But "loose, vague allegations of technological comparability, without any explanation, are insufficient, and do not even provide a basis to meaningfully assess technological comparability."  *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 677–78 (D. Del. 2016); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 at 1326 (Fed. Cir. 2014) (emphasizing that royalty estimates must focus on "damages attributable to the infringing features."); *Zimmer Surgical*, 2019 WL 1082336, at *16 (finding technical comparability not established when an expert "uses broad and nebulous language to describe the technological comparability.").

Mr. Bakewell does not opine that the investments Z-Band was soliciting for its business were somehow solicitations for investment based on the value of the patents-in-suit.  Instead, in discussing the solicitations, Mr. Bakewell cites two marketing documents (a two page "Venture Capital Equity Investment" document and a two page "Equity Investment and Development Program" document) and associated inventor deposition testimony.  (*See* Ex. 1, Bakewell Rpt., ¶¶ 40, 50 (citing excerpts from Earl Hennenhoefer's deposition (Ex. 4), ZBAND_0005371–372 (Ex. 5), ZBAND_0005373–374 (Ex. 3)).)  These materials collectively make clear that the

investment capital is for passive investment to help fund the operation of a product company and not for a potential transaction to license or transfer any patent rights.  (*Id.*)

Further, Mr. Bakewell should not be permitted to offer opinions that Z-Band's investment solicitations for prospective products in the 2000-2002 time-frame are reflective of a reasonable royalty for the patents-in-suit at a hypothetical negotiation a decade later.  *See Zimmer Surgical*, 2019 WL 1082336, at *16 (finding an agreement "entered eight to eleven years before the hypothetical negotiations" was not comparable).  Mr. Bakewell's report recognizes that the "market approach" only applies to comparable transactions, *id.* at ¶ 174, yet none of the communications relied on by Mr. Bakewell resulted in a transaction of any type.  And these discussions did not concern licensing or license agreements with respect to the patents-in-suit, or mention the transfer of any patents or any technology related to the patents-in-suit.  (*Id.* at ¶¶ 39–52, 178–181.)  A minority investment in a start-up company (Z-Band), some of which was targeted for development of a commercial product (GigaTwist) is facially irrelevant.  The cost to design and manufacture a commercial product has nothing to do with patent licensing.  Marketing materials to solicit passive investment in a manufacturing company, years before the patents-in-suit issued, is simply not a "comparable transaction" to a hypothetical negotiation with an infringing company a decade later.

Courts routinely recognize that the *Georgia-Pacific* factors regarding comparable agreements pertain to patent licenses or other agreements valuing the patents-in-suit.  *See, e.g., Uniloc*, 632 F.3d at 1317–18 ("In particular, factors 1 and 2—looking at royalties paid or received in licenses for the patent in suit or in comparable licenses—and factor 12—looking at the portion of the profit that may be customarily allowed in the particular business for the use of the invention or similar inventions—remain valid and important factors in the determination of a

11

reasonable royalty rate."); *Dataquill Ltd. v. High Tech Computer Corp.*, No. 08-CV-543, 2012 WL 1284381, at *7 (S.D. Cal. Apr. 16, 2012) ("[The expert] is attempting to use the Google agreement as if it were a prior license under *Georgia-Pacific* factor 1 or 2 or a customary rate under factor 12. … No reasonable jury could find the Google agreement sufficiently comparable to the license that would have been reached at the hypothetical negotiation because the Google agreement is not even a patent license, it is a revenue sharing agreement."). Courts give weight to existing licenses because they are actual results reached by persons with conflicting economic interests and therefore constitute direct and reliable evidence of the fair market value of a license under the patent (*i.e.*, the payment that a willing buyer and a willing seller would have agreed to in hypothetical negotiations). *See, e.g., Lucent*, 580 F.3d at 1324–25; 7 DONALD S. CHISUM, CHISUM ON PATENTS § 20.07[2][a], at 20-1243–51. The materials relied on by Mr. Bakewell are not evidence of any actual results reached through an arm's-length negotiation and should be excluded for that reason alone.

