IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE CHANBOND, LLC PATENT LITIGATION | ) ) ) ) ) ) ) | C.A. No. 15-842 (RGA)  CONSOLIDATED   REDACTED -- PUBLIC VERSION |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE TESTIMONY OF DR. DAVID TEECE**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Michael L. Brody
Jonathan E. Retsky
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601

David P. Enzminger
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA  90071

Krishnan Padmanabhan
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY  10166-4193

James C. Lin
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA  94025

Served:  April 5, 2019
Original Filing Date: April 8, 2019
Redacted Filing Date: April 16, 2019

## TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ........................................................................................................... v

INTRODUCTION ............................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 1

SUMMARY OF THE ARGUMENT ..................................................................................... 1

    A.    Dr. Teece Should Be Precluded Because His Opinion Is Not Based on the "Incremental Value" of the Patented Inventions.................................... 1

    B.    Dr. Teece Should Also Be Precluded Because His Opinions Rest on Unreliable Data. ....................................................................................... 4

STATEMENT OF FACTS .................................................................................................. 5

    A.    The Accused Devices........................................................................................ 5

    B.    Dr. Teece's Methodology ................................................................................. 7

ARGUMENT ...................................................................................................................... 8

II.    GOVERNING LAW.................................................................................................. 8

III.    DR. TEECE FAILS TO VALUE THE CLAIMED INVENTIONS OR THEIR USE. ....................................................................................................................... 9

    A.    Dr. Teece Calculates the Value of Something Much Broader Than the Claimed Inventions ....................................................................................... 10

    B.    Dr. Teece Captures Noninfringing Use in His Reasonable Royalty Calculation. ...................................................................................................... 15

    C.    Dr. Teece Fails to Separately Value Each Asserted Patent. ................................. 16

IV.    DR. TEECE'S PREMIUM PRICING ANALYSIS IS BASED ON UNRELIABLE DATA AND MUST BE EXCLUDED.................................................. 17

CONCLUSION................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*ART+COM Innovationpool, GmbH v. Google, Inc.*,
    155 F. Supp. 3d 489 (D. Del. 2016).............................................................................9

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    2018 WL 4691047 (D. Del. Sept. 28, 2018)............................................................14

*Commonwealth Sci. & Indus. Research Org. v. Cisco Systems, Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015).................................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)......................................................................................8, 14, 20

*Enplas Display Device Corp. v. Seoul Semiconductor*,
    909 F.3d 398 (Fed. Cir. 2018).................................................................................15

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)..................................................................4, 8, 14, 17

*Furlan v. Schindler Elevator Corp.*,
    516 F. App'x 201 (3d Cir. 2015) ...............................................................................8

*Garretson v. Clark*,
    111 U.S. 120 (1884).................................................................................................1, 9

*GPNE Corp. v. Apple, Inc.*,
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................................16

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999)...............................................................................17, 18

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).................................................................................9

*M2M Solutions, LLC v. Enfora, Inc.*,
    167 F.3d 655 (D. Del. 2016)......................................................................................9

*M2M Solutions, LLC v. Motorola Solutions, Inc.*,
    2016 WL 767900 (D. Del. 2016)...............................................................................9

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
    2017 WL 6268072 (D. Del. Dec. 7, 2017)........................................................15, 16

*Multimedia Patent Tr. v. Apple, Inc.*,
    2012 WL 5873711 (S.D. Cal. Nov 20, 2012) ........................................................20

*Open Text S.A. v. Box, Inc.*,
    2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ..................................................................9

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
    22 F. Supp. 3d 585 (E.D. Va. 2013) ..........................................................................14

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2012) ...................................................................................17

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed.Cir.2014) .....................................................................................9

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*,
    2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) ..........................................................14

**Statutes**

35 U.S.C. § 284 ...............................................................................................1, 9, 14, 16

**Rules**

Fed. R. Evid. 702 .......................................................................................................8

Fed. R. Evid. 703 ...................................................................................................8, 17

# TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| Ex. A | U.S. Patent Nos. 7,941,822 |
| Ex. B | U.S. Patent Nos. 8,341,679 |
| Ex. C | U.S. Patent Nos. 8,984,565 |
| Ex. D | DOCSIS 3.0 Specification (CM-SP-MULPIv3.0-I01-060804) (Defs-Joint-Prod0013532 – 0014281) |
| Ex. E | Opening Expert Report of Dr. David Teece |
| Ex. F | Deposition Transcript of Dr. David Teece |
| Ex. G | Deposition of Dr. David Teece, Ex. 4 |
| Ex. H | Deposition of Dr. David Teece, Ex. 5 |
| Ex. I | Opening Expert Report of Dr. Cleve Tyler |
| Ex. J | Reply Expert Report of Dr. Cleve Tyler |
| Ex. K | Deposition Transcript of Dr. Cleve Tyler |
| Ex. L | Opening Expert Report of Dr. Scott Nettles |
| Ex. M | Duncanson, J., "Inverse Multiplexing," IEEE Comms. Magazine, vol. 32, issue 4, April 1994 at 35-36 |
| Ex. N | Fredette, P., "The Past, Present, and Future of Inverse Multiplexing," IEEE Comms. Magazine, vol. 32, issue 4, April 1994 at 42-46; |
| Ex. O | ITU H.320 (7/1997) |
| Ex. P | ITU T.123 (10/1996) |
| Ex. Q | U.S. Patent No. 7,017,176 (Lee) |
| Ex. R | U.S. Patent No. 7,274,679 (Amit) |
| Ex. S | Deposition Transcript Dr. Robert Akl |
| Ex. T | IPR2016-01744, Paper No. 28 (Final Written Decision) |

| Ex. U | Akl Dep., Ex. 8, File History for Application No. 679,678, Office Action dated April 25, 2018 |
|-------|------------------------------------------------------------------------------------------------|
| Ex. V | Expert Report of Dr. Andrew Cromarty |

## INTRODUCTION

Defendants[1] move to exclude the opinions of ChanBond's damages expert, Dr. David Teece, purporting to set damages in these cases at ▮▮▮▮▮▮ because (a) he failed to base his opinion on the incremental value of the patented invention and (b) his findings are based on unreliable data.

