**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **IN RE CHANBOND, LLC PATENT LITIGATION** | C.A. No. 15-842-RGA<br><br>CONSOLIDATED<br><br>**PUBLIC REDACTED VERSION** |

**PLAINTIFF CHANBOND, LLC'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY OF DR. DAVID TEECE**

Date: May 16, 2019
*Of Counsel:*

Robert A. Whitman *(pro hac vice)*
Mark S. Raskin *(pro hac vice)*
John F. Petrsoric *(pro hac vice)*
Michael DeVincenzo *(pro hac vice)*
Andrea Pacelli *(pro hac vice)*
Eric P. Berger *(pro hac vice)*
**MISHCON DE REYA NEW YORK LLP**
156 Fifth Avenue, suite 904
New York, New York 10010
(212) 612-3270
robert.whitman@mishcon.com
mark.raskin@mishcon.com
john.petrsoric@mishcon.com
michael.devincenzo@mishcon.com
andrea.pacelli@mishcon.com
eric.berger@mishcon.com

**BAYARD, P.A.**
Stephen Brauerman (sb4952)
Sara E. Bussiere (sb5725)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
sbussiere@bayardlaw.com
*Counsel for Plaintiff
ChanBond, LLC*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 2

    **A.**  Defendants' Infringement of the Patents-in-Suit ..................................... 2

    **B.**  Dr. Teece's Technical Understanding Comes from Dr. Nettles ............... 2

    **C.**  Dr. Teece's Damages Analysis ................................................................ 3

        1.  Dr. Teece Considers the Value of the Patented Technology to Defendants Over Three Non-Infringing Alternatives ................................................................ 3

        2.  Dr. Teece Calculated a Reasonable Royalty Based on the Benefit to Defendants of Practicing the Asserted Claims ..................................................... 5

III. LEGAL STANDARD ........................................................................................ 6

IV. ARGUMENT ...................................................................................................... 6

    **A.**  Dr. Teece Properly Values Defendants' Use of the Claimed Inventions ............................ 6

        1.  Dr. Teece Calculated the Value of the Claimed Invention to Defendants, Not Something Broader ......................................................... 7

        2.  Dr. Teece Valued Defendants' Infringing Use ........................................ 11

        3.  Dr. Teece Properly Valued the Claimed Invention and Need Not Separately Value Each Asserted Patent ................................................. 13

    **B.**  Dr. Teece's Analysis Is Based on the Best Data Available, Which is Reliable ............... 15

V.   CONCLUSION ................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Seating Co. v. USSC Group, Inc.*,
514 F.3d 1262 (Fed. Cir. 2008)............................................................................9

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014)...............................................................10, 11, 20

*Enplas Display Device Corp. v. Seoul Semiconductor*,
909 F.3d 398 (Fed. Cir. 2018)...........................................................................12

*Schneider ex rel. Estate of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)................................................................................6

*GPNE Corp. v. Apple, Inc.*,
No. 12-CV-2885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014)..........................15

*Greatbatch Ltd. v. AVX Corp.*,
No. 13-CV-723, 2015 WL 9171042 (D. Del. Dec. 11, 2015) ....................13, 14, 15

*Intellectual Ventures I LLC, v. Check Point Software Techs. Ltd.*,
215 F. Supp. 3d 314 (D. Del. 2014)....................................................6, 8, 11, 20

*Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*,
761 F.2d 649 (Fed. Cir. 1985)...........................................................................16

*Lam, Inc. v. Johns–Manville Corp.*,
718 F.2d 1056 (Fed. Cir. 1983).........................................................................16

*MediaTek, Inc. v. Freescale Semiconductor, Inc.*,
No. 11-CV-5341, 2014 WL 2854890 (N.D. Cal. Jun. 20, 2014)......................19, 20

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
No. 14-CV-804, 2017 WL 6268072 (D. Del. Dec. 7, 2017) ......................12, 13, 14

*Multimedia Patent Tr. v. Apple, Inc.*,
No. 10-CV-2618, 2012 WL 5873711 (S.D. Cal. Nov 20, 2012)..........................20

*Sensonics, Inc. v. Aerosonic Corp.*,
81 F.3d 1566 (Fed. Cir. 1996)...........................................................................16

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015).......................................................................6, 19

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
   225 U.S. 604 (1912)...............................................................................................................16

I.      INTRODUCTION

Defendants claim that ChanBond's damages expert, Dr. Teece, failed to base his opinion on the incremental value of the patented invention and that his findings are based on unreliable data.  That is false.  Dr. Teece determined the incremental value of the patented invention by comparing the benefit Defendants received from practicing the asserted claims of the patents-in-suit with the cost to Defendants of instead adopting non-infringing alternatives.

Defendants' real complaint is not with Dr. Teece's damages methodology, but with ChanBond's technical expert Dr. Nettles's underlying technical opinions regarding the impact of implementing alleged non-infringing alternatives.  The technical experts disagree about whether practicing the asserted claims and using infringing equipment was necessary for Defendants to offer their accused services.  Defendants argue that they could have used hypothetical allegedly non-infringing equipment to offer their accused services at no additional cost, but the propriety of these alternatives is disputed by Dr. Nettles.  At most, this is fodder for cross-examination of Dr. Nettles's technical opinions, not exclusion of Dr. Teece's damages opinions.

Defendants also argue that certain of Dr. Teece's opinions are unreliable because they are based on calculations that use service pricing data from Telogical Services, a third party industry source.  Yet the pricing data at issue is for Defendants' own accused services, and Defendants do not dispute the accuracy of the Telogical pricing data.  Indeed, it was Defendants' inability to produce their own pricing data that forced ChanBond to obtain the best pricing data publicly available.  Courts have long recognized that patent damages may be calculated using the best available evidence if actual damages cannot be precisely ascertained because of inadequate evidence from the infringer.

Accordingly, the Court should deny Defendants' motion.

1

## II.    STATEMENT OF FACTS

### A.    Defendants' Infringement of the Patents-in-Suit

ChanBond alleges that Defendants infringe certain asserted claims of U.S. Patent Nos.

