# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE CHANBOND, LLC PATENT LITIGATION** | C.A. No. 15-842-RGA<br><br>CONSOLIDATED<br><br>**PUBLIC REDACTED VERSION** |

## CHANBOND, LLC'S REPLY BRIEF IN SUPPORT OF ITS DAUBERT MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF DEFENDANTS' DAMAGES EXPERT

Date: June 13, 2019
*Of Counsel:*

Robert A. Whitman *(pro hac vice)*
Mark S. Raskin *(pro hac vice)*
John F. Petrsoric *(pro hac vice)*
Michael DeVincenzo *(pro hac vice)*
Andrea Pacelli *(pro hac vice)*
Eric P. Berger *(pro hac vice)*
**MISHCON DE REYA NEW YORK LLP**
156 Fifth Avenue, suite 904
New York, New York 10010
(212) 612-3270
robert.whitman@mishcon.com
mark.raskin@mishcon.com
john.petrsoric@mishcon.com
michael.devincenzo@mishcon.com
andrea.pacelli@mishcon.com
eric.berger@mishcon.com

**BAYARD, P.A.**
Stephen Brauerman (sb4952)
Sara E. Bussiere (sb5725)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
sbussiere@bayardlaw.com
*Counsel for Plaintiff ChanBond, LLC*

## Table of Contents

I. INTRODUCTION ................................................................................................................. 1

II. MR. BAKEWELL'S "MARKET APPROACH" TO A REASONABLE ROYALTY IS FUNDAMENTALLY FLAWED AND SHOULD BE EXCLUDED .................................... 1

   A. Mr. Bakewell Should Not Be Permitted to Testify that Z-Band's Investment Solicitations Are Indicative of a Reasonable Royalty Rate ...................................................................... 1

   B. The AST Website Posting Is Not a Comparable Transaction ............................................. 3

   C. IP Navigation Related Communications Are Not Comparable Transactions ..................... 6

      1. VDV's Rejected Offer to Buy 40% of the Patents' Net Proceeds ................................... 6

      2. ChanBond's Acquisition from CBV .................................................................................. 7

      3. The UnifiedOnline Transaction ......................................................................................... 9

      4. Mr. Bakewell's Reliance on a Non-Party Email is Improper ....................................... 10

III. CONCLUSION .................................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Thermoplastics Co. v. Faytex Corp.*,
    5 F.3d 1477 (Fed. Cir. 1993)..................................................................................................5

*AU New Haven, LLC v. YKK Corp.*,
    No. 15-cv-03411-GHW-SN, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ...........................6

*AVM Techs., LLC v. Intel Corp.*,
    No. 15-cv-33-RGA, 2017 WL 1753999 (D. Del. May 1, 2017)..............................................8

*AVM Techs., LLC v. Intel Corp.*,
    No. 15-cv-33-RGA, 2017 WL 1787562 (D. Del. May 1, 2017)..............................................5

*Comcast Cable Commc'n, LLC v. Spring Commc'ns Co., LP*,
    262 F. Supp. 3d 118 (E.D. Pa. 2017) ......................................................................................9

*Dataquill Ltd. v. High Tech Computer Corp.*,
    No. 08-cv-543-IEG, 2012 WL 1284381 (S.D. Cal. Apr. 16, 2012) ........................................3

*Intellectual Ventures I LLC v. Xilinx, Inc.*,
    No. 10-cv-1065-LPS, 2014 WL 1814384 (D. Del. Apr. 14, 2014) .........................................6

*MiiCs & Partners, Inc. v. Funai Electric Co., Ltd.*,
    No. 14-cv-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017) ...........................................7

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    365 F.Supp. 3d 466 (D. Del. 2019).........................................................................................3

I.  **INTRODUCTION**

The "Market Approach" analysis performed by Defendants' damages expert, Mr. Bakewell, should be excluded because it is not based on the examination of comparable transactions, as is required. Instead, Mr. Bakewell relies solely on materials that do not reflect the value of the patents-in-suit at the hypothetical negotiation, such as investment solicitations in a product company from a decade before the patents issued. On the rare occasions where Mr. Bakewell's analysis gets close to evaluating an actual transaction, he ignores the transaction terms themselves, and instead uses numbers plucked from extraneous emails that are not part of the transaction and do not reflect the terms of the transaction. But such self-serving attempts to manipulate a determined royalty are not merely fodder for cross-examination; they have no place in a proper damages analysis. Accordingly, the Court should grant ChanBond's motion and exclude Mr. Bakewell's opinions.

