```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4    IN RE: CHANBOND LLC,              )
      PATENT LITIGATION                 ) C.A. No. 15-842-RGA
 5                                      )

 6                                      J. Caleb Boggs Courthouse
                                        844 North King Street
 7                                      Wilmington, Delaware

 8                                      Monday, November 25, 2019
                                        3:37 p.m.
 9                                      Oral Argument

10    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

11    APPEARANCES:

12              BAYARD, P.A.
                BY:  STEPHEN B. BRAUERMAN, ESQUIRE
13
                        -and-
14
                MISHCON DE REYA NEW YORK LLP
15              BY:  ROBERT WHITMAN, ESQUIRE
                BY:  MICHAEL DeVINCENZO, ESQUIRE
16              BY:  ANDREA PACELLI, ESQUIRE
                BY:  JOHN F. PETRSORIC, ESQUIRE
17
                                    For the Plaintiff
18
                MORRIS NICHOLS ARSHT & TUNNELL LLP
19              BY:  JENNIFER YING, ESQUIRE

20                      -and-

21              RICHARDS LAYTON & FINGER, P.A.
                BY:  KELLY E. FARNAN, ESQUIRE
22
                        -and-
23

24

25
```

1    APPEARANCES CONTINUED:

2                    WINSTON & STRAWN LLP
                     BY:  DAVID P. ENZMINGER, ESQUIRE
3                    BY:  KRISHNAN PADMANABHAN, ESQUIRE
                     BY:  JONATHAN E. RETSKY, ESQUIRE
4                    BY:  JAMES C. LIN, ESQUIRE
                     BY:  MICHAEL L. BRODY, ESQUIRE
5
                              -and-
6
                     ARNOLD & PORTER KAYE SCHOLER LLP
7                    BY:  DANIEL L. REISNER, ESQUIRE

8                                    For the Defendants

9
                         ***   PROCEEDINGS   ***
10

11            DEPUTY CLERK:  All rise.

12            THE COURT:  All right.  Everyone can be seated.

13            These are the arguments in relation to various

14   motions that have been filed in ChanBond versus Atlantic

15   Broadband Group, Number 15-842 plus 12 other cases or so.

16            Can we, I guess, have Mr. Brauerman, who is here

17   from your side that's likely to say anything?

18            MR. BRAUERMAN:  Thank you, Your Honor.  Good

19   afternoon.  I'm joined at counsel table by Robert Whitman,

20   Michael DeVincenzo, Andrea Pacelli, and they are the three

21   likely to speak.

22            The other two counsel present are Dominick

23   Vitaliano, the paralegal who will be operating our

24   power-point system, and John Petrsoric.

25            I just wanted to take one moment, Your Honor, to

1    introduce the inventors who are seated in the first row,

2    Robert Stine, Richard Snyder, and Earl Hennenhoefer.

3              THE COURT:  Thank you, Mr. Brauerman.

4              All right, Ms. Ying.  Oh, I guess you have lots

5    of different people here.

6              MS. YING:  Yeah.  Good afternoon, Your Honor.

7    Jennifer Ying from Morris Nichols on behalf of the

8    defendants.  With me at counsel table this afternoon, I have

9    David Enzminger, Krishnan Padmanabhan, Jonathan Retsky.

10   Behind him is James Lin.

11             And then we have a couple folks in the back as

12   well.  We have Michael Brody, and then we have Daniel

13   Reisner, and then we have Kelly Farnan.

14             THE COURT:  All right.

15             MS. YING:  I also have a bunch of in-house

16   representatives that I'm happy to introduce to the Court.

17             THE COURT:  Yes.

18             MS. YING:  We have Seth Kramer from Comcast.

19   Dan Boglioli from Charter.  Rebecca Baneman from

20   Cablevision.  Peter Witty from Cable One.

21             THE COURT:  All right.  And Mr. Witty has been

22   observing for a while now.

23             Okay.  First off, sorry that we're starting

24   late.  I had allotted or my staff allotted two hours.  I

25   intend to give you your two hours.  I may even take a short

1    break in the middle depending.

2              Have you talked to each other about what order

3    it makes sense to do this and whether, in fact, you want to

4    argue all of these, or just some of these, or what?

5              MR. ENZMINGER:  Your Honor, we have not talked.

6    I would recommend we start with the dispositive motions, the

7    non-infringement motion which is dispositive of all the

8    issues.

9              MR. WHITMAN:  Your Honor, I think if you look at

10   this, even the non-infringement arguments are only directed

11   to some patents here and there.  I'm not sure it's really

12   dispositive.  I would suggest we would start with -- we're

13   the plaintiffs, start with our motion, our Daubert on the

14   expert, for example.

15             THE COURT:  So the two summary judgment motions,

16   they're actually both the defendants; right?

17             MR. WHITMAN:  Yes.

18             THE COURT:  All right.  Well, I think I would

19   rather start with the summary judgment motions.  I don't

20   think we're going to get too far on them, but nevertheless,

21   why don't we start with them.

22             All right.

23             MR. WHITMAN:  Thank you, Your Honor.

24             THE COURT:  So Mr. Enzminger, you want to start

25   with non-infringement or written description?

1          MR. ENZMINGER:  Mr. Padmanabhan will be handling

2     the non-infringement.

3          THE COURT:  Okay.

4          MR. PADMANABHAN:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. PADMANABHAN:  Krishnan Padmanabhan on behalf

7     of defendants.

8          THE COURT:  Go ahead.

9          MR. PADMANABHAN:  Thank you, Your Honor.  So

10    we'd like to start off with defendants' motions for summary

11    judgment of non-infringement.

12          THE COURT:  You know what, because you have so

13    many different motions, I only brought out three of the

14    five.  So just hold everything for one minute.

15          MR. PADMANABHAN:  Yes, Your Honor.

16          (Recess was taken.)

17          THE COURT:  All right.  I'm ready.

18          MR. PADMANABHAN:  Thank you, Your Honor.

19          THE COURT:  I will say I did read all of these

20    motions and briefing, but of course, one of the things is

21    that it tends to get all jumbled up in my head.  So, but say

22    what you need to say and --

23          MR. PADMANABHAN:  Thank you.

24          THE COURT:  -- I'll tell you if you're telling

25    me stuff that's too basic, but I doubt it.

1          MR. PADMANABHAN:   Thank you, Your Honor.   We

2     appreciate that.

3          So let me start by saying that in order to help

4     focus the issues, defendants are presenting two specific

5     non-infringement arguments that we think are key that I

6     think are going to clarify a lot.   Contrary to what

7     Mr. Whitman said, they actually do address all of the

8     asserted claims between these two arguments.

9          The first argument we're going to address is we

10     have lovingly called it the when argument.   But if you look

11     at the whole phrase, distribute the digital information when

12     the information throughput exceeds the capacity of the

13     channel, and that hits 13 out of 14 asserted claims, and

14     importantly hits every claim in which ChanBond has accessed

15     no damages.

16          The second argument, the combiner argument

17     hits -- I see your face.   There's one claim, Claim 14 of the

18     '822 for which they haven't really assessed any damages

19     number.

20          THE COURT:   Okay.

21          MR. PADMANABHAN:   The second argument is the

22     combined argument, and that addresses 12 out of the 14

23     asserted claims.   And between the two arguments, they

24     address all 14 of the asserted claims.

25          So the first argument is distribute the digital

1    information across at least two separate RF channels when

2    the information throughput exceeds the capacity of a single

3    RF channel.  As I said, this hits all the claims of the '679

4    and the '565.

5           And looking at the claim in claim 12 of the '679

6    is representative.  Element F has got the key language.

7    It's the limitation that starts a modulator, and you see it

8    says that a modulator configured to distribute the digital

9    information, so on and so forth.

10          Importantly, there are two limitations above

11   there that tie in, a second input that receives digital data

12   and traffic sensor configured to measure that digital data.

13   And claim 1 of the '565 mirrors that language.  So if you

14   break down the limitations, it's pretty straightforward.

15          There's three parts to it.  First, you've got to

16   receive a digital stream containing digital information.

17   Second, you've got to measure the information throughput of

18   that digital information.  And third, you've got to

19   distribute that digital information across at least two

20   separate RF channels when the traffic information indicates

21   that that information throughput is more than the capacity

22   of a single channel.  When you've got more than you can fit

23   on one channel, then you distribute across multiple

24   channels.

25          And that's reflected in the specification.  The

1    specification says -- this is at Column 9, Line 45, the

2    signal entering the modulator bank is preferably measured by

3    a traffic sensor 412 to determine if the information volume

4    is greater than the normal capacity of, for example, a

5    single modulator.  If the volume is greater, the DSP 420

6    will, in turn, direct the incoming data to as many

7    modulators as necessary to modulate all the data from the

8    combiner.

9           So the patent teaches a system that's going to

10   use as many channels or as necessary.  When you go above

11   one, then you distribute across multiple channels.  And

12   that's borne out in the figures as well.

13          THE COURT:  To cut to the chase here --

14          MR. PADMANABHAN:  Yeah.

15          THE COURT:  -- the argument here is about the

16   when, in the sense of your position is that the streams or

17   whatever are distributed over multiple channels basically,

18   as a matter of system design, regardless of how much

19   information there is.

20          And their counter is not really, I think,

21   arguing too much with how they say it's designed, but they

22   say the way that it's designed meets the claim limitation.

23   I mean, isn't that the heart of it?

24          MR. PADMANABHAN:  That's close, Your Honor.  So

25   there is -- yes, although why they say the system is

1    supposedly designed only to satisfy the limitation requires

2    you to stretch the language quite a bit, and we'll get into

3    that.

4              I think Your Honor's cut to the heart of it, so

5    why don't I skip ahead a couple of slides and get to the

6    crux of it and explain how our system works, how our

7    products, the accused devices work, and I think it will

8    provide the context that will be helpful.

9              THE COURT:  Okay.

10             MR. PADMANABHAN:  So there's claim construction

11   here.  I don't think there's any real issue, but when has

12   been agreed by the parties as in the event that/if.

13             And Dr. Nettles, their expert, confirms this

14   much.  They've said as much to the PTAB.  There's no

15   dispute.

16             Now, what does this mean?  How does the patented

17   invention work?  Well, if the throughput or if the maximum

18   capacity of single channel is 40 megabits per second, the

19   patented invention is going to fill up that first channel

20   before it then distributes data across multiple channels.

21   Right.

22             Our accused devices never do that.  There's no

23   conditional clause.  They always distribute data across

24   multiple channels regardless of how little information

25   throughput or how much information throughput.

1          And there's two good pieces of evidence that

2     help support that.  The first is so this is an accused

3     device.  Okay.  This is a cable modem that's accused in this

4     case.  This will start using multiple channels from the

5     moment you plug it in.

6          The second is you'll see there's data produced

7     in the case that shows regardless of how low or how high the

8     information throughput is, the data is going to get

9     distributed across multiple channels.  Okay.  So let's go

10    through it real fast.  So when is the decision to distribute

11    data across multiple channels made for the accused devices?

12    The moment you plug it in.

13         So the accused cable modems, a subscriber will

14    plug it into the wall.  The device will identify itself to

15    the network, say Hey, I'm here.  I'd like to join.  And the

16    equipment in the cloud, CMTS, is going to say, Here are the

17    multiple channels on which you will receive data and

18    transmit data.  And the data will get distributed across

19    those channels from that moment forward for all the

20    transmissions to and from that cable modem.

21         And it's always on regardless of how much

22    throughput you have.  Ten megabits per second, for example,

23    this is actual test data produced in the case.  For a

24    transmission of ten megabits per second, far below the

25    capacity of single channel of 40 megabits per second, the

1    data is distributed across multiple channels.

2              Now, the key is the word distributed, Your

3    Honor.  It's distributed across those channels no matter

4    what.

5              Now, ChanBond's expert doesn't agree.  We asked

6    him during his deposition.  "The accused CMTSes will

7    distribute data across the channels that are bonded

8    regardless of whether information throughput exceeds the

9    capacity or not.  Do you recall that discussion?"

10             "If the premise is that different channels will

11    be used even for a low rate of traffic, I don't disagree

12    with that."

13             "Do you disagree that different channels will be

14    used even when the information throughput does not exceed

15    the capacity of a channel?"

16             "That is what I meant by low rate channels."

17             So we don't have a dispute about the facts.

18    I'll keep going because I think Your Honor gets the point.

19             Now, how is it that our products work?  How do

20    the accused devices work?

21             Well, instead of filling up a first channel and

22    then deciding to distribute data across multiple channels as

23    the amount of information throughput increases, the amount

24    of information throughput across each of those individual

25    channels will increase.  The data gets spread across the

1    channels.

2            So that causal condition in the claim, the

3    decision to distribute data across multiple channels doesn't

4    occur based on information throughput.  It will always

5    happen.

6            So here's a side by side.

7            THE COURT:  So my impression is that, like I

8    said, I don't think they necessarily disagree with what

9    you've said so far.  And so maybe that's the way it works

10   most of the time or even all of the time, but that all

11   that's required here is that they be configured to work so

12   that the when condition is met.  And that if that situation

13   arose, it is configured to do that; right?

14           MR. PADMANABHAN:  That would eviscerate the

15   limitation, Your Honor.  If saying you do something all the

16   time would satisfy the limitation, then it happens, you

17   know.

18           THE COURT:  But the limitation is configured to,

19   not that it actually does it; right?

20           MR. PADMANABHAN:  Well, so the cases we cite

21   show that when a device is configured to or it's intended to

22   operate a certain way, you've got a causal limitation like

23   when.  That means that there's going to be a change in the

24   state.  It can't -- otherwise, it doesn't make any sense.

25   If it's configured to distribute data across multiple

1    channels when I decide I'm going to wake up to get to the

2    gym at 6:00 in the morning, it just has no relationship to

3    information throughput.

4              THE COURT:  Okay.

5              MR. PADMANABHAN:  So what they're going to tell

6    you, Your Honor, is that --

7              THE COURT:  Well, instead of that, why don't we

8    let them tell me what they're going to tell me --

9              MR. PADMANABHAN:  Okay.  That's great.

10             THE COURT:  -- and you can respond to that.

11             MR. PADMANABHAN:  Sure.  Okay.

12             THE COURT:  Okay.  All right.

13             Go ahead, Mr. Whitman.

14             MR. WHITMAN:  Thank you, Your Honor.

15             MR. PADMANABHAN:  Sorry, Your Honor.  If I could

16   just approach to hand you these slides?

17             THE COURT:  That's all right.  Yes, Mr. Whitman.

18             MR. WHITMAN:  Thank you, Your Honor.  And I

19   think that we did get to an issue here that I think is

20   critical.

21             So what defendants are arguing is that their

22   devices are configured to use multiple channels as soon as

23   they're turned on.  The issue is not if they're configured

24   to use.  We know they're going to use them.  So they have to

25   be configured to use multiple channels.

 1               The claims ask:  What happens when the

 2   information throughput of a channel is exceeded?  At that

 3   moment, does the device adopt another channel?

 4               Dr. Nettles, ChanBond's expert, explains that's

 5   exactly what happens.  There is a trigger.  There is a

 6   causal effect that if an information throughput of a channel

 7   is exceeded, the devices always use another channel at that

 8   point.

 9               THE COURT:  And his basis for saying that, is

10   that like reading source code or what?

11               MR. WHITMAN:  Yeah.  So he went through all the

12   technical documents and explained it in great detail, and

13   I'll step through it.  I actually think -- well, we can

14   start with the claim.  It's important here in the claims.

15               So we see a modulated unit -- modulator unit

16   configured to distribute the digital information contained

17   in the stream across two separate RF channels, and it does

18   that.  It triggers this.  The trigger is distribution.

19               When do we use two channels?  The trigger is we

20   do that when the traffic information indicates that the

21   information throughput of the digital information exceeds an

22   information capacity of a single RF channel.  Counsel has

23   never explained here what did their devices do when the

24   capacity of a channel is exceeded.

25               That's what the claims are asking.  That's what

1    Dr. Nettles explained.  He pointed to almost 2,000 pages of

2    expert reports.  He did it in detail.

3                So I'm going to take an example.  This is a

4    downstream scenario.  Somebody sitting at home clicking to

5    download content from the Internet, could be a Netflix

6    video, could be an email.  The information comes down

7    through a CMTS.  It goes to that person's cable modem over

8    one or more channels, and that's the issue here.

9                So it's helpful to look at the -- this is how it

10   was done before the invention.  This is called DOCSIS 2.0.

11   So this is a block diagram of a CMTS.  The person is sitting

12   underneath this DOCSIS 2.0 cable modem below.

