IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE CHANBOND, LLC<br>PATENT LITIGATION | C.A. No. 15-842-RGA<br><br>CONSOLIDATED |

MEMORANDUM ORDER

Pending before the Court is Plaintiff's Motion to Exclude Certain Opinions and Testimony of Defendants' Damages Expert. (D.I. 370). I have reviewed the parties' briefing and heard oral argument. (D.I. 371, 398, 409, 471).

Defendant's damages expert, Mr. Bakewell, offers three quantitative analysis approaches in his 200 page "Rebuttal Expert Report," one of which is the "market approach." (D.I. 399, Ex. A at ¶ 171). Plaintiff argues that Mr. Bakewell's market approach opinions should be excluded because Mr. Bakewell does not use reliable principles or methods. (D.I. 371 at 1). Plaintiff contends that Mr. Bakewell fails to establish that the evidence he relies on is comparable to a hypothetical licensing negotiation in December 2012 for the patents-in-suit. (*Id.*; D.I. 339, Ex. A at ¶164).

Mr. Bakewell's market approach is based on three valuation datapoints: (1) "pre-DOCSIS 3.0 investment solicitations for technology disclosed in the patents-in-suit," (2) "2014-2015 contemporaneous valuations," and (3) "2012 AST offer to sell." (D.I. 399, Ex. A at ¶ 287). Plaintiff argues that each should be excluded, and thus I should exclude Mr. Bakewell's entire market approach opinion. (D.I. 371 at 8).

1.  *Pre-DOCSIS 3.0 investment solicitations for technology disclosed in the patents-in-suit*

The "Pre-DOCSIS 3.0" datapoint relies on investment solicitations by Z-Band, the company formed by the inventors of the patents-in-suit. In December 2000, Z-Band sought between $2 million and $5 million in venture capital funding. In 2001, Z-Band received an offer for $5 million from an unidentified foreign company for a "minority interest," which it rejected. (D.I. 399, Ex. A at ¶¶ 178-79). Mr. Bakewell concludes from these two facts that a lump sum royalty in the "mid seven figures" would be appropriate. (*Id.* at ¶ 287). Plaintiff argues that the investment solicitations and rejected offer are not technologically or economically comparable to a hypothetical negotiation for a license to the patents-in-suit. (D.I. 371 at 9). I agree. The solicitations and offer occurred approximately ten years before the first of the patents-in-suit issued on May 10, 2011. (*Id.*). The solicitations cannot be representative of a hypothetical negotiation for a license to the patents-in-suit when the patents-in-suit did not yet exist. Therefore, Mr. Bakewell's opinion based on "pre-DOCSIS 3.0 investment solicitations for technology disclosed in the patents-in-suit" is irrelevant and excluded.

Further, any marginal relevance that such an analysis might have, even if it specifically related to a license for the patents-in-suit, is minimized by the fact that no agreement was reached and that the investment opportunity took place some ten to twelve years before the date of the hypothetical negotiation. A non-agreement at a distant time period has so little probative value that its probative value is substantially outweighed by the danger of unfair prejudice caused by the failure to interest anyone in the technology at the time and the waste of time needed to explain why the non-agreement is uninformative. I would thus also exclude the 2000-2002 evidence under Federal Rule of Evidence 403.

2. *2014-2015 contemporaneous valuations*

The lawsuit in this case was filed September 21, 2015.

Mr. Bakewell opines that the "2014-2015 contemporaneous valuations" datapoint reflects a reasonable royalty of "less than $20 million." (D.I. 399, Ex. A at ¶ 287). I am unsure why he uses the word "contemporaneous," but I assume he means valuations contemporaneous with each other rather than with the hypothetical negotiation date.

The contemporaneous valuations datapoint is recited in the narrative of the expert report. It seems to consist of two transactions in which ownership of the patents-in-suit changed hands, and various statements made by interested parties during negotiations for the two successful transactions as well as ones that did not take place. (*See* D.I. 399, Ex. A at ¶¶ 210-286; D.I. 371 at 16-20; D.I. 398 at 5-7). The terms of the first completed transaction—sale by CBV to ChanBond on April 9, 2015—stated that the purchaser would pay an upfront fee and a percentage payout based on the recoveries associated with the enforcement of the patents-in-suit. (*See* D.I. 399, Ex. A at ¶¶ 232-233). These transaction terms are not representative of a hypothetical negotiation because they base the payment for the patents on the outcome of litigation. The parties to the transaction are not valuing the patents; rather they are valuing the potential outcomes of litigation. Thus, the estimates by the parties of the likely outcomes of litigation are now offered to prove what the outcome of the litigation should be.