Moreover, a solicitation of investment is not a license agreement and does not in any way evidence a royalty rate for patents-in-suit which did not even exist at the time the investment was solicited. Unsurprisingly, courts conclude that agreements unconnected to patent rights are not informative of a reasonable royalty under *Lucent* and *ResQNet*. In *DataQuill Ltd.*, for example, the court excluded an expert's opinion that a revenue sharing agreement related to software applications was comparable to the license that would have been reached at the hypothetical negotiation. *DataQuill Ltd.*, 2012 WL 1284381, at *6–8. Like here, there was no dispute that the agreement being relied on by the expert did not involve a patent license, but, unlike here, the agreement concerned accused devices that practiced the patented technology. *Id.* at *7. Despite this, the court found that the expert could not rely on the agreement in question, finding that "the

agreement is not a license agreement for a patent or patents" and thus "not evidence of a royalty rate for the use of the invention or analogous inventions." *Id.*

Further, any "agreement" that an expert seeks to rely upon "to support a reasonable royalty analysis must be proven to be sufficiently comparable" to the hypothetical negotiation at issue "with respect to … [the] time period." *Apple*, 757 F.3d at 1315. Z-Band's solicitation of investment capital in 2000-2002 is simply not comparable to a license agreement to the patents-in-suit at a hypothetical negotiation in 2011. Under *Georgia-Pacific*, the fact-finder must consider what would result from a "hypothetical negotiation" between the parties conducted on the eve of first infringement. *See Georgia-Pacific*, 318 F. Supp. at 1120. Here, according to Mr. Bakewell himself, the earliest hypothetical negotiation date would be May 2011 (Ex. 1, Bakewell Rpt., ¶¶ 162–165), almost a decade after the investment solicitations. In the 2000-2002 time-frame, the patents-in-suit had not issued, Z-Band had no products that practiced the patents-in-suit, and infringement did not and could not exist. Indeed, given that the patents-in-suit were not yet filed, let alone issued, and no entity was practicing the patents-in-suit, there is no basis for Mr. Bakewell to suggest that solicitations for investment to fund the operation of a product company could possibly be equivalent to a valuation of the infringing activity of the patents-in-suit a decade later. As such, the investment discussions, which occurred almost a decade before the date of the hypothetical negotiation, do not represent comparable transactions to a hypothetical negotiation. *See ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 810, 813–14 (E.D. Va. 2011) (finding that the plaintiff did not show a sufficient connection between the patents-in-suit and later license agreements that "occurred years after the hypothetical negotiation called for by *Georgia-Pacific* analysis would have occurred"); *see also Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295, 297 (2d Cir. 1971).

**B.** **Mr. Bakewell Should Not Be Permitted to Testify that a Purported AST "Offer to Sell" Is a Comparable Transaction**

The second radically different data point relied on by Mr. Bakewell in his "market approach" is correspondence from a third party, Allied Security Trust ("AST"), that allegedly offered the patents-in-suit for sale.  In particular, Mr. Bakewell opines that a 2012 AST offer to sell evidences a "lump-sum-royalty" of ███████████ (Ex. 1, Bakewell Rpt., ¶¶ 198–201.)  Yet, the amount of this "offer to sell" is conjured from e-mails from a third party, Mark Rosen, and it is not representative of a comparative transaction to a hypothetical negotiation.

The e-mails relied on by Mr. Bakewell state that CBV was seeking ████████████ for rights in the patents-in-suit.  (Ex. 1, Bakewell Rpt., ¶¶ 198–201.)  The e-mails in question, which are indisputably not transactions, were written by a Mr. Rosen, a third party who was not deposed, and simply state a ballpark price range and fail to specify any other terms of any offer.  (*Id.*)  Moreover, Mr. Bakewell points to no evidence that this alleged "offer" was actually received or seen by any entity practicing the patents-in-suit.  (*Id.*)  As specific terms of a transaction were never discussed in the ██████████████ let alone agreed to, the ██████████ ████████ mark is not representative of a "comparable transaction."  As discussed above, while agreements can constitute direct and reliable evidence of the fair market value of a license under a patent, third party e-mails regarding an alleged offer price range, and no other terms, for an alleged potential agreement that never took place provide no such reliability.  *See, e.g., Uniloc*, 632 F.3d at 1317–18; *Dataquill Ltd.*, 2012 WL 1284381, at *7.