## NATURE AND STAGE OF THE PROCEEDINGS

ChanBond has sued 13 cable companies, all of whom provide broadband Internet services to their subscribers, asserting infringement of U.S. Patent Nos. 7,941,822 (the "'822 Patent"), 8,341,679 (the "'679 Patent"), and 8,984,565 (the "'565 Patent"). (collectively, the "Patents.") All discovery is closed. No trial or dispositive motion hearing date has been set, pending results from ChanBond's appeal of a Patent Trial and Appeals Board decision invalidating several asserted claims.

## SUMMARY OF THE ARGUMENT

### A.    Dr. Teece Should Be Precluded Because His Opinion Is Not Based on the "Incremental Value" of the Patented Inventions.

Section 284 of the Patent Act authorizes damages in the amount of "a reasonable royalty [1] for the *use made* of [2] *the invention*" by an infringer. Hence, for more than a century, patent royalties have been limited to the *incremental value* added by a defendant's infringing use of a patented invention to the value of a defendant's noninfringing conduct. *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Plaintiff's expert, Dr. David Teece, ignores this bedrock principle in three ways.

---

[1]    Defendants in this action are Atlantic Broadband Group, LLC; Cable One Inc.; the Altice entities (Cablevision Systems *et al.* and Cequel Communications, LLC *et al.*); the Charter entities (Charter Communications, Inc., Time Warner Cable, Inc., and Bright House Networks, LLC); Comcast Communication *et al.*; Cox Communications, Inc.; Mediacom Communications Corporation; the RCN entities (RCN Telecom Services, LLC and WaveDivision Holdings, LLC); and Wide Open West Finance LLC (collectively "Defendants").

*First*, what Dr. Teece values as "the invention" is the generic concept of what he refers to as "High Speed Internet Services;" namely, in his words, the ability to "download" data at rates above 40 Mbps.  But the idea of "High Speed Internet Services" is much broader than what is claimed.  None of the asserted claims is directed to "High Speed Internet Services."  Rather, each is directed to the combination of a previously known technique for increasing network bandwidth, called channel bonding, with other known components and techniques.  Specifically, Dr. Teece admitted at deposition:

- **The claims of the '822 Patent** do not broadly cover any cable modem that supports High Speed downloads, or any cable modem termination system ("CMTS").  The claims require, more narrowly, a cable modem that includes *a wireless router*.

- **The claims of the '679 Patent** are similarly not drawn to any device—whether a CMTS or a cable modem—merely because that device supports High Speed downloads.  At a minimum, the '679 claims require a variety of recited componentry which supports channel bonding for both downstream *and upstream data transfers*.

- **The claims of the '565 Patent** are not alleged to encompass any cable modems at all, regardless of what componentry they incorporate and whether they perform channel bonding in either direction, or at any speed.  The invention covered by the '565 claims is limited to *CMTSs* that include their own specialized componentry, and *that utilize channel bonding for High Speed downloads*.

Ex. F (Teece Dep. Tr.), at 23:3–26:6.  In other words, what the claims cover is a combination of pre-existing features: a cable modem including both downstream channel bonding and a built-in wireless router ('822 Patent); a cable modem or CMTS that utilizes channel bonding for both downstream and upstream data transfers ('679 Patent); and CMTSs that use channel bonding for high-speed downloads.  However, Dr. Teece admitted at his deposition that he made no attempt to restrict his damages valuation to the incremental valued added by these claimed combinations to other unpatented technology that supports High Speed Internet Services, much of which was in the prior art.  Therefore, contrary to the statutory mandate, he did not apportion his damages solely to "the invention[s]."

**Second**, Dr. Teece fails to limit his damages valuation to the alleged infringement ("the use made" of "the invention[s]" by the Defendants) because his damages model captures the value of noninfringing devices and functionality. Dr. Teece attempts to approximate the asserted patents' value by averaging the "premium" Defendants allegedly charged for offering "High Speed Internet Services" with what it would have cost Defendants to switch from infringing to noninfringing cable modems capable of supporting "High Speed" downloads. *See* Ex. E (Teece Opening Rpt.), Exhibit 2 (line [E], averaging together [A] through [D]); Ex. F, at 42:8–12. These calculations sweep in devices that are necessary to provide High Speed Internet Services, but which are not alleged to infringe any of the asserted claims. For example, it is undisputed that to provide "High Speed" downloads on a cable network using channel bonding, it is essential to use a cable modem that supports channel bonding. But, Dr. Teece conceded at his deposition that a cable modem is not alleged to infringe any asserted claim based on its use of channel bonding. Ex. F, at 26:11–27:2, 34:10–36:20; *id.* at Ex. 5 (top row). Nor could he, because that functionality was in the prior art.[2] Nonetheless, Dr. Teeces's damages analysis substitutes the value of noninfringing High Speed downloads for what is actually alleged to infringe: the incremental addition of wireless functionality ('822 Patent), the incremental combination of upstream and downstream channel bonding ('679 Patent), and the incremental