7,941,822 ("the '822 Patent"), 8,341,679 ("the '679 Patent"), and 8,984,565 ("the '565 Patent").

The inventions covered by the asserted claims are fundamental to the "channel bonding"

technology that allowed Defendants to enhance bandwidth and deliver Internet services of over

40 Megabits per second (Mbps) (*i.e.*, "High-Speed Services") during the damages period.

Defendants used accused cable modem termination systems ("CMTSes") and cable

modems ("CMs") to deliver High-Speed Services.  (*See, e.g.*, Defs. Br. at 6 (citing diagram from

DOCSIS 3.0 specification at Figure 1-2).)  It is Defendants' use of infringing CMs and CMTSes

that enabled them to deliver High-Speed Services.  (Ex. A (Nettles Op. Rpt.), ¶¶ 115-116.)  In his

expert reports Dr. Nettles described this in detail, including infringement of: (i) the '679 and

'565 Patents by DOCSIS 3.0 compliant CMTSes; (ii) the '679 Patent by DOCSIS 3.0 compliant

CMs; and (iii) the '822 Patent by DOCSIS 3.0 compliant CMs. (*See id.* at ¶ 5.)

### B.    Dr. Teece's Technical Understanding Comes from Dr. Nettles

ChanBond is not presenting Dr. Teece as a technical expert.  (Ex. B (Teece Op. Rpt. for

Cox[1], ¶ 12).)  For issues such as infringement and the technical viability of alleged non-

infringing alternatives ("NIAs"), Dr. Teece relied on the opinions of a technical expert, Dr.

Nettles.  (*See, e.g.,* Ex. B (Teece Op. Rpt.) at ¶¶ 16-18, 153-169, 229-268, 270-303; *see also* Ex.

C (Teece Dep. Tr.) at 34:17-35:1.)  As Dr. Teece states:

> I understand from Dr. Nettles that, at least after the beginning of 2013, use of an
> Accused Modem and CMTS was necessary for [Defendants] to deploy any High-Speed
> Service, i.e., in 2013, every High-Speed Service Instance deployed by [Defendants] was

---

[1] ChanBond's experts' reports for each Defendant are substantively the same for the purposes of
this brief.  The reports for Cox Communications, Inc. are used as exemplary.

provisioned using Accused Products that embody the patented invention.

I further understand from Dr. Nettles that the patented invention is the fundamental technology that first enabled [Defendants] to deliver High-Speed Services, i.e., Data Services with 40 Mbps of download capacity or greater.  That is, absent the patented apparatus, in 2013 any Services provisioned would have been limited to Low-Speed, i.e., Services with download capacities below 40 Mbps.

(Ex. B (Teece Opening Rpt.) at ¶¶ 265-266; *see also id.* at 553.)

### C.    Dr. Teece's Damages Analysis

Dr. Teece quantified reasonable royalty damages based on his understanding from Dr. Nettles that the patented invention is the fundamental technology that allowed Defendants to deliver High-Speed Services, and that, at least as of the beginning of 2013, Defendants' delivery of High Speed Services required the use of infringing CMTSes and CMs.  (*Id.* at ¶¶ 265-266; 553.)  Among other inputs, including the *Georgia-Pacific* factors, Dr. Teece considered the economic benefit to Defendants of delivering High-Speed Services through their use of the patented technology as compared to the NIAs.  (*Id.* at ¶¶ 24, 269-308.)

### 1.    Dr. Teece Considers the Value of the Patented Technology to Defendants Over Three Non-Infringing Alternatives

Dr. Teece's analysis of the NIAs limits his damages calculations to the footprint of the patented invention.  Dr. Teece carefully apportioned out benefits Defendants may receive from technical features or economic inputs not covered by the patents-in-suit.  (*Id.*).

### a.    Offer Low-Speed Services Only

First, Dr. Teece considered the possibility that each Defendant does not offer High-Speed Services and instead only provides non-infringing Low-Speed Services.  (*Id.* at ¶¶ 272-281.)  Dr. Teece relied on calculations performed by another ChanBond expert, Dr. Tyler, to determine Defendants' expected fall in price from only offering Low-Speed Services, *i.e.*, a "High Speed Premium," for both promotional and standard pricing.  (*Id.* at ¶¶ 276, 278.)  To perform these calculations, Dr. Tyler used third-party industry data for individual Defendants where available,

3

and industry-wide data for Defendants for which specific data was unavailable.  (*Id*. at ¶ 280.)

Dr. Teece performed two apportionments to limit the value to the footprint of the patents. (*Id*. at ¶¶ 282-293.)  First, he eliminated any technical differences or benefits other than increased download speed enabled by the asserted claims by considering the price differences between otherwise identical DOCSIS 3.0 services differing only by a small incremental download speed, *i.e.* 10 Mbps, in a "Minimum Speed Increment" apportionment.  (*Id.* at ¶ 284.) Here, Dr. Teece calculated the expected price difference between a 50 Mbps High-Speed Service and a 60 Mbps High-Speed Service, effectively holding all other aspects of the network constant and calculating the financial benefit to Defendants of being able to offer a 10 Mbps greater download speed due to the patented technology.  (*Id*. at ¶ 284.)  This calculated expected increase in price is the "Incremental Speed Premium."  (*Id*. at ¶ 286.)  To calculate the apportionment factor, Dr. Teece divides the Incremental Speed Premium by the High Speed Premium.  (*Id*. at ¶ 289.)  To eliminate from his analysis Defendants' economic inputs that are not covered by the patented technology to their delivery of High-Speed Services, Dr. Teece also apportioned using gross margin.  (*Id*. at ¶¶ 291-292.)  These apportionments exclude from Dr. Teece's analysis any technical and economic factors that are not attributable to the patents.