II.  **MR. BAKEWELL'S "MARKET APPROACH" TO A REASONABLE ROYALTY IS FUNDAMENTALLY FLAWED AND SHOULD BE EXCLUDED**

  A.  **Mr. Bakewell Should Not Be Permitted to Testify that Z-Band's Investment Solicitations Are Indicative of a Reasonable Royalty Rate**

As detailed in ChanBond's opening brief, Mr. Bakewell should not be permitted to opine that (1) a December 2000 Z-Band investment request of ▮▮▮▮▮▮▮▮▮▮ in venture capital funding for an unknown share of Z-Band; and (2) a 2001 offer of ▮▮▮▮ for an unknown "minority interest" share in Z-band, establish a "lump-sum-royalty" of ▮▮▮▮▮▮ (D.I. 371 "Op. Br." at 8-13.) These were both solicitations for passive investment in Z-Band's product business that predated issuance of the patents-in-suit by a decade or more.

Defendants' opposition does not mention a ▮▮▮▮▮▮ royalty, let alone attempt to explain how either investment solicitation could reflect the ▮▮▮▮▮▮ royalty that Mr. Bakewell derived from thin air. Instead, Defendants argue that Mr. Bakewell's opinions are

1

admissible because the "technology offered" in 2000-2001 was co-extensive with the patents-in-suit (which had not yet issued) (D.I. 398 "Defs. Br." at 8 (relying on D.I. 372-01, Bakewell Rpt. ¶ 178)),[1] and was Z-Band's only asset at the relevant time, *id.* (arguing all Z-Band "had" was technology of the patents-in-suit). That is false.

First, Z-Band never offered to sell any technology or license any intellectual property. Indeed, all contemporaneous materials (identified in ChanBond's Opening Brief and ignored by Defendants) make clear that Z-Band sought passive investment to help fund its operation as a product company, not the sale or licensing of technology or the licensing of the then non-existent patents-in-suit. (*See* D.I. 372-05 ZBAND_0005371–372 (Ex. 5), D.I. 372-03 ZBAND_0005373–374 (Ex. 3)).). Second, in addition to its original patent application, which was filed on December 27, 2000, Z-Band had a product line and patents that it obtained from a Tyco subsidiary called Whitaker Corporation. (*See* Ex. 1[2], Hennenhoefer Tr., 53:10-21, 100:2-3; Ex. 2, CB_Capital0001292-326 at -296.) Z-Band called its product line the "Multimedia Distribution System" or "MDS," and its first series of MDS products "generation one." (Ex. 1, Hennenhoefer Tr., 22:18-19, 53:10-21.) Mr. Bakewell discusses these assets in his report. (D.I. 372-01, Bakewell Rpt., ¶¶ 34-36.)

There is no basis for Defendants' claims that in 2000-2001 Z-Band only owned the patent application or patented technology or that Z-Band ever sold or offered for sale such assets. The 2000-2001 investment solicitations do not relate to the exchange of consideration for anything resembling a patent license or the monetization of the Z-Band's intellectual property, and

---

[1] Paragraph 178 of Mr. Bakewell's report does not mention the technology being offered for sale by Z-Band and certainly does not suggest that such technology was co-extensive with any patent application or was all that Z-Band owned. (*See* D.I. 372-01, Bakewell Rpt. ¶ 178.)

[2] "Ex. _" refers to the exhibits attached to the Declaration of Michael S. DeVincenzo in support of this motion.

certainly not a reasonable royalty for the patents-in-suit. *See Dataquill Ltd. v. High Tech Computer Corp.*, No. 08-cv-543-IEG, 2012 WL 1284381, at *7 (S.D. Cal. Apr. 16, 2012).