13               The way DOCSIS 2.0 worked, it could only connect

14   to one channel at a time.  So it's connected to Channel 2 of

15   the CMTS.  We see now it's a low data rate situation.  We're

16   never going to exceed the capacity of the channel.

17               Even back then, the capacity of a channel was

18   about 38 megabits per second.  So if he's trying to download

19   some emails, all these -- so you have Channel 1.  There's a

20   channel queue associated with it.  That green box is a

21   modulator.  That's where the data is going to go out.

22               So we see, for example, he clicks on an email.

23   The email comes in.  It's modulated out at Channel 2 at

24   about 38 megabits per second.  It's a low data rate.  That

25   packet is long gone before the next packet comes in.  It

1    comes in Channel 2.  It's modulated out.

2            So if we switch now to the high data rate

3    situation where now a person using a DOCSYS 2.0 old cable

4    modems trying to download a very large burst from the

5    Internet, Netflix video, for example.  First packet comes

6    in.  It's queued up at Channel 2.  The next packet comes in

7    very quickly, more than 38 megabits per second.

8            Before Channel 2 can modulate out that first

9    packet, the second packet comes in.  It's queued behind the

10   first packet.  They all modulate out at 38 megabits per

11   second.  You're basically capped at 38 megabits per second.

12           The person sitting using the DOCSIS 2.0 modem

13   has throttled the 38 megabits per second.  That's all he's

14   going to get.

15           We switch to DOCSIS 3.0.  The big change here is

16   the DOCSIS 3.0 modem can now connect to multiple channels.

17   So here it's depicted as connected to four channels at the

18   CMTS.  This is how the accused devices work.  This is how

19   Dr. Nettles explained.

20           Same situation.  The person clicks on a high

21   data rate burst, a Netflix video, for example.  The first

22   packet comes in.  It's queued up on Channel 2.  It starts to

23   get modulated out at 38 megabits per second.  Packets keep

24   coming in.  They're coming in faster than 38 megabits per

25   second.

1          What happens in the accused device?  Next packet

2     comes in, the CMTS says, Okay, we have a problem.  The first

3     packet is in Channel 2. It has been modulated out.

4     Channel 2 is working at 38 megabits per second trying to get

5     that packet out, but it can't.

6          So the device now knows that the incoming

7     traffic has exceeded the capacity of Channel 2.  So

8     Dr.  Nettles explained, this is the trigger.  That next

9     packet will never go to Channel 2.  The CMTS is going to

10    make a decision and say, Channel 2 is over its capacity.

11    It's working at 38 megabits per second.  It can't send

12    anything.  If you just take that packet and put it behind

13    the one in Channel 2, it's going to get stuck at 38 megabits

14    per second.

15         We don't want to do that.  We want to switch,

16    send it out to Channel 3.  They both get modulated out in

17    parallel over two channels.  You've effectively doubled your

18    data rate now.

19         So now you're transmitting at 76 megabits per

20    second instead of 38 megabits per second.  That's exactly

21    what the accused products do.  That's why they infringe.

22    That's the trigger.  Dr. Nettles explained this.

23         THE COURT:  And just to go back to your last --

24    yeah.  So even in this scenario, if the little yellow

25    rectangle on Channel 2 is there, and let's say it's going

1  ten megabits or whatever kind of data rate you have, isn't

2  the system going to send the next one to Channel 3 no matter

3  what's happening with Channel 2?

4             MR. WHITMAN:  That's the key question.  No, and

5  Dr. Nettles explained that.  So in a low data rate

6  situation, if a packet comes in, the packet will queue up on

7  Channel 2.  It will be modulated out because it's being

8  modulated about 38 megabits per second.  It is long gone

9  before the next packet comes in.

10             Then the CMTS says, Okay, where am I going to

11  send this packet?  And it uses a different algorithm called

12  historic utilization, not relevant to the invention.  So the

13  CMTS says, Well, I'm probably going to send it out over

14  Channel 2.  There's nothing there.  Go out of Channel 2.

15             Third packet comes in.  Might as well go out

16  over Channel 2 as well until an algorithm kicks in that

17  says, you know what, you have used Channel 2 too much.

18  Let's switch to another one for a little while.

19             So that's this graph.  I'll jump ahead here.

20  That's this graph.  So this is the graph that defendants put

21  together for purposes of the litigation.  This shows a low

22  traffic rate situation, ten megabits per second.  A first

23  packet comes in.  It's going to be long gone, be modulated

24  out before the next packet comes in because it's not over 38

25  megabits per second.  It's never going to exceed the

1    capacity of a channel.

2           If you see here, you'll see that Channel 1 is

3    being used about twice as much as the other channels.  You

4    ask:  Why is that?  Well, that's because it's historic

5    utilization.

6           So packet one came in, went out over Channel 1.

7    Packet two comes in.  It goes out over Channel 1.  Packet

8    three comes in.  It goes out over Channel 1.

9           At some point, the CMTS says, You've used

10   Channel 1 enough.  Let's look to Channel 2.  Use Channel 2

11   on Tuesdays.  Use Channel 3 on Fridays, but the key is this

12   is an irrelevant graph because it does not answer the

13   question as to what happens when the capacity of a single

14   channel has been exceeded.  And that can only happen above

15   38 megabits per second.

16          THE COURT:  All right.  And before I asked the

17   question and you went in this direction, I think you were

18   about to show something that Dr. Nettles --

19          MR. WHITMAN:  Yes.

20          THE COURT:  -- said in his report.

21          MR. WHITMAN:  Yeah.

22          THE COURT:  Because what I'd like you to show me

23   is the disputed material fact.

24          MR. WHITMAN:  Sure.  Yeah.  So this is -- he

25   even disputed this chart.  So this came up in their

1    opposition to his infringement report.  He spent many pages

2    disputing that graph showing and explaining that the next

3    packet that comes in is not going to go to Channel 3.  It

4    may just go back to Channel 2 like the previous packet.  It

5    depends on the historic utilization algorithm which is

6    irrelevant to the invention.

7                It could just sit there going out on Channel 2

8    for a long time, and then the CMTS, you've used Channel 2,

9    switch to Channel 3.  It has nothing to do with the

10   invention.  It has nothing to do with what happens when you

11   exceed the capacity.

12               So going back, so this is what Dr. Nettles had

13   to say about what happens when you do exceed the capacity of

14   a channel.  So here, he was saying if there is a non-zero

15   depth in this channel queue for a particular channel, that

16   means that channel is working to get that packet out 38

17   megabits per second.

18               If another packet comes in, the CMTS is

19   triggered.  It will assign the next packet to a different

20   channel.  The information throughput of a channel is

21   exceeded, it switches.

22               THE COURT:  All right.  So hold on a second.  So

23   Mr. Padmanabhan, why isn't that a disputed material fact

24   here?

25               MR. PADMANABHAN:  Your Honor.

```
1              THE COURT:  Mr. Raskin, don't go away, or
2    Mr. Whitman.
3              I'm sorry.  I have some other case with a
4    Mr. Raskin.
5              MR. PADMANABHAN:  It's this case, also.
6    Mr. Raskin is just not here today with us.  Good memory.
7              Your Honor, let me start with the fact that it's
8    irrelevant.
9              THE COURT:  Okay.  Why is it irrelevant?
10             MR. PADMANABHAN:  It's irrelevant because even
11   when that data comes in at that low data rate, it's going to
12   get spread out amongst those different channels.
13             THE COURT:  But if it comes in at the high data
14   rate, it's going to do this thing that Dr. Nettles says;
15   right?
16             MR. PADMANABHAN:  It's also going to get spread
17   out.  The point is it's going to get distributed across the
18   same channels regardless of whether it's a high information
19   throughput or a low information throughput.
20             The claim doesn't say anything about having to
21   put two packets on two channels at the same exact instant in
22   time.  That's what their infringement theory is about.
23   They're saying, well, you don't really use the invention.
24   You don't actually modulate to, you know, distribute data
25   across two channels unless you do it at the same exact
```

1    instant in time.

2              There's nothing in the claim, in the

3    specification, in the Court's claim construction that

4    requires that.  The claim is really simple.  It asks whether

5    you distribute data across multiple channels, and it

6    conditions that on information throughput.  And we do that

7    at low throughput or high throughput regardless across the

8    same channels.

9              THE COURT:  Okay.  Thank you.

10             All right.  Mr. Whitman.

11             MR. WHITMAN:  All right.  Your Honor, so I think

12   defendants are raising two points there.

13             One, the claim does not say distribute across

14   multiple channels when and only when the information

15   throughput is exceeded.  So we don't really care what they

16   do at a low throughput.  We know that they use this historic

17   utilization algorithm.  It's really irrelevant.

18             What we do care about is what happens when

19   you're over the throughput, and Dr. Nettles explained that

20   this is a trigger.  This is what happens.  It happens every

21   time.  If the information capacity of a channel is filled

22   up, the CMTS will always, in every instance, use a different

23   channel.

24             And we also know from the spec, the claims, and

25   Your Honor's claim construction, the channels are in

1      parallel.  That is being sent out in parallel.  There's no

2      dispute about that.

3                  Defendants have now kind of twisted that into

4      some type of data has to be sent out simultaneously.  Data

5      has to be sent out in parallel over channels.  No one even

6      disputes that.  So the claim is very --

7                  THE COURT:  Does parallel mean more than two

8      different channels?

9                  MR. WHITMAN:  It means just as what the claim

10     says.  If one is full, switch to another.  They're going --

11                 THE COURT:  No, but I'm just asking from an

12     engineering perspective, when you say something is being

13     done in parallel --

14                 MR. WHITMAN:  It's probably simultaneous.  It's

15     probably at the same time or very close to it, but that's

16     not the issue as long as it's in parallel which isn't even

17     disputed here.

18                 They're trying to raise a red herring, but their

19     data is sent out simultaneously.  Their data is sent out in

20     parallel exactly as in the demonstrative.  When a packet is

21     being modulated out of one channel, and another comes in,

22     the CMTS will send that next packet out over a second

23     channel.

24                 THE COURT:  Okay.  I think I got your point

25     there.

 1               Mr. Padmanabhan, do you want to say anything

 2     further in response?

 3               MR. PADMANABHAN:  I do, Your Honor.  So I'll

 4     make two points.

 5               So first is, again, the claims require

 6     distributing data across channels based on this condition.

 7     And if you look at what our products do, there is an analogy

 8     regarding highways and toll booths.  Our products will

 9     distribute data packets consecutively across channels even

10     at low throughput rates.

11               It doesn't matter.  They'll go Channel A,

12     Channel B, Channel C, Channel D sometimes referred to as

13     Round Robin.

14               Now, if there's a backup, which may happen, what

15     they were trying to allude to, for example, a car stuck at a

16     toll booth, the data will then just continue to be

17     distributed amongst the remaining channels.  It doesn't

18     change the behavior.  Low throughput or high throughput,

19     data is distributed across the channels.

20               THE COURT:  Well, it does change the behavior in

21     your example there because, as you say, it goes through

22     other channels.  It didn't go through -- it didn't get

23     behind A.

24               MR. PADMANABHAN:  But it doesn't change the

25     behavior in a manner that matters for the asserted claim.

1   The claim just requires distributing across multiple

2   channels.  We will do that regardless.  What does the fact

3   that Lane A is blocked have to do with distributing data

4   across the channels?

5           The other thing is, Your Honor, they have taken

6   contrary positions on infringement and invalidity.  So one

7   of the pieces of prior art that we've talked about

8   repeatedly is the Lee patent.

9           THE COURT:  And so when you say "they have taken

10  contrary positions," you're going to be handicapped at the

11  trial because there's not going to be any obviousness or

12  anticipation defenses; right?

13          MR. PADMANABHAN:  Why do you say that, Your

14  Honor?

15          THE COURT:  Because of the IPR.

16          MR. PADMANABHAN:  No, the IPRs are separate and

17  done.  They've killed almost all the claims in one patent.

18  But at present, we have -- no, there was only an IPR -- all

19  the IPRs that went through were successful and --

20          THE COURT:  Oh, they weren't instituted?

21          MR. PADMANABHAN:  They were not instituted.

22          THE COURT:  Okay. All right. Never mind then.

23          MR. PADMANABHAN:  But I appreciate Your Honor

24  looking for an opportunity to slim the issues.  So one of

25  the key pieces of prior art we've talked about is the Lee

1    patent, and it's a cable modem that transmits on two

2    channels.  Okay.  It's assigned to just go to the vendor of

3    the accused --

4              THE COURT:  So you're going to be introducing

5    this at trial, this particular piece of art?

6              MR. PADMANABHAN:  Well, yeah.  Well, hopefully

7    not, Your Honor, if you find in our favor.  But importantly,

8    this is what their validity expert says, okay.  In the Lee

9    patent, the two channels that are used are selected when the

10   modem comes on, and they will -- the data will be spread

11   across regardless of throughput.  Okay.

12             And Dr. Axl says that doesn't satisfy the one

13   limitation.  He says, Both MACS, and that's a fancy way of

14   saying both channels are selected regardless of whether the

15   traffic level exceeds the capacity of a single upstream

16   channel.  Therefore, Lee's load-balancing MAC does not use

17   two upstream channels when the information throughput

18   indicates that the information throughput of the digital

19   information exceeds an information capacity of a single RF

20   channel.

21             THE COURT:  So I mean, I understand at some

22   level why you're showing me this, but what is the point?

23             MR. PADMANABHAN:  So we select these channels

24   and we distribute data across them regardless of whether the

25   throughput is low or high.  That's what the prior art does.

1    That's what our accused devices do.  It's not coincidence.

2    They're a vendor, and that's their patent.  So it's not that

3    surprising.

4                And what does it tell you?  Even for validity

5    purposes, this can't satisfy the when limitation.  But for

6    infringement purposes, you know, it doesn't quite cut the

7    mustard.

8                THE COURT:  Okay. Do you have anything more?

9                MR. PADMANABHAN:  I think that will do it, Your

10   Honor.

11               THE COURT:  Okay.  Thank you.

12               MR. WHITMAN:  Thank you, Your Honor.  Counsel

13   just put up a demonstrative saying that they distribute data

14   consecutively across channels, and he actually used the word

15   Round Robin, Channel 1, then 2, then 3, then 4.  That is not

16   what their products do.

17               Their products use historic utilization, use one

18   channel for a while, CMTS.  If you use that enough, switch

19   it to another one.  They don't use Round Robin.  They don't

20   switch from Channel 1.

21               THE COURT:  If they did use Round Robin, would

22   they have a non-infringement defense?

23               MR. WHITMAN:  They did raise it as an

24   alternative, as a non-infringement alternative.

25   Non-infringing alternative they say for damages purposes, we

1   could just switch to Round Robin.  We could do that tomorrow

2   if we wanted to.

3                   THE COURT:  And do you agree that's a

4   non-infringing alternative?

5                   MR. WHITMAN:  We would, but they can't do it.

6   Dr. Nettles already addressed it and explained in detail why

7   that could not possibly work.  And it can't possibly work

8   because, as we showed, the CMTS has talked to many modems.

9                   So there may be some old DOCSIS 2.0 modems

10  hanging off of it, and they probably are.  Those can only

11  talk to one channel.  You can't possibly go Round Robin and

12  talk to an old modem that can only use one channel.  So they

13  can't switch to Round Robin because of the -- they're still

14  using old modems connected to the network.

15                  Some people don't pay for this extra Internet

16  service, so you just have low-speed Internet service.  They

17  have an old modem.  They can't use Round Robin.

18                  Another reason Dr. Nettles said, what happens if

19  a channel starts to degrade?  One of those channels that's

20  operating at 38 megabits per second, something's wrong.

21  Some connection went bad.  Now, it's down to 20 megabits per

22  second, and ten megabits per second.

23                  Round Robin would throttle your entire network

24  back to that lowest channel.  Everything would degrade at

25  that point if you're just going willy-nilly Round Robin.

1          It's why they don't do it.  It's why they don't

2     do it.  It's why they raise it as a non-infringing

3     alternative.  It's because it doesn't happen here.

4          And Dr. Nettles explained exactly what they do.

5     It was shown in their own demonstrative that they prepared

6     for this litigation.  Channel 1 is used more than the

7     others.  If you remember, it's used twice as much as the

8     other channels.  If it was Round Robin, it wouldn't look

9     like that.  Because they use historic utilization, not Round

10    Robin, which they raised as a non-infringing alternative.

11         Talking about the prior art, one practicing the

12    prior art, not a defense to infringement, that Lee --

13    there's no inconsistency.  The Lee reference they refer to

14    has no trigger when they go over the capacity of the single

15    channel.  There's no trigger as there was in the accused

16    device products.