The second completed transaction is the October 27, 2015 sale of ChanBond, a month after the lawsuits in this case had been filed, to UnifiedOnline. (D.I. 399, Ex. A at ¶¶ 244-248). ChanBond's only assets were the patents-in-suit, two other patents, two patent applications, and this litigation. (*Id.* at ¶ 244). To purchase ChanBond, UnifiedOnline paid $5 million and 44.7

3

million shares of its common stock.[1] (*Id.*). Thus, as with the earlier 2015 transaction, and as the expert report makes clear, the thing being valued in the transaction was this litigation. This transaction therefore is not comparable to the hypothetical negotiation. A licensing transaction values the patents. All other things being equal, a licensing transaction is much preferred over a settlement agreement that licenses a patent. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012). Estimating the hypothetical negotiation, that is, what a willing licensee and a willing licensor would agree to, is one step further removed from being comparable than a settlement agreement. Instead of its being an agreement between a party who has a patent and a party that wants to be able to use the patent, it is an agreement between two parties who want to be on one side of that transaction, that of the licensor. There has been no showing, and I doubt that there could be, that the agreement between two parties who want to be on one side of either a litigation-influenced settlement or a trial is a reliable basis as an input for determining the outcome of the hypothetical negotiation. Thus, the "contemporaneous valuations" including not only the two completed transactions but the various statements during the same time period are excluded as unreliable.

Further, any marginal relevance that the two transactions and the related statements might have has so little probative value that the probative value is substantially outweighed by the danger of unfair prejudice and confusion of issues inherent in bringing into the litigation how trials are financed. Thus, even if there were any relevance to this analysis, I would exclude it. Fed. R. Evid. 403.

---

[1] Mr. Bakewell assigns negligible value to the 44.7 million shares of UnifiedOnline on the basis of the par value of the stock. I assume it did not have any known market value. At least at this stage, the value of the shares is not at issue.

3.  *2012 AST offer to sell*

Mr. Bakewell's market approach opined that the 2012 offer to sell the patents by non-party Allied Security Trust ("AST") reflected a reasonable royalty of "high seven figures." (D.I. 399, Ex. A at ¶ 287). AST is a cooperative that helps member companies secure rights to patents. (*Id.* at ¶ 192). Rights to the patents-in-suit were offered to AST member companies for "high seven figures." (*Id.* at ¶ 198). While the fact that rights to the patents-in-suit were offered for "high seven figures" is relevant to the valuation of the patents-in-suit, this datapoint alone cannot serve as the basis for Mr. Bakewell's market approach opinion. Neither Defendants nor their expert have shown that a single offer to sell rights to patents is a viable basis for a market approach calculation of a reasonable royalty. (*See* D.I. 470). The 2012 AST offer is therefore excluded from Mr. Bakewell's market approach opinion.

I am not concerned about excluding this last remaining datapoint of Mr. Bakewell's market approach, and thus his entire market approach opinion, because Mr. Bakewell offered two other damages theories aside from the market approach. The market approach is not essential to Defendants' damages analysis. *See United States v. Driggs*, 823 F.2d 52, 54-55 (3d Cir. 1987).

Outside of the market approach, the 2012 AST offer itself is independently relevant to the valuation of the patents-in-suit and may come in as evidence of such.

A word of caution. The fact that no company responded to the 2012 AST offer is not only irrelevant to a reasonable royalty analysis but also would be unfairly prejudicial to Plaintiff, confuse the issues, and mislead the jury. A hypothetical negotiation assumes that the parties are a willing licensor and a willing licensee and that the patents are valid and infringed. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009). Because no company

5

responded to the 2012 AST offer, the situation does not represent a hypothetical negotiation with a willing licensee. Therefore, the fact that no company responded to the 2012 AST offer is irrelevant and inadmissible under Federal Rule of Evidence 402.

Further, even if the nonresponse to the 2012 AST offer were relevant to a reasonable royalty analysis, any possible probative value it might have would be substantially outweighed by the danger of unfair prejudice and confusion of the issues that would result from evidence that AST's offer was not accepted. Thus, even if there were any relevance to this analysis, I would exclude evidence that the offer was not accepted. Fed. R. Evid. 403.

For the reasons above, Plaintiff's Motion to Exclude Certain Opinions and Testimony of Defendants' Damages Expert (D.I. 370) is GRANTED.

IT IS SO ORDERED this 4th day of February 2020.

*/s/ Richard G. Andrews*
United States District Judge