The dangers presented by Mr. Bakewell's reliance on Mr. Rosen's e-mails here are compounded because Mr. Rosen was never deposed in this action and he never communicated with the owners of the patents-in-suit.  (Ex. 4, Hennenhoefer Tr. at 207:20–213:10.)  In fact, the patent owners never authorized AST to offer their patents-in-suit for ██████████████ (*Id.*;

14

*see also* Ex. 1, Bakewell Rpt., ¶ 205.)  Instead, as Mr. Bakewell admits, the inventors testified that they were seeking ███████ for any sale through AST.  (Ex. 4, Hennenhoefer Tr. at 198:16–200:21; Ex. 1, Bakewell Rpt., ¶ 205.)  Mr. Bakewell disregards the inventors' expectation of ███████ from any AST sale.  Instead, Mr. Bakewell opines that ███████ ███ is relevant because it allegedly reflects that CBV faced an "inability to sell" the patents-in-suit at a ███████████ price.[2]  (Ex. 1, Bakewell Rpt. at ¶ 204.)  That is simply not true.

Mr. Bakewell's analysis is fundamentally flawed.  Moreover, he ignores all context regarding this alleged offer for sale, which was not related to any actual transaction and was not comparable to a hypothetical negotiation for a license to the patents-in-suit.  Of course, the hypothetical negotiation assumes not only that an accused infringer is aware of a patent, but also assumes the patent is valid and infringed.  *See Lucent*, 580 F.3d at 1325 ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed.").  Thus, in order for Mr. Bakewell to conclude that the alleged offer is relevant, he must show that a Defendant, or other comparable entity similarly situated, saw the offer, appreciated the patents-in-suit and the potential implications on its services, believed the patents-in-suit to be valid, and then decided not to purchase the patents-in-suit.  There is no evidence that any of the Defendants (or anyone similarly situated) saw the alleged offer on AST's website or downloaded any materials regarding the patents-in-suit.  (*See* Ex. 6, Bakewell Tr. at 103:6–12, 104:3–105:12 (unable to identify any entity that allegedly saw AST's purported offer).)  In the absence of such evidence, there is no basis for Mr. Bakewell's conclusion that the unauthorized, purportedly posted ███ ███████████ price was believed to be too high by a potential licensee.

---

[2] Mr. Bakewell ignores that there was "interest" in the patents-in-suit at the posted price.  (*See* Ex. 7, Binns Tr. at 47:7--16.)  Thus, although AST was unable to determine who was interested in the patents-in-suit, or what happened regarding that interest, it is undisputed that there was interest at the posted price.  (*Id.*)

Lastly, although AST was never authorized to offer the patents-in-suit for sale, AST only listed the patents-in-suit for an extremely short period of time, making Mr. Bakewell's reliance on the AST alleged offer for sale more speculative.  On October 11, 2012, AST first received information concerning the patents-in-suit, Ex. 1, Bakewell Rpt., ¶ 203, and by February 8, 2013, AST was no longer monitoring the portfolio, *id.* at ¶ 204.  Thus, at best, AST posted information related to the patents-in-suit for a few months, again with no evidence that any party practicing the patents-in-suit was aware of the posting or appreciated its significance.

Put simply, Defendants cannot show that AST's unauthorized posting of a ███████ ███████ price range for a few months, which was not seen by any relevant entity, represents a comparable transaction to a hypothetical negotiation for a license to the patents-in-suit.

### C.    Mr. Bakewell Should Not Be Permitted to Testify that Purported "Contemporaneous Evaluations" Reflect Comparable Transactions

Mr. Bakewell's third market analysis data point concerns alleged "contemporaneous evaluations" radically different from the hypothetical negotiation, which he opined reflect a reasonable royalty of ████████████████ (Ex. 1, Bakewell Rpt., ¶ 287.)  This data point is based on numbers plucked from e-mails related to various transactions discussed by CBV, the owner of the patents-in-suit, during the 2014-2016 timeframe, three to five years after the occurrence of a hypothetical negotiation.  But the e-mails are not part of any transaction and the numbers Mr. Bakewell relies on do not appear in any transaction.