---

[2] The technique of channel bonding was widely implemented in telecommunications systems in the mid-1990s. *See, e.g.,* Ex. M (Duncanson, J., "Inverse Multiplexing," IEEE Comms. Magazine, vol. 32, issue 4, April 1994 at 35-36); Ex. N (Fredette, P., "The Past, Present, and Future of Inverse Multiplexing," IEEE Comms. Magazine, vol. 32, issue 4, April 1994 at 42-46) at Fig. 3; Ex. O (ITU H.320 (7/1997)), at 3, n.3; Ex. P (ITU T.123 (10/1996)), at 29-30. Further, the use of channel bonding was disclosed for cable systems in the late 1990s. *See, e.g.,* Ex. Q (U.S. Patent No. 7,017,176, issued to Lee, claiming priority to application filed on June 10, 1999), *e.g.,* at 4:39-49 and 6:35-39; Ex. R (U.S. Patent No. 7,274,679, issued to Amit, claiming priority to provisional application dated June 22, 2000), *e.g.,* at 2:36-56. *See also* Ex. S (Akl Dep., Tr.), at 122:6–124:5. Unsurprisingly, the patent claim that ChanBond alleged to be infringed by a cable modem supporting channel bonding for downloads (e.g., '822, claim 1) was invalidated in proceedings before the Patent Trial and Appeals Board. *See* Ex. T (IPR2016-01744, Paper No. 28 (Final Written Decision)) at 52; *see also* Ex. U.

addition of downstream channel bonded CMTSs ('565 Patent). Thus, Dr. Teece's opinion is not apportioned as the statute requires—to account for the "use made" by Defendants of "the invention."

*Third*, Dr. Teece fails to separately value Defendants' alleged infringement of each of the asserted patents. Instead, he proposes a single undifferentiated royalty for all of them. Each of the three asserted patents claims an "invention" drawn to different combinations of componentry and features, and is alleged to be infringed by different equipment. To calculate the "use made" of each patented "invention," each "invention" necessarily must be assigned its own value. Dr. Teece fails to do so.

In sum, by failing to opine at the level of granularity needed to distinguish patented from unpatented features, or infringing from noninfringing conduct, Dr. Teece does not meet the "essential requirement" that any patent damages "award must be based on the incremental value that the patented invention adds to the end product," and no more. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). As such, his opinions should be excluded.

### B. Dr. Teece Should Also Be Precluded Because His Opinions Rest on Unreliable Data.

Dr. Teece's opinions also should be excluded because, in valuing the "premium" allegedly charged for "High Speed Internet Services," he relies on a data set that is missing information for ■ of the named defendants, and which has significant gaps for ■ others. Accordingly, his opinions as to these ■ defendants are based on absent or incomplete information, and therefore inherently unreliable data, and should be excluded for this additional reason.

## STATEMENT OF FACTS

### A.     The Accused Devices

The current generation of cable broadband networks equipment complies with an industry standard known as DOCSIS 3.1. This case is about the prior industry standard, DOCSIS 3.0, and the accused devices are two types of networking equipment—cable modems and CMTSs—that comply with the DOCSIS 3.0 standard. *See* Ex. L (Nettles Opening Rpt.), at ¶¶ 5, 67. Cable providers use this equipment to provide broadband Internet service. *See* Ex. E, at ¶¶ 231–239.

The accused products are alleged to infringe due to their use of a bandwidth enhancement technique known as "channel bonding" (a version of which was a part of DOCSIS 3.0[3]) in combination with other specific features. *See* Ex. L, ¶ 67; Ex. E, ¶¶ 259–61. Channel bonding is the technique of combining multiple channels of limited bandwidth to create a single virtual channel of higher bandwidth. *See id.*, ¶ 259–261. It was widely implemented in telecommunications systems by the mid-1990s, and the prior art clearly discloses its use for cable systems by the end of that decade.[4] *See* Ex. Q, at 4:39–49, 6:35–39; Ex. R, at 2:36–56; *see also* Ex. S, at 122:6–124:5, 149:13–16.[5] DOCSIS 3.0 networks allowed cable subscribers to

---

[3]     DOCSIS 3.1 replaced DOCSIS 3.0 in October 2013 (two years before this case was filed). DOCSIS 3.1 utilizes a different bandwidth enhancement technique known as orthogonal frequency division multiplexing (OFDM). Devices utilizing OFDM are not accused of infringement and, indeed, are treated by both damages experts as noninfringing alternatives to the claimed devices. DOCSIS 3.1 delivers peak download speeds of 10 Gbps, which is within Dr. Teece's definition of High Speed Internet Services.

[4] In addition, in invalidating numerous of '822 patent claims, the PTAB recognized the prior art "address[es] the problem of transmitting high rate data over existing communications infrastructure, and teach the selective use of multiple channels in an RF signal to send high-rate data streams in multiple smaller data streams allows for high-rate data transfer while efficiently using the available RF spectrum." It is this basic functionality that Dr. Teece tries to capture in his damages model.