### b.     Offer Dual Low-Speed Services

The second NIA Dr. Teece considered is Defendants providing dual Low-Speed Data Services in parallel.  (*Id*. at ¶¶ 294-302.)  Here, Defendants would provide a hypothetical, modified "Dual Low-Speed Modem" that complies with non-infringing DOCSIS 2.0 that would provide two Low-Speed Data Services in parallel to the user by housing two separate sets of DOCSIS 2.0 modem components that would each communicate independently with the CMTS and could each deliver up to 40 Mbps of download speed.  (*Id*. at ¶¶ 294-295).  To calculate the cost to Defendants of this NIA, Dr. Teece analyzed industry data on bill of materials costs for

4

exemplary DOCSIS 2.0 and DOCSIS 3.0 modems and determined how much the additional duplicate DOCSIS 2.0 components would cost relative to the cost of the DOCSIS 3.0 modem it would be replacing.  (*Id*. at ¶¶ 300-301.)  By only determining the actual additional costs of this NIA to Defendants, Dr. Teece excluded from his analysis any benefits external to the patents.

### c.        Non-Backwards Compatible DOCSIS 3.1 OFDM Modems

Third, Dr. Teece considers an NIA proposed by Defendants of delivering High-Speed Data Services via implementation of a theoretical, modified, non-backwards compatible, version of DOCSIS 3.1 based on non-accused Orthogonal Frequency Domain Multiplexing ("OFDM") technology (instead of the channel bonding covered by the patents).  (*Id*. at ¶¶ 270, 303-308.)  To calculate the additional cost of this alternative, Dr. Teece analyzed the average purchase costs of DOCSIS 3.0 modems and the price premium for DOCSIS 3.1 modems and determined the cost of moving to the hypothetical DOCSIS 3.1 modems.  (*Id*. at ¶ 307.)  Again, by only determining the actual additional costs to Defendants, Dr. Teece excluded any benefits external to the patents.

### 2.        Dr. Teece Calculated a Reasonable Royalty Based on the Benefit to Defendants of Practicing the Asserted Claims

Dr. Teece calculated the benefit to Defendants of infringing by looking at the cost of NIAs, *i.e.*: offering only Low-Speed Services under promotional and standard pricing; offering Dual Low-Speed Services using hypothetical non-infringing modems; and offering High-Speed Services using hypothetical OFDM modems.  (*See id*. (Teece Op. Rpt.) at Exhibit 2 [A]-[D].)  Dr. Teece averaged these four values to calculate the apportioned benefit to Defendants.  (*Id*. at [E].)  Recognizing that in a hypothetical negotiation the patentee would not capture all of the financial benefit to Defendants of a license, Dr. Teece determined a concluded bargaining range of 26%, which he multiplies by the apportioned benefit to determine the royalty rate.  (*Id*. at [F],

[G].)  Finally, Dr. Teece applied this royalty rate to the accused services beginning in 2013.[2]

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony.

Fed. R. Evid. 702; *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05

(3d Cir. 2003).  "[E]stimating a reasonable royalty is not an exact science."  *Summit 6, LLC v.*

*Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).  "The record may support a range of

reasonable royalties, rather than a single value," and "there may be more than one reliable

method for estimating a reasonable royalty."  *Id.*

## IV.   ARGUMENT

### A.   Dr. Teece Properly Values Defendants' Use of the Claimed Inventions

Dr. Teece's damages analysis properly apportioned between what is covered by the

patented invention and what is not.  Dr. Teece thoroughly considered the value to Defendants of

practicing the asserted claims by determining the costs to Defendants of adopting NIAs, using

three separate valuation approaches.  (*See* p. 3-5, *supra*.)  In each case, Dr. Teece determined the

value to Defendants of offering High-Speed Services using the patented technology relative to

the NIAs, before carefully apportioning that value to account for non-infringing features.  (*Id.*)

Defendants' technical arguments (*e.g.*, regarding the costs associated with the NIAs addressed by

Dr. Teece, or Dr. Nettle's opinions regarding the non-availability or non-acceptability of

allegedly additional NIAs) are, at best, fodder for cross examination of technical experts, not the

proper subject of a *Daubert* motion against Dr. Teece.  *See Intellectual Ventures I LLC, v. Check*

*Point Software Techs. Ltd.*, 215 F. Supp. 3d 314, 324 (D. Del. 2014).

---

[2] The '822 Patent (issued May 2011) is subject to an IPR.  There are asserted claims of the '822 Patent that are not part of any IPR, but Dr. Teece's damages calculation begins after the '679 Patent issued, making his analysis correct even if ChanBond does not assert the '822 Patent at trial.  Defendants agree with this approach and used the same start date for calculating damages.

Defendants argue that Dr. Teece did not properly value the claimed invention because: 1) he valued the generic concept of High-Speed Services instead of what is claimed; 2) he failed to limit damages to the alleged infringement and instead captured the value of non-infringing devices and functionality; and 3) he was required to separately value Defendants' infringement of each patent. (Defs. Br. at 1-4.) As shown below, each of these three points is incorrect, and in any event does not provide a basis to disqualify Dr. Teece.

### 1. Dr. Teece Calculated the Value of the Claimed Invention to Defendants, Not Something Broader

Defendants argue that practicing the patents was not necessary to deliver High-Speed Services and that Dr. Teece should have apportioned over some unidentified hypothetical equipment Defendants claim could have been used to deliver these services at a lower cost than the NIAs Dr. Teece analyzed. (Defs. Br. 10-16.) Put simply, Defendants' attorneys disagree with ChanBond's technical expert over the importance of the patents to the accused services.

Defendants' argument stems from a dispute about the scope of infringement and what NIAs are acceptable. Defendants ignore that a reasonable juror could accept Dr. Nettles's opinion that "the patented invention is the fundamental technology that first enabled [Defendants] to deliver its High-Speed Services, *i.e.*, at least after the beginning of 2013, use of an Accused Modem and CMTS was necessary for [Defendants] to deploy any High-Speed Service." (Ex. B (Teece Op. Rpt.) at ¶ 553; *see also* Ex. A (Nettles Op. Rpt.) at ¶¶ 115-116.) Defendants in essence argue that they could have offered High-Speed Services without infringing by using hypothetical equipment that never existed, and that Dr. Teece's analysis is flawed because he did not opine on how the patents add value over and above this hypothetical alternative equipment. (Defs. Br. at 10-13.) But this just highlights the factual dispute between the parties' technical experts regarding the appropriate NIAs, their costs, and their availability.