In addition, ChanBond demonstrated that Z-Band's solicitation of investment capital in 2000-2001 cannot be compared with a hypothetical negotiation in 2011. (D.I. 371 at 11-12.) Again, Defendants ignore that in 2000-2001: 1) the patents-in-suit and all related patents were years away from issuing; 2) no products (or prototypes) existed that practiced the patents-in-suit; and 3) none of the Defendants had contemplated utilizing the patented technology. (*See* Defs. Br. at 19-20.) Instead, Defendants argue these critical distinctions can all be ignored because "the solicitations [at issue] pre-dated the 2006 release of DOCSIS 3.0 … allow[ing] Mr. Bakewell to value the technology independently of the alleged standardization." (*Id.* at 20.) Of course, the release of DOCSIS 3.0 in 2006 does not make the irrelevant 2000-2001 investment solicitations comparable transactions. *See Zimmer Surgical*, *Inc. v. Stryker,* 365 F.Supp. 3d 466, 495 (D. Del. 2019) (finding an agreement "entered eight to eleven years before the hypothetical negotiations" not comparable).

**B.    The AST Website Posting Is Not a Comparable Transaction**

Z-Band never contemplated any transactions involving AST and the patents-in-suit, never made any offers for sale, and never received any bids. Nevertheless, Mr. Bakewell treats a ▌▌ ▌▌▌▌▌▌ price posted on AST's private website, which was not authorized by the patentees and did not result in any transaction, as a comparable transaction for purposes of his Market Approach. Defendants argue Mr. Bakewell should be allowed to rely on the AST posting as part of his Market Approach because "[c]ourts have repeatedly found that a patentee's *offer* to license or sell a patent is relevant to the parties' hypothetical negotiation." (Defs. Br. at 12 (emphasis in original) (citations omitted).) Even if relevant, no court has held that offers may be considered comparable transactions. (D.I. 372-01, Bakewell Rpt. ¶ 174 (requiring assets to be "valued

3

based on comparable arm's-length transactions").) By definition, Mr. Bakewell's Market Approach requires comparable transactions. (*Id.* at ¶¶ 173-175.) The AST postings are not transactions at all, let alone comparable transactions. Regardless of whether the AST postings may be introduced as an "offer to license," Defendants have failed to demonstrate that the AST postings represent a comparable transaction.

And Defendants are also wrong with respect to the separate issue of whether the AST postings are admissible as an "offer to license." The ███████ posting was not an offer approved by the patentees. As such, it cannot reflect an amount they were willing to accept. The ███████ phrase was derived from internal emails authored by AST employee, Mr. Rosen. *See* D.I. 399-20 (Ex. T, Jul. 13, 2012, email) and 399-21 (Ex. U, Sep. 24, 2012 email). The term ███████ appears in no internal or external communications with the inventors, Z-Band, CBV (a Z-Band holding company), or their outside counsel Mr. Keane. Defendants argue that the "AST emails confirm Mr. Keane as the source of the ███ ███████ 'price expectation.'" (Defs. Br. at 12.) But the facts directly contradict Defendants' position. As Mr. Bakewell acknowledges, the patentees wanted ███████ from any AST sale. (*See* D.I. 372-01, Bakewell Rept., ¶ 205; *see also* Ex. 1, Hennenhoefer Tr. at 200:15-18.) Defendants have not only adduced no evidence that Mr. Keane ever mentioned ███████ Defendants have also identified no evidence that Mr. Keane was ever authorized to offer the patents for sale for ███████ Mr. Rosen, the AST employee whose email mentioned ███████ has not been deposed. Oddly, Defendants rely on the interpretation of Mr. Binns – an AST employee who was not a party to the communications –

4

in place of Mr. Rosen's interpretation.³ (Defs. Br. at 12.) Relying on Mr. Binns's inadmissible lay interpretation of Mr. Rosen's emails, Defendants go so far as to falsely claim that "Mr. Keane initially stated the owners' 'price expectation' as ▮▮▮▮▮▮▮▮▮▮ (*Id.*).