17         They changed their device years after the

18    patents were filed here, so that there is now a trigger just

19    like Dr. Nettles explained.  So if the capacity of a channel

20    has been exceeded, you switch to another channel.  You go

21    from 38 megabits per second to 76 megabits per second.  If

22    you want to use three channels in parallel, you've now

23    tripled your data rate.  It's exactly what the accused

24    products do.

25         THE COURT:  Thank you.  All right.  So let's go

1    on to something else.

2              MR. PADMANABHAN:  So, Your Honor, the second

3    non-infringing argument relates to the combiner term.  And

4    as we mention, between the first argument and this argument,

5    we address all the asserted claims.  And this argument alone

6    addresses 12 out of 14 asserted claims, just as all the

7    claims of the '822 and the '679.

8              So claim 12 is representative.  It reads a

9    demodulator unit configured to demodulate at least two

10   channels contained in the first modulated RF signal.  And

11   then a first combiner is configured to combine the at least

12   two channels.

13             And claim 1 of the '822 mirrors the same.  The

14   spec is pretty clear on what the combiner is.  It says,

15   Following the demodulation, the IP digital signals are

16   combined by a digital combiner such as a multiplexer, if

17   necessary, in order to effectuate a parallel-to-serial

18   conversion.  The output of the digital combiner is a

19   high-speed serial digital output.  The output.

20             The input, obviously, is parallel because it's

21   doing parallel-to-serial conversion.  That's what's shown in

22   the specification figures.  That's the stuff coming in in

23   parallel and coming out in serial.

24             Now, during the Markman process, defendants

25   requested a construction of combiner that says it's a

1    multiplexer that performs parallel-to-serial conversion.

2    Plaintiffs did not want to go with such a construction.  But

3    when we got to the Markman hearing, Mr. Petrsoric, on behalf

4    of plaintiff, said that the combiner effectuates a

5    parallel-to-serial conversion.

6           The Court asked a very apt question which is,

7    okay, so you don't disagree on that point?  And they agreed

8    that a multiplexer effectuates parallel-to-serial

9    conversion.

10          So you said, hey -- the Court said, It doesn't

11    look like there's much of an disagreement, why don't you go

12    back and see if you can actually come to an agreement.  We

13    did go back and meet and confer.  We thought we would be

14    able to agree on a parallel-to-serial conversion, but

15    ChanBond walked back on that agreement.

16          Now, why is all of that relevant?  Well, the

17    Court in the end went with defendants' construction.  In the

18    Markman order, it's actually reversed and says it's

19    plaintiff's construction, but it is defendants'

20    construction.  And that is, a combiner is a multiplexer

21    that, when it receives multiple channels or inputs performs

22    parallel-to-serial conversion on those channels or inputs.

23    And the basic point that we established during the Markman

24    is that means it has to be able to receive data in parallel

25    and transmit in serial.

1          Now, what they're doing today, because they have

2     not found any such combiner that receives data in parallel

3     and transmits in serial, they're saying it doesn't matter as

4     long as the intelligent device receives channels in

5     parallel.  But that's not what the spec discloses, and

6     that's not what the Court's construction requires.

7          Dr. Nettles said this is irrelevant.  That being

8     said, we did confirm what he understands the claims to

9     require.

10          So we asked him during deposition, "You would

11     agree with me that each of the asserted claims is an

12     apparatus which requires specific components; correct?

13          "That's right.

14          "One of those components is a combiner, correct?

15          "That's right.

16          "The Court has construed a combiner, right?"

17          THE COURT:  I'm sorry, Mr. Padmanabhan.

18          MR. PADMANABHAN:  Yes.

19          THE COURT:  Under my claim construction

20     opinion --

21          MR. PADMANABHAN:  Yeah.

22          THE COURT:  -- you said that when I said I was

23     adopting plaintiff's construction that I meant that I was

24     adopting defendants' construction?

25          MR. PADMANABHAN:  It was just a typographical

1    error.

2              THE COURT:  But I'm just looking at the opinion,

3    and it looks to me like I adopted plaintiff's construction.

4              MR. PADMANABHAN:  Right.  It was a typographical

5    error.  I think you meant to write defendants'.  The

6    reasoning was consistent with defendants' construction, you

7    just mixed up defendants and plaintiffs.

8              THE COURT:  But the actual construction that I

9    adopted was --

10             MR. PADMANABHAN:  The one we proposed.

11             THE COURT:  Well, did I get them mixed up when I

12   had them listed as plaintiff and defendant?

13             MR. PADMANABHAN:  You just had the nomenclature

14   of plaintiff and defendant mixed up.  Yeah.  So Your Honor,

15   just the word upfront that says plaintiff is what's --

16             THE COURT:  So they're reversed upfront as to

17   which is which?

18             MR. PADMANABHAN:  That's correct.

19             THE COURT:  Oh.

20             MR. PADMANABHAN:  But we all sorted it out when

21   we filed the official order that Your Honor signed.

22             THE COURT:  All right.  Well, I'm sorry about

23   that.  Okay.  I'm sorry.  I may have missed what you said

24   there because --

25             MR. PADMANABHAN:  No, that's okay.

1              THE COURT:  -- I was trying to figure out --

2              MR. PADMANABHAN:  So let's take a step back.  So

3  today we agreed that a combiner, during the Markman process,

4  a combiner has to receive data in parallel and transmit in

5  serial.  Okay.  And it's got to be a combiner that's a

6  component of the intelligent device.

7              Today ChanBond's theory is it doesn't matter.

8  Dr. Nettles said it's irrelevant if the combiner itself,

9  that component receives data in parallel and transmits in

10  serial, as long as the entire intelligent device, the CMTS

11  or cable modem receives data in parallel.

12             THE COURT:  Yeah, that's what I thought the

13  briefing said.  And so that the heart of the dispute here

14  is --

15              MR. PADMANABHAN:  That's --

16             THE COURT:  -- they're saying it comes in

17  parallel to the intelligent device, and you're saying it has

18  to come in parallel to the combiner, and that the combiner

19  gets serial?

20             MR. PADMANABHAN:  That's exactly right, Your

21  Honor. So these are the accused combiners here.  This is

22  from Dr. Nettles' report.  For the CMTS, he identifies

23  something called the CCF processor, the cable modems and --

24  or the downstream resequencer.

25              Now, we asked Dr. Nettles, "You don't know

1    whether the thing that you have identified as the combiner

2    in each of the accused CMTSes actually receives data in

3    parallel?"

4              And he says, But I don't know if the specific

5    thing that takes individual segments and stitches them

6    together, a lot of gobbledygook, has parallel input or

7    serial input, and I would expect that at least sometimes

8    it's serial.

9              Now, defendants' expert did analyze each of the

10   items, the elements that were identified as the combiner.

11   And in each case, defendants' expert found, and it's

12   undisputed, that it has a serial input and a serial output.

13   So this is what the asserted patents require.

14             THE COURT:  Sorry, Mr. Padmanabhan, do you mind

15   just being quiet for a second?

16             MR. PADMANABHAN:  Yes, Your Honor.

17             THE COURT:  Okay.  I'm sorry.  Go ahead.

18             MR. PADMANABHAN:  So defendants' expert did

19   analyze each of the alleged combiners, and it's undisputed

20   that each of them has a serial input and a serial output.

21   And that's not what the Court's construction requires.

22             What the asserted patents under the Court's

23   construction requires is a combiner that has parallel input

24   and a serial output.  And the accused combiner in each of

25   the accused products has a serial input and a serial output.

1                    THE COURT:  And at some point in the accused

2      products before it gets to the combiner, it's coming in in

3      parallel and something happens to put it into serial; right?

4                    MR. PADMANABHAN:  It's on the outside of the

5      box, Your Honor, and plaintiff's expert hasn't analyzed what

6      happens between where it comes in and what happens at the

7      alleged combiner.

8                    THE COURT:  Well, but presumably your expert

9      has; right?

10                    MR. PADMANABHAN:  Our expert has analyzed the

11     devices, but the bottom line is his job is to identify

12     whether what plaintiff's expert has pointed to actually

13     satisfies the Court's construction.  And in this case, the

14     thing that's the combiner doesn't perform parallel-to-serial

15     conversion.

16                    THE COURT:  Okay.  All right.

17                    Anything more you want to say about this?

18                    MR. PADMANABHAN:  Yeah.  Importantly, Your

19     Honor, we asked Dr. Nettles if it matters.  It doesn't

20     matter what the physical inputs are as long as the data

21     comes from parallel sources.  That's, again, the channels

22     outside the box.  He said, It's not important.  It doesn't

23     matter what comes into the combiner.

24                    Now, note there's no doctrine of equivalents

25     theory here.  The claims require a specific element, a

1      combiner.  And the Court's given us a specific instruction,

2      and they have -- plaintiff has not identified any element

3      that satisfies that construction.

4                    THE COURT:  Okay.  Well, let me hear what

5      plaintiff has to say.

6                    MR. WHITMAN:  So Your Honor, let me just start

7      with the Court's claim construction, and Mr. Padmanabhan

8      failed to mention a few things.  So defendants' original

9      construction recited a multiplexer that when it receives

10     multiple inputs performs parallel-to-serial conversion on

11     those inputs.

12                   So during the negotiation process, we said the

13     claims talk about channels, receiving multiple channels, and

14     then performing parallel-to-serial conversion on those

15     channels.  So defendants said, Okay, you're right, and added

16     it to their proposed construction.

17                   At the end of the day, we couldn't resolve the

18     other issues.  And this is the construction, a multiplexer

19     that when it receives multiple channels or inputs.

20                   So Mr. Padmanabhan came up here and argued that

21     there must be parallel inputs, parallel wires, or something

22     like that forgetting that the actual claim construction

23     receives multiple channels or inputs.  Dr. Nettles

24     explained, again, in hundreds of pages how the devices have

25     a multiplexer that receive multiple channels in parallel and

1    then perform a parallel-to-serial conversion on these

2    channels.

3                    At his deposition, defendants --

4                    THE COURT:   So are you telling me that the

5    multiplexer gets a serial input, not parallel channel

6    input --

7                    MR. WHITMAN:   Yeah.

8                    THE COURT:   -- or parallel channels.

9                    MR. WHITMAN:   So that's a good point.   So we'll

10   go back to the claim language itself.   Get rid of the

11   highlighting here.

12                   So we have an intelligent device for

13   bidirectional distribution of modulated RF signals.   So the

14   first element of the claim is a first input.   There's one

15   input to the intelligent device.   It receives a first

16   modulated RF signal.

17                   So the input into the device, there's one input,

18   and there's one signal.   It's an RF signal.   Inside that RF

19   signal are multiple channels.   Those channels are logical

20   constructs within the overall signal at the beginning.   The

21   channels are just logically constructed within one signal.

22                   So we work our way down the claim.   The

23   modulated unit demodulates at least two channels.   And then

24   you have a combiner configured to combine the two channels

25   demodulated by the demodulator unit into a first digital

1    information stream.

2              So take this example again, somebody sitting at

3    home, clicks on a Netflix video to download.  That video

4    comes in, has a serial stream.  It hits the CMTS.  It's

5    split up over these logical channels, four channels, for

6    example, within one signal, an RF signal.  That signal is

7    received by the intelligent device.  Those four channels are

8    then processed and turned into a digital stream back into

9    that Netflix video which is then output to the addressable

10   device, somebody's computer.

11             So that's exactly what the accused product does.

12   That's exactly what Dr. Nettles explained.  We're talking

13   about channels, multiple channels, and then performing

14   parallel-to-serial conversion on those channels back into

15   the digital stream.

16             We don't care about the input.  The input is an

17   alternative construction.  You can satisfy the Court's claim

18   construction by either having multiple channels in parallel

19   or multiple inputs in parallel.  Dr. Nettles said, We always

20   have multiple channels in parallel.

21             You want to talk about inputs.  I can talk about

22   inputs.  I don't think there's any requirement for any

23   particular number of physical inputs, but any input you have

24   is always going to have parallel channels.  That's how the

25   device works.  That's what your combiner does.

1        So this is defendants' demonstrative that they

2   put in their opening brief at Page 14.  They have a CMTS

3   connected to a cable modem.  Adam's cable modem, and he's

4   trying to download a Netflix video.  So his Netflix video,

5   for example, are these yellow packets that are coming in.

6        And we see that the intelligent device is

7   receiving these multiple channels over a single RF signal.

8   They're just logical constructs within the signal.

9   Parallel-to-serial conversion on those channels inside the

10   cable modem in a serial output of digital information

11   stream, the Netflix video.

12        This is their demonstrative.  That's exactly how

13   it works.  Dr. Nettles was always talking about channels in

14   parallel, parallel-to-serial conversion.  Dr. Nettles,

15   paragraph 127 of his reply report, addressed this exact

16   issue.  Pulled out one of defendants' technical documents.

17        It's an ARRIS Motorola document explaining

18   exactly how these devices work.  The cable modem is going to

19   transmit packets in parallel over multiple channels.  The

20   cable modem needs to be able to receive these multiple

21   channels in parallel.

22        And then at number three, the cable modem has to

23   reorder and recreate the original serial packet stream.

24   This is almost word for word right out of the claim and

25   right out of the Court's Claim Construction Order.  This is

1    how defendants are describing how their products work in

2    their own documents.

3              Thank you, Your Honor.

4              MR. PADMANABHAN:  Can you leave that up?

5              THE COURT:  Okay.

6              MR. PADMANABHAN:  Your Honor, this is the

7    problem.  This is exactly the problem.

8              If this is enough for them to say that they've

9    got a combiner that performed parallel-to-serial conversion,

10   then they don't need to actually -- they're saying they

11   don't need to satisfy the elements of the claim.  This is

12   the entire accused intelligent device.  These are channels

13   on the outside of it that are in parallel, and they're

14   saying there's serial output from the device.  That isn't

15   sufficient to say that you've got a combiner that's going to

16   perform parallel to serial.

17             There are different ways to do this.  They

18   haven't analyzed whether or not there's any device inside of

19   that box and --

20             THE COURT:  So the business that Mr. Whitman was

21   saying about channels or inputs, on that particular point,

22   what do you have to say?

23             MR. PADMANABHAN:  Channels are continuous data.

24   Inputs are single pieces of data.  It's just language taken

25   directly from the spec.  It's immaterial, no matter what the

1    construction requires, parallel on one side and serial on

2    the other.

3              Let me switch over to ours.  Maybe this will

4    help, Your Honor.  So let's look at what the actual accused

5    combiners do.  A resequencer, it takes serial data in, and

6    it changes the order for the data on the output.

7              THE COURT:  And so hold on a second.  So if the

8    expert for the plaintiff said the multiplexer gets parallel

9    channels, that would be sufficient; right?

10             MR. PADMANABHAN:  It has to receive them in

11   parallel and perform conversion.  There's got to be

12   something --

13             THE COURT:  Well, I'm assuming that this

14   conversion part is not actually in issue here.

15             MR. PADMANABHAN:  Well, it is, Your Honor,

16   because think about it, parallel-to-serial conversion means

17   it's got to look different on one side than the other.  It's

18   got to be in parallel on one side.  It's got to be in serial

19   in the other.

20             The thing that they've accused is the same on

21   both sides.  It's serial on both.  How can that be

22   parallel-to-serial conversion?

23             THE COURT:  I thought the multiplexer was the

24   thing that was accused, not the resequencer.

25             MR. PADMANABHAN:  That's one of their accused

1    multiplexers.  It's called the downstream resequencer.

2              THE COURT:  Okay.

3              MR. PADMANABHAN:  And it resequences.  And so

4    the analogy would be let's think of a -- you've got a line

5    of school children, and they're in random heights.  It's a

6    straight line, and then you say, Okay, let's reorder you

7    from tallest to shortest.  That's resequencing.  It's serial

8    to serial.

9              I mean, they have an obligation to demonstrate

10   that the claims as construed have been satisfied, and they

11   can't hand wave around it.

12             THE COURT:  And what you're saying, just to make

13   sure I understand what you're saying, is they don't have any

14   evidence that the multiplexer gets parallel channels.  And

15   whatever evidence they have is whatever comes into the

16   multiplexer, the exact same thing comes out of it on the

17   other side.

18             MR. PADMANABHAN:  It comes out in the same form.

19   Comes in in serial and out in serial.

20             THE COURT:  Okay.  Thank you.  So let me just

21   hear from Mr. Whitman again on that.

22             MR. WHITMAN:  Yes, Your Honor.  Dr. Nettles, of

23   course, he didn't rely on defendants' demonstrative.  He's

24   got, again, hundreds of pages directed to --

25             THE COURT:  Well, instead of telling me a

1    hundred pages, isn't there a sentence or two where he says

2    what you want him to say?