***First***, Mr. Bakewell relies on CBV's discussions with █████████████████████, which did not result in an agreement.  (*Id.*, ¶¶ 210–221.)  In fact, these discussions did not concern license agreements of any kind.  Instead, these potential agreements each contemplated ████████████████████████████████████████████████████████████ ██████████████████████████████.  (*Id.* at ¶ 217–218.)  Mr. Bakewell's failure to

account for CBV's ████████████████████████████████ is in itself

sufficient to prohibit Mr. Bakewell's reliance on this information in his market analysis. *Hanson*

*v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (upholding a magistrate

judge's decision rejecting a royalty rate from a previous license where as part of the license the

licensee paid the patentee licensor a percentage interest in the licensee's corporate entity and

indicating "in granting the license [patentee licensor] speculated on the value of his interest in

[licensee] as a corporate entity.  The worth of that investment and the extent to which it enhanced

the royalty is unknown.").

Moreover, this type of potential agreement is simply not a comparable transaction to a

hypothetical negotiation with an infringer.  Indeed, the accused infringers do not remotely

resemble ████████ who was negotiating for the right to receive recoveries based on the

enforcement of the patents-in-suit, not a license to practice the patents-in-suit.

In the course of CBV's discussions with ████████████████████, a third party,

who was negotiating against CBV with a financial incentive to convince CBV that the patents

were worth as little as possible, told CBV that gross recoveries of ████████████████

████████████████████████ (*See* Ex. 1, Bakewell Rpt. at ¶ 213.)  Although no

deal was consummated with ████████, Mr. Bakewell relies on ████████████

████████ as if it were a contemporaneous license transaction.  (*Id.* at ¶¶ 213–230.)  Of

course, an e-mailed, expressly-qualified 'opinion' of a third party, who is not an expert and was

not deposed, with an incentive to underrepresent the value of patents, is not a comparable

transaction.  Mr. Bakewell should not be able to rely on ████████████ e-mail as if it was

comparable transaction to a license to practice the patents-in-suit, and indeed it is not.

*Second*, on April 9, 2015, CBV entered into a patent purchase agreement with ChanBond. (Ex. 8, CHANBOND_001483–536 ("CBV-ChanBond Agreement").) This agreement was not for the purchase of the patents-in-suit for a lump sum. Instead, the agreement provided that: (i) ChanBond would own the patents-in-suit; (ii) as the patent owner, ChanBond would enforce the patents; █████████████████████████████████

████████████████████████████████████████████████████████

██████████████ (*Id.* at §§ 1.2, 1.3, 2.7, 2.8, 4.1–4.4.) On its face, CBV's sale of the patents-in-suit to ChanBond was for the purpose of ChanBond enforcing the patents against third parties, which is not remotely comparable to a license for an infringer to practice the patents-in-suit. The agreement is not a license agreement of any kind and bears no resemblance to a hypothetical transaction between CBV and the accused infringers.

In order to arrive at his desired royalty, Mr. Bakewell disregards the nature and terms of the transaction. He states: "both sides to the transaction valued the patents at ████████ in contemporaneous e-mails." (Ex. 1, Bakewell Report at ¶ 238.) Of course, e-mails regarding a transaction are not a transaction, let alone the e-mails at issue, which Mr. Bakewell mischaracterizes. First, prior to the execution of the agreement, ████████ explained to the inventors that ████████ ████████████████ which reflected the expected expenditures of enforcing the patents-in-suit. (Ex. 9, Reply Expert Report Dr. David Teece ("Teece Reply Rpt."), ¶ 144.) Mr. Bakewell improperly characterizes this "████████ ██████ as the expected total lump sum royalty, rather than expected cost to enforce the patents. (Ex. 1, Bakewell Rpt., ¶¶ 234, 238.) He further misrepresents an e-mail from one of the inventors, Mr. Hennenhoefer, which was unrelated to the transaction at issue, as referring to an estimated ████████ in expected gross licensing revenue. (*Id.* at ¶ 227.) In fact, Mr.

Hennenhoefer's e-mail, on its face, only concerned one Defendant, ███████, and he was expressly referring to expected recovery from ███████ as, ███████████████████ on a yearly basis based on their revenue.  (*Id.*; *see* Ex. 9, Teece Reply Rpt., ¶ 143.)  Thus, not only are these e-mails not part of the transaction that resulted in the sale of the patents-in-suit, they simply do not support Mr. Bakewell's opinions, and in fact undercut and contradict his opinions.