[5] Thus, channel bonding, including for use in cable networks, predate the December 27, 2000 priority date of the asserted patents.

download data at speeds of up to 1 Gbps.  *See* Ex. E, at ¶¶ 260–61.  Before DOCSIS 3.0, cable

networks complied with DOCSIS 2.0, which enabled download speeds of up to 40 Mbps.  *See*

Ex. E, at ¶¶ 252, 258.

The accused cable modems are devices located in a cable subscriber's home that link

their home network to the cable company's broadband network.  *See* Ex. E, at ¶ 16.  Specifically,

the cable modem communicates with a CMTS, which links the user's home to the Internet

through the cable company's network.

Cable modems and CMTSs transmit data in the form of RF (radio frequency) signals,

which, in DOCSIS 3.0, are carried on multiple "bonded" RF channels.  *See* Ex. V (Cromarty

Rpt.) at ¶¶ 142–144.  The basic configuration of a DOCSIS network is shown in the following

diagram from the DOCSIS standard:



*Figure 1–2 - Transparent IP Traffic Through the Data-Over-Cable System*

Ex. D (DOCSIS 3.0 Specification) at Figure 1-2.

Data transfers flowing from the CMTS to the cable modem (i.e., from left to right in the

diagram) are known as "downstream" transfers or "downloads." Ex. D, at 13.  Data transfers

going in the other direction, from the cable modem to the CMTS (i.e., from right to left in the

diagram), are known as "upstream" transfers or "uploads."  *Id.*, at 24.  In order for the channel

bonding technique of DOCSIS 3.0 to be used, both the cable modem and CMTS must be

DOCSIS 3.0 compliant.  *See* Ex. E, at ¶¶ 260–261, 265, 553; *see also* Ex. L, at ¶¶ 115, 64, 69–

70.

B.      **Dr. Teece's Methodology**

Dr. Teece's reasonable royalty opinion is based on a calculation of the benefit of using a cable modem to deliver "High Speed Internet Service," which he defines as "[a] Data Service that has a Maximum *Download* Speed greater than or equal to 40 Mbps." Ex. E, at ¶16 (emphasis added). To arrive at a specific dollar figure for this value, he performs four analyses that produce four different dollar figures, which he averages into the final number. *See* Ex. E, at Exhibit 2 (items [A] through [D], averaged as [E]); *see also* Ex. F, at 42:8–12. The first two data points are based on the "premium" that Dr. Teece opines is charged by cable carriers for offering "High Speed Internet Service." *See* Ex. E, at Exhibit 2 (items [A] and [B]). To calculate this premium, Dr. Teece relies on a regression analysis performed by his colleague, Dr. Cleve Tyler. *See* Ex. F, at 54:12–18. Dr. Tyler's regression ostensibly correlates the prices charged by cable carriers for broadband services with the different speed tiers that they offer. Ex. K (Tyler Dep. Tr.), at 29:13–22. Dr. Tyler regressed both standard and promotional prices against the analyzed speed tiers, producing a "promotional" and a "standard" premium" for High Speed Data Service—Dr. Teece's first two data points. Ex. E, at Exhibit 2 (items [A] and [B]).

The two other data points that Dr. Teece relied on relate to two types of noninfringing cable modems: a DOCSIS 3.1 modem, which uses only noninfringing OFDM technology instead of channel bonding to enhance bandwidth, and a "dual low speed modem," which is essentially the combination of two DOCSIS 2.0 modems into a single higher-speed device. Ex. E, at Exhibit 2 (items [C] and [D]); *see also* Ex. F, at 54:18–55:5, 97:25–98:9, 98:24–100:1. Dr. Teece determines a cost for replacing DOCSIS 3.0 cable modems that support High Speed Downloads with these alternative cable modems that he has identified as noninfringing alternatives. *See* Ex. E, at ¶¶ 301–302, 307–308.

Dr. Teece then averages the "standard" pricing premium, the "promotional" pricing premium, and the two noninfringing alternative costs to arrive at a single number corresponding to the supposed benefit of providing High Speed Internet Service to each customer on a monthly basis. He then multiplies that number by a discount factor, based on a bargaining range calculation, to arrive at a royalty rate applicable to all defendants.[6] His final damages sum for each Defendant is the royalty rate multiplied by the number of subscriber months in the damages period for that Defendant.[7] *See* Ex. E, at Exhibit 2 ([G]).

## ARGUMENT

## II.   GOVERNING LAW

The Federal Rules of Evidence, along with *Daubert* and its progeny, do not allow expert testimony that is based on unreliable principles and methods, or legally insufficient facts and data. *See* Fed. R. Evid. 702, 703; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Furlan v. Schindler Elevator Corp.*, 516 F. App'x 201, 205 (3d Cir. 2015) ("To establish reliability, … the expert must have good grounds for his [ ] belief," "based on methods and procedures appropriate to the discipline").

It is an "essential requirement" that any patent damages "award must be based on the incremental value that the patented invention adds to the end product," and no more. *Ericsson,*

---

[6]   More specifically, Dr. Teece calculates his damages number by using a "bargaining range" methodology. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ Accordingly, the sole driver of his damages number is the number he selects as defining the "top" of the range. The "top" of Dr. Teece's bargaining range is the figure he derives for valuing "High Speed Internet Services." *See* Ex. F, at 42:8–12 (referencing Ex. E, at Exhibit 2, average of [A] – [D]).