Defendants begin by attacking Dr. Teece's starting point "that the claimed 'invention is the fundamental technology that first enabled' the Defendant cable companies 'to deliver High-Speed [Internet] Services.'" (Defs. Br. at 10.) However, Dr. Teece relied on Dr. Nettles for that presumption. (Ex. B (Teece Op. Rpt.) at ¶¶ 265-266, 553; *see also* Ex. A (Nettles Opening Rpt.) at ¶¶ 115-116.) Thus, Dr. Teece used the proper starting point for the footprint of the asserted claims, which allowed him to analyze the benefit of infringement to Defendants as compared to potential NIAs. *Intellectual Ventures*, 215 F. Supp. 3d at 324.

Rather than challenging Dr. Teece's damages methodology, Defendants instead attack Dr. Nettles's technical opinion that practicing the patents-in-suit was necessary to offer High-Speed Services. (*See* Ex. B (Teece Op. Rpt.) at ¶¶ 265-266, 553.) Defendants argue that "none of the asserted claims are broadly directed to enabling High Speed Internet Services or downloads over 40 Mbps," and that, "[r]ather, the asserted claims are all drawn to an 'intelligent device' with specific features." (Defs. Br. at 10.) Defendants further state, incorrectly, that "Dr. Teece has admitted, in no uncertain terms, that he … has not limited his valuation to these patented features." (*Id.*) These arguments simply ignore the evidence that the claimed intelligent devices, with their specific features, are what enabled Defendants' accused services.

Defendants similarly argue that Dr. Teece "fail[ed] to apportion between what is covered by the claims and what is not," including by failing "to account for the incremental value associated with the claimed features beyond the value of the unclaimed features" for each patent. (Defs. Br. at 10-14.) Here, Defendants focus on non-existent, hypothetical, non-infringing equipment that would purportedly be stripped of infringing elements found in the equipment Defendants actually used to deliver High-Speed Services. Of course, whether Defendants would have known of and used such alternatives, and the associated costs, are all questions of fact.

Defendants provide an inaccurate and misleading chart of hypothetical NIAs (*see* chart at

Defs. Br. at 10) prepared by Defendants' counsel who presented it to Dr. Teece at his deposition. (*See* Ex. C, (Teece Dep. Tr.) at 22:2-24.)[3]  This chart includes CMs without wireless routers and hypothetical CMs and CMTSes (which do not appear to have ever existed) that could purportedly facilitate downstream channel bonding, but not upstream channel bonding.  (*See, e.g.*, chart at Defs. Br. at 10; *see also* "Noninfringing Devices" column of chart at Defs. Br. at 14 (same information).)  Defendants argue this equipment "can be used to provide High Speed Internet Services."  (*See* Defs. Br. at 13.)  ChanBond and its technical expert Dr. Nettles dispute as a factual matter Defendants' position that CMs without wireless routers do not infringe and that these purported NIAs based on hypothetical CMs and CMTSes were available, acceptable, and their cost.  (*See, e.g.*, Ex. B (Teece Op. Rpt.) at ¶¶ 265-266, 553; Ex. A (Nettles Op. Rpt.) at ¶¶ 5, 96-106, 115-116; Ex. D (Nettles Rep. Rpt.) at ¶¶ 323-327, 333-334.)  Indeed, "a non-infringing replacement product is not considered a substitute unless it is 'acceptable to all purchasers of the infringing product.'"  *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1270 (Fed. Cir. 2008) (citation omitted).  Here, Defendants' motion largely rests on their contention that this Court should decide in their favor the factual dispute over whether certain equipment infringes and the availability, acceptability, and cost of their hypothetical NIAs.

Further, as a legal matter, Defendants' arguments go to the weight of Dr. Teece's testimony, not its admissibility.  Even without technical expert testimony disputing the relevance of every hypothetical NIA proposed by Defendants, Dr. Teece's testimony would be admissible.  Indeed, there is no "requirement that a patentee value every potential non-infringing alternative in order for its damages testimony to be admissible."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*,

---

[3]  ChanBond objected to this chart as misleading, inaccurate, and not a proper reflection of its infringement positions.  (*See* Ex. C, (Teece Dep. Tr.) at 37:4-39:1.)

792 F.3d 1339 (Fed. Cir. 2015) (*en banc*).

To confuse the issues, Defendants rely heavily on Dr. Teece's deposition testimony given in response their blatantly misleading chart prepared by Defendants' attorneys.  (*See* Defs. Br. at 10-14.)  Defendants ask this Court to presume, without evidence, that each piece of hypothetical equipment identified in the chart would have allowed the Defendants to deliver High-Speed Services during the relevant timeframe without infringing, and that such alternatives would have been acceptable to each of their customers.  (*Id.*)  ChanBond disputes these allegations.

First, Defendants ignore that delivery of High-Speed Services requires both a CMTS and a CM.  Thus, if Defendants' High-Speed Services use either an infringing CMTS *or* an infringing CM, then Defendants' delivery of High-Speed Services infringes.  As such, even if a juror were to credit Defendants' attorneys' position that certain hypothetical CMs would have been acceptable NIAs during the relevant time (which ChanBond disputes), Defendants' High-Speed Services would still infringe based on Defendants' use of infringing CMTSes.  (*See, e.g.*, Ex. A (Nettles Op. Rpt.) at ¶¶ 68-70.)

Defendants' use of their misleading chart during Dr. Teece's deposition cannot change the products accused of infringement in this action.  Indeed, Dr. Nettles is ChanBond's infringement expert and Dr. Teece did not and could not change the products accused of infringement during his deposition.  Dr. Teece explained that his understanding regarding the extent of infringement comes from Dr. Nettles.  (*See* Ex. C (Teece Dep. Tr.) at 34:17-35:1.)