Defendants also rely on an email from AST to Mr. Keane, requesting "verification that the portfolios referenced are available for sale and the seller is aware of the sales offer." (*See, e.g.*, Ex. 3, Keane Tr. at 28:1-34:2; *see also* D.I. 399-14, Ex. N to Defs. Br. at Comcast-Chnbnd0322555.) Mr. Keane never provided any such verification to AST and Mr. Keane had no knowledge of any purported offer. (Ex. 3, Keane Tr. at 33:5-7; *see also id.* at 34:1-2 ("I don't recall if there was a sales offer, so I don't know. It's hypothetical.").) Nor did the inventors know of any AST sales offer. (Ex. 1, Mar. 13, 2018 Hennenhoefer Tr. at 210:12-211:16-22 (Q: "Did Mr. Keane tell you that he was going to send AST information about what your price expectation was for the patents?" A: "We did not discuss anything about pricing with Mr. Keane."); *see also id.* at 208:2-209:3.) Put simply, no reliable evidence demonstrates that the patentees or Mr. Keane made an offer to sell the patents-in-suit for ▮▮▮▮▮▮▮▮▮▮

Fundamentally, for purposes of Mr. Bakewell's Market Approach opinions, the ▮▮▮▮▮▮▮▮▮▮ posting does not represent or evidence a comparable transaction at all. With respect to the question of admissibility of the posting as an "offer for sale," because neither the patentees nor their agent was the source of the alleged ▮▮▮▮▮▮▮▮▮▮ amount, the posting does not represent an "offer for sale." Contrarily, in each case relied on by Defendants, the patentees made the relevant offers to sell or license the patents. *See AVM Techs., LLC v. Intel Corp.*, No. 15-cv-33-RGA, 2017 WL 1787562 (D. Del. May 1, 2017); *Atl. Thermoplastics Co. v.*

---

³ It is unclear why Defendants chose to depose Mr. Binns instead of Mr. Rosen to interpret Mr. Rosen's emails, especially since Mr. Rosen is still listed as an AST employee. https://www.ast.com/about-us/our-team/ (last visited June 12, 2019).

*Faytex Corp.*, 5 F.3d 1477 (Fed. Cir. 1993); *AU New Haven, LLC v. YKK Corp.*, No. 15-cv-03411-GHW-SN, 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019); *Intellectual Ventures I LLC v. Xilinx, Inc.*, No. 10-cv-1065-LPS, 2014 WL 1814384 (D. Del. Apr. 14, 2014).

### C. IP Navigation Related Communications Are Not Comparable Transactions

Defendants defend Mr. Bakewell's reliance on three groups of IP Navigation related transactions, namely purported evidence concerning: 1) VDV's offer to buy 40% of the patents' net proceeds; 2) ChanBond's acquisition from CBV; and 3) the UnifiedOnline transaction. (Defs. Br. at 15-19.) But in none of these instances does Mr. Bakewell analyze a comparable transaction to a license to the patents-in-suit at the hypothetical negotiation as required by the Market Approach.

#### 1. VDV's Rejected Offer to Buy 40% of the Patents' Net Proceeds

In 2014, VDV (an affiliated entity to IP Navigation) offered to buy the patents-in-suit and their family from CBV for ▮▮▮ after VDV had ▮▮▮ (D.I. 372-01, Bakewell Rpt., ¶ 217.) CBV rejected this offer, demanding ▮▮▮ up front. (*Id*. at ¶ 218.) VDV agreed to increase ▮▮▮ in exchange for CBV ▮▮▮ (*Id*. at ¶¶ 218-219.) Mr. Bakewell interpreted this as VDV effectively offering ▮▮▮, suggesting a value of ▮▮▮. (*Id*.) Notably, VDV's offer, which the patentee rejected, was made by a potential acquirer offering to buy, not an offer to sell by the patentee.