3              MR. WHITMAN:  I'm going to get that, but I'm

4    going to first spend one minute here as to the resequencer

5    is definitely part of the accused combiner that Dr. Nettles

6    identified.  But here, again, defendants' demonstrative is

7    simply wrong.  There's always one signal coming in.

8              And in this example, I don't know what 1, 2, 3,

9    and 4 is.  There's got to be multiple channels.  You're

10   going to have multiple 1's.  You're going to have multiple

11   2's.  You might have -- you're trying to combine that

12   Netflix video back from the four channels back into the

13   serial stream.

14             So there's always some difference.  And

15   Dr. Nettles explained that in the memory, for example, the

16   channels will be logically constructed so that the

17   resequencer and the combiner knows what to combine back.

18   They have to take the parallel information from the parallel

19   channels and convert it into -- back into that Netflix

20   video.

21             And Dr. Nettles was explaining that in some of

22   his paragraphs.  We can switch back to ours.  I'll show you.

23             So here again, Dr. Nettles at his deposition,

24   this is just one example where he's explaining -- he's being

25   asked these questions again.  Defendants were hung up on the

1    input issue.  How many inputs are there?  Where are those

2    parallel inputs?

3                  And Dr. Nettles kept saying the input is always

4    parallel.  It's always parallel.  That's what he's trying to

5    say.  The input are things we receive in parallel.  You see

6    parallel channels.  Takes the data that comes in as

7    parallel, and it puts it in the right sequence and sends it

8    out as a serial flow.

9                  It's not about the number of pins.  It's not

10   about the number of wires.  It's not about, you know, how

11   many wires are coming into the combiner because the whole

12   intelligent device is only working on one signal.  It only

13   has one master input.  It's about the function that the

14   combiner plays in the system, and that is to combine the

15   channels that are received in parallel and to produce a

16   serial output.

17                  So every --

18                  THE COURT:  So the sentence that is important in

19   all of that is the one that's right in the middle, takes the

20   data that came in as parallel and puts it in the right

21   sequence --

22                  MR. WHITMAN:  Yes.

23                  THE COURT:  -- and then sends it out as a serial

24   flow?

25                  MR. WHITMAN:  Yeah.  Yes.  So it takes the

1   channels that are coming in --

2              THE COURT:  And where it says the it, what's it

3   referring to there?

4              MR. WHITMAN:  I believe it's the combiner that's

5   at issue here.  It's a very long answer.  It spreads across

6   a page.

7              THE COURT:  No.  No, but I'm just --

8              MR. WHITMAN:  Yes.

9              THE COURT:  The argument that Mr. Padmanabhan is

10  making seems to be concentrating on whether the it is the

11  intelligent device, the CM, if you will, or whether it's the

12  multiplexer.

13             MR. WHITMAN:  Yeah, in this particular question,

14  it's the resequencer itself.  So they're talking about this

15  resequencer box that's part of the combiner.

16             THE COURT:  Which the resequencer is a

17  multiplexer of the --

18             MR. WHITMAN:  It is.  It is.  The box is bigger

19  than just the resequencer.  So there's memory associated.

20             THE COURt:  So hold on just a minute.

21  So Mr. Padmanabhan, the it there, is it referring back to

22  the sequencer?

23             MR. PADMANABHAN:  Your Honor, if I might

24  redirect the Court.  It takes the data that came in as

25  parallel.  When it says in as parallel, they're talking

1    about into the box, not into the resequencer.

2              THE COURT:  So the it is talking about the

3    multiplexer?

4              MR. PADMANABHAN:  It takes data.  Does it take

5    data from multiple channels that --

6              THE COURT:  No.  No.  No.  Is the it referring

7    to either the sequencer or the resequencer which is a

8    multiplexer?

9              MR. PADMANABHAN:  So Your Honor, let me finish

10   the phrase.  He says it takes the data that came in.  Let's

11   go down there.

12             It takes the data that came in in parallel.

13   Whether or not it takes it -- how it reads it into his own

14   processing system, I don't -- it's not important.  It takes

15   the data that came in as parallel.  Again, that's in the

16   box, and it puts it in the right sequence.  So he's saying

17   it doesn't matter if it comes in in parallel to the actual

18   resequencer.

19             THE COURT:  All right.  Mr. Whitman, does it

20   matter whether it comes in in the resequencer in parallel or

21   not?

22             MR. WHITMAN:  It's much more complicated than

23   that because, and as Dr. Nettles explained in his expert

24   report -- and so my colleague actually pointed me to

25   paragraph 146 in his reply report, where Dr. Nettles is

1   explaining -- he's explaining about how the memory systems

2   work and things like that, but he says flat out that we're

3   talking about the resequencer.   In the CMTSes, it's the CCF

4   processer that performs the combining function.

5           Dr. Nettles says flat out, it receives packet

6   segments in parallel for multiple upstream R channels, and

7   it multiplexes them and provides a serial -- single serial

8   output.   That's paragraph 146.

9           Dr. Nettles did say, it's that box, the combiner

10  that does these things.   It's receiving the channels in

11  parallel, and it is doing the parallel-to-serial conversion

12  to turn them into a serial stream.

13          So what defendants are doing is they're trying

14  to play, I think, semantics with, well, there's only one

15  signal, so you know, at some point in time that signal is

16  sometimes serial as Dr. Nettles says.   Sometimes it's

17  serial, but he didn't say it's always serial.

18          There's always these logical constructs.   If

19  you're doing channel bonding at high data rates, the

20  combiner must multiplex those parallel channels back into a

21  serial stream.   That's why we argued to have channel read

22  into the claim construction, and that's actually what the

23  claims recite.

24          The receiving channels from one signal, and

25  that's what's being combined.   It's not number of inputs.

1    It's not whether there's some serial stream for some

2    millisecond before the data is put into memory and then

3    turned back parallel again into channels.  That's not what

4    it's about.

5              The combiner has to take these channels that are

6    received in parallel, and everybody agrees that channels are

7    received in parallel, and the combiner then multiplexes them

8    together to form this single stream.  That's what

9    Dr.  Nettles said.  He said it in his deposition.  He said

10   it in his expert report, and he points to specific boxes in

11   his deposition.

12             THE COURT:  All right.  I've got your position

13   on this.

14             Is there anything more you want to say on this,

15   Mr. Padmanabhan?

16             MR. PADMANABHAN:  Your Honor, the paragraph that

17   Mr. Whitman pointed you to, paragraph 146 of the reply

18   report says very clearly, the CMTSes -- the CMTS is obtained

19   by converting parallel information received on multiple

20   upstream RF channels.  It's talking about the channels

21   received at the outside of the box.

22             There's never a discussion of parallel to the

23   thing that's allegedly in the combiner.  And if you want to

24   just say it kind of happens hocus pocus, the claims are

25   rendered meaningless.  The Court gave us a specific

1    construction, and that's what we've applied.

2                THE COURT:  Okay.

3                MR. WHITMAN:  If I may, he didn't read the next

4    sentence in paragraph --

5                THE COURT:  Read the next.

6                MR. WHITMAN:  -- 146 that addresses that exact

7    point.  "Whether the data may be temporarily buffered to a

8    memory, and/or transferred over a packet bus interface,

9    while still in parallel format, before being multiplexed and

10   serialized is merely additional functionality."

11               Dr. Nettles is saying it's always in parallel.

12   Channels are always in parallel, and that's what the CCF

13   process and the CMTS is doing.  It's irrelevant that the

14   device, that the CMTS itself received those channels in

15   parallel.  That's a given.  That's step -- that's the first

16   element of the claim.

17               Those channels come in.  They're eventually sent

18   to the combiner.  They must be combined every time back into

19   that stream or that person clicking on the Netflix video

20   isn't going to get it.  And the combiner does that, takes

21   those logical channels, converts them back in the serial

22   stream, and sends it out.  That's exactly how it works, and

23   that's what Dr. Nettles said.

24               THE COURT:  All right.  Okay.  Let's move on.

25               Do you really want to argue this written

1    description invalidity argument which I have to say seems

2    pretty weak to me?

3            MR. PADMANABHAN:  Your Honor, I guess we don't

4    think it's that weak, but maybe if you want to move to a

5    Daubert issue first.

6            THE COURT:  Yeah, let's do that because I have a

7    question.  Other than the one Federal Circuit case that you

8    all cited from like 1992 where they said, you know,

9    essentially on the face of the patent, there's no written

10   description, has there ever been another case where the

11   Federal Circuit has said no written description based on no

12   expert testimony?

13           MR. PADMANABHAN:  On no expert testimony or lack

14   of disclosure?  I'm sorry, Your Honor.

15           THE COURT:  That somebody's made, we've proved

16   written description by clear and convincing evidence even

17   though they have no expert testimony to support the

18   argument.

19           MR. PADMANABHAN:  Your Honor, if I could take a

20   moment, I'm being consulted by a couple people.

21           THE COURT:  Yeah, I see.

22           MR. PADMANABHAN:  I'll report back to you.

23           THE COURT:  Why don't you all think about that.

24   You all think about that.  Let's do one of these Dauberts,

25   and why don't we now give the plaintiff a chance to go

1    first.

2              MR. DeVINCENZO:  Thank you.

3              THE COURT:  And Mr. DeVincenzo, did I get your

4    name right there?

5              MR. DeVINCENZO:  Yes, you did.

6              THE COURT:  A popular name in Delaware.  Which

7    one are you arguing here?

8              MR. DeVINCENZO:  ChanBond's motion with respect

9    to Mr. Bakewell's opinion on the market theory of reasonable

10   royalty.

11             THE COURT:  Okay.  This is the damages expert.

12   Yes.  Okay.  I know what you're talking about.

13             Let me just find that.  Okay.  Hold on just a

14   second.  That's not the right one.

15             Okay.  Now, I've got it.  Yeah.

16             MR. DeVINCENZO:  Okay.  Mr. Bakewell offers

17   three different methods to come to a reasonable royalty, and

18   our motion is with respect to one of those methods.

19             THE COURT:  Right.

20             MR. DeVINCENZO:  With respect to the market

21   approach, there's no dispute that it's a proper methodology.

22             THE COURT:  Right.

23             MR. DeVINCENZO:  The question is:  He didn't

24   follow the methodology, and his failure to follow the

25   methodology is rather blatant.  In fact, in response to our

1    motion, defendants argue separately that various pieces of

2    information are admissible, but they tend to avoid the

3    question of whether those data points actually represent a

4    comparable transaction.

5              THE COURT:  And the market approach, for the

6    sake of this argument here, is valuing the patents, right,

7    not trying to value some license?

8              MR. DeVINCENZO:  Well, they use many different

9    data points, most of which aren't agreements at all, and

10   that's the central problem.  But in general, he's trying to

11   use the market approach to show a reasonable royalty.  So

12   what he's got to do --

13             THE COURT:  Right.  Right, but the thing that

14   he's trying to show a market approach to is the market

15   approach as to how much the patents are worth; right?

16             MR. DeVINCENZO:  Yeah.  Well, how much a

17   reasonable royalty, so a license to an alleged infringer --

18             THE COURT:  Okay.

19             MR. DeVINCENZO:  -- would cost, right, because

20   that's, at the end of the day --

21             THE COURT:  No, but that's the end product.  But

22   when you talk about a market approach, I don't know, I

23   always thought that normally meant how much you would buy or

24   sell something for.

25             MR. DeVINCENZO:  It could mean that, but in

1    terms of reasonable royalty determinations, the market

2    approach involves consideration of the terms of licenses and

3    other transactions involving comparable technology.  So

4    Mr. Bakewell recognized that the objective of his approach

5    was to --

6              THE COURT:  Okay.  So let me cut you short here

7    because as I gather, we have three different things that

8    defendants are offering on this one approach.

9              One has something to do with the financing of

10   ZBand in the approximate time period of 2001.  The second

11   has to do with some sort of purported offer to sell in about

12   2012 by somebody who's connected to AST which talks about

13   high seven figures. And then the third thing is some emails

14   and other stuff after the litigation was commenced where

15   various people or players are busy, for lack of a better

16   word, handicapping the litigation.

17             So you think Bakewell needs all of these things

18   to do a market approach, or can he do it with something less

19   than all of this?

20             MR. DeVINCENZO:  Well, I think the problem is he

21   doesn't identify any comparable transactions.  And if he had

22   one, the question would be:  Is that a proper basis for a

23   reasonable royalty with one?

24             THE COURT:  Well, so --

25             MR. DeVINCENZO:  When he -- sorry.

1            THE COURT:  -- here's my reaction after reading

2     this which is I think the 2001 business is irrelevant

3     because then they're talking about buying a company that has

4     no patents or at least doesn't have these patents.  So when

5     I say buying, investing in.  So I don't know, that just

6     seems to me to be irrelevant.

7            And the third where the people are busy trading

8     shares in ChanBond, it's pretty clear ChanBond's main asset

9     is this litigation.  Then they're just betting on the

10    litigation outcomes, and I don't think that's much of a

11    basis for finding out what a license, which I think is

12    supposed to be in 2012, is supposed to be.

13           On the other hand, if the inventors or their

14    agents offered to sell the patents in 2012 for high seven

15    figures, that seems to me to be a fairly useful data point

16    to try to figure out how much they thought the patents were

17    worth.  And sort of the corollary to that is any license is

18    going to be for less because why would you take a license if

19    you could just buy all the patents for, you know, $10

20    million.

21           MR. DeVINCENZO:  First, I agree with you on

22    points one and three.  With point two, and that's really

23    where our arguments are two ships passing in the night.  The

24    problem with the offer for sale, right now we're not arguing

25    it's inadmissible.  They cited many cases that it could be

1    admissible to show how much the inventors were willing to

2    accept, but it's not a comparable transaction.   No

3    transaction was --

4              THE COURT:  Well, you say that because the terms

5    of the, so to speak, sale were, other than monetary, not

6    mentioned; is that what you're saying?

7              MR. DeVINCENZO:  Even more fundamentally,

8    there's no evidence that anyone even saw the offer.

9              THE COURT:  Well, it doesn't matter, I mean, if

10   the inventors or whoever owned the patent at the time had

11   just had a conversation between the three of them which they

12   memorialized in writing saying how much would you sell it

13   for, how much would you sell it for, how much would you sell

14   it for?  They all said $10 million.  I wouldn't care whether

15   anybody ever saw that.

16             MR. DeVINCENZO:  I understand that, but does

17   that -- you can't then dress that up under the market

18   approach which is an economic principle for valuing assets.

19             THE COURT:  Well, so that's an interesting

20   point, maybe a good point.  Well, I have two questions.

21             One is:  Saying that, does that mean that the

22   question of whether or not the purported offer to sell would

23   come in as a piece of evidence, that that's a separate

24   question from the market approach?

25             And the second thing is, I'm just curious, the

1    income approach and whatever the other approach was that the

2    defendants' expert used, what did the expert conclude about

3    those?

4                    MR. DeVINCENZO:  Their expert concluded

5    royalties of those two approaches as well, but --

6                    THE COURT:  Were they relatively consistent with

7    the "market approach"?

8                    MR. DeVINCENZO:  Relative in the same ball park.

9                    THE COURT:  Okay.  All right.

10                   MR. DeVINCENZO:  And just briefly on the offer

11   to sell, it is a separate question.  More importantly here,

12   there is not a single shred of evidence that one of the

13   inventors made that offer.

14                   THE COURT:  Well, no, I understand --

15                   MR. DeVINCENZO:  It's hearsay.

16                   THE COURT:  -- it was made by some other person.

17                   MR. DeVINCENZO:  Yeah.

18                   THE COURT:  But from what I could tell, and I

19   haven't, obviously, looked through all the different things

20   recited -- well, and maybe I'll give the defense a chance to

21   do this, but I was trying to piece together exactly who it

22   was that made the offer to sell because I had the impression

23   maybe that's not the same person as the one who says I

24   cleared it with the inventors.