CBV's sale of the patents-in-suit to ChanBond on its face does not reflect any reasonable royalty value.  Mr. Bakewell does not opine otherwise.  Instead, he ignores the terms of the sale while using it as a vehicle to inject opinions based on his own misinterpretation of e-mails that did not concern the agreement itself.  Mr. Bakewell does not and cannot rely on the agreement itself because, as part of the sale, CBV received ███████████████████.  This makes that agreement economically incomparable to a patent license under which a patentee licensor grants an infringing licensee the right to practice a patent in exchange for a lump sum payment, ███████████████.  *Hanson*, 718 F.2d at 1078.

***Third***, in 2015, six months after ChanBond purchased the Patents-in-Suit, ███████████ purchased ChanBond, with little or no seed money, whose only assets were the patents-in-suit and the recently filed litigation, for: ███████████████ ███████████████  (Ex. 1, Bakewell Rpt., ¶ 244.)  On its face, this transaction is not a comparable transaction to a license agreement to the patents-in-suit for an infringer like Defendants.  *Hanson*, 718 F.2d at 1078.  Nonetheless, Mr. Bakewell attempts to place a value on the patents-in-suit by surmising that because ███████████████████ ███████████████████████ ███████████  (Ex. 1, Bakewell Rpt., ¶ 246.)  This approach is inconsistent with Mr. Bakewell's "market approach," which, as a pre-requisite, requires valuing technology based

19

on comparable transactions.  Mr. Bakewell's attempt to derive a "value" based on a non-comparable transaction is inappropriate and should be excluded.  *Apple*, 757 F.3d at 1315.

The danger of relying on a non-comparable transaction is especially acute for ████ ██████████████████████████████████████████████████ ████████████ does not remotely resemble a hypothetical transaction to license the patents-in-suit to an infringer.  First, ██████ was securing a █████████████ and was not receiving money for a license or licensing the patents-in-suit, let alone to an accused infringer.  Second, prior to the sale ████████████████████████████████████████ ████████████████████ (Ex. 9, Teece Reply Rpt., ¶ 153.)  Of course, ████████ and the risk of a finding of invalidity or non-infringement were paramount factors for ██████, but are not taken into account in a hypothetical negotiation.  *Id.*  Third, ████████████, ██████████████████████████████████████████████ ██████████████████████ (*Id.*)  Fourth, a litigation stake is a relatively illiquid asset, especially considering the complexity of this litigation, the early stage of the litigation, and the ████████ anticipated campaign costs.  (*Id.*)  And fifth, ████████████ ████████████████████████████████████████████ █████████████████████████ *Hanson*, 718 F.2d at 1078.  It is far-fetched to suggest ████████████████████████████ represents a transaction comparable to a license to an infringer for practicing the patents, and Mr. Bakewell does not even perform the analysis required to meet his burden of establishing comparability.

## V.    CONCLUSION

For the foregoing reasons, ChanBond respectfully requests that Mr. Bakewell's opinions regarding the "market approach" be excluded because he does not establish that there are any technically and economically "comparable transactions" to the hypothetical negotiation.

Date: April 5, 2019

*Of Counsel*:

Robert A. Whitman *(pro hac vice)*
Mark S. Raskin *(pro hac vice)*
John F. Petrsoric *(pro hac vice)*
**MISHCON DE REYA NEW YORK LLP**
156 Fifth Avenue, suite 904
New York, New York 10010
(212) 612-3270 (Telephone)
(212) 612-3297 (Facsimile)
robert.whitman@mishcon.com
mark.raskin@mishcon.com
john.petrsoric@mishcon.com

**BAYARD, P.A.**

/s/ *Stephen B. Brauerman*
Stephen Brauerman (sb4952)
Sara E. Bussiere (sb5725)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
(302) 655-5000 (Telephone)
(302) 658-6395 (Facsimile)
sbrauerman@bayardlaw.com
sbussiere@bayardlaw.com

*Counsel for Plaintiff*
*ChanBond, LLC*