[7]   Defendants take issue with multiple facets of Dr. Teece's total damages calculation, the majority of which cannot be addressed here. The present motion focusses on Dr. Teece's use of High Speed Internet Services as his measure of the value of the patented invention because it affects all aspects of his damages calculation. Defendants reserve all other methodological and factual objections.

*Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *see* 35 U.S.C. § 284 (limiting any reasonable royalty to "the use made of the invention by the infringer"). "This principle— apportionment—is the 'governing rule' where [, as here,] multi-component products are involved." *Commonwealth Sci. & Indus. Research Org. v. Cisco Systems, Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015); *see Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) ("if plaintiff's patent only created part of the profits, he is only entitled to recover that part of the net gains").[8] Thus, the patentee must "give evidence tending to separate or apportion the infringer's profits and the patentee's damages between the patented features and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). To be admissible, "all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features." *VirnetX, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1329 (Fed.Cir.2014). Absent a claim (not made here) that the entire market value of a good or service is attributable to a claimed invention, a reasonable royalty must disaggregate the patented from the unpatented features and "apportion value between the patented features and the vast number of non-patented features contained in the accused product." *VirnetX*, *Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). Dr. Teece fails to perform this fundamental task.

## III.   DR. TEECE FAILS TO VALUE THE CLAIMED INVENTIONS OR THEIR USE.

Despite acknowledging that his job as a damages expert is to "value the contributions … the claimed invention makes," Dr. Teece fails at this fundamental task, because he does not value

---

[8]     *Accord ART+COM Innovationpool, GmbH v. Google, Inc.*, 155 F. Supp. 3d 489, 498–99 (D. Del. 2016); *M2M Solutions, LLC v. Enfora, Inc.*, 167 F.3d 655, 670 (D. Del. 2016); *M2M Solutions, LLC v. Motorola Solutions, Inc.*, 2016 WL 767900, at *2 (D. Del. 2016); *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *7 (N.D. Cal. Jan. 23, 2015).

what is claimed, he does not value what allegedly infringes, and he lumps all three Patents together, despite their varying claim scope.  *See* Ex. F, at 30:19–31:24.

A.      **Dr. Teece Calculates the Value of Something Much Broader Than the Claimed Inventions**

Dr. Teece's starting point is his presumption that the claimed "invention is the fundamental technology that first enabled" the Defendant cable companies "to deliver High-Speed [Internet] Services."  Ex. E, at ¶ 266; *see also id.*, ¶¶ 504, 553; Ex. F, at 47:25–48:8, 87:6–22.  However, none of the asserted claims are broadly directed to enabling High Speed Internet Services or downloads over 40 Mbps.  Rather, the asserted claims are all drawn to an "intelligent device" with specific features.  D.I. 89, ¶ 1.  Dr. Teece has admitted, in no uncertain terms, that he has not limited his valuation to these patented features.

During his deposition, Dr. Teece acknowledged the accuracy of this chart:

| | '822 | '679 | '565 |
|---|---|---|---|
| Issue Date/First Infringement | May 10, 2011 | December 25, 2012 | March 17, 2015 |
| • CM with no wireless router <br> • Only downstream channel bonding | No Infringement Alleged | No Infringement Alleged | No Infringement Alleged |
| • CM with no wireless router <br> • Downstream and upstream channel bonding | No Infringement Alleged | Infringement Alleged | No Infringement Alleged |
| • CM with wireless router <br> • Only downstream channel bonding | Infringement Alleged | No Infringement Alleged | No Infringement Alleged |
| • CM with wireless router <br> • Downstream and upstream channel bonding | Infringement Alleged | Infringement Alleged | No Infringement Alleged |
| • CMTS (has no wireless router) <br> • Only downstream channel bonding | No Infringement Alleged | No Infringement Alleged | Infringement Alleged |
| • CMTS (has no wireless router) <br> • Downstream and upstream channel bonding | No Infringement Alleged | Infringement Alleged | Infringement Alleged |

Ex. G (Teece Dep., Ex 4); Ex. H (Teece Dep., Ex. 5); Ex. F, at 23:3–27:2.  The top row of this chart illustrates Dr. Teece's failure to apportion between what is covered by the claims and what is not.  Dr. Teece's entire analysis is based solely on cable modems using downstream channel bonding, but those cable modems using downstream channel bonding *do not infringe any*

10

*asserted claim.* Accordingly, his opinions are not based on the "incremental value" of the patented features and must be precluded.

        1.        **The '822 Patent**

The '822 Patent claims an "intelligent device" that utilizes, among other things, a specified form of channel bonding to receive downstream data transfers on multiple channels, and that also has "a wireless receiver," among other components. *See* '822 Patent, claim 14. The claim does not purport to cover "High Speed Internet Services," 40-plus Mbps downloads, or channel bonding per se. What is alleged to infringe is a cable modem that both practices downstream channel bonding and has an integrated wireless receiver. *See* Exs. G, H; Ex. F, at 23:3–27:2. Cable modems without both downstream channel bonding and a wireless receiver do not infringe, nor do any CMTSs.



Ex. F, at 26:22–27:2; *see also id.* at 23:3–16 ("Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). Dr. Teece further admitted that he made no attempt to account for the incremental value associated with the claimed features beyond the value of the unclaimed features:



Ex. F, at 34:10–15, 36:2–20.  Accordingly, Dr. Teece failed to apportion between claimed and unclaimed features.