Second, the acceptability of shutting off upstream channel bonding is a question of fact that was disputed by Dr. Nettles.  (*See* Ex. A (Nettles Op. Rpt.) at ¶¶ 96-106; Ex. D (Nettles Rep. Rpt.) at ¶¶ 323-327, 333-334.)  Dr. Teece relied on Dr. Nettles's opinions about the availability and acceptability of NIAs.  (Ex. B (Teece Op. Rpt.) at ¶¶ 265-266; 553.)  Contrary to Defendants' assertions, Dr. Teece is permitted to rely on Dr. Nettles's opinions regarding the

scope of infringement and NIAs. *Apple*, 757 F.3d at 1321 ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field."); *Intellectual Ventures*, 215 F. Supp. 3d at 324; *see also* Fed. R. Evid. 703. Put simply, Dr. Teece was not obligated to apportion the patents' value over hypothetical equipment that Defendants failed to show is an acceptable NIA, particularly when Dr. Nettles opined that such equipment is not an acceptable NIA. *See Apple*, 757 F.3d at 1320–22; *Intellectual Ventures*, 215 F. Supp. 3d at 324.

This is analogous to *Intellectual Ventures*, where plaintiff objected to defendant's damages expert's opinions by disputing the technical underpinning of alleged NIAs. *Intellectual Ventures*, 215 F. Supp. 3d at 324. As here, the damages expert's technical understandings came from the technical expert. *Id*. There, the Court held that plaintiff's "objections may be properly addressed during cross examination and through the presentation of competing evidence," and that the damages expert may rely on statements made by the technical expert. *Id*. Here, the Court should similarly reject Defendants' arguments that Dr. Teece valued something broader than the claimed invention based on Defendants' contention that Dr. Teece's technical understanding from Dr. Nettles is incorrect. *Id*. at 324 (An expert "may rely upon another expert's opinions so long as they are of the type reasonably relied upon by experts in the field.").

### 2.      Dr. Teece Valued Defendants' Infringing Use

Defendants argue that Dr. Teece's royalty should be excluded because, under their NIA theory, he captured non-infringing use. In support, Defendants point to four sets of purported "noninfringing devices and functionality" and wrongly argue that Dr. Teece was required to analyze such hypothetical devices. (Defs. Br. at 15-16.) Defendants completely ignore that Dr. Teece expressly apportioned based on the benefits Defendants received from practicing the asserted claims as compared to NIAs. (*See* p. 3-5 *supra*; *see also* Ex. B (Teece Op. Rpt.) at ¶¶269-308.) Defendants' argument that Dr. Teece failed to value their use of the invention

11

because he used "downstream pricing tiers" is simply wrong.

In assessing damages, Dr. Teece excluded the value of non-infringing functionality, including Defendants' purported "noninfringing devices and functionality," by performing a "minimum speed increment" apportionment.  Here, Dr. Teece considered Defendants only offering non-accused Low-Speed Services instead of infringing High- Speed Services.  (*Id*. at ¶¶ 282-293.)  Dr. Teece considered, based on his understanding from Dr. Nettles, that *"*other capabilities beyond Download Speed were changed between DOCSIS 2.0 and DOCSIS 3.0." (*Id*. at ¶ 282.)  As a consequence, Dr. Teece applied a "minimum speed increment" apportionment that "eliminate[d] any differences other than Download Speed between the DOCSIS 2.0 (Low-Speed) and DOCSIS 3.0 (High-Speed) standard, and any value contributions of other technologies within the DOCSIS 3.0 standard."  (*Id*. at ¶¶ 283-284.)

Put another way, Dr. Teece attempted to hold everything else equal (including the purported "noninfringing devices and functionality") and only calculate the benefit to Defendants of being able to offer a 10 Mbps faster High-Speed Service, *i.e.*, moving from 50 Mbps to 60 Mbps.  (*Id*. at ¶ 285.)  "This is an effective apportionment metric for the contribution of the Patents in Suit to the incremental Service price gained by [each Defendant] through its High-Speed Services."  (*Id*. at ¶ 284.)  Defendants fail to even mention this apportionment.

Defendants' reliance on *Enplas Display Device Corp. v. Seoul Semiconductor*, 909 F.3d 398 (Fed. Cir. 2018), and *MiiCs & Partners, Inc. v. Funai Electric Co.*, 14-CV-804, 2017 WL 6268072 (D. Del. Dec. 7, 2017), is misplaced.  (Defs. Br. at 15.)  In *Enplas*, the Federal Circuit overturned a damages award "because the only evidence supporting the jury's award was based, in part, on non-infringing sales of non-accused [products]."  *Enplas*, 909 F.3d at 411.  Similarly, in *MiiCs* the disputed damages calculation "force[d] the Defendants to pay a royalty for patents that Defendants' products are not even accused of infringing."  *MiiCs*, 2017 WL 6268072, at *5.

Here, Dr. Teece calculated damages for Defendants' services that used equipment that infringed

all of the patents.  In sum, here the parties' technical experts disagree regarding NIAs and their

impact on Defendants.  Such arguments do not bear on the admissibility of Dr. Teece's opinions.

### 3.    Dr. Teece Properly Valued the Claimed Invention and Need Not Separately Value Each Asserted Patent

Defendants' argument that Dr. Teece is required to offer separate royalty opinions for

each asserted patent is based on an incorrect premise that the patents are not all fundamental to

Defendants' delivery of High-Speed Services, in contradiction to Dr. Nettles's opinions.  (*See,

e.g.*, Ex. B (Teece Op. Rpt.) at ¶¶ 115-116.)  Dr. Teece is permitted to, and does, rely on this

understanding.  (*See, e.g.*, *id*. at ¶¶ 265-266, 553, 595.)