Defendants fail to cite any authority holding that an offer to purchase an interest in patents that is rejected by the patentee is a comparable transaction to a hypothetical negotiation. The cases Defendants cite at best stand for the proposition that an offer to sell patents ***by a patentee*** may be relevant to a hypothetical negotiation because it could reflect how much a

6

licensor would be willing to accept at a hypothetical negotiation.  Of course, an offer that is rejected by a patentee is completely different because it does not evidence the amount a licensor would be willing to accept.  Not surprisingly, Defendants cite no cases where a rejected offer to purchase a patent was found relevant for any reason.  Put simply, a rejected offer to purchase is not a comparable transaction for purposes of Mr. Bakewell's Market Approach.  (D.I. 372-01, Bakewell Rpt. ¶¶ 173-175.)

Moreover, offers to sell or license patents are not always admissible.  *See MiiCs & Partners, Inc. v. Funai Electric Co., Ltd.*, No. 14-cv-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017) (holding that an unaccepted offer is not a proper starting point to value a patent license).  Courts recognize that rejected offers to license patent rights do not indicate what a willing licensee would pay.  (*Id.*)  Similarly, a patentee's rejection of an offer to acquire patent rights does not reflect what a willing seller would accept.  Here, the patentee rejected VDV's offer without discussion.  This shows that no counter offer was made by the patentee and no comparable transaction was contemplated, let alone completed.

### 2.  ChanBond's Acquisition from CBV

ChanBond acquired the patents-in-suit from CBV so that ChanBond could assert them, for which CBV would receive ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Op. Br. Ex. 8 at §§ 1.2, 1.3, 2.7, 2.8, 4.1-4.4.)  This was a transaction.  Mr. Bakewell's opinions concerning this transaction are inadmissible, however, because he ignores the transaction's terms and instead merely adopted a lump-sum royalty of ▮▮▮▮▮▮▮ in his Market Approach for purported "2014-2015 contemporaneous valuations," which includes the ChanBond acquisition from CBV.  (D.I. 372-01, Bakewell Rpt. ¶¶ 238-239, 287.)

Instead of using actual transaction terms, Mr. Bakewell uses the CBV acquisition as an improper pretext to rely on a royalty derived solely on contemporaneous ***communications*** as a

7

"comparable transaction," even though the communications do not reflect any terms of the CBV acquisition. In particular, Mr. Bakewell derives his royalty from an email in which ███████ ███████████████████████████████████████████████████████████████ for the patents-in-suit. (Op. Br. Ex. 9 at ¶ 144.) ████████ email concerning ████████████ ███████████████████████ was not part of any transaction, is not reflected in the transaction terms, and has no bearing on the interpretation of any transaction terms. ((D.I. 372-01, Bakewell Rpt. ¶¶ 238-239, 287.) Yet Mr. Bakewell relies solely and exclusively on the email when deriving a "royalty" based on the ChanBond/CBV deal under his Market Approach. (Defs. Br. at 17-18.) In opposing ChanBond's motion, Defendants nowhere address the fact that Mr. Bakewell ignored the ChanBond/CBV transaction terms and relied exclusively on irrelevant email correspondence in arriving at his royalty under the Market Approach.

Regardless of how the ████████ figure from ████████ email is interpreted, the cases Defendants cite do not support their view that an email from around the time of a transaction, which is not part of the transaction and does not define the terms of the transaction, can be relied on as a "comparable transaction." *See AVM Techs., LLC v. Intel Corp.*, No. 15-cv-33-RGA, 2017 WL 1753999, at *1 (D. Del. May 1, 2017) (finding how much plaintiff paid for a patent, plaintiff's licensing approach, and past offers to defendant to license the patent are "historical facts" potentially relevant to a reasonable royalty); *see also Comcast Cable Commc'n, LLC v. Spring Commc'ns Co., LP*, 262 F. Supp. 3d 118, 145 (E.D. Pa. 2017) ("Where, as here, the current patent owner purchased the patent, **the value of the consideration given in exchange for the patent may be relevant** to the determination of a reasonable royalty because it may bear on the amount that might have been accepted by a prudent patentee who has engaged in a hypothetical licensing negotiation.") (emphasis added). If anything, these cases show that "the value of the consideration given in exchange for the patent[s]" is what should be considered.