25                   MR. DeVINCENZO:  Yeah, because we plan to file a

```
 1    separate motion in limine at the appropriate time on the
 2    offer for sale, but regardless of its admissibility, our
 3    point is that single data point, even if it's admissible --
 4              THE COURT:  Right.  Yeah, one data point is
 5    probably not enough.
 6              MR. DeVINCENZO:  Exactly.
 7              THE COURT:  Well, I'll tell you what,
 8    Mr. DeVincenzo, unless you have something that you're
 9    burning to tell me, why don't I hear from the other side to
10    see whether you actually need to say any of this stuff.
11              MR. DeVINCENZO:  Okay.  Thank you, Your Honor.
12              THE COURT:  All right.  Mr. Enzminger.
13              MR. ENZMINGER:  Good afternoon.  Good afternoon,
14    Your Honor.  Starting from Your Honor's question with
15    respect to the offer for sale, there's substantial evidence
16    that the inventors authorized that offer.  And whether they
17    did or not is a factual question that doesn't go to the
18    admissibility of the methodology used by the expert.
19              So that particular factual question will be up
20    to the jury, or if they move to in limine, up to you to
21    exclude, but it's not a methodology issue.  Clearly experts
22    under the market approach are allowed to use offers made by
23    plaintiff.
24              THE COURT:  And so just to go terminology-wise,
25    is the market approach the same thing that essentially
```

1      happens in a lot of patent cases that basically we're

2      talking about?  And in the normal case, it's comparable

3      licenses comparable economically and technologically, and

4      then you massage it with Georgia-Pacific, and you come out

5      with some number?  Is that --

6                  MR. ENZMINGER:  Sort of --

7                  THE COURT:  -- a different market approach?

8                  MR. ENZMINGER:  It is a little bit different.

9      Certainly a market approach is to consider comparable

10     licenses.  That's one data point that can be considered.

11                 But the other aspect of it is that the market

12     approach also deals with other transactions.  For example,

13     as this Court found in AVM which is cited in our papers --

14                 THE COURT:  Yeah, you know, I remember that.  I

15     don't think it's comparable because there you had the

16     inventor actually selling, trying to sell.  The inventor was

17     also the plaintiff in that --

18                 MR. ENZMINGER:  Right.

19                 THE COURT:  -- trying to sell before, and in

20     fact, actually making some transaction before the litigation

21     began.

22                 MR. ENZMINGER:  That's exactly what's going on

23     here.  So if we go back to the timeline, so there are three

24     sorts of sets of evidence in the report.  You've dealt with

25     your impressions of the first and third, but I wanted to

 1    take just a quick moment.  We have a 15-year period of the

 2    inventors trying to monetize these patents, and they had

 3    several business models.

 4              The first is trying to get investment for the

 5    technology.  The evidence will be that the technology we're

 6    talking about are these patents.  It's not that the

 7    plaintiffs in their motion talk about the fact that the

 8    asserted patents didn't issue until years later, but the

 9    parent patent was applied for right when they formed this

10    company.

11              THE COURT:  But even it hadn't issued at the

12    time; right?

13              MR. ENZMINGER:  Pardon me?

14              THE COURT:  It hadn't issued.

15              MR. ENZMINGER:  It had not.  So they went out

16    into the market and tried to get investment in that idea,

17    the underlying technology.  And they approached 15 to 20

18    companies and said, Here's our idea.  This is what we're

19    working on, and they got no investment.

20              The second set is the inventors -- the second

21    timeline is the inventors trying to sell the patents.  They

22    didn't just try to sell it through the AST brokerage, they

23    also tried to sell them directly to some of the -- to

24    operators.

25              THE COURT:  But nobody was interested; right?

1              MR. ENZMINGER:  No one was interested.

2              THE COURT:  So how does that tell you what a

3    valid and infringed patent would sell for?

4              MR. ENZMINGER:  Because --

5              THE COURT:  I'm guessing Sprint and Verizon, if

6    you said 100 percent what you're doing, this is a valid

7    patent and you're infringed, one would hope that they would

8    not say, sorry, our offer is zero.

9              MR. ENZMINGER:  Offers to sell by the inventor

10   are indicative of value under the market approach, and there

11   are a number of decisions that hold that.

12             THE COURT:  I'm sorry.

13             MR. ENZMINGER:  Yeah.

14             THE COURT:  So here's the thing:  So in 2008,

15   what were they offering to sell the patents for?

16             MR. ENZMINGER:  The patents.

17             THE COURT:  Or what were they offering to sell?

18             MR. ENZMINGER:  I'm sorry?

19             THE COURT:  I'm sorry.  I think we're --

20             MR. ENZMINGER:  We're maybe --

21             THE COURT:  So you said in 2008, what did they

22   offer to sell to Sprint and Verizon?

23             MR. ENZMINGER:  In terms of a dollar value?

24             THE COURT:  I don't --

25             MR. ENZMINGER:  No, what they tried to sell then

1    were these patents.

2              THE COURT:  And they said not interested in

3    buying; right?

4              MR. ENZMINGER:  Correct.

5              THE COURT:  What did they offer to sell them

6    for?

7              MR. ENZMINGER:  I don't have that on the tip of

8    my hand.  Yeah.  They didn't quote a price to Sprint.

9              THE COURT:  So how is an offer to sell without a

10   price being quoted probative of anything?

11             MR. ENZMINGER:  Because it's probative of a lack

12   of interest on the part of the industry that could use it.

13             THE COURT:  Yeah, that seems to me not to be

14   something -- you know, what you're trying to get is what

15   somebody would have paid for a valid and infringed patent.

16   People who don't think it's valid or don't think it's

17   infringed, their opinions don't count.

18             MR. ENZMINGER:  The issue was that there was no

19   interest in the technology by the companies to which it was

20   being marketed.  And when they put it on the AST market

21   price, they did set a price.

22             THE COURT:  Okay.  Well, that's a different

23   thing.

24             MR. ENZMINGER:  Okay.  And they adjusted the

25   price.  So they had two prices over a period of time on the

1     AST marketplace.  And then the third attempted monetization

2     of these patents were when they reached out to litigation

3     funders to sell the patents for purposes of litigation.  And

4     perhaps that's betting on litigation, but there still is a

5     valuation of the patent and what can reasonably be expected

6     to be --

7               THE COURT:  Well, actually --

8               MR. ENZMINGER:  -- recovered.

9               THE COURT:  -- I think litigation funders are

10    actually betting on the value of the litigation, aren't

11    they?

12              MR. ENZMINGER:  Well, in part, but they're also

13    betting on the underlying valuation of the technology

14    because that's what would drive a recovery in the

15    litigation.

16              THE COURT:  So one of the questions I have is

17    Mr. DeVincenzo said, and I'm sure he's right, that the other

18    two approaches to valuation that your expert uses that

19    they're not complaining about come out to more or less the

20    same place in terms of value; right?

21              MR. ENZMINGER:  They're actually a little bit

22    lower, but --

23              THE COURT:  Okay.

24              MR. ENZMINGER:  -- within the order of

25    magnitude.

1          THE COURT:  And so one of the things that I'm

2    wondering is how much of this is really designed to say

3    their technology is worth less is more fitting in with your

4    non-infringement arguments than something that you actually

5    need for damages?

6          Do you understand my question?

7          MR. ENZMINGER:  I do understand your question,

8    but again, that goes to -- that's the interesting thing

9    because it goes to both facts.  The plaintiff's experts

10   have -- I'm sorry, the inventors, and ChanBond, and plus

11   their damages expert have said that they had an expectation

12   of high value for these patents.  And there's no empirical

13   evidence of that from the beginning of the time when they

14   filed them and formed ZBand to the sale in this litigation.

15   All the valuations are, you know, ten orders of magnitude

16   less than what they're claiming.

17         THE COURT:  Well, so I understand why you might

18   say that, and of course, I suppose if the first witness

19   called for the plaintiff in the trial and its inventor says,

20   yeah, we always thought this was a hundred-million-dollar

21   thing, or a billion-dollar thing, or whatever they might

22   say, then I suppose that might open the door to a bit of

23   cross-examination.

24         But just looking at this as a basis for an

25   expert to testify, it seems to me that on your best day,

1    you'd be able to get in actual offers by or on behalf of

2    whoever held the patents at the time to sell them or to

3    license them depending on where you are in the offer to

4    license.  But I do think, you know, the offer to sell has

5    some logical relationship to how much they'd be willing to

6    accept in a licensing negotiation.

7                But I don't think for that, Mr. Enzminger, that

8    you need what the market reaction was.  All you really need

9    to have is what the offers to sell were for; right?

10               MR. ENZMINGER:  Well, that's among the data

11   points, but the fact they couldn't monetize it in other ways

12   as well or at any time in the 15-year program is indicative.

13               THE COURT:  But that just seems like the

14   question of, you know, monetizing it, it seems to me like --

15   I don't have -- and I'm not saying that's what happened

16   here, but that would seem to have a perverse incentive that

17   the industry gets together, says well, we just won't license

18   these patents, and later on, if anyone ever calls us into

19   account, we'll say, Well, look nobody licensed the patents

20   which doesn't seem like a good --

21               MR. ENZMINGER:  That's certainly a

22   cross-examination point, but it doesn't go to the

23   methodology of the market approach which both sides agree is

24   a sound methodology for purposes of rendering a patent

25   royalty opinion.  I mean, certainly they will make that

1    argument.  Certainly, we will counter that argument, but

2    that's not a methodological argument.

3                THE COURT:  All right.  Do you have anything

4    more to say?

5                MR. ENZMINGER:  Not unless Your Honor has

6    questions.

7                THE COURT:  So let me ask you, Mr. Enzminger,

8    how much of these data points do you need or does your

9    expert need to make this market approach valuation?

10               MR. ENZMINGER:  How much does he need as a

11   matter of law?

12               THE COURT:  Well, or as a matter of his

13   expertise.  I mean, in other words, I presume, though I

14   could be wrong, that one data point is not much of a

15   methodological basis for coming to a conclusion.  I mean, I

16   suppose --

17               MR. ENZMINGER:  Well, certainly two gives you a

18   greater degree of certainty.  But in terms of an opinion, if

19   you're talking about a marketplace, and the inventors are

20   willing to sell the patents for a particular price, call it

21   $10 million, it is unreasonable to think that the buyer

22   would then offer more than that.  That's just not the way

23   markets work.

24               So when the plaintiff has made an offer, and

25   they did -- they sold the patent.  They actually had a

1  couple of offers to sell the patents to non-practicing

2  entities, and they also had the AST brokerage which was then

3  sent out to dozens of companies in the industry setting a

4  price.  And then they set a second price a few months later

5  by indicating that their first price was soft.  So that's at

6  least three data points, and I think that's sufficient.

7               Yeah.  The other thing, too, is with respect to

8  the AST, it's a listing.  So it's offers to dozens of

9  companies.  But the salient fact is that the inventors were

10  willing to sell the patent portfolio including, you know,

11  having uploaded claim charts where they accuse the cable

12  modems in this very industry.  Having uploaded all that,

13  putting it on the marketplace, they set a price.  Got no

14  offers.

15               Set a second price a few months later.  Well, it

16  wasn't a second price.  It was still the same high seven

17  figures, but then they agreed that they would take all

18  reasonable offers.

19               So that is indicative of the value that the

20  plaintiff would be able to take in a market approach --

21  would be willing to take in a market approach.

22               THE COURT:  All right.  Anything else?

23               MR. ENZMINGER:  No.

24               THE COURT:  All right.

25               MR. ENZMINGER:  Thank you, Your Honor.

1          THE COURT:  Mr. DeVincenzo, what would you like

2    to say in terms of what Mr. Enzminger was saying about

3    methodology?

4          MR. DeVINCENZO:  He's -- sorry.

5          THE COURT:  No, go ahead.

6          MR. DeVINCENZO:  It is a methodology issue and

7    here's the issue.  Mr. Bakewell is trying to dress up

8    irrelevant data points under the legitimacy of the market

9    approach and under any reasonable interpretation.  These

10   data points, they want to go through all of this with the

11   jury, that they were seeking $2 million in investment to

12   develop a product for development.  I mean, that's entirely

13   irrelevant that -- the Sprint point, well, they tried to

14   sell it.  How much?  We don't know.

15         They have one data.  It's an offer for sale.

16   The inventors never made the offer, but that's a question of

17   admissibility, and we'll argue that then.

18         It certainly isn't proper to take an offer that

19   we don't know if anyone saw.  We don't know if anyone

20   downloaded the claim charts.  We don't know of any infringer

21   who believed the patents were valid and infringed, actually

22   saw the offer and say that puts a cap on damages under the

23   market approach.

24         It just doesn't.  There's no evidence.

25   Mr. Bakewell defined the market approach in his report as

1    requiring comparable transactions.

2              THE COURT:  And I'm sorry to interrupt you, and

3    Mr. Enzminger can chime in on this, too.  For various

4    reasons, I guess I thought I knew what the market approach

5    was.

6              Does the Federal Circuit in some case or cases

7    talk about what kind of stuff can be considered in the

8    market approach?

9              MR. DeVINCENZO:  As to -- the Fed Circuit has

10   discussed comparable actions.  So I read it as Mr. Bakewell

11   has defined the market approach in his report.  But for an

12   agreement to be considered under that approach, it must be

13   comparable as the Fed Circuit has --

14             THE COURT:  But that's just a regular --

15             MR. DeVINCENZO:  Comparable --

16             THE COURT:  -- license or somebody's licensed

17   something, and you're taking license agreements and, you

18   know, massaging them to see what the hypothetical

19   negotiation would do here.

20             MR. DeVINCENZO:  Yes.

21             THE COURT:  But Mr. Enzminger said that's a

22   different market approach than what they're doing here, I

23   think.

24             MR. DeVINCENZO:  I think what they're doing here

25   or what their expert touts as what he's doing under his

1    methodology is he says he's taking comparable transactions

2    and making adjustments to the terms of licensed agreements

3    or other similar types of agreements.  But that's not what

4    he does.

5             The Fed Circuit has said offers for sale are

6    admissible, but they've never said an offer for sale is a

7    comparable transaction.  And that's the difference.

8             And why is it admissible?

9             THE COURT:  So I'm inclined to believe you on

10   that.  Mr. Enzminger, in terms of what the Federal Circuit

11   has said that would support what your expert has done here,

12   do you have some cases?  You don't necessarily have to cite

13   them to me right now, but do you have some cases that say

14   this kind of thing can be used the way your expert's using

15   it?

16            MR. ENZMINGER:  Yes.  Well, there are numerous

17   cases that talk about offers made by the --

18            THE COURT:  Okay.  All right.  And

19   Mr. DeVincenzo just conceded that one.

20            MR. ENZMINGER:  Right.

21            THE COURT:  But this other stuff of either

22   litigation financing, or you know, offers, investment

23   financing ten years earlier --

24            MR. ENZMINGER:  Well, it's not just litigation

25   financing.  It's a sale of the patents to someone who is

1    going to then assert them.

2            But the answer is yes.  Do you have the

3    Smartflash?  We'd be happy to brief this, but *Smartflash vs.*

4    *Apple*, this is an Eastern District of Texas case.  I was

5    actually -- I apologize.  I was trying to find the actual

6    case because it does cite the Federal Circuit.

7            But --

8            THE COURT:  So this is a District Court case?

9            MR. ENZMINGER:  This is a District Court case in

10   the Eastern District of Texas.

11           THE COURT:  Right.

12           MR. ENZMINGER:  But you know, they're talking

13   about the initial investment in technology, the success of

14   the company, offers to sell the patents-in-suit, the

15   relationship of the parties can all be used and allowed this

16   report.  So you know, with the market approach, even a

17   single data point where it's an offer by the patentholders

18   can support the opinion.  In this case, we have more than

19   one.

20           THE COURT:  Right.  Let me just write this down.

21   All right.

22           Well, okay.  All right.  Is there anything more

23   to be said on this particular issue?

24           MR. DeVINCENZO:  Your Honor, I'd just like to

25   point out the case says monetization attempts surrounding

```
 1   the date of the hypothetical.  The monetization attempts
 2   here are ten years prior to the hypothetical, so --
 3               THE COURT:  I appreciate that.
 4               MR. DeVINCENZO:  -- on its face, it doesn't
 5   support --
 6               THE COURT:  Yes.
 7               MR. ENZMINGER:  In this case, it was six years.
 8               THE COURT:  I'm sorry, in this case?
 9               MR. ENZMINGER:  In this particular case where
10   the judge said monetization attempts around the hypothetical
11   negotiation, the date was six years.
12               THE COURT:  All right.
13               MR. ENZMINGER:  So it wasn't exactly.  It wasn't
14   contemporaneous.
15               THE COURT:  All right.  Shall we move on to
16   something else?
17                    When did we start?  Did we start at about
18   3:30?  Why don't we take a short break here.
19               THE CLERK:  All rise.
20               THE COURT:  We'll take a little break.
21               (Recess was taken.)
22               THE CLERK:  All rise.
23               THE COURT:  All right.  Everyone can be seated.
24   Why don't we go to the plaintiff's attempt at excluding the
25   written description opinions of the defendants' expert,
```

1    Quigley?

2                  MR. ENZMINGER:  Okay.  Your Honor, are we going

3    to have a chance to hear the defendants' Daubert on damages?

4                  THE COURT:  We'll do something with that before

5    we're done.