### 2. The '679 Patent

The '679 Patent claims "[a]n intelligent device for ***bi-directional*** distribution of modulated RF signals," which, among other things, sends and receives RF signals on multiple channels in a specific manner.  *See* '679 Patent, claim 12 (emphasis added).  Far from claiming "High Speed Internet Services," this patent claims a specific device with highly specialized componentry that performs a particular manner of "channel bonding" in ***both*** the upstream and downstream directions.  Both upstream and downstream channel bonding were indisputably known in the prior art.[9]  Thus, accused cable modems and CMTSs are alleged to infringe only insofar as they combine these prior art capabilities.  Ex. G, Ex. F, at 22:2–26:6.  Dr. Teece acknowledges that the '679 Patent is not infringed by cable modems or CMTSs merely because they support "High Speed" downloads and that he did not account for the incremental value that the claimed features when compared with the unclaimed features:

---

[9]      It is undisputed that both upstream and downstream channel bonding were known in the prior art.  <u>Upstream channel bonding</u>: Ex. Q (Lee, claiming priority to June 22, 1999)), at, e.g., 6:36–39 ("For example, the present invention provides mechanisms for configuring a cable modem to transmit on two or more channels.  This features provides a significant increase in bandwidth over the single upstream channel configuration"); Ex. U (Akl Dep., Ex. 8, File History for Application No. 679,678, Office Action dated April 25, 2018, at page 7 ("Lee discloses a method for bonding a plurality of upstream—upstream digital channels in a customer-premises equipment operating on a cable system capable of providing at least television content.")).  ChanBond's validity expert, Dr. Robert Akl, has acknowledged that he has no basis to dispute the Patent Office's finding that Lee teaches upstream channel bonding. *See* Ex. S, at 81:4–14.  <u>Downstream channel bonding</u>: *See discussion of Amit patent, supra*, at p. 3 (fn. 2), 5.



Ex. F, at 34:17–35:10.  Thus, Dr. Teece fails to apportion based on the patented invention.

### 3. The '565 Patent

The '565 Patent claims an "intelligent device" that utilizes, among other things, a specific form of channel bonding "for transmitting information on a modulated RF signal."  *See* '565 Patent, claim 1.  Dr. Teece concedes that the '565 Patent is not infringed by any cable modems, whether or not they use channel bonding to download data.  Ex. G; Ex. F, at 22:2–26:6.  It is only allegedly infringed by CMTSs that transmit downstream utilizing channel bonding.  Exs. G, H; Ex. F, at 22:2–25:22.  However, Dr. Teece did not assess the value of CMTSs at all (*see* Ex. E, at Ex. 2; *see also* Ex. K, at 31:22–12), and he did not analyze the incremental value added by the allegedly infringing CMTSs to the value added by the admittedly noninfringing High Speed cable modems:



Ex. F, at 36:2–36:20.  Accordingly, Dr. Teece once again failed to apportion between claimed and unclaimed features.

### 4. Dr. Teece's Valuation Included Both Claimed and Unclaimed Features.

The chart below summarizes some of the cable modems and CMTSs that can be used to provide High Speed Internet Services.  Dr. Teece's admission that some of them do not infringe the asserted claims establishes conclusively that he failed to apportion his damages claim to "the

invention," as required by 35 U.S.C. § 284.[10]

| | Claim Scope | Accused Devices | Noninfringing Devices |
|---|---|---|---|
| '822 Patent Claim 14 | An intelligent device that utilizes a specified form of channel bonding to receive downstream data transfers on multiple channels, *and that also comprises "a wireless receiver"* | A cable modem with an integrated wireless router | Any CMTS<br><br>Any cable modem lacking "a wireless receiver" |
| '679 Patent Claim 12 | An intelligent device that "for *bi-directional* distribution of modulated RF signals," which sends and receives RF signals on multiple channels in a specified manner | Cable modems and CMTSs that support upstream and downstream channel bonding | Any cable modem or CMTS that utilizes downstream, but not upstream, channel bonding |
| '565 Patent Claim 1 | An intelligent device that utilizes a specified form of channel bonding "for transmitting information on a modulated RF signal" | CMTSs that transmit downstream utilizing channel bonding | Any cable modem |
| Source | '822, '679, and '565 Patents | Exs. G, H; Ex. F, at 23:3–27:2 | Exs. G, H; Ex. F, at 23:3–27:2 |

Accordingly, Dr. Teece has failed to meet the "essential requirement" that any patent damages "award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  Courts routinely exclude testimony when an expert fails to "offer a cogent explanation of how [the expert] separated the value of the numerous valuable non-patented features from that of the [multiple] patented features asserted in this case." *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, 2016 WL 5956325, at *19 (E.D. Mich. Oct. 14, 2016) (granting *Daubert* motion where the expert "failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products"); *see Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 2018 WL 4691047, (D. Del. Sept. 28, 2018); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 594–95 (E.D. Va. 2013).  On this basis alone, Dr. Teece's opinions should

---

[10]    Dr. Teece's colleague, Dr. Tyler, similarly fails to identify any data tending to separate the value of what is claimed or alleged to infringe from what is not.  He admitted that he did not analyze: the presence or absence of the wireless functionality required by the '822 Patent (Ex. K, at 30:10–32:12), the presence or absence of the upstream channel bonding required by the '679 Patent (*see id.* at 29:15–25), or any information, such as costs or prices, related to CMTSs alleged to infringe the '565 Patent (*see id.* at 31:22–12).

be excluded.