The facts here are analogous to those in *Greatbatch Ltd. v. AVX Corp.*, where the Court

denied a motion to exclude an opinion that did not apportion damages by patent.  No. 13-CV-

723, 2015 WL 9171042 (D. Del. Dec. 11, 2015).  In *Greatbatch*, defendant argued that plaintiff's

damages expert "failed to establish demand or apportion damages on a patent-by-patent basis

according to the 'distinct, discrete features' of the claimed invention."  *Id*. at 6.  The Court noted

that "the key points of novelty for each of the patents-in-suit appear to relate to the overall

assembly of the entire [accused product] and [defendant] offers no alternative apportionment

methodology in its briefing" to that used by plaintiff's damages expert.  *Id.*  The Court held that

plaintiff's expert "is allowed to rely on his understanding, as informed by the opinions of

[plaintiff's] technical experts . . . that infringement of ***any*** of the asserted claims would implicate

the ***entirety*** of [defendant's] accused [products] rather than individual aspects of the [products]

for the purposes of his damages analysis."  *Id*. (emphasis added).

Similarly, here Dr. Teece understands from Dr. Nettles that the largest benefit from

practicing any of the asserted claims is Defendants' ability to deliver High-Speed Services.  (*See,

*e.g.*, Ex. B (Teece Op. Rpt.) at ¶¶ 265-266, 553.)  As in *Greatbatch*, each of the patents relates to Defendants' ability to deliver High-Speed Services during the damages period, *i.e.*, each of the asserted claims covers fundamental technology that allows for the delivery of High-Speed Services.  (*Id.*)  A license to every asserted claim is necessary for Defendants to offer those services, and a license to one patent only would not deliver material value to Defendants, as those services would still be precluded by the other, unlicensed, claims.  Accordingly, Dr. Teece is not required to separately value each asserted patent.

This case is unlike *MiiCs*, where an expert "applie[d] a royalty base that includes units accused under ***any*** asserted patent to a royalty rate with contributions from ***every*** asserted patent."  *MiiCs*, 2017 WL 6268072, at *5 (emphasis added).  Dr. Teece does not start with a royalty rate based on the incremental value of multiple patents and apply that aggregate rate to products only accused of infringing some of the patents.  Instead, Dr. Teece determined the value of the patents to Defendants using four metrics and averaged those metrics to determine the apportioned benefit to Defendants.  (*See, e.g.*, Ex. B (Teece Op. Rpt.) at Ex. 2.)

Oddly, Defendants take issue with Dr. Teece's calculation of the apportioned benefit being the same both before and after the '565 Patent issued.  But this merely evidences the conservativeness of Dr. Teece's calculations and understates the benefits to Defendants.  Dr. Teece did not double count the benefits of the '565 Patent to Defendants to the extent these benefits, including the ability to offer High-Speed Services, were included in his calculations for the other patents-in-suit.  And additional benefits of the '565 Patent, above and beyond the shared benefits of the patents, would result in a royalty greater than Dr. Teece calculated.  Dr. Teece's methodology is not faulty because he focused on the central benefits of practicing all the patents and did not separately calculate every conceivable benefit of practicing each claim.

Defendants' argument also finds no support in *GPNE Corp. v. Apple, Inc.*, No. 12-CV-

2885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014), where the court granted defendant's motion to exclude damages opinions where no methodology was provided to derive a $1 per unit royalty and no apportionment was done between the value of the patented pager technology and the non-infringing features of the related 3G and 4G LTE standards. *Id*. at *4–5. That expert relied on generic statements about 3G and 4G LTE technology and the importance of cellular technology to the defendant without attempting to apportion the importance of those technologies to plaintiff's patents. *Id*. at 5 (Plaintiff "must make some attempt to distinguish the allegedly infringing features of 3G and 4G LTE from the non-infringing features," yet plaintiff's expert "cites no evidence indicating the value of the specific technology claimed by GPNE's patents.")

Dr. Teece calculated the benefit to Defendants of providing High-Speed Services by practicing the asserted claims, and apportioned the incremental value of providing High-Speed Services from any other features of the standard. (*See, e.g.*, Ex. B (Teece Op. Rpt.) at ¶¶282-290.) In short, Dr. Teece's calculations are unlike the "black box" analysis in *GPNE* "that provides no basis for the $1 per unit royalty figure, cloaking this arbitrary choice in broad statements about the general value of cellular connectivity." *GPNE*, 2014 WL 1494247, at *6.

## B.    Dr. Teece's Analysis Is Based on the Best Data Available, Which is Reliable

Defendants contend Dr. Teece's premium pricing analysis must be excluded because they claim Dr. Tyler (not Dr. Teece) analyzed allegedly unreliable pricing data to calculate the relationship between speed and price for Defendants' services. (Defs. Br. at 17-20.) To be clear, at issue is pricing data for ***Defendants'*** own services, which Defendants failed to produce. Defendants now argue public data regarding their pricing may theoretically be unreliable, but they fail to identify a single inconsistency between the data and their actual pricing. As shown below, the Telogical data is reliable and the most comprehensive and accurate data available.

As a threshold matter, the need to use pricing data from a third party is a situation of

Defendants' own making.  During discovery, ChanBond diligently sought Defendants' pricing

data, which was uniquely in their possession, custody, and control.  (*See, e.g.*, Ex. E Pl.

ChanBond, LLC's First Set of Common Req. for Produc., No. 56; Ex. F Pl.'s R. 30(b)(6) Notice

of Dep. to Cox Communications, Inc., No. 38.)  But Defendants produced only minimal pricing

information for their own services.

Defendants argue that Drs. Teece and Tyler must rely on specific pricing offered by each

Defendant, even though they failed to produce that data.  "[I]f actual damages can not be

ascertained with precision because the evidence available from the infringer is inadequate,

damages may be estimated on the best available evidence, taking cognizance of the reason for

the inadequacy of proof and resolving doubt against the infringer."  *Sensonics, Inc. v. Aerosonic

Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996); *see Westinghouse Elec. & Mfg. Co. v. Wagner Elec.

& Mfg. Co.*, 225 U.S. 604, 620 (1912) (The infringer bears the risk when a precise calculation

not possible.); *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 655 (Fed.

Cir. 1985) ("Fundamental principles of justice require us to throw any risk of uncertainty upon

the wrongdoer rather than upon the injured party.").  "[W]hen the calculation of damages is

impeded by incomplete records of the infringer, adverse inferences are appropriately drawn.*"

Sensonics,* 81 F.3d at 1572; *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir.