8

*Comcast*, 262 F. Supp. 3d at 145.  Mr. Bakewell ignored the value of the consideration given in exchange for the rights received, and instead derived his royalty exclusively from a self-serving interpretation of an extraneous email that was not part of the transaction.

### 3. The UnifiedOnline Transaction

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.  As ChanBond has explained, an investor's purchase of an existing patent litigation and the underlying patent assets is a fundamentally different transaction from an infringer paying a reasonable royalty at the hypothetical negotiation for a license to practice the patents.  (Op. Br. at 19-20.)  Defendants do not dispute these factual differences between the transactions, which are dispositive.  (*See* Defs. Br. at 18-19.)  Instead, Defendants attempt to rely on the very facts that differentiate ChanBond's sale to UnifiedOnline from a comparable transaction.  (Defs. Br. at 17-18 (arguing that ■■■■ viewed infringement and validity as "paramount factors" when contemplating the sale to ■■■■ wherein those factors are assumed in a hypothetical negotiation); *id*. at 18 (acknowledging ChanBond's reliance on the fact that ■■■■ was ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■).)

Defendants deposed ■■■■ extensively about ■■■■■■■■■■■■■■■■, confirming that the sale was not a comparable transaction to a reasonable royalty for a license to practice the patents.

- ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
- ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
- ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
- ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

(Ex. 4, ■■■ Tr. at 91:4-12; *see also id*. at 89:4-91:3; 115:13-117:25.)  Defendants also

9

questioned ▓▓▓▓ extensively about the risks of a non-infringement or invalidity finding. (*Id*. at 117:20-25.)

Defendants have failed to establish that ▓▓▓▓ sale of the ChanBond litigation is, or can be, a comparable transaction. Defendants do not dispute that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Mr. Bakewell presumed that ▓▓▓▓ sale of ChanBond was a comparable transaction to a patent license for purposes of the Market Approach; yet, he ignored all differentiating factors regarding the sale. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ which in no way is analogous to a reasonable royalty set at a hypothetical negotiation that assumes the patents are valid and infringed.

### 4. Mr. Bakewell's Reliance on a Non-Party Email is Improper

Finally, one of the purported ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that Mr. Bakewell relies on as a comparable transaction is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*See* Op. Br. at 17.) ▓▓▓▓▓▓▓▓ is not, and has never been, a party to any transaction involving the patents. Yet, Mr. Bakewell improperly treats this email as if the email itself was a comparable transaction to a patent license under the Market Approach. *Id*. Defendants do not attempt to explain how ▓▓▓▓▓▓▓▓ email could reasonably be considered a comparable transaction under the Market Approach. (*See, e.g.*, Defs. Br. at 16, 18.) Nor could they. A self-interested third party email stating that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is plainly not a comparable transaction to a license to the patents-in-suit.

## III. CONCLUSION

For the foregoing reasons, the Court should grant ChanBond's motion.

| | |
|---|---|
| Date: June 13, 2019 | **BAYARD, P.A.** |
| | |
| | */s/ Stephen Brauerman* |
| *Of Counsel:* | Stephen Brauerman (sb4952) |
| | Sara E. Bussiere (sb5725) |
| Robert A. Whitman *(pro hac vice)* | 600 N. King Street, Suite 400 |
| Mark S. Raskin *(pro hac vice)* | Wilmington, Delaware 19801 |
| John F. Petrsoric *(pro hac vice)* | (302) 655-5000 |
| Michael DeVincenzo *(pro hac vice)* | sbrauerman@bayardlaw.com |
| Andrea Pacelli *(pro hac vice)* | sbussiere@bayardlaw.com |
| Eric P. Berger *(pro hac vice)* | *Counsel for Plaintiff* |
| **MISHCON DE REYA NEW YORK LLP** | *ChanBond, LLC* |
| 156 Fifth Avenue, suite 904 | |
| New York, New York 10010 | |
| (212) 612-3270 | |
| robert.whitman@mishcon.com | |
| mark.raskin@mishcon.com | |
| john.petrsoric@mishcon.com | |
| michael.devincenzo@mishcon.com | |
| andrea.pacelli@mishcon.com | |
| eric.berger@mishcon.com | |