6                  MR. ENZMINGER:  Okay,

7                  MR. PACELLI:  Good afternoon, Your Honor.

8    I'm --

9                  THE COURT:  You're Mr. Pacelli?

10                 MR. PACELLI:  Yes.

11                 THE COURT:  Okay.  Go ahead.

12                 MR. PACELLI:  I don't know if that's a common

13   last name in Delaware.  So I'm going to address ChanBond's

14   motion, Daubert motion on the alternative summary judgment

15   motion regarding Ms. Quigley's opinion.  That's the

16   defendants' expert.

17                 Just a little summary, we started with 12 --

18                 THE COURT:  Right.  I got rid of all the

19   enablement and some of the written description.

20                 MR. PACELLI:  Yes, Your Honor.  So we're left

21   with really two issues.  One is the distribution unit issue,

22   and the second is the receiving channel in use information.

23                 So let me start with the first one.  The issue

24   of the distribution unit has already come up at claim

25   construction.  There was one term, the intelligent device.

1          Defendants proposed a construction that required

2     a distribution unit.  Your Honor rejected that argument

3     because a distribution unit is not a required element of the

4     invention.

5          Likewise, for the wideband signal distribution

6     system term, defendants proposed a construction that

7     included a distribution unit.  It was essentially the same

8     argument they're making now just recast in the claim

9     construction format.

10          Now, when Ms. Quigley was asked expressly

11     whether there was written description for the claims as

12     construed by the Court, for example, a system that

13     distributes signals on a wideband of frequencies, she agreed

14     she did not dispute that.  In fact, she conceded that the

15     patents do describe a system that transmits a wideband of

16     frequencies.  And that was the Court's construction of

17     wideband signal distribution system.

18          With respect to the other term, the intelligent

19     device, when Ms. Quigley was asked whether the inventors

20     were in possession of an invention that distributes a

21     wideband signal as expressly defined by the specification to

22     the Court's order, she agreed.

23          And defendants simply ignore the testimony.

24     Instead, they make an argument based on the Gentry Gallery

25     line of cases.  Now, as Your Honor knows, Gentry Gallery has

1        a narrow applicability.  For each case that follows Gentry

2        Gallery, ten cases go the other way, and there's a reason

3        for that.  The reason is there's a very high bar.

4              The Federal Circuit has explained that Gentry

5        Gallery applies when the disclosure makes crystal clear that

6        a narrow understanding of a claim term is an essential

7        element of the invention.  Now, in this case not only is

8        there no such crystal clear indication, the specification

9        counsels in the opposite direction.

10             And if what follows sounds familiar, that's

11       because the same argument was made in claim construction.

12       So here, one, the specification states that a wideband

13       signal distribution system typically includes a distribution

14       unit.  As Your Honor noted in the claim construction

15       opinion, typical does not mean always.  For that matter, the

16       system also typically includes cables and presumably other

17       things which were known in the art.

18             There is more.  The specification also defines

19       the BUD or the distribution unit.  The two terms are

20       essentially used interchangeably in the specification, and

21       BUD is defined as any type of unit or component for the

22       distribution of wideband signals.

23             So in view of this evidence, even if the

24       distribution units were required, it could be met by any

25       type of unit, or component, or any hardware that performs a

1    function.  So defendants do not explain what difference it

2    would make whether or not the claims recite or do not recite

3    the limitation.

4         So to sum it up, as Your Honor -- as this Court

5    has found in a similar case, in this case, whether or not

6    the claims recite expressly the distribution unit, neither

7    changes how the system functions nor broadens the scope of

8    the invention.

9         So the second issue is receiving channel in use

10   information.  Now, both of Ms. Quigley's challenge opinions

11   relate to receiving the channel in use information.  These

12   are just headings for the two relevant sections of her

13   opening report.

14        So the first problem is that with respect to two

15   of the patents, the '565 and '679, the claims do not require

16   receiving channel in use information.  So the whole body of

17   opinions with respect to those claims, those two patents,

18   two out of three don't apply at all.  And so --

19        THE COURT:  So the '822 patent which, as I

20   understand it, there's only one asserted claim?

21        MR. PACELLI:  That is correct.  The '822.

22        THE COURT:  So let me just ask a question

23   because I really did read these briefs, so I noticed all

24   kinds of little odd things.  And the one thing I noticed

25   that was odd that caught my attention was somewhere, I don't

1    remember where, but somewhere in all this, defendants said

2    something like, and the '822 patent, if it's still in the

3    case at trial.

4            You can save me a lot of effort if you told me

5    you're going to drop it now.

6            MR. PACELLI:  The '822?

7            THE COURT:  Yeah.  Yeah.  You can't answer this

8    question.

9            MR. PACELLI:  I'm sorry.

10           THE COURT:  Are you --

11           MR. PADMANABHAN:  We're the defendants, Your

12   Honor.

13           THE COURT:  Yeah.

14           MR. PADMANABHAN: Are we dropping a defense or

15   are you asking --

16           THE COURT:  Wait.  I'm sorry.  You guys are

17   right.  You're right.  Everybody's right.  I'm wrong.

18           MR. WHITMAN:  Okay.  They missed an opportunity.

19   Yes.  We're going to trial on the '822, Claim 14, the

20   dependent claim.

21           THE COURT:  Okay.  So that footnote that I saw,

22   whatever it was, that was just a teaser?

23           MR. WHITMAN:  I believe so.  That was their

24   footnote.

25           THE COURT:  Oh, is that right?

1                    MR. WHITMAN:  Yes.

2                    MR. ENZMINGER:  Well, there are no damages

3    associated with the '822 according to them with the Teece

4    damages report.

5                    MR. DeVINCENZO:  Your Honor, that's not true.

6    That's just not true.

7                    THE COURT:  All right.  See, I guess I didn't

8    read it that closely because I thought you all were going to

9    drop the '822 patent.  You'd like to.

10                    MR. ENZMINGER:  We're willing to.

11                    THE COURT:  Okay.  Never mind.  Go ahead,

12    Mr. Pacelli.

13                    MR. PACELLI:  So with respect to the '679, again

14    the '679 and the '565 do not require in the claims receiving

15    channel in use information; therefore --

16                    THE COURT:  So actually, hold on.  This was my

17    other thing.

18                    MR. PACELLI:  Yeah.

19                    THE COURT:  So these other two written

20    description arguments only go to this '822 patent?  Somebody

21    on the defense side?

22                    MR. PADMANABHAN:  No, Your Honor.  No.  So Your

23    Honor, they argue that this is only relevant to the '822

24    because where it's not -- it's only relevant to the '822

25    because the word receive is only in there.  They're

1    misconstruing what the argument is all about.

2              THE COURT:  All right.  So thank you.

3              MR. PADMANABHAN:  We'll present it in a moment.

4              THE COURT:  Got it.  Thank you.  Sorry.

5              So Mr. Pacelli, you can respond to that if you

6    want.

7              MR. PACELLI:  Yes.  If I understand that

8    correctly, counsel's argument would be coextensive with

9    their summary judgment motion or written description which

10   is a separate issue.  I understand that Your Honor doesn't

11   want to hear argument on that.

12             THE COURT:  No.

13             MR. PACELLI:  We have plenty of slides and

14   things to say, but --

15             THE COURT:  All right.  So go ahead.

16             MR. PACELLI:  All right.  So second, with the

17   '679, the '679 just recites channel in use information.

18   There is no receiving language here.

19             With respect to the '565, '565 is a little bit

20   more complex.  It recites a processer which is configured to

21   receive channel in use information.  But the processer is an

22   internal component, and it can receive channel in use

23   information from inside the device.

24             In fact, Ms. Quigley's second argument has

25   exactly -- is exactly based on the distinction between

1    receiving the channel in use information from inside the RF

2    system channel detector in the preferred embodiment and

3    receiving it from the outside world.  So there's no dispute

4    that this language does not require receiving channel in use

5    information as Ms. Quigley opined.

6             So if we can skip a few more slides.  Here, the

7    '822.  The '822 does have two receive limitations.  It says

8    receive a modulated RF signal and receive channel in use

9    information.  That is correct.

10            However, if I can go back one slide, Ms. Quigley

11   assumes that the claims of the '822 recites an intelligent

12   device that receives channel in use information on modulated

13   RF signal.  So she conflates these two limitations.

14            However, the claim, if I can put back the claim,

15   says receive a modulated RF signal and receives channel in

16   use information.  There's nothing that connects this claim

17   to the two limitations.  So nothing here says that the

18   claimed channel in use information has to be received on the

19   claimed modulator RF signals.  Defendants did not even

20   address this issue in their opposition brief.

21            There's another issue which is essentially the

22   same that is at issue in defendants' summary judgment motion

23   with written description which is that the addressable

24   device has to be identified by the channel in use

25   information as opposed to the channels.  But Your Honor

1     agrees, I'm going to skip that.

2          So going to Slide 25 here, if one sets aside all

3     these artificial non-existent limitations in the claim,

4     there's no dispute that the specification discloses what the

5     claims recite.  With respect to the '679 and the '565

6     patents, Ms. Quigley -- this is an excerpt from her

7     report -- is conceding that this limitation could be

8     supported by the disclosure to the extent that it requires

9     detecting only whether a channel is being used or not, but

10    that's the claim language.  The only issue is the

11    modulation, but the modulation is not a claim limitation of

12    any patent.

13         With respect to the '565, she goes even further

14    and she states in her opening report that the common

15    specification describes what the claims of the '565 patent

16    require.  Again, the only disagreements are about things

17    that the claims do not -- the claims don't recite.

18         One thing, if I can clarify, if Your Honor has

19    one more minute, the distinction between what the written

20    description summary judgment motion is about and what the

21    Daubert -- ChanBond Daubert motion is about because that's

22    important.  In their summary judgment motion, defendants are

23    arguing that there's no written description for when channel

24    in use information identifies the at least two channels and

25    and so on.

1    So that's about using the channel in use

2  information to control the other elements of the claim which

3  are the modulator unit and combiner, essentially using that

4  information to control those two hardware elements.

5  Instead, Ms. Quigley opined on written description for

6  receiving before the modulation and receiving rather than

7  generating.  So again, as we explain in our briefing, those

8  two issues should be kept separate meaning that we have many

9  more arguments in this Daubert motion than are in the

10  defendants' written description motion.

11    THE COURT:  Okay.  So you know, it's funny.  You

12  have just stood up and argued for summary judgment on these

13  written description issues.  I took the caption of the

14  briefing literally which is it's a motion to exclude the

15  expert opinions of Ms. Quigley or for summary judgment in

16  the alternative.

17    And I spent most of my time thinking about the

18  first part, not the second part.  But you seem to be saying

19  you're perfectly happy with Ms. Quigley's opinions.  They

20  all work with your summary judgment motion.

21    MR. PACELLI:  No, Your Honor, just a slight

22  distinction.  What we're saying is that under the correct

23  construction, because all of Ms. Quigley's opinion are based

24  on an incorrect claim construction.  So because they are

25  legally incorrect and legally flawed, they should be

1    excluded.  And there is no dispute based on those

2    concessions that we just saw here that under the correct

3    construction, there's no dispute that there's written

4    description for the claims.

5                    THE COURT:  Okay.  So one of the things, and I'm

6    hesitant to say that I got from reading the briefs because

7    almost everything I said I got from reading the briefs,

8    you've proved I got wrong.  But I thought I saw somewhere

9    that Ms. Quigley has 26 or 30 different written description

10   opinions.  So maybe she conceded or the defendants on her

11   behalf conceded three of them in this briefing here.

12                   Does that mean that besides from the three

13   things we're arguing about, there's another 20 to 25 written

14   description opinions that she has?

15                   MR. PACELLI:  There are other written

16   description opinions that are not at issue in this motion.

17   Yes, Your Honor.

18                   THE COURT:  Okay.

19                   MR. PADMANABHAN:  I am not sure how accurate

20   that is, Your Honor.  These motions are -- pretty much cut

21   to the core of it.  What we dropped, we --

22                   THE COURT:  Well, you dropped three things.

23                   MR. PADMANABHAN:  Right.  Enablement --

24                   THE COURT:  And you've still got these three.

25   Maybe you have a thing in your other motion --

1           MR. PADMANABHAN:  Right.

2           THE COURT:  -- but I thought I saw somewhere

3    that she had, you know, 24, 26, 28 different --

4           MR. PADMANABHAN:  That's -- I don't think -- I

5    think that's probably plaintiff's calculation.  Between

6    plaintiff's motion and our motion, I think that's

7    effectively the universe of her opinions.  It might be

8    something else out there, but top of my mind, it's pretty

9    much the universe.

10          THE COURT:  All right.  So Mr. Pacelli, thank

11   you.

12          MR. PACELLI:  Thank you, Your Honor.

13          THE COURT:  All right.  Mr. Padmanabhan or

14   whoever.

15          MR. PADMANABHAN:  Can we go back to the slide

16   that you had before?  Andrea, the one before this.

17          MR. PACELLI:  The one before this?

18          MR. PADMANABHAN:  Yeah, that would be helpful.

19   Your Honor, we'll switch to our slide in a minute.  Before

20   we do that, I just want to clarify the record on a couple of

21   things, if that's okay, from some of the previous issues.

22          THE COURT:  Sure.

23          MR. PADMANABHAN:  So I want to make sure there's

24   no misconception.  So one of the questions the Court asked

25   was whether ChanBond's expert, Dr. Nettles, reviewed source

1   code in order to support his opinion.  He did not.  There is

2   no source code review involved in this case in the sense

3   that Dr. Nettles has not based any of his opinions on source

4   code.

5           So it's important because these are computer

6   devices, and obviously, computers run on code.  So that's

7   not the basis for his --

8           THE COURT:  I take it neither side has looked at

9   the code and is relying on that for anything.

10          MR. PADMANABHAN:  No, although defendants have

11  data that support their position, so --

12          THE COURT:  But in terms of does source code

13  matter to either side here, you're telling me no?

14          MR. PADMANABHAN:  No.  I just don't want there

15  to be a misconception.

16          So second, I think that -- well, we'll just

17  leave it at that.  Let me go over some housekeeping matters.

18          Your Honor had asked about case cites with

19  respect to defendants' written description motion --

20          THE COURT:  Yes.

21          MR. PADMANABHAN:  -- and whether or not a motion

22  or a motion of this sort could be supported without an

23  expert opinion and whether there are cases that cite that.

24  So as an initial point, in our footnote three of our reply

25  brief, we make clear that ChanBond conceded that we, in

 1     fact, did cite opinions from Ms. Quigley.  We cited summary

 2     paragraphs, but they're lengthy opinions in there on the

 3     exact --

 4               THE COURT:  Not in her opening brief.

 5               MR. PADMANABHAN:  Maybe not in her opening

 6     brief, Your Honor.

 7               THE COURT:  Well, her reply brief is too late.

 8               MR. PADMANABHAN:  Understood.  Understood, Your

 9     Honor.  But in opposition to their brief as well, we've

10     cross moved.  Right.  But there are cases, and so in talking

11     about University of Rochester which we cite --

12               THE COURT:  That's a 1992 case or so?

13               MR. PADMANABHAN:  No.  2004, Your Honor.

14               THE COURT:  Hold on just a minute.  There was

15     some case that involved the compound that I think was X2.

16     Was that the University of Rochester case?

17               MR. PADMANABHAN:  I wish I had a memory like

18     that.  Is that right?

19               MR. REISNER:  You're probably referring to

20     Cox-2.  That would be University of Rochester.

21               THE COURT:  Okay.  Thank you.

22               All right.  So that's the case that you cited in

23     the briefing.  Is there something more?

24               MR. PADMANABHAN:  There is an additional case

25     that was cited in our reply brief, and that's *Turbocare*

1    *Division of Demag vs. General Electric*, 264 F. 3d 1111.  And

2    that's --

3                    THE COURT:  Sorry.  Can you just say that again?

4                    MR. PADMANABHAN:  Sure.  264 F. 3d 1111, and

5    that's a Federal Circuit case from 2001.

6                    THE COURT:  And that's a case where the District

7    Court or perhaps the Court of Appeals, but someone said

8    lacks written description, and there was no expert testimony

9    to support that?

10                   MR. PADMANABHAN:  That's right.

11                   THE COURT:  Okay.

12                   MR. PADMANABHAN:  So look, Your Honor, here

13   ChanBond's argument on this concept of receiving channel in

14   use information before the RF signal is demodulated, they

15   say that that's decoupled from our addressing argument, that

16   has nothing to do with the issue on which we moved.

17                   It is exactly the issue on which we moved.

18   Okay.  This is what I'd like to call lawyer confusion.  So

19   here's the issue.

20                   So this is the claim language.  When the channel

21   in use information identifies the at least two channels as

22   containing information addressed to the at least one

23   addressable device, long phrase, but simply put, you've got

24   to know the channel's got data for this particular

25   addressable device.  Right.