**B.    Dr. Teece Captures Noninfringing Use in His Reasonable Royalty Calculation.**

In addition, Dr. Teece's opinions should be excluded because they fail to distinguish between the value contributed by infringing and noninfringing conduct.  Because he lumps the contribution of infringing and noninfringing devices together, Dr. Teece's "damages calculation [ ] overstates the footprint of each claimed invention in the marketplace, as it forces the Defendants to pay a royalty for patents that Defendants' products are not even accused of infringing."  *MiiCs & Partners, Inc. v. Funai Elec. Co.*, 2017 WL 6268072, at *5–6 (D. Del. Dec. 7, 2017).  A reasonable royalty "*cannot* include activities that do not constitute patent infringement."  *Enplas Display Device Corp. v. Seoul Semiconductor*, 909 F.3d 398, 411 (Fed. Cir. 2018) (emphasis added).  This failure is an independent basis on which Dr. Teece's opinion should be precluded.

Dr. Teece acknowledges that much of the functionality necessary for High Speed Internet Services does not infringe any of the asserted patents.  *See* Exs. G, H; Ex. F, at 23:3–36:20.  As the chart at page 12 shows, there is *no* allegation that any CMTS, or any device lacking wireless functionality, infringes any claim of the '822 Patent.  Likewise, there is no allegation that any device without upstream channel bonding infringes any claim of the '679 Patent.  And there is no allegation that any cable modems infringe the '565 Patent.  Yet, such noninfringing devices are necessary to provide High Speed Internet Services and were therefore included in Dr. Teece's damages valuation.

In other words, Dr. Teece failed to distinguish between infringing and noninfringing devices.  His damages calculation includes the contribution to High Speed Internet Services made by at least the following noninfringing devices and functionality:

15

> (1)   Any CMTS ('822 Patent)
>
> (2)   The pure downstream functionality of any cable modem, i.e., without a built-in wireless receiver ('822 Patent)
>
> (3)   The pure downstream functionality of any cable modem or CMTS, i.e., without upstream channel bonding ('679 Patent)
>
> (4)   Any cable modem ('565 Patent)

Dr. Teece calculated his proposed reasonable royalty by valuing "High Speed Internet Services" based solely on downstream pricing tiers, without parsing out the value contributed by this noninfringing functionality. Accordingly, it fails to value the actual "use made of the invention" by the Defendants. *See* 35 U.S.C. § 284.

### C.   Dr. Teece Fails to Separately Value Each Asserted Patent.

Finally, Dr. Teece offers a single unitary damages number for all of the alleged infringement of all of the asserted Patents. But it is precisely the "use made" of a distinct patented "invention" that can be compensated under the Patent Act. 35 U.S.C. § 284. This Court and others have declined to entertain expert opinions that failed to differentiate among the distinct contribution of each patent where multiple patents were at issue. *MiiCs & Partners, Inc.*, 2017 WL 6268072, at *5–6 (D. Del. Dec. 7, 2017) (excluding damages expert because his "royalty rate assigns to each accused product the same per-unit royalty regardless of how many patents that product is accused of infringing"); *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (excluding expert because he "cites no evidence indicating the value of the specific technology claimed by GPNE's [three] patents" and thus he could not "apportion value between them"). Dr. Teece's opinions should be excluded for the same reason.

Dr. Teece fails to offer separate royalty opinions for each asserted patent, even though, as demonstrated above, each has a very different footprint. He fails to differentiate on the basis of whether a particular cable modem or CMTS includes wireless technology (which is what is

required to infringe the '822 Patent, but not the '679 or '565), or bi-directional channel bonding

(which is what is required to infringe the '679 Patent, but not the '822 or '565), or a CMTS that

implements "High Speed" downloads (which is what is required to infringe the '565 Patent, but

not the '822 or '679).  *See* Ex. F, at 34:10–36:20.  Dr. Teece simply offers no opinion of ***any***

specific alleged act of infringement or of ***any*** specific claimed invention.  In other words, he

opines that the reasonable royalty in this case would be the same regardless of which patents, or

accused products, are found to be valid and infringed.  Accordingly, his opinions constitute

"evidence unrelated to the claimed invention [which] does not support compensation for

infringement but punish[es] beyond the reach of the statute."  *ResQNet.com, Inc. v. Lansa, Inc.*,

594 F.3d 860, 869 (Fed. Cir. 2012); *see Ericsson*, 773 F.3d at 1226.  They should be excluded.

## IV.  DR. TEECE'S PREMIUM PRICING ANALYSIS IS BASED ON UNRELIABLE DATA AND MUST BE EXCLUDED.

To calculate the premium that Defendants allegedly secured for High Speed Internet

Services, Dr. Teece relied on the work of his colleague, Dr. Tyler.  Dr. Tyler used data from a

company named ███████ that relates solely to downstream Internet speed pricing tiers.

However, this data included no information for ██ of the Defendants.[11]  For ██ other

defendants,[12] the ████ data is missing information for up to 72% of the damages period.  As

a result, this data is inherently unreliable, and Dr. Teece's and Dr. Tyler's opinions, insofar as

they are based on nonexistent or egregiously incomplete data, are not admissible.