1983) (stating adverse consequences of the infringer's incomplete records rest on the infringer).

As is common in this area of expertise, Dr. Tyler sought out and used the best available

public data (Telogical) in conjunction with Defendants' data to determine the relationship

between download speed and pricing.  The Telogical data consists of REDACTED records of

Defendants' monthly Internet plan information from REDACTED

. (*Id.* at ¶80; Table 4.4.)  Table 4.5 from Dr. Tyler's Opening Report shows

timing, number of records, and DMAs for the Defendants for which Telogical has data.



REDACTED

Dr. Tyler extensively analyzed the pricing data Defendants produced along with the

Telogical data to assess the pricing premiums for High-Speed Services.  (*See, e.g.*, Ex. G (Tyler

Op. Rpt. for Cox) at ¶¶ 63-66, 72-85.)  Dr. Tyler then assessed his results for statistical reliability

both within each Defendant, and across Defendants as a group.  (*Id*. at ¶¶ 39-44, 49-55, 67-70.)

In his Reply expert report, which Defendants simply ignore, he explained:

> In summary, the Telogical Systems Data are subject to a rigorous quality assurance
> program.  The data are relied upon broadly including by Defendants in these matters, the
> FCC, and academics, including for regression analysis to predict high-speed data prices.
> Moreover, information from publicly-available documents matches the Telogical
> Systems Data.  Based on my investigation, I have found that the data I have used from
> Telogical are the most comprehensive, most accurate source of information regarding
> high-speed data prices charged by cable companies that is publicly available covering
> 2011-2018.

(Ex. H (Tyler Reply Rpt.) at ¶¶ 17-31.)  At his deposition, Dr. Tyler similarly provided a cogent

rebuttal to Defendants' concerns about the Telogical data.  (Ex. I (Tyler Dep. Tr.) at 32:13-

39:25.)  Dr. Tyler's statements and opinions regarding the Telogical data are unrebutted.

Indeed, Telogical pricing data is widely relied upon.  The Federal Communications

Commission relied on Telogical pricing data as an indicator for High-Speed data prices.  (Ex. H

(Tyler Reply Rpt.) at ¶ 25.)  A member of the FCC Task Force that developed the National

Broadband Plan compared Telogical pricing data with the FCC's own survey results, finding an

average broadband price of $46.25 from the FCC survey, and $46 from Telogical.  (*Id*.)  A

related FCC working paper found that "Telogical figures for stand-alone prices track reasonably

well with what respondents in the FCC survey say about stand-alone bills." (*Id*.)

Turning to Defendants' specific objections, they first argue the Telogical pricing data is "inherently unreliable" because it does not contain pricing information for five defendants and, for five other defendants, is missing pricing information for portions of the damages period. (Defs. Br. at 17-18.) These arguments are, at best, fodder for cross-examination. Dr. Tyler's pricing analysis is not unreliable merely because the Telogical data does not completely fill the many gaps in Defendants' production of their pricing data. (Ex. H (Tyler Reply Rpt.) at ¶ 12 ("I demonstrate analytically that the relationship between speed and price is stable over time – that is, there is no indication that missing price information substantially influences my results.").)

Defendants argue that gaps in the pricing data make Dr. Tyler's analysis unreliable, but they offer nothing but attorney argument to support this unfounded claim. As Dr. Tyler explained, while the data shows variations over time ("temporal variations") and over product type and geography ("cross-sectional variations"), "cross-sectional variation is substantially greater than time series variation," meaning product type and location determine prices more than time, and temporal gaps are less significant. (Ex. H (Tyler Reply Rpt.). at ¶¶ 61-63.)

In looking at the data by speed, company, and region, Dr. Tyler found "cross-sectional variation is substantially greater than time series variation (as prices tend to be constant for a given speed for several months)." (*Id*.) Looking at median prices by speed over time, Dr. Tyler found "standard prices are approximately flat over this timeframe [*i.e.*, the relevant damages period] and promotional prices show a downward trend, not an upward trend as Mr. Bakewell contends." (*Id*. at ¶¶ 66-67.) Defendants' corporate representatives admitted in deposition that pricing stays constant over long periods of time. (*See, e.g.*, Ex. J (Dep. Tr. of Cablevision and Cequel at 38:23-39:3 ("The prices have been fairly stable over three years.").)

Dr. Tyler's analysis showed that for a given service and market, price tended to stay the

same for months, if not years, rendering unnecessary pricing data for each month.  One of skill in

the art would recognize that the gaps in public pricing data confirm the correctness of Telogical's

data.  (Ex. H (Tyler Reply Rpt.) at ¶ 50 ("The data are missing for certain months because certain

companies (Charter, in particular) did not publicly report standard pricing at certain times, and

during these time periods Telogical correctly recorded those prices as undisclosed.").)

Defendants also argue, contrary to their corporate representatives' deposition testimony,

that industry data does not give insight into their pricing behavior because they compete in

different markets and set prices independently.  (Defs. Br. at 19-20.)  This is incorrect.  (*See, e.g.*,

Ex. K, CableOne Dep. Tr. at 24:21-25:8 (REDACTED

); Ex. L, BrightHouse

Dep. Tr. at 69:22-70:8 (REDACTED), 71:15-

72:22 (same); Ex. M, RCN Dep. Tr. at 18:7-24 (REDACTED

.)  That "each cable company independently sets its prices for

broadband services" does not make industry average prices irrelevant to the damages analysis.  If

Defendants believe using Telogical data results in too high of a royalty based on their prices,

they may cross-examine Drs. Tyler and Teece on this issue.  Of course, Defendants' complaint

regarding industry pricing data has nothing to do with Dr. Teece's methodology.