1          So Ms. Quigley offers opinions on this, and what

2   she says is you can't know what's on the channel unless you

3   demodulate the data and look at the information.  It's

4   simple.  It's like putting stuff in an envelope.  That's

5   what modulation is like.  Unless you open up the envelope,

6   there's nothing on the envelope that says what's inside.

7   Unless you open up the envelope, you don't know what's

8   inside.  You don't know what device it's for.

9          That's --

10         THE COURT:  Can you just go back to the claim

11  language?

12         MR. PADMANABHAN:  Sure.

13         THE COURT:  And so how is your envelope example

14  related to this?

15         MR. PADMANABHAN:  So let me show you a figure

16  from the patents that will help.  Okay.  So there's a system

17  with many of these intelligent devices, right, and they're

18  channels coming in where it says inputs will be multiple

19  channels.  And that intelligent device needs to know if it's

20  receiving channels that contain data for that addressable

21  device in purple that sits behind it.

22         And what Ms. Quigley says is that device, it

23  can't know because it's a modulated RF signal without doing

24  that demodulation.  It's got to receive information --

25         THE COURT:  Does the claim say it has to know,

1       or does it just say it has to have the information?

2               MR. PADMANABHAN:  So it just says that the

3       channel in use information identifies.  So it's got to have

4       something called channel in use information that identifies.

5       Now, the only disclosure of channel in use information in

6       the entire specification is a single usage of the term.  It

7       is unrelated to even receiving data which is what this claim

8       is about.

9               Single usage.  The only thing that is disclosed,

10      if I can get there, Your Honor, is this thing here, an RF

11      channel detecter.  And what Ms. Quigley opines is based on

12      her knowledge, a person of skill in the art, that thing

13      doesn't tell you, cannot tell you if you're getting data, if

14      you have data on a given channel for an addressable device.

15              THE COURT:  But for the signal, whatever it is,

16      whatever the data is that's coming through --

17              MR. PADMANABHAN:  Down here?

18              THE COURT:  Somewhere down there.

19              MR. PADMANABHAN:  Yeah.

20              THE COURT:  Doesn't this have the address

21      information --

22              MR. PADMANABHAN:  Ah.

23              THE COURT:  -- somewhere in it because how

24      otherwise does it know where to go?

25              MR. PADMANABHAN:  Exactly, Your Honor.  That's

1    the problem.  So this thing first needs to figure it out and

2    then tell this DSP.  And it tells the channel, the

3    demodulator which channels to demodulate.

4            That's what the claim requires.  The claim

5    requires that the demodulation, and the combining, and then

6    the output to the addressable device are all pegged to this

7    channel in use information and knowing that it's going to

8    that particular addressable device.

9            Now, the problem is Ms. Quigley says there's

10   nothing in the spec that teaches that this thing can do it,

11   and a person of skill would know looking at this that it

12   can't do it.  So they've essentially drawn claims that are

13   much broader than what are disclosed.

14           So what's their argument?  Their counter to

15   this, their counter is it doesn't matter.

16           Let's fast forward actually.  The counter is it

17   doesn't matter.  The counter is that if you've got Channel A

18   and Channel B coming in, you've got a network of these

19   intelligent devices if you've got Channel A and Channel B

20   coming in.  And the channels are carrying data only for

21   addressable device number two, okay, not addressable device

22   number one, not what's behind intelligent device number one.

23           All intelligent device number one needs to know

24   is that it's got data for devices in general.  You just need

25   to know that these channels carry data for devices as

1    opposed to the devices that sit behind it that it's going to

2    output data to.  Okay?

3              Now, why does that not work?  Why can't that

4    satisfy the written description?  Because that's not what

5    the claim says.  If you look at the claim, it's very clear.

6    You've got a demodulator unit configured to demodulate these

7    two channels when this channel use information is there,

8    identifying it.  You're going to combine the data on that

9    condition, and then you're going to output the digital data

10   to the at least one addressable device.

11             So based on this information, it knows, okay,

12   I've got device from my data, or I've got data from my

13   device on this channel.  I'm going to demodulate it.  I'm

14   going to combine it.  I'm going to send it out to my device.

15             Now, importantly, Your Honor, for purposes of

16   102 and 103, because obviously this limitation is in play

17   for all issues.  They take a different position.  So for

18   112, they say it doesn't matter if that channel in use

19   information identifies a specific device.  As long as you

20   know you've got channels with data, that's enough.

21             For 102 and 103, for devices where you just

22   assign a channel and you don't identify a specific device

23   behind it, they say that doesn't satisfy the limitation.  So

24   they're taking contradictory positions just to salvage the

25   claims in 112.

1            So this is a patent called the Amit patent where

2    the cable modem is assigned channels.  And what does Dr. Axl

3    say?  You have to have a combiner that relies on this

4    channel in use information to know what to combine.  Is that

5    a fair way of summarizing it?  I'm referring to his opinion

6    there.

7            He says, Well, the first part of the limitation

8    says you need to have a combiner that's configured to

9    combine.  But the extra part of that limitation is what's

10   missing.  If it's sufficient to have a demodulator and a

11   combiner, you don't need the extra stuff in the claim.  He's

12   talking about saying if you know the channels demodulate and

13   combine, that's not enough.  You need to know what's going

14   to that addressable device behind you.

15           And that's what we're saying is that the patent

16   does not teach -- there is not a single spec -- I would

17   actually challenge you to identify disclosures in the

18   specification that teaches for an intelligent device that's

19   receiving data, it's going to identify the address of a

20   device behind it.

21           THE COURT:  Okay.

22           MR. PACELLI:  Your Honor, may I respond?

23           THE COURT:  Sure.

24           MR. ENZMINGER:  Your Honor, they presented three

25   arguments.  Mr. Padmanabhan responded to one of them.

1    Mr. Retsky would like to respond to the other two.

2              THE COURT:  Okay.  So Mr. Pacelli, let me give

3    counsel here an opportunity to say something.

4              Mr. Retsky.

5              MR. RETSKY:  Thank you, Your Honor.  So Your

6    Honor, the two issues that Mr. Pacelli raised are what I'd

7    like to address next.

8              So do you have that clicker?  And we'll look at

9    the intelligent device issue first.  This impacts all three

10   of the patents at issue.

11             Now, counsel went all the way back to claim

12   construction, and I want to raise another part of the claim

13   construction process that I don't think counsel highlighted

14   or appreciated.  Our point is when we were at Markman, the

15   parties were advocating different scopes of the claims.  The

16   plaintiff was advocating a broad scope.  They were asking

17   for plain meaning on intelligent device and wideband signal

18   distribution system.  Those are the two key terms here for

19   this Daubert motion.

20             The Court pretty much adapted to the broader

21   construction that the plaintiff was proposing.  So it got --

22   it succeeded in Markman.  It was advocating for broad claim

23   scope, and the Court granted that breadth.

24             So what happens next?  Let me skip to -- there's

25   actually a case that they cited in their brief that

1    addresses this very situation.  In fact, it poses the

2    dilemma.  The irony of this situation is that Liebel

3    successfully pressed -- it had -- its claim included

4    jacketless systems.  This was about syringes.

5         But having won that battle, it then had to show

6    that such a claim was fully enabled, and that's what it

7    couldn't do.  So be careful.  If you ask for broad scope,

8    you still have to have a patent disclosure that supports

9    that breadth.

10        Now, we found, Your Honor, that that actually

11   wasn't the only case that came out this way.  That was a

12   Federal Circuit case.  Another Federal Circuit case, this is

13   a quote from the District Court decision, and I have a copy

14   of that that I'm happy to hand up.

15        THE COURT:  No.  No, that's all right.  I've got

16   access to Westlaw.

17        MR. RETSKY:  Okay.  You're more than welcome to

18   a copy, counsel.

19        Similar situation.  They're saying, here again,

20   doesn't this sound familiar, we're rehashing old claim

21   construction arguments.  That's what they want to try to

22   make this into.  No.  There's a subtlety here that I don't

23   think they're appreciating.

24        THE COURT:  Well, no.  I mean, somebody cited

25   this case, American Hooks.  I'm probably not pronouncing it

1   right.  I think they cited it for essentially the same thing

2   that if you get broad claim construction, then you create

3   possible written description issues.

4               MR. RETSKY:  Right.  Exactly.  So that's our

5   point, Your Honor.  The Court's construction tells us

6   intelligent device is not limited to transmitting into a

7   distribution unit and addressable devices.  It's broader

8   than that.  Okay.

9               Ms. Quigley lived with that.  She honored Your

10  Honor's constructions.  She said based on those

11  constructions now, what is the claim scope, and is there

12  written description disclosure to support that breadth?

13  Okay.  Because the scope had already been determined.  She

14  wasn't arguing different claim constructions.  She wasn't

15  trying to change the claim constructions.

16              She was applying your claim constructions and

17  saying, okay, that's pretty broad.  Does the specification

18  support that breadth?

19              So the prosecution -- let me just cut ahead

20  here.  The intelligent device requires an intelligent

21  distribution system.  As you can see -- I don't know if I'm

22  working it.  Here you go.

23              Taking digital signals off of a wideband signal

24  distribution system.  Okay.  And Your Honor is right, it

25  says typically includes a distribution unit.

1          Now, the claims don't have the distribution

2    unit, so it's broader than that.  And that's what

3    Ms. Quigley was talking about.  If you can see the original

4    claim from the first patent, it's not in this case, the '918

5    patent.  It had a wideband distribution unit element.  If

6    you look at the '679 patent, that's not there any longer.

7          So these claims are broader.  They've been

8    construed broader.  So what Ms. Quigley was opining on, is

9    there sufficient disclosure in the specification to support

10   now that breadth?  That's what we believe she should be

11   entitled to testify about.

12          In the prosecution history, the patentee also

13   distinguished what the prior art was which did not have a

14   distribution unit.  In order to get their invention, the car

15   path was cited.

16          THE COURT:  Yeah.  So as I told Mr. Pacelli, I

17   wasn't looking at this in so much as a summary judgment

18   argument, but I'm pretty sure that the written description

19   argument, what's in the prosecution history is irrelevant.

20          MR. RETSKY:  Okay.  Let me just cut to the chase

21   here because I think that's kind of what you've been asking

22   for all afternoon.

23          Ms. Quigley's opinions are directed to this.

24   The inventors did not possess an intelligent device that

25   transmits to and receives from a cable network, okay,

1    without the presence of an intervening distribution unit.

2              Ms. Quigley, as a person of skill in the art,

3    wants to testify that here's what a person of ordinary skill

4    in the art would, in fact, understand based on this

5    disclosure.  And there's a gap.  That's the point.

6              The wideband signal distribution systems as

7    controlled as construed is broad enough to encompass cable

8    networks.  That's what the plaintiff is trying to do here

9    based on that construction that they have.  But cable

10   networks, they have specific properties that are nowhere

11   disclosed in the disclosure of the patent.

12             So a person of ordinary skill in the art, in

13   other words, would read that disclosure and not come to the

14   conclusion that it supports a scope as broad as connecting

15   directly to the cable networks.  That's the point of her

16   testimony.  She's a person of ordinary skill in the art.  We

17   believe she should be entitled to tell the jury.

18             THE COURT:  Well, I have a lot of doubts about

19   this sort of testimony because it seems like it's basically

20   comparing the written description with the accused products

21   which I also don't think is something you do on written

22   description.  You know, I had understood the argument to be

23   that, yes, broad claim scope, the patent teaches

24   distribution units.  It says typical.  That's where you get

25   the broad construction.  It doesn't say anything else.

1           And so there's some line of cases or some cases

2    somewhere that kind of say if you're going to -- you know,

3    I'm simplifying here -- two ways to do something, and the

4    only way you say is way A, but you give no description on

5    way B, then you have a written description problem.

6           MR. RETSKY:  Right.

7           THE COURT:  And so the issue here, I think, or

8    thought was the references to distribution units that, you

9    know, somehow or another, you were then trying to tie that

10   within -- that no other way to do this is shown, so a POSITA

11   reading the specification would say, gee, there's no other

12   description of how to do this; and therefore, it's invalid.

13          I mean, isn't that what you're trying to do

14   here?

15          MR. RETSKY:  Yeah. Let me unpack that a little

16   bit because I think there's two issues in there.  And I

17   think the case that they're arguing is the Inline case.

18          THE COURT:  Right.

19          MR. RETSKY:  Okay.

20          THE COURT:  That's from this district; right?

21          MR. RETSKY:  Right.  So I think we have maybe

22   confused the issue a little bit.  The plaintiff wants to say

23   that what we're trying to argue is that the written

24   description doesn't disclose the accused products, but

25   that's not our argument.  Okay.

1          What we're saying is we know what the written

2     description is.  It's the patent.  It's on paper.  We don't

3     know until we're in front of you what the scope of the

4     claims is going to be ruled to be.  So we have a Markman

5     hearing in front of a District Court judge, and the Court

6     tells us, based on the specification, I'm not looking at

7     that so much.  But on the claims, this is the breadth of the

8     claims.

9          THE COURT:  Right.

10          MR. RETSKY:  You'll see arguments from both

11     sides.  You decide.  The Markman said that.  The Supreme

12     Court said, You get to decide the scope of the claims.

13          THE COURT:  Right.

14          MR. RETSKY:  Okay.  Now, going back, what we're

15     saying is, uh-oh, the scope doesn't match the disclosure.

16          THE COURT:  Right.

17          MR. RETSKY:  And all Quigley is trying to do is

18     point out the differences, and why a person of ordinary

19     skill in the art in her position reading that disclosure

20     would not know how to connect directly to a cable network,

21     which is how they're trying to read the claims, without the

22     presence of a distribution unit.

23          There isn't disclosure that supports the absence

24     of a distribution unit.  That's kind of related to our 112

25     motion for summary judgment.

1          So let me get to the other issue.  This relates

2     to just the '565 and '679 patents, a little more subtle of

3     an issue.  The issue, as Mr. Pacelli kind of explained it,

4     the focus is on receiving, okay, that's in the claims.  This

5     part doesn't relate to '822, because as Mr. Pacelli said,

6     the '822 patent claims have receiving in the claim language,

7     but the other two patents don't.

8          And what -- in real short terms without --

9     trying to cut to the chase here as quickly as possible,

10    they -- well, let me do this.  The disclosure that is in the

11    patents is right here, and it discloses a detecter, a

12    channel detecter.

13         Now, that's not receiving.  And what Ms. Quigley

14    includes in her reports is why isn't that detecting

15    different than receiving?  And she goes into a lot of detail

16    on why simply having a channel detecter does not satisfy

17    receiving, and they don't show any other way other than the

18    detecting.  She talks, for example, about carrier sends

19    versus receiving, and that's the point on the detecter.

20         THE COURT:  So just going back to the last

21    diagram, there she's saying the channel detecter doesn't

22    receive channel in use information?

23         MR. RETSKY:  It detects a signal.  This is kind

24    of wrapped up in the address question that you were just

25    talking about with my co-counsel.  It's designed to detect

1   whether a wire is hot or not.  If there's something on it,

2   you can detect it and know, yeah, there's information on

3   there, but that's all it does is detect.  It's --

4              THE COURT:  But before it can detect, doesn't it

5   have to receive a signal?

6              MR. RETSKY:  It does receive it.  It does

7   receive it, and it receives it here at the distribution unit

8   as it's shown, and the signal comes in.  It's split.

9              Some of it goes off to the TV which is not part

10  of this case.  The other part of it, the channel detecter

11  detects is there information on that wire.  It doesn't know

12  what the information is.

13             So our point is, okay, the '822 patent has

14  received in it.  The other two patents don't.

15             THE COURT:  But just to go back there, if you

16  don't mind, for a second, just remind me:  What is it that

17  is being received for what you say there is no written

18  description?

19             MR. RETSKY:  So it's receiving channel in use

20  information.  That's the whole point here.

21             THE COURT:  And what you're saying is a signal

22  going through the channel detector has channel in use

23  information.  The channel detecter just doesn't read it.

24  It's just saying hot, or I don't know what it's saying.

25             But why isn't it literally receiving it if the

1    signal is coming into it from the RF splitter?

2              MR. RETSKY:  And if you take that approach,

3    that's fine.  The other two patents don't even have the

4    receiver in them, so there's no way of knowing.  The claims

5    are so broad, the channel in use information can come from

6    anywhere.

7              But the written description doesn't tell you how

8    to do that.  All it shows you is this detecter which maybe

9    arguably is enough to satisfy receives.  We might disagree

10   on that.  That's claim 1, and that's the '822 patent, and

11   we're not focusing on that.