Federal Rule of Evidence 703 requires courts to "focus[ ] on the data underlying the

expert's opinion."  *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999).  "If the data underlying

---

[11]      These Defendants are: ████████████████

[12]      These Defendants are: ████████████████

the expert's opinion is so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *Id.*  The "trial judge must conduct an independent evaluation into reasonableness" and "there must be good grounds on which to find the data reliable." *Id.*  This Court need not take the expert's word for it.  Rather, the court serves "as a gatekeeper in order to ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation." *Id.*

Dr. Teece opines that the Defendants earned a "High Speed Premium" by offering DOCSIS 3.0 "High Speed Internet Services"—as compared to what they charge for DOCSIS 2.0 Internet Services.  **Ex. E, at ¶¶** 272–281; Exs. 2-A, 2-B, 3, 9.  He admits, however, that "[t]he data [he] used to perform that calculation relies in material part on the information [from] Dr. Tyler's report" and that "if [he] didn't have that information," he would not "have been able to make this calculation."  Ex. F, at 54:12–18.  Dr. Tyler, in turn, sourced his data from ███████ ███████  which provided ████████████████████  ██████████████████████  Ex. I (Tyler Opening Rpt.), at ¶ 73.  These records do not reliably support the calculated premium.

To start, ████████████████████████████████████████  ████████████████████████████  Ex. K, at 43:23–44:10; *see* Ex. I, at ¶ 74.  Moreover, there are also significant gaps in the data for ██████████  ██████████████—depending on the cable company and the dataset, up to 72% of the data is missing for the calculated damages period:[13]

---

[13]  The damages for the '822 Patent normally would run from its date of issue, May 10, 2011, which would be a 91-month damages period.  Dr. Teece, however, begins his damages calculation on the date of issue for the '679 Patent, December 25, 2012.  Dr. Tyler's data ran only through July 2018.  Taken together, this means that Dr. Tyler had data related to the



- ████████████████████████████

  *See* Ex. K, at 46:19–47:3.

- ████████████████████████████ *See* Ex. K, at 66:12–20.

- ████████████████████ *See* Ex. K, at 74:4–17; Ex. I at 29 & n.123.

- ████████████████████████████

  *See* Ex. K, at 71:24–74:3.

- ████████████████████████ *See* Ex. K, at 74:2–24.

Absent any data for ████████████████████████ and in view of the massively incomplete data for ████████████████, Dr. Teece lacked any reasonable basis on which he could calculate any price premium for these defendants.

Dr. Tyler argues that the absence of data for individual defendants can be cured by reliance on data for the industry as a whole. But, as Dr. Tyler effectively concedes, the industrywide data does not (and cannot) explain the pricing behavior of specific cable companies. As a preliminary matter, Dr. Tyler did not opine that there is a causal relationship between speed tiers and pricing. Ex. J (Tyler Reply Report), at ¶ 65. Moreover, as Dr. Tyler testified at his deposition, ████████████████████████

████████████████ (Ex. K, at 51:19–23), all cable companies operate in ████████████

damages as calculated for only the 67-month period from January 2013 through July 2018 (the "damages period").



and, in those restricted geographic markets, cable companies face ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and deal with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (Ex. K, at 51:25–52:20). Taken together, these facts confirm that there is simply no basis to believe in the existence of industrywide pricing behavior that is determined by broadband download speeds, let alone that such download speeds explain the pricing behavior of cable operators for whom no data exists.

Dr. Tyler also tries to explain away the temporal gaps in the data. He claims that the data is ▮▮▮▮▮▮▮▮ and thus any differences in time are irrelevant. *E.g.*, Ex. K, at 86:12–23. This argument ignores the many changes in pricing behavior that necessarily occur over time. At his deposition, Dr. Tyler explicitly conceded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that this is ▮▮▮▮▮▮▮ because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including ▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ Ex. K, at 57:12–58:10.

"Generic industry data" is not admissible where it "is not tethered to the relevant facts and circumstances of the present case," *Multimedia Patent Tr. v. Apple, Inc.*, 2012 WL 5873711, at *9 (S.D. Cal. Nov 20, 2012). Because Dr. Tyler's industry data is not so tethered, Dr. Teece's opinions that rely upon it are not admissible. As in *Multimedia*, this Court should "exclude … Dr. Teece's expert testimony" with respect to "generic industry data."

## CONCLUSION

Defendants respectfully submit that Dr. Teece's opinions should be excluded as unreliable under *Daubert*, the Federal Rules of Evidence, and this Court's precedent, because they are not based on the "incremental value" of the patented inventions and they rely upon unreliable data.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jennifer Ying

OF COUNSEL:

Michael L. Brody
Jonathan E. Retsky
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601

David P. Enzminger
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA  90071

Krishnan Padmanabhan
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY  10166-4193

James C. Lin
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA  94025

Served:  April 5, 2019
Filed:    April 8, 2019

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2019, I caused copies of the foregoing document

to be served upon the following in the manner indicated:

Richard D. Kirk, Esquire                                              *VIA ELECTRONIC MAIL*
Stephen B. Brauerman, Esquire
Sara E. Bussiere, Esquire
BAYARD, P.A.
600 North King Street, Suite 400
Wilmington, DE  19801
*Attorneys for Plaintiff*

Mark Raskin, Esquire                                                  *VIA ELECTRONIC MAIL*
Robert Whitman, Esquire
John F. Petrsoric, Esquire
Michael S. DeVincenzo, Esquire
Andrea Pacelli, Esquire
MISHCON DE REYA NEW YORK LLP
156 Fifth Avenue, Suite 904
New York, NY  10010
*Attorneys for Plaintiff*


                                              */s/ Jennifer Ying*
                                              _____
                                              Jennifer Ying (#5550)


1