Further, there is no requirement that a royalty must be based on Defendants' individual

pricing rather than industry average pricing.  *Summit 6*, 802 F.3d at 1296.  Indeed, courts have

deemed an expert's reliance on industry data to quantify patent damages appropriate and

admissible.  *See, e.g., MediaTek, Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341, 2014

WL 2854890, at *5 (N.D. Cal. Jun. 20, 2014).  In *MediaTek*, a damages expert estimated

infringing sales using publicly available industry data because she did not have access to actual

sales data for infringing products.  *Id*.  The court found that the expert's estimates of infringing

sales based on industry data "are not based on speculation, but are simply reasonable approximations no different than any proper damage calculation." *Id*. The court noted that defendant "does not dispute the reliability of the data source itself here, only [plaintiff's expert's] conclusions and opinions," and that defendant's "quarrels with this evidence are not a basis for its exclusion, but are disagreements and credibility challenges that can be clarified on cross-examination." *Id*.

The situation here is unlike *Multimedia Patent Trust v. Apple, Inc.*, where the court excluded expert testimony based on "various industry surveys" to support a litigation discount of 20% to 50% applied to a royalty calculated based on licenses to the patents-in-suit. No. 10-CV-2618, 2012 WL 5873711, at *9 (S.D. Cal. Nov 20, 2012). There, plaintiff "fail[ed] to provide any explanation of how this industry data is related to the facts in this case." *Id*. Here, the relevance of High-Speed Service pricing to the facts of this case is not disputed. Dr. Tyler is not using industry surveys to derive a litigation discount to apply to licenses unrelated to those surveys. Instead, Dr. Tyler uses the Telogical data, because Defendants failed to maintain their own pricing data, to analyze the correlation between price and speed for High-Speed Services.

Finally, Dr. Teece did not analyze the Telogical data. Instead, he relied on Dr. Tyler's opinions regarding the pricing premiums for High-Speed Services. Defendants have not challenged the admissibility of Dr. Tyler's opinions concerning such pricing premiums. As such, Dr. Teece is permitted to rely on Dr. Tyler's opinions. *See Apple*, 757 F.3d at 1320–22; *Intellectual Ventures*, 215 F. Supp. 3d at 324. For this reason alone, Defendants' *Daubert* challenge of Dr. Teece based on the Telogical data fails. *See id.*

## V.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Date: May 16, 2019

*Of Counsel:*

Robert A. Whitman *(pro hac vice)*
Mark S. Raskin *(pro hac vice)*
John F. Petrsoric *(pro hac vice)*
Michael DeVincenzo *(pro hac vice)*
Andrea Pacelli *(pro hac vice)*
Eric P. Berger *(pro hac vice)*
**MISHCON DE REYA NEW YORK LLP**
156 Fifth Avenue, suite 904
New York, New York 10010
(212) 612-3270
robert.whitman@mishcon.com
mark.raskin@mishcon.com
john.petrsoric@mishcon.com
michael.devincenzo@mishcon.com
andrea.pacelli@mishcon.com
eric.berger@mishcon.com

**BAYARD, P.A.**

*/s/ Stephen Brauerman*
Stephen Brauerman (sb4952)
Sara E. Bussiere (sb5725)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
sbussiere@bayardlaw.com
*Counsel for Plaintiff*
*ChanBond, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2019, a true and correct copy of the foregoing

**[SEALED] PLAINTIFF CHANBOND, LLC'S BRIEF IN OPPOSITION TO**

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. DAVID TEECE**

has been served upon the following parties via electronic mail.


Jack B. Blumenfeld
Jennifer Ying
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Michael L. Brody
Jonathan E. Retsky
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601


Krishnan Padmanabhan
Anup K. Misra
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166

James C. Lin
Winston & Strawn LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025


*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)

## Briefs, Responses and Replies

1:15-cv-00842-RGA ChanBond, LLC v. Atlantic Broadband Group, LLC

LEAD,MEDIATION-MPT,PATENT

### U.S. District Court

### District of Delaware

**Notice of Electronic Filing**

The following transaction was entered by Brauerman, Stephen on 5/16/2019 at 4:44 PM EDT and filed on 5/16/2019

**Case Name:**          ChanBond, LLC v. Atlantic Broadband Group, LLC
**Case Number:**      1:15-cv-00842-RGA
**Filer:**                   ChanBond, LLC
**Document Number:** 390

**Docket Text:**
**[SEALED] ANSWERING BRIEF in Opposition re [361] MOTION to Exclude the Testimony of Dr. David Teece filed by ChanBond, LLC.Reply Brief due date per Local Rules is 5/23/2019. (Attachments: # (1) Certificate of Service)(Brauerman, Stephen)**


**1:15-cv-00842-RGA Notice has been electronically mailed to:**

James C. Lin    jalin@winston.com

Jennifer Ying    jying@mnat.com, jyefiling@mnat.com, winston-strawn-7942@ecf.pacerpro.com

Jonathan E. Retsky    jretsky@winston.com, ahodgson@winston.com

Krishnan Padmanabhan    kpadmanabhan@winston.com, ecf_ch@winston.com

Mark S. Raskin    mark.raskin@mishcon.com, allnypatent@mishcon.com

Michael L. Brody    mbrody@winston.com, vkennedy@winston.com

Sara E. Bussiere    sbussiere@bayardlaw.com, jlately@bayardlaw.com, Njoyce@Bayardlaw.com, ntalarowski@bayardlaw.com, tdevine@bayardlaw.com

Stephen B. Brauerman    sbrauerman@bayardlaw.com, jlately@bayardlaw.com, Njoyce@Bayardlaw.com, ntalarowski@bayardlaw.com, SBussiere@bayardlaw.com, tdevine@bayardlaw.com

**1:15-cv-00842-RGA Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/16/2019] [FileNumber=3827817-0
] [c269a0bcd1158f711257b92a9c628e875cdfa36bb6495e3f284ef0b427848a1adc6
df43bc713a28dbd6729d7fbdc6ec5741e1e4d61eade28bff5a25454e282b7]]
**Document description:** Certificate of Service
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/16/2019] [FileNumber=3827817-1
] [800e008df56d781688746f537ec66ae1beb07a846b0d67153aae701a9dd40b7ecb0
6bc96d87af87e6811765acbb3f4d66757fc86cbe218a7e44408a90b64e6ee]]