12             But for the '679 and the '565, there's not even

13   received in the claims.  So how do you get the channel in

14   use information?  There's no teaching on how to do that.

15   It's not part of the patent disclosure.

16             THE COURT:  All right.  Do you have anything

17   more?

18             MR. RETSKY:  No.

19             THE COURT:  All right.  Thank you, Mr. Retsky.

20             MR. RETSKY:  Thank you.

21             MR. PACELLI: Let me start going to channel in

22   use information.  Let me start with this one.

23             THE COURT:  Okay.

24             MR. PACELLI:  This is something that came

25   from -- it's a different Gentry Gallery type of theory --

1          THE COURT:  Okay.

2          MR. PACELLI:  -- where the preferred embodiment

3     uses a RF channel detecter, and now defendants are arguing

4     that without reciting a particular way of obtaining that

5     channel in use information in the claims that don't require

6     any receiving or any -- that don't further limit channel in

7     use information, there is allegedly no written description.

8          It's not clear what's this essential element,

9     however you want to call it, Your Honor, that's missing, but

10    there's certainly nothing in the specification that

11    indicates that this generating is so key to the invention

12    that the claims are invalid because they don't recite it.

13         And the law is clear, and we cited, I think the

14    ScriptPro case in our brief that says that inventors are

15    free -- unless something in the specification contradicts

16    it, they're free to pick whatever limitations they want to

17    include in the claim.  In this case, the '565 and the '679

18    simply recite channel in use information.  '822 recites

19    receiving, but that's -- defendants are not arguing written

20    description under this argument for the '822.

21         And again, here the inventors were perfectly

22    free to claim other aspects.  Those are long claims, by the

23    way, Your Honor.  They recite many other limitations.  They

24    just don't recite the detecting step.

25         If I can go back to -- okay.  Counsel challenged

1    us to find a single disclosure in the specification that

2    supports the one channel in use information supports -- it's

3    supported.  Now, as Your Honor knows, there's no requirement

4    that the specification uses the same exact words of the

5    claims.

6                THE COURT:  This is the famous Latin in --

7                MR. PACELLI:  Exactly.  Now, but the main

8    problem, before we get to that, is that defendants are

9    basing their argument on a misunderstanding of the claim

10   language.

11               For example, here they're saying that channel in

12   use information identifies which channels have information

13   addressed to one of the intelligent devices, addressable

14   devices.  That is incorrect.  That is not the claimed

15   device.

16               Let me put the claim up, and then I'll try to be

17   brief in explaining how that's supported by the

18   specification which was a whole other motion that I

19   understand Your Honor doesn't really want to hear about

20   given the late hour.  So --

21               THE COURT:  Actually I wouldn't want to hear

22   about it if it was not a late hour.

23               MR. PACELLI:  So I'll keep it very brief.  The

24   claim recites at least one addressable device.  This is

25   claim 12 of the '679.  The '822 has similar limitations.

1            That's a set of one or more addressable devices.

2    The same limitation is repeated twice.  At least one

3    addressable device which means the set or one or more.  The

4    claim never calls out any one individual addressable device.

5    The claim does not require the channel in use information to

6    provide an address to reach one of these addressable

7    devices.  It always calls out the set as a whole.

8            What we call the collective, and I have to

9    explain that word.  Here the claim requires channel in use

10   information to identify channels.

11           Now, next slide.  Okay, here.  This is Figure 5.

12   It's just one of the embodiments.  It's a representative

13   embodiment.

14           What the claimed intelligent device does for the

15   '679 and '822 patents is provide the path from the element

16   38, which is the network connection on the right, to the

17   collective addressable devices on the left-hand side.  It's

18   the big red oval that represents the set of devices.  That's

19   the one or more addressable devices attached to the

20   intelligent device.

21           We use the word collective simply to mean set.

22   That's a set of intelligent -- of addressable devices which

23   are attached to the intelligent device where it is to the

24   left of the intelligent device.  So we never said that

25   collective means as -- there was some confusion in

 1    defendants' reply brief.  They understood collective to mean

 2    the universe of all addressable devices whether or not they

 3    are attached to the claimed intelligent device.

 4              That is not what we meant.  That's not correct,

 5    Your Honor.  By collective we mean the set or at least one

 6    addressable device.

 7              Now, how to deliver data to one of the

 8    addressable devices is not claimed.  The claims -- the

 9    asserted claims never call out any one addressable device.

10    They just don't require an address.

11              I have -- maybe I can find one slide that shows

12    how the claims support it.  Here.  On the left you see a

13    blowup of the preferred embodiment.

14              I don't want to take 20 minutes of Your Honor's

15    time to explain how it works, but just in a nutshell, let's

16    compare the claim to the preferred embodiment of Figure 5.

17    This is the demodulator unit 220, and that's explained in

18    our briefs.

19              There is a combiner.  First combiner, element

20    212.  There are three other elements here.  The DSP 420

21    which is kind of the brains of the system.  You have an RF

22    system channel detector which updates DSP with which

23    channels are bringing information in intended for the

24    addressable devices.  Addressed to the addressable devices.

25              And finally, there is element 14 which is a

1   bandpass filter.  As the name suggests, that's a filter that

2   lets some channels pass through and blocks others.  It's a

3   gate.  So when the gate opens, when the channel using

4   information identifies certain channels that contain

5   information addressed to the addressable devices, as a

6   whole, as a set, then the gate opens, and that's what the

7   claim requires.  The demodulator unit and combiner are

8   reached by the channels by certain channels only when the

9   channel in use information, which is in the brink of DSP

10  420, identifies those channels as containing information on

11  at least one addressable device.  And that's how it works.

12          I hope I kept it short enough, Your Honor.

13          THE COURT:  Okay.

14          MR. PACELLI:  Very quickly on the channel in use

15  information issue, counsel pointed to alleged contradictions

16  between invalidity, and sorry, different invalidity

17  positions under 102, 103 and 112.  I don't remember that in

18  the briefing, but at best it would be fodder for cross, Your

19  Honor.

20          THE COURT:  Okay.

21          MR. PACELLI:  And I'm talking about the

22  defendants' written description motion.  I'm not talking

23  about our counter written description motion.

24          Now, regarding the -- can we switch to the other

25  presentation?  And the reason why I'm pointing out that the

1  difference between the two summary judgment motions and

2  written description is that our motion is based on

3  Ms. Quigley not having applied the correct claim language so

4  that there is a legal -- a full legal nature that goes

5  beyond any disagreements between the -- if I can get this to

6  work.

7           Okay.  Now, on the distribution unit argument,

8  counsel mentioned the Liebel-Flarsheim argument case.  If I

9  recall correctly, that's an enablement case.

10          THE COURT:  Yeah, it did say enablement, but

11  it's the same idea.

12          MR. PACELLI:  Yeah, so looking at that case, the

13  case was -- the reason why I'm pointing it out was that in

14  the case, there was testimony, if I recall correctly, from

15  plaintiff that they could not make the device at the time of

16  the invention without the claim limitation.  That was a

17  unique fact that went to enablement.  That's why there was

18  an enablement issue, Your Honor.

19          So likewise, let me go -- see if I can go to --

20  sorry.  Still remaining on enablement, if I can get to the

21  right slide.  Slide 28.  Twenty-nine actually.

22          So again, counsel has mentioned all these

23  features, you know, this information on master slave, and so

24  on and so forth.  These -- as Your Honor observed, these are

25  features of the accused products.  They're not claim

1    limitations.  And it's important to note, since we're

2    talking about enablement, that these were really opinions --

3              THE COURT:  Aren't we talking about written

4    description?

5              MR. PACELLI:  Sorry?

6              THE COURT:  Aren't we talking about written

7    description?

8              MR. PACELLI:  No, because we're mentioning

9    enablement in reference to the Liebel-Flarsheim case.

10             THE COURT:  Okay.

11             MR. PACELLI:  These were really opinions related

12   to enablement.  And finally, counsel distinguished the

13   Inline case.  I would refer Your Honor to the Hologic case

14   which we also cite in our brief, and it stands for   the --

15             THE COURT:  All right.  So I think we need to

16   end, Mr. Pacelli.  Thank you.  Why don't you have a seat.

17             We're just going to take a very short break.

18   Then I'll come back.  Maybe I'll rule on a couple of these

19   things, maybe I won't.  And we'll figure out what to do

20   about plaintiff's damages expert, but we won't be much

21   longer.

22             Okay.  So we'll just be briefly in recess.

23             THE CLERK:  All rise.

24             (Recess was taken.)

25             THE COURT:  All rise.

1          MR. PADMANABHAN:  Your Honor, do I win by

2    default?

3          THE COURT:  No, but we'll wait.  Do you have one

4    of these?

5          MR. PADMANABHAN:  I do, Your Honor.

6          THE COURT:  Because I think we got -- actually,

7    I don't know who's -- no.  Defendants, I've got yours.

8    Actually, I've got yours.  It's the plaintiffs that I don't

9    have.

10          Do you all have a binder of slides?

11          THE REPORTER:  I have an extra one.

12          MR. WHITMAN:  Yes.

13          THE COURT:  All right.  In terms of the

14    defendants' motion on plaintiff's damages expert, Mr. Teece,

15    one of the things that I'm curious is:  Are the inventions

16    in the three patents at issue, are they different inventions

17    in the three patents?

18          MR. DeVINCENZO:  Your Honor, they cover the same

19    server and the non-infringing alternatives are identical for

20    each one.

21          THE COURT:  All right.  But my question is:  Are

22    they the same invention?

23          MR. DeVINCENZO:  Well, they cover the same

24    intelligent -- the same things pretty much.  I mean, the

25    same server software is how I would say it.

1            THE COURT:  Well, okay.  So one of the questions

2    I have is whether, you know, given the Federal Circuit's

3    decisions in the not too distant past about you're supposed

4    to be measuring the footprint of the patent, and they seem

5    to be directed, at least a little bit, to different things,

6    whether you can say that they all have the exact same

7    footprint which is what your damages expert seems to say.

8            And in regards to what your damages expert had

9    to say, I wasn't too concerned about his use of industry

10   data.  But what I wanted to do is basically schedule a time

11   for him to come and testify so that I can sort of make sure

12   that I'm satisfied about his apportionment, and that he's

13   properly measuring the scope of the invention and not

14   something broader.  So we're not going to be able to figure

15   out that date today, but my staff will be in touch.

16           I would imagine approximately a half hour for

17   direct and a half hour for cross of this thing.  And it's

18   possible, though, because I think sometime in January we

19   have some, I guess, trial conference, the thing where I'm

20   supposed to decide consolidation.  Possibly, if he's

21   available then, that would be a good time to do it.  But you

22   can, you know, think about it.

23           But I'm not really interested in hearing from

24   him about the industry data.  I'm interested in hearing from

25   him about the apportionment issues.

1      So in terms of the other things that I've heard

2   today or haven't heard -- by the way, you all can sit down.

3   Sorry about that.

4      The motion of defendants for summary judgment

5   and no infringement of the ChanBond patents, I think there's

6   a disputed material fact about whether or not the infringing

7   or the accused infringing products meet the when limitation.

8   I thought that the toll road example when you have a car in

9   the lane, and they skip that, that seemed to me to be

10  arguably meeting the when limitation.

11     In terms of the combiner, I'm not convinced that

12  the plaintiffs have no evidence that the defendants meet the

13  combiner limitation.  So I'm going to deny the motion for

14  summary judgment of no infringement of the ChanBond patents.

15     For the motion for summary judgment of

16  invalidity based on attorney argument and the case that I

17  guess you all are calling the University of Rochester case,

18  I think that's a fairly unique situation and -- oh, yeah,

19  *University of Rochester vs. G.D. Searle.*  Yeah, I thought

20  the Searle patent that proves that it has a lack of written

21  description, I thought that was a pretty unique situation.

22     I do understand I've been cited another case,

23  but from reading it, I was certainly not convinced that the

24  defendants had proven by clear and convincing evidence that

25  I should grant that motion.  So I'm going to deny it.

1    In terms of what I've just heard about

2  Ms. Quigley and the written description opinion she has, I'm

3  going to take that under advisement.  You know, I read the

4  briefs looking at different things and what you've been

5  arguing about today, so I need to take that under

6  advisement.

7    And in terms of the plaintiff's motion about the

8  defendants' damages expert, I'm going to take that under

9  advisement because I want to see what Judge Gilstrap said in

10  Smartflash and maybe think about that.  But my opinions

11  going into this argument, which haven't for the most part

12  changed during the course of the argument, is that what

13  happened in 2001 when the inventors were trying to do a

14  start-up company and get investments in their company to try

15  to make a product, and they didn't have the patents that are

16  at issue in this case.  I just think there's no

17  comparability there that gives it any weight, and that

18  there's been no showing of any comparability.

19    You know, we're not talking about patent

20  licenses.  We're not talking about licenses.  We're not

21  talking about selling a company that has patents at issue

22  here, so I think that's going to be out.

23    You know, my impression of what I've called the

24  litigation funding arguments that are the most recent in

25  time is that that's extremely remote from actually valuing

1    the patents.  You know, one most directly evaluates, and I

2    think it's basically done by lawyers and people who think

3    they have some knowledge of the legal system is they're

4    evaluating litigation.  And to the extent that that puts a

5    value on a company, it puts a value on the litigation which

6    is at least one and maybe two steps removed from what the

7    patents are actually worth.

8          So you know, as it seems to be the case,

9    everyone agrees if something is an offer to sell close

10    enough to the right time period, that is, at a minimum, a

11    relevant data point.  I'm not entirely sure whether that's

12    enough by itself to come up with some market approach.  I'd

13    be kind of inclined to think that even if that supplies a

14    value for a market approach, that I'd be inclined to exclude

15    it under Rule 403 because defendants don't have any great

16    need of the market approach considering they have two other

17    approaches.  And there's a Third Circuit case which might be

18    called *United States vs. Driggs* that says one of the things

19    you take into account in Rule 403 balancing is how much the

20    party that wants it, wants something, needs it.

21          The second thing is that I think to the extent

22    that the offers to sell are actually combined with responses

23    from the marketplace, I think that's incredibly prejudicial

24    given that there's going to be, at least the suggestion,

25    even if it's never expressly stated by defendants, that the

1    response to the marketplace, you know, essentially showed

2    that it's going to be used on infringement.

3         And the point that defendants really want or

4    should really want out of that which is the offers to sell,

5    if it's good enough for a market opinion, it's also going to

6    be good enough for me to let it into evidence.  And so I

7    think to the extent that there is an offer to sell, that's a

8    kind of check on the reasonableness of the damages opinions

9    being offered by plaintiff's damages expert that seems to be

10   very relevant.  So that's what I'm thinking about that.

11        But as I said, I'm going to look at Smartflash

12   and perhaps just think about this.  On that issue, do the

13   defendants want to have any time to cite to me any cases

14   other than Smartflash in connection with this market

15   approach, or is it the case that if I look at Smartflash,

16   Judge Gilstrap will have cited all of the other relevant

17   cases, and so, therefore, I don't need anything more from

18   you?  Or are you there's no point in you giving me anything

19   more?

20        MR. ENZMINGER:  If we can have just two days, we

21   can give you additional citations.

22        THE COURT:  All right.  So two days, that's the

23   Wednesday before what's considered to be a holiday.  I'm

24   already getting a lot of push back in other cases, people

25   aren't working that day, but that's all right for you?

1          MR. ENZMINGER:  That's all right.

2          THE COURT:  Okay.  All right.  Well, if you just

3    want to send me a letter with any citations.  And to the

4    extent that there's citations that kind of cover the same

5    sort of stuff as you're advocating here, you know, don't

6    necessarily do it by the highest court first.  Just do it by

7    the most relevant case first --

8          MR. ENZMINGER:  Okay.

9          THE COURT:  -- just in case.  Because if I start

10   reading and I say, well, that's not a relevant case, and I'm

11   probably not going to read the rest of it.

12         MR. ENZMINGER:  Understood.

13         THE COURT:  So, okay.  Is there anything else to

14   discuss right now?

15         MR. WHITMAN:  I don't believe so, Your Honor.

16         MR. ENZMINGER:  No, not from our perspective.

17         THE COURT:  All right.  Well, thank you for your

18   patience in the late start that we got.  I have found the

19   arguments, for the most part, to be helpful, and I

20   appreciate that.

21         All right.  We'll be in recess.

22         THE CLERK:  All rise.

23         (Court was recessed at 6:35 p.m.)

24         I hereby certify the foregoing is a true and

25   accurate transcript from my stenographic notes in the

1    proceeding.

2                        /s/ Heather M. Triozzi
                         Official Merit Reporter
3                        U.S. District Court

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25