```
 1                IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   IN RE:  CHANBOND, LLC PATENT    ) C.A. No. 15-842-RGA
     LITIGATION,                     ) (Consolidated)
 5                                   )

 6
                                       J. Caleb Boggs Courthouse
 7                                     844 North King Street
                                       Wilmington, Delaware
 8
                                       Tuesday, February 18, 2020
 9                                     2:11 p.m.
                                       Expert Hearing
10

11   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

12   APPEARANCES:

13                 BAYARD, P.A.
                   BY:  STEPHEN B. BRAUERMAN, ESQUIRE
14
                               -and-
15
                   KING & WOOD MALLESONS LLP
16                 BY:  MICHAEL DeVINCENZO, ESQUIRE
                   BY:  ROBERT WHITMAN, ESQUIRE
17                 BY:  JOHN F. PETRSORIC, ESQUIRE

18                                     For the Plaintiff

19                 MORRIS NICHOLS ARSHT & TUNNELL LLP
                   BY:  JENNIFER YING, ESQUIRE
20                 BY:  JACK B. BLUMENFELD, ESQUIRE

21                             -and-

22                 WINSTON & STRAWN LLP
                   BY:  DAVID P. ENZMINGER, ESQUIRE
23                 BY:  KRISHNAN PADMANABHAN, ESQUIRE
                   BY:  DANIEL McNEELY, ESQUIRE
24

25                             -and-
```

1    APPEARANCES CONTINUED:

2                RICHARDS LAYTON & FINGER, P.A.
              BY:  KELLY E. FARNAN, ESQUIRE

3                          -and-

4
               ARNOLD & PORTER KAYE SCHOLER LLP
5              BY:  DANIEL L. REISNER, ESQUIRE

6                              For the Defendants

7

8                  ***  PROCEEDINGS  ***

9                THE COURT:  All right.  Good afternoon,

10   everybody.  Please be seated.

11               This is a hearing on testimony of Dr. David

12   Teece in In Re:  ChanBond, Number 15-842.

13               Oh, Mr. Brauerman, good afternoon.

14               MR. BRAUERMAN:  Good afternoon, Your Honor.

15   Steve Brauerman from Bayard.  I'm joined at counsel table by

16   Michael DeVincenzo, Robert Whitman, John Petrsoric, and

17   Dominick Vitaliano from King & Wood Mallesons, LLP.

18               I'd also like to introduce Your Honor to the

19   inventors:  Earl Heinenhoeffer, Richard Snyder, and Robert

20   Stine.

21               And also in the courtroom, Your Honor, today is

22   Dr. David Teece.

23               THE COURT:  Okay.

24               MR. BRAUERMAN:  Thank you, Your Honor.

25               THE COURT:  Okay.  Thank you.

1           Ms. Ying, good afternoon to you.

2           MS. YING:  Good afternoon, Your Honor.  Jennifer

3    Ying from Morris Nichols Arsht & Tunnell on behalf of the

4    defendants.  With me at counsel table, we have David

5    Enzminger, Christian Padmanabhan.  And then behind him is

6    Daniel McNeely, and they are all from Winston & Strawn.

7           I also have in the back, Dan Reisner from

8    Arnold & Porter, and then we have a number of client

9    representatives with us in the gallery today.

10          THE COURT:  All right.  Thank you.  So welcome,

11   everyone.

12          So I think what I envisioned was the plaintiffs

13   were going to call their expert, Dr. Teece.  They can do

14   what they like with him for up to a half hour, and then he

15   can be cross-examined for a half an hour.  It seemed to me

16   that I was mostly interested in things relating to

17   apportionment.

18          Mr. DeVincenzo, and you don't need to do any

19   qualifications because I see he's overly qualified.

20          MR. DeVINCENZO:  Thank you, Your Honor.  I have

21   demonstratives, if I can hand them up.

22          THE COURT:  Okay.  Sure.

23          Dr. Teece, come on forward.

24          DEPUTY CLERK:  Please state and spell your full

25   name for the record.

1          THE WITNESS:  David John Teece, T-E-E-C-E.

2          DEPUTY CLERK:  Please place your left hand on

3    the Bible and raise your right hand.

4          David J. Teece, after having been duly sworn

5    under oath, was examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. DeVINCENZO:

8    Q.     Good afternoon, Dr. Teece.

9    A.     Good afternoon.

10   Q.     What have you been retained to testify about in this

11   case?

12   A.     I've been asked to testify about my methodology that

13   I've used to compute damages should the plaintiff's patents

14   be found to be valid and infringed.

15   Q.     And what's your understanding regarding why you're

16   here today to testify?

17   A.     It's my understanding that the defendants claim that

18   I have not apportioned correctly, and that my damages don't

19   reflect the footprint of the patented technology.

20   Q.     And are you prepared to address those issues?

21   A.     I am, indeed.

22   Q.     As a general matter, can you explain the approach

23   that you used to estimate the economic value of the patents

24   in this case to the defendants?

25   A.     Yes.  Actually, I have a slide on that that I'd be

1    happy to present.  Fundamentally, I've used what we refer to

2    as a cost approach of which there are two versions.  On the

3    left, I call that direct cost, and on the right, I call it

4    the opportunity cost.

5            If I may begin on the left, you have a base

6    system when we know the cost of operating it and then we add

7    IP, intellectual property, the patents-in-suit, and it

8    lowers the cost.  And so what I look at is a differential

9    between the cost after and the cost before.  That's the

10   simplest methodology, if you will.  It's a difference in

11   systems costs.

12           On the right, I would look at the opportunity

13   cost which is more revenue related.  This is a base system.

14   The use of the intellectual property enhances the operation

15   of the base system, but the intellectual property are not

16   the only thing that leads to the enhancement of the

17   performance.  There's also what I call complementary assets.

18           And so I have to subtract out the value

19   contributed by the complimentary assets so that I'm

20   confident I've only got the incremental value to the

21   intellectual property.  So it's a difference in systems

22   value minus the value contributed by complementary assets

23   and expenditures by the defendants.

24   Q.    Okay.  And when you calculate the direct costs or the

25   opportunity costs in this case, is that the amount of the

1    royalty you ultimately opined on in this case?

2    A.    It is an important step towards getting to a royalty,

3    yes.

4    Q.    And with respect to the cost approach, how is the

5    methodology you used different from that used by

6    Mr. Bakewell, the defendants' expert?

7    A.    At a high level, it is the same methodology.

8    Q.    And can you explain how you went about the cost

9    approach in this particular case?

10    A.    Yes.  I have a slide on that.  So on the left, I

11    showed the actual world and on the left on the top.  And on

12    the bottom, I have a but-for world, the alternative system

13    without the infringing technology.

14          So that's a comparative that I'm looking at.  I

15    rely on technical analysis from technical experts to tell me

16    what changes you would have to make in the system in order

17    to avoid infringement.  That's what I call the technical

18    change that's needed to avoid infringement.

19          And then my job is to analyze the costs

20    associated with that to estimate the economic cost of those

21    changes, and that gives me the incremental cost in the

22    but-for world, and in the cost approach that's associated

23    with increased material costs, increased assembly costs, and

24    other costs.  So it's a combination of technical analysis

25    and economical cost analysis.

1   Q.      Okay.  On the demonstrative it says "NIA Analysis."

2   What does NIA mean?

3   A.      NIA is a shorthand for non-infringing alternative.

4   In this case, because we don't have benchmark royalties and

5   things, other license agreements, we look at the

6   hypothetical negotiation and what the parties in the

7   hypothetical negotiation would have in mind as commercially

8   viable and technically possible non-infringing alternatives.

9   Q.      And can you explain at a high level how you went

10  about analyzing the non-infringing alternatives in this

11  case?

12  A.      Yes.  Once again, I have a slide on that.  There

13  are --

14  Q.      You can start on the left and go to the right.

15  A.      Yes, if I start on the left, let me just quickly walk

16  through the four non-infringing alternatives that actually,

17  on both sides -- the technical experts on both sides, both

18  Dr. Nettles and Dr. Cromarty believe are technically viable.

19          So the first one is getting to high speed using

20  DOCSIS 2.  So there's an approach, a technical approach that

21  they outlined that I costed.

22          The second one is getting to high speed using

23  DOCSIS 3.1 which doesn't infringe, but it involves higher

24  costs.  Also, it's not backwardly compatible, but I haven't

25  bothered to -- I've turned a blind eye to the fact that it's

1    not backwardly compatible to give the defendants the benefit

2    of the doubt.

3            The third one is to use low speed using DOCSIS

4    2.  I've called it the fastest low speed possible using

5    DOCSIS 2.  And then also briefly look at removing the modem

6    Wi-Fi capability.  So they are the non-infringing

7    alternatives that I look at.

8            The defendants have put forward three others.

9    I'm told by Dr. Nettles that they don't work.  I note that

10   the defendants themselves don't do any significant analysis

11   of those and don't do the kind of costing that you need to

12   to figure out what those non-infringing alternatives, if

13   they are, in fact, non-infringing.  And if, in fact, they do

14   work, what it would cost.  They haven't done any work on

15   that, so I don't look at them, either.

16   Q.    Okay.  And with respect to the column that says

17   "Claims Avoided," when with respect to non-infringing

18   alternative 4 and 7 it says disputed, what does that mean?

19   A.    What it means is the parties dispute that, in fact,

20   removing the modem Wi-Fi capability would, in fact, create a

21   non-infringing alternative.  And I'll deal with that later.

22   Q.    Okay.  And now, you analyzed the cost associated with

23   the first three non-infringing alternatives?

24   A.    I did, and I have a slide on that.

25   Q.    With respect to the fourth one --

1    A.      Yeah.

2    Q.      -- which both experts agreed would be technically

3    feasible, can you explain how that alternative would affect

4    your cost analysis assuming that other claims were infringed

5    besides the '822 patent, claim 14 and the '679 patent, claim

6    36?

7    A.      Yes, I have a slide on that.  So here the defendants

8    proposed to remove Wi-Fi from modems.  And in this scenario,

9    I look at two scenarios.

10            In this scenario, I'm assuming that all of the

11   asserted claims are valid and infringed.  And so what you

12   see here in the right-hand side is a depiction of the

13   replacement of the modem with Wi-Fi with a modem that

14   doesn't have Wi-Fi.

15            And what the slide also points out is because

16   there's other patents involved, the modems and the CMTS all

17   continue to use the 565.1 and the 679.12.  There's no value

18   in this.  It's not a non-infringing alternative.

19   Q.      So how would this affect your royalty rate or damages

20   base in consideration of the Wi-Fi, this alternative,

21   assuming a claim besides the '822, claim 14 or the '679,

22   claim 36 was found to infringe?

23   A.      This particular alternative doesn't do anything to

24   the hypothetical negotiation.  It wouldn't be relevant, and

25   it wouldn't affect the royalty rate.  So the royalty rate

1    and the damages stay the same.

2             In this case where all asserted claims are valid

3    and infringed, then you simply remove the Wi-Fi from the

4    modem.

5    Q.    Okay.  Now, I'm going to ask you to consider the

6    situation where only the '822, claim 14 or the '679, claim

7    36 is found to infringe.  Can you explain how alternative

8    four, this Wi-Fi-less alternative would affect the

9    reasonable royalty calculation you did?

10   A.    I have a slide on that, too.  So in this case, you do

11   end up with the modem not infringing and some limited

12   services that are not infringing, but the royalty rate for

13   that which is infringed doesn't change.  The non-infringing

14   alternative is still the same, but the infringement base is

15   going to be different.

16            So the royalty base is now only wireless modems.

17   Obviously, this would be a significant degradation in

18   services.  It's not a particularly exciting alternative, but

19   it would -- indeed, it's possible it would mean that the

20   infringement base would be less, although the royalty rate

21   for an infringed product would be the same.

22   Q.    Okay.  And you say on the demonstrative that it would

23   likely be more expensive than the alternatives you

24   considered.

25            Can you explain why that's the case?

1   A.     It's likely to be more expensive because there are

2   many, many customers that they use Wi-Fi.  And if you're

3   selling a premium product, you expect it to have Wi-Fi.  If

4   you don't have it, you can't get premium pricing.  You'll

5   lose some customers.  It would be a considerable negative --

6   have a negative impact on the marketing campaigns of the

7   defendants to not be able to provide Wi-Fi.

8   Q.     And what kind or type of analysis and documents have

9   you seen from the defendants regarding the cost associated

10  with this alleged alternative?

11  A.     They have not provided any type of analysis of all

12  those relevant considerations, so it's hard to take their

13  claim seriously.

14  Q.     Thank you.

15             MR. DeVINCENZO:  Now, sorry, Your Honor.

16  Just --

17  BY MR. DeVINCENZO:

18  Q.     Can you explain, at a general level, the manner in

19  which the defendants used the asserted claims in this

20  action?

21  A.     Yes, I can.  I have a slide on that.

22             It's really important in this case, Your Honor,

23  to understand that we have a system, a service sitting on

24  top of a system.  And to look at non-infringing

25  alternatives, you've got to have a non-infringing system.

1     You just can't take one component of it and remove

2     infringement from one component and declare that the system

3     is non-infringing.

4               So what I'm trying to point out here is the

5     defendants high-speed services use the patented technology

6     to communicate.  That's what the red arrows here are all

7     about.  It's a communication up and down between the CMTS

8     and the modem.

9               And any viable non-infringing alternative must

10    resolve infringement and allow for communication between the

11    two.  If you just resolve infringement, if you win on one

12    side and the communication on the other side is still

13    implicated, you don't have a non-infringing alternative.

14              And here, because communication implicates both

15    sides, each non-infringing alternative incurs costs at both

16    sides.  And so that's critical to keep in mind.  It's a

17    little bit different from a normal one patent, one product

18    kind of intellectual property damages case.

19    Q.    Okay.  And what value would a non-infringing CMTS

20    that can provide channel bonding in the downstream direction

21    have if the defendants were unable to have cable modems that

22    could receive such channel bonded signals?

23    A.    It just doesn't work.  It's not viable.  So it's not

24    commercially viable, technically feasible, or commercially

25    feasible, so it's not a non-infringing alternative.

1   Q.     Okay.  In this case in the chart we put up mentioning

2   the non-infringing alternatives, many of the non-infringing

3   alternatives are for all the claims.

4              Can you explain what relevance that fact has in

5   this case?

6   A.     Because it's a system, you have to clear all the

7   hurdles.  And so even if it's on one patent or one claim,

8   that doesn't get you around and doesn't give you a different

9   non-infringing alternative.  So you have that effect to take

10  into account because it's a system, and the non-infringing

11  alternative has to be viable as a system.

12  Q.     Yeah.  Now, I'm kind of shifting through the fact

13  that the claims all have the same non-infringing

14  alternatives.

15             Can you explain what relevance that fact has?

16  A.     If they all have the same non-infringing alternative,

17  they all have the same reasonable royalty.  Some cases, the

18  damages case may be a little different depending on the age

19  of the patents or so forth, but basically the royalty rate

20  doesn't change.

21  Q.     Okay.  And why, in particular, would the royalty rate

22  not change if the non-infringing alternatives are the same?

23  A.     Because what drives the royalty rate in the

24  hypothetical negotiation is knowledge of the available

25  non-infringing alternatives.  So if one puts forward an

1    alternative which possibly infringes, that doesn't cut the

2    mustard.  It has to be a non-infringing alternative for the

3    system, not just for one piece of it.

4    Q.    And what value would there be if only one piece of

5    the system didn't --

6    A.    There would not be value, and so that's the reason

7    why the royalty rate is the same.

8    Q.    Okay.  And can the claims in this case be referred to

9    as complements?

10   A.    Yes.  Actually in economics we have a term for this.

11   If the two sides of the system, if you will, are perfect

12   complements, they don't have -- one side doesn't have value

13   without the other.  So the CMTS doesn't have value without

14   the modems and vice versa.

15          It's like a pair of shoes.  The left shoe is not

16   much use to you without a right shoe and vice versa.  And

17   looking at the non-infringing alternatives, you have to take

18   that into account.  If you don't take that into account,

19   it's methodologically flawed and in error.

20   Q.    Now, moving on to the defendants' motion.  I'm going

21   to put up a quote from defendants' motion.  Using this chart

22   that the defendants created themselves and put in front of

23   you at your deposition, the defendants asserted that the way

24   you went about calculating damages, your entire analysis was

25   based solely on the value of the first row.

1          How do you respond to that?

2     A.     That's not correct.  That's not what I did.

3     Q.     Can you explain, using the defendants' own chart, how

4     you went about explaining damages on a patent-by-patent

5     basis?

6     A.     Yes.  So instead of looking across the rows, I looked

7     vertically down at the columns, and I have a slide on that.

8     I believe the Court requires me to analyze damages patent by

9     patent which in the diagram here means column by column.

10          What the defendants were trying to do in my

11     deposition was ignore the fact that infringement occurs on

12     both the CMTS and the modem, and you need to take that into

13     account.  Their view of things ignores the fact that the

14     non-infringing alternatives increases cost on both the CMTS

15     and the modem.

16          It's true that I haven't calculated those costs

17     on the CMTS.  I've given them the benefit of the doubt that

18     they're not high, even though I believe they're high,

19     because I don't have the data.  But just because I've just

20     looked at the modem cost doesn't mean to say I don't

21     recognize that the CMTS will have incremental costs

22     associated with non-infringement.

23          So I'm back to my earlier point, that clearing

24     any particular device, which seems to be the defendants'

25     approach, does not clear the entire system and allow for the

1    service.  So I believe what I've done is not only correct,

2    it is correct economically, but it's my understanding that

3    that's what the law requires.

4    Q.    Okay.  Now, with respect to the '822 patent, can you

5    explain why the fact that infringement is not alleged with

6    respect to cable modems without wireless routers has no

7    bearing on the cost approach you employed in this action?

8    A.    Because infringement is alleged elsewhere.  So you

9    have to look at both the cable modem and the CMTS.  So I

10   stepped through this here in my bottom box where I say

11   removing Wi-Fi is an inferior alternative.  You would

12   substantially degrade service if that's what you did.  You

13   would expect to drive greater sacrifices in opportunity cost

14   than the NIA's that I've put forward.

15         And the defendants' experts haven't put forward

16   any data or done any analysis to indicate what the consumer

17   impact would be.  So I don't take very seriously their

18   non-infringing argument on Wi-Fi or removing Wi-Fi because

19   they haven't done the analysis to establish that it's

20   viable, or what the cost would be, or shown that the cost

21   would be less and go into non-infringing alternatives.

22   That's what they would have to do to show that my analysis

23   is wrong.

24   Q.    Okay.  Now, turning to the '679 patent, the middle

25   column, can you explain how the fact that infringement is

1    not alleged with respect to the '679 patent against products

2    that can't do upstream channel bonding, can you explain what

3    relevance that has to your analysis?

4    A.    Once again, I have a slide on that one.  First point

5    I'd note is that according to Dr. Nettles, removing upstream

6    channel bonding is not technically feasible.  So setting

7    aside its commercial viability, it's not even technically

8    possible.

9             I do note that in the market, there are no

10   modems without upstream channel bonding.  So that's a factor

11   to consider.

12            And then, finally, defendants' experts perform

13   no analysis on the impact of this.  If you didn't have

14   upstream channel bonding, photo uploads would be very

15   clunky.  Video conferencing probably wouldn't work.  There's

16   all kinds of things, all kinds of performance impairments

17   that the defendant would have to analyze and put forward if

18   they're going to suggest that that's a non-infringing

19   alternative, and they didn't.  If they had, I would have

20   responded and looked at it.

21   Q.    And lastly, with respect to the '565 patent, using

22   the defendants' chart, can you explain why the fact that

23   that patent has been asserted against the CMTS, what

24   relevance the fact that that patent has only been asserted

25   against CMTSs or cable modem termination system has on your

1   analysis?

2   A.      Yes, I have a slide on that, and basically it's the

3   same point over again.  CMTS channel bonding is essential

4   for high-speed services.  And defendants ignore the

5   requirement that the modem and the CMTS must support channel

6   bonding, that they both have to be there, not just one.

7   Having one shoe without the other doesn't enable you to walk

8   very far or to run very fast.

9              So the essence of it is the location of

10  infringement.  You know, where in the system it is.  The

11  CMTS or the modem does not change the impact on the

12  non-infringing alternative.  And if you don't change a

13  non-infringing alternative, then you don't change the

14  royalty rate in the standard and proper analysis.

15  Q.      Okay.  Now, I'm going to turn back to the first three

16  alternatives you discussed on that chart a little bit ago.

17             With respect to the first alternative, the

18  high-speed using DOCSIS 2, can you explain how you went

19  about the cost approach with respect to that alternative?

20  A.      Yes.  This one is pretty straightforward.  I have a

21  slide on it.

22             Here, I'm assuming that it's possible, although

23  it's at increased expense, to modify the CMTS and the modem.

24  And the defendants would do that by replacing infringing

25  modems with modems modified to use two separate DOCSIS

1    channels.

2            In other words, it's staying out of infringement

3    by essentially putting two channels in parallel.  And I've

4    looked at the cost impact of that because Dr. Nettles has

5    told me the additional components would be needed in the

6    modem.  I've gone out, got the data, and looked at the

7    increased cost of building that product.  It doesn't exist

8    in the market, but I'm assuming that it could be

9    hypothesized in the hypothetical negotiation.

10           I haven't taken into account the efficiency

11   losses.  I haven't taken into account the fact that it would

12   be loss of customers.  There would be price reductions.

13           I've just looked at the extra costs of building

14   a product that would actually clear infringement hurdles and

15   deliver a service.

16   Q.   And could you explain the results of your analysis

17   with respect to the cost associated with this alternative?

18   A.   Yes.  I have a chart on that.  And just very briefly,

19   the right-hand side indicates that there's an increase

20   because of bill of materials.  And there's -- that leads to

21   a higher average purchase cost for this dual modem.

22           And I transform that into a cost per subscriber

23   month of 58 cents.  So I'm willing to assume that this is

24   viable.  You wouldn't lose any customers.  You could

25   probably see that's a generous assumption, but it would cost

1  a bit extra to build.  And I roll that into a

2  cents-per-subscriber-month number which is my number at the

3  bottom, 58 cents.

4  Q.    Now, is that 58 cents what you used as the royalty

5  rate in this case?

6  A.    No.  No.  This is just feeding into the hypothetical

7  negotiation to set the upper end of the bargaining range.

8  It's one of four data points that I use to set the upper

9  range of the bargain that's going to take place in the

10  hypothetical negotiation.

11  Q.    Now, does that 58 cents represent the value of

12  high-speed Internet services of defendants?

13  A.    No, it does not.  This represents simply the cost of

14  engineering a different approach to getting there.

15  Q.    Okay.  And now, with respect to the second

16  alternative --

17          THE COURT:  Actually, can you skip the second

18  alternative just because it strikes me that the first,

19  second, and third alternatives are all going to be the same

20  analysis; right?

21          MR. DeVINCENZO:  The third one --

22          THE WITNESS:  The third one is different.

23          MR. DeVINCENZO:  The third one is the

24  opportunity cost.

25          THE COURT:  Why don't you just work through from

1    this point, you've got 58 cents that's the extra cost.

2                    THE WITNESS:  Yeah.

3                    THE COURT:  Is there any apportionment that

4    happens after that?

5                    THE WITNESS:  Not on this one because I'm just

6    looking at the cost with and without the intellectual

7    property.  So the apportionment is built in on this one.

8    When I get to the opportunity cost where there's revenue

9    impact, that's where I do --

10                   THE COURT:  Okay.  Why don't we go to that one.

11                   MR. DeVINCENZO:  Yeah, the third one.  The

12   second one is similar to the cost, the alternative.

13   BY MR. DeVINCENZO:

14   Q.    Okay, the third one.

15   A.    Okay.  So the third one here is more complicated, and

16   it's looking at this sort of opportunity cost of providing

17   low-speed services using DOCSIS 2.  So I replace the

18   infringing modem and the CMTS with DOCSIS 2 versions which

19   were available and allow defendants to offer the fastest

20   low-speed service which is at 40 megabits per second.

21                   And I'll assume that there's no additional

22   network inefficiency costs, but I've now got to calculate

23   the revenue impact.  Because if they're not selling the

24   high-speed service, they aren't going to get the same price,

25   but not all the price drop is because of the lack of the

1    ChanBond technology.  There's other things that go into it

2    as well.

3              So the next slide, Your Honor, will get me

4    there.  So on the left, I've got low-speed service.  On the

5    right, I've got high-speed service.  And there's a price

6    premium that's due to high-speed service, and then I

7    apportion it.

8              And on the right-hand side, I show what I

9    apportion it amongst.  It's moving from the DOCSIS 2 to the

10   DOCSIS 3.  That's change in standard.  There's other

11   company's technology.

12             Dr. Nettles tells me, and I know this is a fact,

13   that there's other technology in there as well that is

14   driving the high-speed services, not just the -- it's not

15   just ChanBond technology.  So I've got to take out the

16   standards, and I've got to take out the fact that the

17   defendants are also spending more money providing high-speed

18   service than low-speed service or lower speed service.

19             So I have a methodology that takes those out one

20   at a time.  If you just flip through the next slide --

21   Q.     Before I flip through the next slide --

22   A.     Yes.

23   Q.     -- is the price premium the entire price premium

24   associated with high-speed Internet services?

25   A.     It is a price premium associated with going from 40

1    to 50.  So we're not actually going from low to high, but to

2    take the standards effect out, I look at what the value is

3    associated with going from 40 to 50 where there's no

4    standards effect, and I use the differential to subtract out

5    an amount associated with the standards effect.

6    Q.    Okay.  Go on.

7    A.    And so that you notice on the right-hand side, I've

8    now dropped that out, and now I drop out defendants'

9    expenditure by looking at all the costs that they spend to

10   deliver the service.  And that's my second step.

11        And then I look at that collectively, I subtract

12   those two elements, and that gets me down to the residual

13   increase in price due to the ChanBond technology.

14   Q.    I just want to slow down a little bit.  Okay.  I

15   believe you said that this slide shows how you remove the

16   standards effect?

17   A.    Yes.

18   Q.    Can you explain why that's the case?

19   A.    Yes.  So I look at the incremental speed here going

20   from 50 to 60.  This is all within a standard.  The standard

21   hasn't changed.  So that gives me a control for how much

22   increasing speed without changing a standard is worth.

23        So that then flows back into my analysis and

24   enables me to calculate a differential for non-standard

25   increase in speed.  If you will, that's sort of a value of a

1    naked speed increase without crossing -- without bringing in

2    a new standard.

3    Q.    And now, when you said increase in speed, how much

4    increase in speed are you looking at?

5    A.    In this case, it's ten megabits per second.  I've

6    looked at 50 versus 60.

7    Q.    And why did you choose that?

8    A.    Pardon me?

9    Q.    Why did you choose the ten megabits?

10   A.    Because that's the smallest.

11              MR. ENZMINGER:  Objection, this answer is not in

12   his report.

13              THE COURT:  Noted.  Keep going.

14              THE WITNESS:  That's the smallest increase that

15   I can price out.  So I could have looked at a much larger

16   total price premium if I had gone from, you know, say, 50 to

17   80.  In fact, a lot of customers are taking 80, but I'm just

18   valuing a small increase in speed and subtracting out the

19   other contributing factors.  And subtracting out means I'm

20   apportioning.

21   BY MR. DeVINCENZO:

22   Q.    Okay.  And then after you apportioned out the

23   standards of that, can you explain how you apportioned out

24   the defendants' expenditures?

25   A.    That's where I looked at the differential gross

1    margins and the total expenditures that the -- and the

2    incremental expenditures that the defendants incurred in

3    order to provide high-speed service.

4    Q.    And now once you calculated the cost associated with

5    the three different alternatives that you analyzed -- well,

6    strike that.

7          Can you explain the results of the opportunity

8    costs associated with this alternative?

9    A.    Yes, that's on my next chart.  When I -- I begin with

10   high-speed premium of $3.41 for standard pricing.  What

11   would make a discount which is what I call promotional

12   price, which is $2.44.  After I make the adjustments, the

13   apportionment adjustments, it's down to $1.57 for standard

14   pricing and $1.12 for promotional pricing.

15   Q.    Okay.  And now, it says high-speed premium, $2.44 and

16   $3.41.  Is that the entire premium charged by the defendants

17   or only the smallest incremental premium?

18   A.    That's the smallest incremental premium for the speed

19   jump that I identified earlier.

20   Q.    And then once you did the cost approach using each of

21   your three different approaches, what did you do next in

22   order to arrive at the reasonable royalty?

23   A.    Well, my next table shows how I did that.  You can

24   see the four different numbers.  The last methodology

25   generated two numbers, one using promotional pricing and one

1    using standard pricing.  And I treated these as four

2    independent observations, and I averaged them.  None of them

3    are absolutely precise, but I think they're all

4    conservative.  And because I treat them as four different

5    observations, that would be in the minds of the parties in

6    the hypothetical negotiation.

7              I average it, and say, well, that would be

8    persuasive for the benefit of the technology, and that sets

9    the table for the hypothetical negotiation.

10   Q.    Now, after you've determined that the defendants, on

11   average, it would cost them approximately $1.06 per

12   subscriber month to avoid infringement, how did you arrive

13   at the royalty after making that determination?

14   A.    Yes.  So the $1.06 is the average of those four, and

15   I let that flow into the bargaining range here.  I've got

16   the bargaining range in the hypothetical negotiation, and

17   I've used it to anchor the top end.

18             So I'm not saying that $1.06 is what's going to

19   come out as a royalty rate, but that's the benefit of the

20   technology, $1.06 per subscriber month.  I've got to get the

21   lower end of the bargaining range, and to be honest, I

22   couldn't find a principled way to come up with a number.

23             It would obviously be low, but it wouldn't be

24   zero.  But to be conservative, I've used zero to the benefit

25   of the defendants.  So here I've got my range from zero to

1    $1.06.

2    Q.    Now, can you explain what royalty rate you arrived at

3    after determining that the defendants would save $1.06 per

4    subscriber month in average using the alternatives in this

5    case?

6    A.    Yes, it is.

7    Q.    Can you explain what the actual royalty you arrived

8    at was, please?

9    A.    Okay.  Well, here I've identified four classes.

10   Actually, go back.  The four classes of factors that will

11   affect the outcome of the negotiation:  the amount of

12   supply, access to information, negotiating skill, all those.

13        Access information is symmetric in the

14   hypothetical negotiation.  No reason to believe one side

15   would know more than the other.  Demand and supply, no

16   reason to believe they would see that dramatically

17   different.  I'm even willing to assume negotiating skill

18   would be similar.

19        The risk aversion and patience is something

20   where I should quantify that factor because I've got data

21   with respect to discount rates.  So I was able to calculate

22   the defendants' discount rates, and I was able to get

23   information on the plaintiff's discount rates.  And to an

24   economist at least, a discount rate gives you an inside into

25   how you value the future and how quick and how eager you

1   would be to cut a deal.

2          So I've used the bargaining model and put as an

3   input into it the discount rates of the parties.  It's a

4   Rubinstein bargaining model, and that produces a number

5   which is on the next slide.  Twenty-eight cents per

6   subscriber month.

7          So the defendants get the lion's share of the

8   value in this analysis.  The plaintiffs end up with 28

9   cents.  And then, of course, that sets my reasonable

10  royalty.  The damages require me to multiply that by the

11  infringing sales, and I've tentatively used the period

12  December 2012 through early 2018, but recognize that it may

13  be a longer infringement period.

14  Q.     Okay.  And defendants claim that the only thing you

15  value is the value of high-speed services to them.

16         How do you respond to that?

17  A.     That is wrong.  First of all, I looked at various

18  types of high speed and low-speed service.

19         And in addition, I subtracted out through

20  apportionment the value contributed by the defendants

21  through their expenditures.  I subtracted out the benefit

22  contributed by other parties through standards, through

23  technology contributed to the standard.  And I've not

24  penalized the defendants here for potential loss of

25  customers.

1           On the cost model, I just simply looked at the

2    cost with and without the infringing technology.  That has

3    apportionment built into it because I'm subtracting out only

4    the infringing bits and redoing the product.  So I believe

5    I've faithfully done what's required, and what I've done

6    before, and what I've written on with respect to how you do

7    this the right way.

8           MR. DeVINCENZO:  Thank you, Your Honor.

9           Thank you, Dr. Teece.

10          THE COURT:  Thank you, Mr. DeVincenzo.

11          All right.  Mr. Enzminger.

12                  CROSS-EXAMINATION

13   BY MR. ENZMINGER:

14   Q.    Good afternoon, Dr. Teece.

15   A.    Good afternoon.

16   Q.    I feel as though, in many respects, we are ships

17   passing in the night, and I hope to clear that up a little

18   bit.

19   A.    Okay.

20   Q.    We can agree that one of your jobs as a damages

21   expert is to focus the damages only on the incremental value

22   of the use of the patents-in-suit; right?

23   A.    Yes, if by that you mean I have to apportion out the

24   contributions of others, but it also means you have to take

25   the systems into account, not just look at an individual

1    product.

2    Q.     You prepared your calculations based on the ability

3    of the defendants to offer high-speed services; correct?

4    A.     Well, there was one of those scenarios which was

5    actually the fastest low-speed service.

6    Q.     Right.  But that was one of the non-infringing

7    scenarios?

8    A.     Yes.

9    Q.     You're assuming for all of your analysis that

10   high-speed services is high-speed services which you define

11   as greater than 40 megabits per second downstream?

12   A.     I define it as a high-speed service.  I -- I didn't

13   attach particularly a downstream.

14          MR. ENZMINGER:  Okay.  May I have Dr. Teece's

15   report, paragraph 2.2?  Paragraph 16, Section 2.2.

16   Paragraph 16.

17   BY MR. ENZMINGER:

18   Q.     Dr. Teece, in your cross-examination binder, if you

19   need to refer to it, there is a copy of your report.  It is

20   correct that you defined high-speed Internet service as a

21   data service that has a maximum download speed greater than

22   40 megabits per second?

23   A.     Well, that's what's advertised, yes.

24   Q.     And yet, you do not indicate that high-speed Internet

25   service also has an upload speed associated with it;

1  correct?

2  A.    I didn't indicate that, but I understand that it

3  does.  If you have one without the other, it's not a very

4  satisfactory service.

5  Q.    All right.  We'll come to that.

6        I'd like to show you the same definition with a

7  graphic next to it.  Slide 6, just so we make sure we're on

8  the same page.

9        You agree with me that when we talk about

10 downstream, we're talking about a transmission from the

11 cable company's CMTS to a cable modem; correct?

12 A.    That's correct.

13 Q.    Pardon?

14        THE COURT:  He said yes.

15        MR. ENZMINGER:  Yes.

16 BY MR. ENZMINGER:

17 Q.    And as you define high-speed Internet service, we're

18 talking about this downstream direction; correct?

19 A.    That's technically, I think, the way it's typically

20 marketed, but it doesn't -- as I said before, you need

21 upstream speed.  And if you try and just go one way fast

22 without going fast the other way, it doesn't work is what I

23 understand from Dr. Nettles.

24 Q.    Your damage analysis, in terms of offering high-speed

25 services, doesn't distinguish between the patents, correct,

1    because you're valuing the ability of a system to provide

2    downstream high-speed service; right?

3    A.      When I'm looking at a non-infringing system versus an

4    infringing system.

5    Q.      Okay.  There are no claims in this patent that are

6    system claims; correct?

7    A.      I'm not a patent expert, but I think that's probably

8    correct.

9    Q.      Did you say --

10   A.      But, yes, I think that's correct, but it doesn't mean

11   to say that as with the left shoe and the right shoe, the

12   shoes are not systems, but you still need one without -- one

13   without the other isn't much use.

14   Q.      But just so we're clear, every claim in this case is

15   directed to a device?

16   A.      It's an apparatus, yes, but that doesn't mean that it

17   doesn't implicate a system, just like a left shoe implicates

18   a right shoe.

19   Q.      We'll come to it.  If you could just answer my

20   question, it will go a little bit faster.

21   A.      Sure.

22   Q.      You have no separate opinion regarding a reasonable

23   royalty with respect to the '822 patent?

24   A.      With respect to which patent?

25   Q.      The '822 patent.

1    A.      You want to remind me?  I don't have a separate

2    opinion, I think --

3    Q.      Oh, okay.

4    A.      -- on that.

5    Q.      It's fair to say that you don't have a separate

6    opinion with respect to any of the three patents?

7    A.      That is correct because, as I indicated, the system

8    underneath has to operate in a non-infringing way clearing

9    one claim and one patent or clearing all, but one claim

10   doesn't necessarily get you a non-infringing alternative.

11              MR. ENZMINGER:  Okay.  Can I have slide 4,

12   please?  Thank you.

13   BY MR. ENZMINGER:

14   Q.      Dr. Teece, this is a table we prepared of the

15   allegations, and it's similar to one of the exhibits that

16   Mr. DeVincenzo showed you.  But you have no reason to

17   dispute that '822, claim 14 is only asserted against the

18   cable modem that has wireless; correct?

19   A.      Correct.

20   Q.      So if the cable modem doesn't have wireless, it

21   doesn't infringe the '822 patent?

22   A.      That would be likely correct.  It doesn't mean to say

23   that other patents are not indicated, but the '822 may not

24   be.

25   Q.      And certain claims of the '679 patent -- first of

1    all, you understand that there's only one independent claim

2    of claim 12 or claim 12 of the '679 patent?

3    A.      I don't know that for sure.

4    Q.      But you do understand that the '679 requires

5    receiving and transmitting the bonded channels?

6    A.      I'm not the patent expert.  That may well be correct.

7    Q.      That's your understanding; correct?

8    A.      I don't -- I -- I have no reason to dispute that.

9    Q.      And for the '565 patents, the only allegation is

10   against the CMTS; right?

11   A.      Yes, but once again, this CMTS must work with the

12   modem.  So once again, you're clearing a left shoe.  If you

13   haven't cleared the right shoe, you can't walk.

14   Q.      Okay.  There's no patent in this case that covers

15   both types of accused devices; right?

16   A.      I'm not an expert, but I think that's probably

17   correct.

18   Q.      Let's talk about the '822 patent.

19               MR. ENZMINGER:  And may I have claim 1, please?

20   BY MR. ENZMINGER:

21   Q.      Dr. Teece, this is unasserted claim 1 of the '822

22   patent.  It's currently unasserted, but do you have an

23   understanding that this claim was originally asserted in

24   this case?

25   A.      No, I do not.

1    Q.      Okay.  Do you understand that there were certain

2    claims in this case that were subject to re-examination?

3    A.      That may have been the case.  I really haven't

4    followed that aspect of the case.

5    Q.      Okay.  And what you do know, though, is that the

6    asserted claims of the '822 are just claim 14; right?

7    A.      Not entirely sure, but that could be correct.

8    Q.      Let's turn to claim 14.  Claim 14.

9            Do you have an understanding of what a dependent

10   claim is?

11   A.      No, I'm not the infringement expert.  I'm the damages

12   expert.

13   Q.      Okay.  With respect to this particular claim, let me

14   ask you a question.  You don't have any reason or basis to

15   dispute that the independent claim 1 was invalidated by the

16   Patent Office?

17   A.      No.

18   Q.      Okay.  So is it fair to say that you did not do an

19   incremental analysis to determine the value, any

20   differential value between claim 1 and claim 14 which

21   requires a wireless unit?

22   A.      That's correct for the reasons I've already stated.

23   Q.      Okay.  In this case, there are wireless modems or

24   there are modems that are accused of being infringed that

25   are accused devices that do not have wireless.

1          You're aware of that; right?

2     A.     I am.

3     Q.     And that makes no difference whatsoever to your

4     damages analysis?

5     A.     It doesn't change the royalty rate, but if there's no

6     infringing device, then the base changes and so the damages

7     change.  That was one of the slides that I had up there.

8     Q.     So with respect to --

9     A.     If it clears all the other patent --

10    Q.     Pardon?

11    A.     If it clears all the other patent variances.

12    Q.     Well, let's focus on that a little bit because with

13    respect to the '822 patent, the incremental value of the

14    '822 patent is its wireless functionality; correct?

15    A.     Well, it depends on whether it's in the system or

16    not, but in essence, wireless matters.  Yes.

17    Q.     Okay.  I'm holding in my hand, Dr. Teece, an ARRIS

18    cable modem.  It's wireless.  For the record, it's the TM822

19    model.

20          I'm sorry.  This is a wired.  There's no

21    wireless capability in this modem.

22    A.     Okay.

23    Q.     Okay?  Are you aware that over four-and-a-half

24    million versions of that modem have been sold?

25    A.     It doesn't surprise me.

1    Q.    Okay.  Your damages analysis talks about downstream

2    subscriber months; correct?  That's what you assign your

3    royalty to?

4    A.    To the per subscriber month, that is correct.

5    Q.    Okay.  So if the '822, the wireless modem, the wired

6    modem that we just talked about of which four-and-a-half

7    million is actually six point some million -- can I get that

8    slide?

9          You rely on Dr. Nettles for the technology;

10   right?

11   A.    Correct.

12   Q.    Okay.  This is Exhibit 4 from Dr. Nettles' report.

13   And if you look at line 135, wireless modem.  I'm sorry,

14   modem TM 822 which has no Wi-Fi capability, shows sales

15   across the defendants of 4.695 million.  Right?

16   A.    Yes.

17   Q.    And that is a DOCSIS 3.0 modem; correct?

18   A.    It appears to be, yes.

19   Q.    And because it's a DOCSIS 3.0 modem, that means it

20   can receive downstream channel bonding, it can receive

21   high-speed Internet downloads; correct?

22   A.    Once again, I'm not the infringement expert.  I don't

23   know what patents this particular modem might infringe

24   besides the wireless ones.

25   Q.    Your analysis is based on the ability to provide

1  downstream high-speed Internet; correct?

2  A.    It's based on the ability to provide a non-infringing

3  alternative to the claims, the patent claims in this case.

4  Q.    The wireless or the wired modem that we just saw of

5  which nearly 4.7 million examples were shown, the

6  plaintiff's '822 patent does not have the ability to exclude

7  this modem from the marketplace; correct?

8  A.    That patent alone, maybe not, but I understand it

9  works in conjunction with other patents.  So I'm not the

10 infringement expert.  That's Dr. Nettles' area.

11 Q.    Is it fair to say that the '822 patent, there's no

12 damages analysis in your report that is associated with the

13 '822 patent?

14 A.    I did have a slide that says if that's the only

15 issue, that there's an adjustment to the royalty base that

16 can be done, but the royalty rate doesn't change.

17 Q.    The one thing we can agree on, however, that since

18 the '822 -- let me put it this way:  You don't dispute that

19 the defendants in this case are able to provide high-speed

20 download services using channel bonding without infringement

21 of the '822 patent?

22 A.    I'm relying entirely on Dr. Nettles for what

23 infringes and doesn't infringe.  I've looked at the

24 scenarios that he's helped map out for me for the

25 non-infringing alternatives.  I have nothing to add to the

1    infringement analysis.

2    Q.     Okay.  Let's talk about the '679 patent and slide 4.

3    Do you have an understanding that the '679 patent requires

4    bidirectional bonded channels?

5    A.     Yes.

6              MR. ENZMINGER:   Okay.  Let's go to slide 18.

7    BY MR. ENZMINGER:

8    Q.     Dr. Teece, I just put up the '679 patent claim, and

9    we can agree that the '679 requires bidirectional

10   distribution of signals; correct?

11   A.     Apparently so.

12   Q.     Now, in order to infringe the '679 patent, the device

13   must both be able to send and receive bonded channels;

14   correct?

15   A.     I'm not the infringement expert.  I'm sorry.  I don't

16   have any opinion beyond --

17   Q.     But you understand what upstream channel bonding is;

18   correct?

19   A.     I do.  Yes.

20   Q.     Okay.  And since the '679 requires bidirectional

21   channel bonding, you would agree that the '679 does not

22   exclude the defendants from offering high-speed download

23   services only; correct?

24   A.     Well, as I indicated earlier, Dr. Nettles has told

25   me -- it's in my report -- that he doesn't think that that's

1    viable nor have your damages experts looked at the

2    commercial implications of such unlimited offering.

3           So I haven't explored it further nor have your

4    experts, and I'm being told that it's not viable

5    technically.

6    Q.    Okay.  We're going to come back to that in a minute.

7    A.    Sure.

8    Q.    But with respect to whether it's viable, you do

9    understand that you have an obligation to value the

10   technology that is claimed in the patent; correct?

11   A.    The way to do that is to look at what the

12   non-infringing alternatives would be and look at the

13   difference in costs or the difference in whether it's

14   opportunity costs or direct costs.

15           That's the way you do it.  You don't do it the

16   way you're trying to do it particularly when you have a

17   system and both sides are implicated.

18   Q.    Okay.  You did no analysis to determine the cost of

19   providing services only with a modem that receives only with

20   a CMTS that provides downstream service only; correct?

21   A.    I did not and nor did your experts.

22   Q.    You understand, Dr. Nettles -- I mean, Dr. Teece,

23   that in this case, there are accused CMTSs that only had

24   downstream capability?

25           MR. DeVINCENZO:  Objection, Your Honor.  That

```
 1    assumes facts.  We don't believe that's the case.

 2    BY MR. ENZMINGER:

 3    Q.    You relied on Dr. Nettles for the technology?

 4    A.    I did.

 5    Q.    I would like to show you an excerpt from Dr. Nettles'

 6    report.

 7                And paragraph 28, I will represent to you

 8    relates to an accused Cisco CMTS, and it talks about coming

 9    in three variants that support DOCSIS 3.0 capabilities.  The

10    MCS20S and X20U can support DOCSIS 3.0 downstream channel

11    bonding only and the MCX2H supports DOCSIS 3.0 upstream and

12    downstream channel bonding.

13                Do you see that?

14    A.    I do.

15    Q.    Do you have any reason to believe that accused

16    products in this case that were available that -- only had

17    downstream channel bonding?

18                MR. DeVINCENZO:  Your Honor, it's my

19    understanding that this isn't accused, and it's just not

20    true that that's an accused product.

21                THE COURT:  Well, your objection is noted.

22                THE WITNESS:  Sorry.  Could I have the question

23    again, please?

24    BY MR. ENZMINGER:

25    Q.    Do you have an understanding whether or not accused
```

1    products in this case with DOCSIS 3.0 line cards supporting

2    only downstream channel bonding are accused?

3                MR. DeVINCENZO:  Same objection.

4                THE WITNESS:  I don't -- I'm not an infringement

5    expert.

6    BY MR. ENZMINGER:

7    Q.    I'm sorry?

8    A.    I'm not the infringement expert.

9    Q.    Paragraph 21 of the Nettles' appendix talks about an

10   ARRIS CMTS download card, line card, and this particular one

11   supports 3.0 downstream channels only.

12               Do you see that?

13               MR. DeVINCENZO:  Same objection.

14               THE WITNESS:  I do.  I see what's written in his

15   report.  I'm not an expert in this area.

16   BY MR. ENZMINGER:

17   Q.    You don't know whether all of the accused products in

18   this case that you include in the royalty base offer

19   upstream and downstream channel bonding?

20               MR. DeVINCENZO:  Objection.  This is not how he

21   did the royalty basis.

22               THE COURT:  All right.

23               THE WITNESS:  I'm able to ascertain that if I

24   needed to.  It's not particularly pertinent, but it's

25   ascertainable

1   BY MR. ENZMINGER:

2   Q.     Go to slide 29, please.  I'm sorry.

3              (Discussion held off the record:)

4   BY MR. ENZMINGER:

5   Q.     Dr. Teece, I'm showing you a highlighted -- I'm

6   sorry, Exhibit 5 from your deposition.  With respect to the

7   '679 patent, this, to your understanding, accurately

8   reflects that devices with only downstream channel bonding

9   do not infringe; correct?

10  A.     Correct.

11  Q.     So the plaintiff cannot preclude the defendants from

12  offering only downstream service via channel bonding,

13  correct, with the '679 patent?

14  A.     Look, once again, I'm not an infringement expert.

15  I've looked at the non-infringing alternatives that

16  Dr. Nettles put forward.  I know that your experts haven't

17  put forward and analyzed these particular non-infringing

18  scenarios which you're now suggesting.  And so I don't have

19  much more to say other than I don't believe they're viable.

20              And if they were, it's not clear that they would

21  be better because of the deep compromise in service and the

22  hit that the defendants would take on price.  It's not clear

23  that they would dominate in any way the non-infringing

24  alternatives that I have calculated.

25  Q.     There's a difference between the economic benefit of

1    the incremental contribution of a patent and the economic

2    benefit of a product or a system; right?

3    A.      Yes, and that's what the non-infringing alternative

4    helps you do.  It says, okay, without the benefit of the

5    technology, what's your fall back?  And what's the value

6    then of having the technology versus not having it.

7    Q.      Okay.  Your analysis -- let's turn to slide 3.  This

8    is Exhibit 2 from your report?

9    A.      Yes.

10   Q.      Okay.  The first two line items here are the

11   promotional and standard price impacts of high-speed

12   services; right?

13   A.      Correct.

14   Q.      And those high-speed services here are high-speed

15   download services greater than 40 megabits per second?

16   A.      It's the services offered by the defendant.

17   Q.      And those are download services only; correct?

18   A.      No, they may be marketed that way, but there's

19   uploads associated with them as well.

20   Q.      The only numbers you looked at for this analysis are

21   downstream speed numbers; correct?

22   A.      Yes, I was keying off downstream -- downstream speed

23   numbers, that's correct, but it's not the only numbers I

24   looked at.

25   Q.      You do not value in your report the contribution of

1    upstream channel bonding provided by the '679 patent;

2    correct?

3    A.     I didn't specifically carve that off and nor did any

4    of your defendants' damages experts.

5    Q.     And to be clear, the '679 patent cannot block the

6    defendants from offering the downstream high-speed services

7    that are included in your analysis?

8    A.     Once again, I'm not the infringement expert.  I'm

9    relying on Dr. Nettles.

10   Q.     You don't have any reason to believe that the

11   defendants could offer downstream, and in fact, did offer

12   downstream channel bonding only or channel bonding in the

13   downstream direction only during the damages period;

14   correct?

15   A.     I don't know for sure.  I believe that some companies

16   at certain times may have had a limited offering, but I have

17   not studied that in any detail.

18   Q.     Let's turn to the '565 patent.  Now, the '565 patent

19   is only accused -- the only device accused is the CMTS;

20   correct?

21   A.     Once again, I'm not the infringement expert.  I'm

22   willing to take your representation for the purposes of

23   discussion.

24   Q.     You have no reason to believe that any of the

25   defendants' cable modems are accused of infringement?

1    A.     Well, in the system they have to be -- even if

2    they're not accused, they've got to work together in a

3    system.  They've got to be compatible.

4    Q.     The '565 patent, and if I can call that up, the '565

5    patent issued on March 17, 2015?

6    A.     Okay.

7    Q.     That's correct?

8    A.     It appears to be.

9    Q.     Yeah.  You don't have an opinion in your report using

10   March 17, 2015 as a hypothetical negotiation date for the

11   '565 patent?

12   A.     No, I don't.

13                MR. ENZMINGER:  Let's go to slide 3.  Actually

14   slide 4.

15   BY MR. ENZMINGER:

16   Q.     So the '565 patent does not preclude a defendant from

17   making, using, or selling cable modems that are capable of

18   receiving high-speed downloads; correct?

19   A.     Once again, I'm not the infringement expert.

20   Q.     You don't know which accused products are asserted by

21   plaintiffs to infringe which patents?

22   A.     I could go look it up, but I'm relying on Dr. Nettles

23   to do that aspect of the work.

24   Q.     Okay.  So let's take a look at your damages analysis

25   and how it relates to the '565 patent.

1              The '565 patent, do you have an understanding

2    that it relates to the cable -- the CMTS sending downstream

3    signals to the cable modem?

4    A.     I think that's right, but I'm -- once again, I'm not

5    an expert on the patents as such.

6    Q.     So as alternatives -- you posit some alternatives.

7    For example, dual low-speed chip and a 3.1 modem; correct?

8    A.     Yes.

9    Q.     Okay.  Before we get there, you don't do any analysis

10   in your report to apportion the royalty for the '565 patent

11   between the cable modem which is accused and the CMTS which

12   is accused and the cable modem which is not?

13   A.     No, for the reason I indicated, that these products

14   support a service, and the service is where the value is

15   manifested.  It's not an individual product that somebody

16   else makes the products.

17   Q.     And with respect to your damages opinion, one of the

18   alternatives you posit is the dual low-speed modem; correct?

19   A.     Yes.

20   Q.     Okay.  And in the dual low-speed modem, what that is

21   is providing high-speed services by having actually two

22   low-speed chips in the modem itself; correct?

23   A.     Yes, it's providing higher speed by coupling together

24   two lower speed modems which, for some purposes, would

25   provide higher speed, and others it would be compromised.

1  Q.     And in that alternative, you are assuming that

2  there's no change to the cable modem.  It uses the old

3  DOCSIS 2.0 standard; right?

4  A.     I believe that's correct.

5  Q.     Okay.  And that would be the -- and the CMTS would

6  be --

7  A.     Which -- sorry, which scenario are you asking me

8  about?

9  Q.     The dual low-speed modem alternative.

10 A.     Pardon me.  Which alternative?

11 Q.     Dual -- your cost of dual low speed.

12 A.     Dual low-speed modem.  Okay.

13         And what's the question?

14 Q.     The question was:  In that scenario, the CMTS is

15 using the old DOCSIS 2.0 standard, and you've assumed no

16 cost associated with changing the CMTS?

17 A.     That's what I assumed, yes.

18 Q.     Okay.  So you have assumed no cost associated with

19 the accused device?

20 A.     Well, I've measured no additional costs.  I've

21 actually -- because it's very difficult to figure out how

22 you would change the CMTS, I've just used the cost of

23 modifying the modem, recognizing there are other costs that

24 I haven't encountered which, of course, means I've been

25 conservative in the way I've valued the patented technology.

1    Q.      The third alternative that you're talking about here

2    is the cost of deployment of DOCSIS 3.1 modems; correct?

3    A.      Yes.

4    Q.      Okay.  And you understand that DOCSIS 3.1 is a

5    standard that is not accused of infringement?

6    A.      That is right.  That's why I used it as a

7    non-infringing alternative.

8    Q.      Okay.

9    A.      Even though it wasn't -- it wouldn't have been

10   available in the hypothetical negotiation, it would still be

11   something that's five years off into the future.  But I was

12   willing to bring it into the hypothetical negotiation and

13   say, well, defendants could raise this factor, that that's a

14   potentially valid way of -- to get around the infringing

15   technology, recognizing that it wouldn't be compatible, and

16   it would be handicapped if I did that.  But I, nevertheless,

17   was willing to analyze it and take it into account.

18   Q.      With respect to the -- let's explore that for a

19   moment.  With respect to that hypothetical negotiation date,

20   you value all three patents together; correct?

21   A.      I'm looking at the accused patents.  That's correct.

22   Q.      You're valuing altogether, and you start the

23   hypothetical negotiation date in December 2012?

24   A.      It was 2011.  I think 2000 -- I think it was late

25   2011, but it doesn't matter very much.  The actual date of

1    the hypothetical negotiation doesn't matter.

2    Q.    Well, I'm not so sure that's right.  Well, let's

3    look -- is this your slide that you showed?

4    A.    Yes.

5    Q.    And you started calculating the damages in

6    December 2012 when the '679 issued; correct?

7    A.    That's correct.

8    Q.    And that's when you did the hypothetical negotiation

9    date?

10   A.    No.  The hypothetical negotiation date is back in

11   2011, some time towards the end of 2011.  And what I'm

12   indicating here is that certain products, I don't actually

13   have the data I need to calculate damages, and so I've

14   started the clock for damages in December 2012.

15   Q.    Okay.  You don't have the data you needed to

16   calculate any damages for when only Wi-Fi modems infringe;

17   correct?

18   A.    As I indicated, if everything else is cleared and the

19   only thing that's left is the Wi-Fi, then there's -- I would

20   adjust the damages base to reflect that, but not the royalty

21   rate on the infringing ones.

22   Q.    And sir, you set the hypothetical negotiation date

23   back here in May or 2012; right?

24   A.    Around late 2011, somewhere in there, early on

25   considerably before DOCSIS 3.1 rolls out.

1    Q.      But in any event, you set the hypothetical

2    negotiation date before the third patent issued?

3    A.      Yes.

4    Q.      And the third patent issued in March 2015, and I

5    think you just told me that the alternative DOCSIS 3.0 was

6    not available.  That's correct?

7    A.      I -- I --

8    Q.      Can we have Dr. Teece's report?

9    A.      It came along in --

10   Q.      Pardon me?

11   A.      It came around in 2016-'17, if I remember correctly.

12           THE COURT:  Mr. Enzminger, you said in the last

13   question DOCSIS 3.0.  Did you mean 3.1?

14           MR. ENZMINGER:  I'm sorry, 3.1.

15           THE WITNESS:  I understood you to mean 3.1.

16           MR. ENZMINGER:  Okay.  Thank you for the

17   correction.

18           Can we see Dr. Teece's report at paragraph 263?

19           MR. DeVINCENZO:  Your Honor, this is way outside

20   the scope of the motion and I --

21           THE COURT:  Well, so Mr. Enzminger, you have

22   like two more minutes.  Okay?

23           MR. ENZMINGER:  Okay.

24   BY MR. ENZMINGER:

25   Q.      Your report indicates that DOCSIS 3.1 was first

1    produced in 2013 offering maximum download and upload speeds

2    of ten gigabits per second and 1.2 gigabits respectively, so

3    your download and upload speeds.

4             The standard was produced before the '565 patent

5    issued?

6    A.    Remind me of the date for the '565.

7    Q.    March 17, 2015.

8    A.    Yeah.  Yes, it would be then.

9    Q.    Let's turn back to your analysis here, and I want to

10   ask you a question about the 3.1 modem royalty rate.  You

11   have assumed in that rate that the 3.1 modem would be more

12   expensive and have an additional cost over the 3.0 modem;

13   correct?

14   A.    I haven't assumed it.  I actually calculated it.  I

15   was able to get data on it and showed that it was at least

16   in the early years.

17   Q.    Your calculation is based on -- in your report at

18   Exhibit 7 -- do you recognize Exhibit 7 to your report?

19   A.    That's correct.

20   Q.    Okay.  And you indicate for C, the estimated purchase

21   cost premium over DOCSIS 3.0 modems is 30 percent; correct?

22   A.    Correct.

23   Q.    And the source for that is a web blog by a guy named

24   Jeff Baumgartner?

25   A.    That's right.

1    Q.    And it's fair to say that there's no other source in

2    your report for that price premium?

3    A.    That is correct.

4              MR. ENZMINGER:   Okay.  Can we pull up

5    Mr. Baumgartner's blog.  I need it bigger than that.

6    BY MR. ENZMINGER:

7    Q.    This is the article that you were referring to;

8    correct?

9    A.    It is.

10   Q.    In this article, Mr. Baumgartner talks about the

11   deployment of DOCSIS 3.1 devices which are non-infringing,

12   and he says it's difficult to do an apples-to-apples

13   comparison on DOCSIS 3.0 versus 3.1 since many new classes

14   of gateways bake in a lot more than the modem.  Advanced

15   Wi-Fi, radios, MoCA technology, et cetera.

16             Do you see that?

17   A.    Yes.

18   Q.    And you don't have any analysis in your report that

19   excludes these other features from the ability to provide

20   high-speed download services; correct?

21   A.    Correct.  But bear in mind, I'm also having to modify

22   it to make it non-backwardly compatible.  Otherwise, it's

23   not going to work.  So it's going to be deeply compromised

24   as a product in order to meet the criteria of not

25   infringing.

1    Q.    Okay.  The only support in your report for 30 percent

2    price premium is this line here in Dr. -- sorry, Jeff

3    Baumgartner's January 14, 2016 article that he talked to

4    several vendors last fall and the expectation was that the

5    new class of modems will cost between 30 percent to

6    50 percent more in the early going and then decline as

7    volumes increase; correct?

8    A.    Yes.  I took the lower range of that range.

9    Q.    Okay.  Without apportioning it for the other features

10   that are provided by those products; correct?

11   A.    And without adjusting it with the -- for the fact

12   that the other way that it would -- could not be backwardly

13   compatible as, in fact, the product in the marketplace would

14   be, because otherwise it would infringe.

15   Q.    Okay.

16        THE COURT:  And by "backwardly compatible," you

17   mean a 3.1 compliant modem that might work, you expect it

18   would also be able to handle a 3.0, but it wouldn't be

19   because that would infringe?

20        THE WITNESS:  Exactly.  So from a deployment

21   point of view, it would mean the cable companies would have

22   to either be incredibly disruptive on their customers, or if

23   it was a start-up company, maybe it would be okay.  But it

24   would be very disruptive not to provide that connection,

25   that backward compatibility.

1          So I -- you know, that would be huge, in my

2    view, probably knock it out as commercially viable, but

3    I'm -- notwithstanding that, I'm willing to use it as a

4    non-infringing alternative.

5    BY MR. ENZMINGER:

6    Q.     Okay.  The backward compatibility part, though, isn't

7    the non-infringing alternative?

8    A.     The absence of backward compatibility makes it

9    non-infringing.

10   Q.     Okay.  But you have done no analysis removing

11   backward capability -- compatibility would affect the

12   pricing?

13   A.     Correct.  You would -- it would probably push it up,

14   but I have not.  I assume --

15   Q.     You have no opinion on it?

16   A.     Well, I do have an opinion which would be creating a

17   mongle (phonetic) product in the market and probably would

18   cost more, but for purposes of this exercise, I'm willing to

19   use the numbers that I could find in the record, and it

20   wasn't very much.

21   Q.     Okay.

22          THE COURT:  All right.  Mr. Enzminger, I think

23   that's enough.

24          MR. ENZMINGER:  Okay.

25          THE COURT:  Mr. DeVincenzo, you can have about

1    three minutes max.

2                    REDIRECT EXAMINATION

3    BY MR. DeVINCENZO:

4    Q.    Just real quick.  Counsel showed you an article that

5    mentioned a 30-percent price increase.  Do you recall that?

6    A.    I do.

7    Q.    Do you know whether Dr. Tyler performed an analysis

8    of the actual price increase with respect to DOCSIS 3.1

9    modems vis-a-vis DOCSIS 3.0?

10   A.    I think in the end he did.

11   Q.    Okay.  And was the result greater than the amount

12   suspected in the article identified by counsel?

13   A.    I believe it was.

14             MR. ENZMINGER:  Objection, not in his report.

15   BY MR. DeVINCENZO:

16   Q.    It's in Dr. Tyler's report.  With respect to DOCSIS

17   3.1 modems, counsel pointed to an article saying DOCSIS 3.1

18   was first approved, I believe it was, in 2014.

19             Do you know when products were first offered for

20   sale or sold that were DOCSIS 3.1 compatible?

21   A.    No, I think it was later.

22   Q.    Okay.  Do you know whether it was after the last

23   hypothetical negotiation date?

24   A.    I don't know for sure.

25             MR. DeVINCENZO:  Okay.  Counsel, can I just

1    borrow this for a second?

2    BY MR. DeVINCENZO:

3    Q.    Counsel showed you this, and they asked you if the

4    only patent found infringed required a wireless modem, and

5    this isn't a wireless modem, how would that affect your

6    damages base with respect to these products if they

7    infringed?

8    A.    If the only patent was a wireless?  Excuse me.  If

9    there was only one patent in there, and it -- and it

10   infringed?

11   Q.    And it required wireless, and this doesn't have

12   wireless.

13   A.    And it required, and it infringed then that -- the

14   infringement base would be the sales of that device.

15   Q.    No, if this one doesn't have --

16   A.    Oh, okay.  Okay.  If that didn't have it?

17   Q.    Yeah.

18   A.    Then if it doesn't have the infringing product in

19   it --

20   Q.    Would it be included in your damages case?

21   A.    No.

22   Q.    Now, lastly, have you seen any evidence in this case

23   that this supposed wireless alternative would be cheaper or

24   better than the non-infringing alternatives you've analyzed

25   in this case?

1   A.      No, the -- the new non-infringing alternatives that

2   would be proposed, I think I haven't seen any evidence from

3   defendants that it would be -- A, that it's viable, they

4   haven't done the analysis, or that it's cheaper.  So --

5   Q.      And if the defendants had produced such evidence or

6   their experts had done such analysis, would you have

7   considered it?

8   A.      Of course, I would have.

9   Q.      Now, with respect to the disabling upstream

10  non-infringement alternative, have you seen any evidence on

11  the cost impact that would have on the defendants' network

12  structure?

13  A.      No, I -- I do note that Dr. Nettles says he's not

14  sure it's even viable, but it would be costly on the -- and

15  I -- I believe he's also opined it would be costly to try

16  and manage around it.  It would compromise service which

17  would have an impact on revenues as well.

18  Q.      And lastly, with respect to the '565 patent, that's

19  the patent that only concerns cable modem termination

20  systems, what value is a cable modem that can receive

21  channel bonding without a cable modem termination system

22  that can send channel bonding signals?

23  A.      No value.

24  Q.      And when you analyzed the non-infringing alternatives

25  in this case for each individual patent, did you go about

1    calculating the value of the patents compared to the best

2    non-infringing alternative that you're aware of?

3    A.      I looked at the value of the noninfringement.   I

4    calculated value by looking at the difference between the

5    actual cost and what the non-infringing alternative would

6    be, and that's how I fed and motivated my hypothetical

7    negotiation.

8              MR. DeVINCENZO:  Thank you.

9              THE COURT:  All right.  Thank you,

10   Mr. DeVincenzo.

11             All right.  Dr. Teece, you can step down.  Thank

12   you.

13             All right.  So Mr. Enzminger, do you want to

14   tell me what you think it is that you have just shown that

15   should cause me to exclude any portion of Dr. Teece's

16   opinion?

17             MR. ENZMINGER:  Yes, Your Honor.  With respect

18   to the plaintiff's analysis, the '822, I think it's

19   reasonably clear that the '822 patent has no damages

20   associated with it.  He says before the '679 patent issued,

21   he couldn't determine whether services were provided by

22   Wi-Fi-enabling modems or non-Wi-Fi-enabled modems.  But

23   regardless, it doesn't matter because what he is valuing in

24   his analysis is the ability to provide download services,

25   not Wi-Fi.  There's no aspects of his report that put a

1    value on this incremental requirement of this dependent

2    claim that it have wireless.

3              And in the Q and A from counsel just a moment

4    ago where he asked have you seen any evidence, he said, no,

5    defendants didn't provide it, but it wasn't the defendants'

6    burden to establish some incremental value with respect to

7    the claim of the '822 patent which is specific to wireless

8    cable modems or at least cable modems with wireless routers

9    in them.

10             Claim 1 of that patent provides a claim on

11   downstream channel bonding.  That claim was invalidated and

12   upheld by the Federal Circuit.  So the one thing we can

13   agree on in this case is that downstream channel bonding,

14   receiving by a cable modem cannot be the patented invention.

15   It cannot form the basis for a damages analysis because that

16   is valuing what the Patent Office, affirmed by the Federal

17   Circuit, have declared to be the prior art.

18             So what isn't the prior art, according to the

19   plaintiffs in the remaining claim here, is the addition of a

20   wireless router in the cable box.  Now, we can argue, and we

21   will later if need be, as to whether that's even novel, but

22   the point is it's not valued.

23             Dr. Teece admitted multiple times today that he

24   did not have any value on -- place any value on the Wi-Fi

25   portion of this.  And he says, Well, I can -- if you show me

1    which are wireless, I can back them out of the royalty base.

2    But backing them out of the base doesn't solve the problem

3    because then all you're saying is for some portion of

4    modems, I'm going to value the prior art not the incremental

5    contribution.  So just because a router happens to have a

6    wireless router in it doesn't mean Dr. Teece valued that

7    incremental contribution.

8            Here, this analysis is based on providing

9    downstream high-speed services of greater than 40 --

10   actually it's greater, it's from 50 to 60 in his report, but

11   it's downstream only.  So no Wi-Fi.

12           And we turn to the '679 patent, and here he

13   acknowledged they did no analysis on the upstream portion of

14   this claim.  So we already know from the Federal Circuit

15   that the downstream portion is prior art.  That downstream

16   claiming in claim 12 of '679 is almost word for word what

17   Claim '822, invalidated claim 22 was.

18           So what is the incremental value of the '679

19   patent?  It's not the downstream portion because that was

20   declared to be prior art.  It's adding an upstream bonded

21   channel.

22           Now, again, Dr. Teece says, Well, you know, if I

23   know which modems were not used with a CMTS, they're only

24   offered downstream channel bonding, I can back them out of

25   the base.  But that isn't the problem.  The problem is if

1    you back those out of the base, you're still just valuing

2    the downstream channel bonding which isn't the incremental

3    aspect of the invention that allowed the patent to issue.

4    This is determined by the Federal Circuit to be prior art.

5             Now, if we go to the next slide, the next

6    allegation which is the '679 patent allegation against the

7    CMTS, that is the equipment at the cable office, once again,

8    it requires bidirectional transmission.  Only sending

9    downstream information from the CMTS to the cable modem does

10   not infringe.  There has to be upstream.

11            What Dr. Teece valued in his report is the

12   ability to provide downstream service.  There's not one word

13   in his report valuing upstream which is the incremental

14   contribution of the '679 patent.

15            And he says, Well, but it's a system.  No, it

16   isn't.  Each of these patents is directed solely to a

17   device.  There are no system claims in this case.  There are

18   no method claims in this case, nor is there any opinion in

19   Dr. Teece's allocating value as between these two devices.

20            So his report is only I have valued downstream,

21   what the defendants could get from downstream channel

22   bonding, but that isn't the patented feature in any of the

23   products.  In any of the accused patents, I mean.

24            If we go to the '565 patent, here we have the

25   claim covers downstream transmission by the CMTS, but that

1    wasn't valued, either.  Dr. Teece's entire analysis is based

2    on the cable modem, changing the cable modem here, and not

3    apportioning it to the CMTS which is the only infringing

4    device of this patent.

5              Interestingly enough, we talked about a unitary

6    damages case where all three patents contribute, he says, to

7    his analysis, but that presumes, even if you were to agree

8    with that as a rationale, a downstream portion cannot be

9    blocked by this patent because it's not covered.  The

10   bidirectional aspects of it can't be covered, so we not only

11   have non-infringing functionality, but the defendants

12   deployed non-infringing cable modems by the millions.  They

13   deployed CMTS with line cards that only allow downstream.

14             Here, there's no evaluation, so you can't say

15   that all the patents contribute because it's not the same

16   invention.  This invention is downstream channel bonding

17   with wireless.  This one is bidirectional channel bonding.

18   And this one is a cable modem that has downstream and some

19   other aspects.

20             But the point is for purposes of the damages

21   report, this isn't apportioned to the other half of the

22   system.  This is a device claim.  There's no apportionment.

23             And further, with respect to this one, it did

24   not issue until March of 2015, so it cannot possibly form a

25   basis for a unitary damages claim going all the way back to

1    2012.

2              THE COURT:  All right.  Do you have anything to

3    say, Mr. DeVincenzo?

4              MR. DeVINCENZO:  Yeah.  First, defendants don't

5    get to pick what the footprint of the invention is.  You've

6    heard counsel say the '822, claim 1.  The incremental

7    improvement is wireless based on prior art.

8              A non-infringing alternative analysis or cost

9    analysis looks at the best alternatives available.  So if

10   you look at all three patents, they all require a

11   downstream, right.  One alternative is to shut off

12   downstream.  Defendants claim a better alternative is to

13   shut off Wi-Fi.

14             Now, with respect to non-infringing

15   alternatives, the defendants have the burden of proving that

16   it was available and acceptable.  Defendants offer no

17   evidence on that point.  None.  Their expert did not

18   quantify the effect if they went to wireless.

19             So what did our expert do?  He looked at it.  He

20   said, Well, if people don't have Wi-Fi in their house,

21   they're probably going to leave in drones.  So what I'll do

22   is I'll let them keep the Wi-Fi, and instead, I'll look at

23   how much it would have cost them to avoid infringement which

24   is exactly what Federal Circuit precedent and this Court's

25   precedent requires.

1           He looked at the first two alternatives, which
2   the defendants didn't even mention in their briefing, and he
3   explained why avoiding infringement would cost, how much it
4   would cost our per-subscriber-month basis.  He said this is
5   how they would modify the modem to allow it to talk to the
6   CMTS.
7           And when you have two devices that talk to each
8   other in a hypothetical negotiation, your accused infringer
9   cannot walk in and say, Well, we'll just go to DOCSIS 3.1
10  and modify the CMTS.  Any patentee in their right mind is
11  going to know, well, that's not your only cost.
12          In order to modify the CMTS, so to speak, 3.1
13  language, you have to modify the cable modems.  That's an
14  actual real-world cost.
15          Prism Technologies from the Federal Circuit
16  expressly authorizes and recognizes the manner in which
17  Dr. Teece calculated damages in this case.  Patentee must
18  carefully tie proof of damages to the claimed inventions
19  footprint in the marketplace.  That requirement for valuing
20  the patent technology can be met if the patentee adequately
21  shows that the defendant's infringement allowed it to avoid
22  taking a different, more costly approach.
23          That's exactly what our expert did in this case.
24  Defendants' entire argument boils down to rank speculation,
25  that a wireless alternative would be cheaper and better with

1    no evidence, and the turning off upstream would be cheaper

2    and better.  That is just unsupported.

3            And they criticize our expert for failing to

4    analyze those alternatives and determining cost associated

5    with the alternatives, those alternatives when the burden

6    was on them.

7            I would like to point out that the DOCSIS 3.1

8    alternative was identified by defendants in this section.

9    They said that's an appropriate alternative to consider for

10   every claim in this action.

11           And then when Dr. Teece considers it for every

12   claim in this action, they moved on Daubert and said, No,

13   that's not the right one.  They say the proper thing to do

14   is not to look at the non-infringing alternatives and the

15   cost it would be associated with.  It's to look at the prior

16   art and say, Well, claim 1 was invalid, so therefore, claim

17   12, the footprint, has to be only the limitation added by

18   claim 12, and that has to be separately evaluated.

19           You'll notice there's no case law supporting

20   that.  In fact, the only case law relied on in defendants'

21   brief is the smallest saleable unit case law which isn't

22   even implicated in this case.

23           At each turn, Dr. Teece tried to adequately

24   determine how much it would cost the defendants on a per

25   subscriber month to avoid infringement of each patent.

1    Merely because the alternatives apply to all the patents

2    does not make it wrong.

3              The reason the alternatives apply to all the

4    patents is because the cost of avoiding infringement is the

5    same for each claim.  And if defendants want to cross him on

6    different alternatives that they allege would be cheaper,

7    they're free to do that because in the non-infringing

8    alternative context and the cost context, these are all

9    issues for the jury, whether the alternative was available,

10   whether it was acceptable, and the extent of its

11   acceptability.  And this Court recently had a case where it

12   said that.

13             And just lastly, the TC Tech case on the third

14   analysis performed by Dr. Teece is directly on point.  He

15   looked at a smallest incremental price increase that

16   apportioned two times and used that as a basis for

17   negotiation.  Defendants don't even mention that

18   apportionment in their moving papers and never explained why

19   that could possibly be incorrect or inaccurate.

20             Instead, all the defendants argued in their

21   briefing and most of what they're argued today is Dr. Teece

22   analyzed the costs -- the value of downstream channel

23   bonding.  That's not what he evaluated.  He evaluated for

24   each individual patent the cost of avoiding infringement.

25   And when a damages expert performs an analysis that way, the

1    Federal Circuit has made clear that that's an appropriate

2    footprint of the invention.

3              And this Court's TC Tech case says there's not

4    an independent requirement to analyze the footprint of the

5    invention when you've used the cost savings approach.  And

6    we respectfully submit that's exactly what Dr. Teece did.

7              THE COURT:  All right.  Hold on a minute.  You

8    can sit down.

9              MR. DeVINCENZO:  Oh, I thought --

10             THE COURT:  I just wanted to think for a minute.

11   Claim 1, I take it, was that anticipated, or obvious, or

12   both?

13             MR. ENZMINGER:  Obvious.

14             THE COURT:  Okay.  Obvious.

15             MR. ENZMINGER:  Obvious.

16             THE COURT:  Okay.  So like every dependent

17   claim, claim 14 of the '822 patent is drawn more narrowly

18   than the claim that was invalidated as being obvious.  For

19   purposes of damages, we assume dependent claim 14 is

20   infringed and not obvious, not otherwise invalid.

21             And so the problem for the defendant is they

22   have to have some non-infringing alternative.  One of which

23   would be to go back to the -- or one of which would be to

24   have whatever it is that claim 1 corresponded to.  I mean, I

25   don't know what that is.

1          But there is a cost involved in doing that even

2     if the Wi-Fi feature of dependent claim 14 doesn't by itself

3     provide any appreciable benefit to the use of the system.

4     And so I guess I'm having trouble figuring out why what

5     Dr. Teece depends on, whether or not the Wi-Fi portion of

6     the assumed valid and infringed claim, is useful in this

7     situation or not.

8          You know, I mean, when you're talking about

9     non-infringing alternatives, you're always going to be going

10    to something that's not infringed, at least not infringed

11    because it's prior art maybe, and it seems to me that what

12    Dr. Teece actually talked about during his direct testimony

13    wasn't even questioned on cross.

14         It seems to me that in the end, Dr. Teece was

15    following what seems to me to be an understandable

16    methodology.  It seemed to be tied to the facts of this

17    case.  It seems to me that the cross-examination of what he

18    said at trial is the appropriate method for figuring out

19    whatever weaknesses there might be in his opinions.  And so

20    I'm going to deny the defendants' motion, and I'll enter an

21    order to that effect.

22         So let's take a short break, and then we'll talk

23    about scheduling.  Okay?

24              DEPUTY CLERK:  All rise.

25              (Recess was taken.)

1            THE CLERK:  All rise.

2            THE COURT:  All right.  Please be seated.

3            So in terms of the schedule, I'm correct in

4    thinking there's really nothing to do other than the

5    pretrial order and trial; right?

6            MR. PETRSORIC:  That is correct, Your Honor.  We

7    do still have an outstanding JMOL motion to consolidate.

8            THE COURT:  Yes.  Thank you for mentioning that.

9    Yeah, so I looked through the letters on consolidation, and

10   I certainly am not going to consolidate 13 defendants in one

11   trial.  It would produce a ridiculous mismatch of a case.  I

12   actually think you probably can't do it in view of the

13   severance statute, 35 U.S.C. Section 299.  But even if you

14   could do it, I wouldn't do it.  You know, my whole thing as

15   a judge is to try to simplify things, and 13 defendants is

16   not any kind of thing that could possibly be comprehended.

17           So hold on a minute.  I was looking at Professor

18   Teece's damages report.  Some of them, am I correct because

19   it was a big thick document, that say for Atlantic

20   Broadband, the proposed royalty, at least through 2018, is a

21   lump sum, $26.1 million?

22           MR. PETRSORIC:  That is correct, Your Honor.

23           THE COURT:  Okay.  And so I was looking in the

24   right place.  I looked at some others.

25           Is Atlantic Broadband the smallest of the

1    damages?

2            MR. PETRSORIC:  No, Your Honor.  I believe Wave

3    Device and WideOpen West is slightly smaller, but Atlantic

4    Broadband is in the bottom three.

5            THE COURT:  Okay.  So what's the largest damages

6    number, not counting willfulness?

7            MR. PETRSORIC:  It's Comcast, Your Honor, by a

8    factor of almost 2.5.

9            MR. PADMANABHAN:  I think Your Honor asked for

10   not counting willfulness?

11           THE COURT:  Right.

12           MR. PADMANABHAN:  Oh, meaning the number or

13   counting --

14           THE COURT:  Well, in other words, let's assume

15   that Bright House is 28.2 million.  Charter then, I would

16   figure, has to be at least, you know, 74 million or

17   something like that.

18           Is that what we're talking about?

19           MR. PETRSORIC:  I believe, Your Honor, the

20   Charter number between the common and the individual

21   calculations by Dr. Teece ranges from 74, 75 million to 90

22   million approximately.

23           THE COURT:  And they're the ones who have a

24   willfulness --

25           MR. PETRSORIC:  No, Your Honor.  Only Comcast

1    has a willfulness claim.

2              THE COURT:  I'm sorry.  You said Charter is the

3    leader in just raw numbers?

4              MR. PETRSORIC:  No, Your Honor.  Comcast is the

5    leader in raw numbers.

6              THE COURT:  Okay.  So which one has the

7    willfulness claim?

8              MR. PETRSORIC:  Comcast.

9              THE COURT:  Okay.  Got it.

10             What's the Cox claim?

11             MR. PETRSORIC:  The Cox claim is approximately

12   $82 million.

13             THE COURT:  Eighty-two?

14             MR. PETRSORIC:  Yes.  Cox is a Cisco-only CMTS.

15             THE COURT:  Yeah.  No, I got that, or there's no

16   reason you would know that.  I'm looking at the chart that

17   was submitted with checkboxes as to who's what.

18             So why don't we start with a trial involving

19   Cox.  They seem to have the advantage of there's only one

20   company that makes the devices and the number of damages is

21   large.

22             Is there some reason why we shouldn't start with

23   Cox?

24             MR. PETRSORIC:  Well, I think, Your Honor, we

25   would probably be better served if we start with a defendant

1    that uses more than just one of the suppliers of CMTS.

2              THE COURT:  Okay.  Thank you for your opinion.

3              Mr. Padmanabhan.

4              MR. PADMANABHAN:  I don't think that we would --

5    we would put ourselves in Your Honor's hands.  I mean --

6              THE COURT:  I like to say throw yourself at my

7    mercy, but I get the picture.

8              MR. PADMANABHAN:  As you said, Your Honor.

9              THE COURT:  As a practical matter, I think this

10   was actually addressed in one of these letters somewhere.

11   As between the Cisco and the ARRIS devices, what are the

12   odds that one set infringes and the other set doesn't?

13             MR. PETRSORIC:  We believe there's zero, Your

14   Honor.

15             MR. PADMANABHAN:  And we would disagree.  They

16   are different systems.  They have different operations.

17   They have different infringement allegations as to how they

18   operate.

19             So while Mr. Petrsoric would obviously like

20   every device to infringe, you know, they're different cases.

21             THE COURT:  So I'm not going to make you say

22   which, but I mean, do you have a better case on one of them

23   than the other?

24             MR. PADMANABHAN:  ChanBond is wrong across the

25   board, Your Honor, and you won't be surprised to hear me say

1    that.  They're wrong for multiple reasons in both cases.

2              THE COURT:  Are they more wrong in one of them

3    than the other?

4              MR. PADMANABHAN:  I think they probably have

5    less evidence on one of them than the other in the sense of

6    they seem to be guessing on ARRIS, to some extent, on how

7    the devices work, but --

8              THE COURT:  Okay.  Well, so I'd like to start

9    with Cox because, you know, we don't have the complication

10   of what does the ARRIS device do.  You know, there's enough

11   money to make it worth the plaintiff's while.

12             So how much time do the sides need to be ready

13   for this?

14             MR. PETRSORIC:  For ChanBond, midsummer would be

15   appropriate, Your Honor.

16             THE COURT:  All right.  Mr. Padmanabhan?

17             MR. PADMANABHAN:  I think now that you told us

18   who you'd like to start with, I'd like to talk to them.  As

19   you can appreciate, we have 13 clients, and we haven't taken

20   a toll to figure out when they will all be ready.  But they

21   each have different witnesses, so there's some

22   considerations.

23             THE COURT:  All right.  Hold on just a minute.

24             Well, so why don't we see about the week of

25   June 22nd.  We would have a pretrial conference on June 5th

1   at 10:00 a.m.

2              MR. PADMANABHAN:  Your Honor, I think we at

3   least know some members of our team that may be in trial

4   that week.

5              THE COURT:  Well, which week?

6              MS. YING:  Your Honor, Jack and I are in trial

7   at least on the June 5th pretrial date.  On the 22nd at

8   least, I was planning on being on vacation, but --

9              THE COURT:  Well, Ms. Ying, you know, I would

10  like you to go on vacation on the 22nd regardless.

11             MS. YING:  Yes.

12             THE COURT:  It's important that you do things

13  like that.  And I don't mean to in any way suggest that

14  you're not replaceable, but as you said, it's you and

15  Mr. Blumenfeld, and I imagine between the two of you, if

16  there needs to be a second person -- hi, Mr. Blumenfeld, I

17  didn't see you back there.

18             So I didn't have a chance to say I understood

19  she was more important than you are, Mr. Blumenfeld.  You

20  know --

21             MR. BLUMENFELD:  I will be in trial with Judge

22  Stark that week.

23             THE COURT:  Okay.  Well, you know, things have a

24  way of -- in any event, I'm sure you can come up with

25  some -- you're a large firm; right?

```
 1                    MR. BLUMENFELD:  We are.

 2                    THE COURT:  If you know, and maybe you don't,

 3      were either you or Ms. Ying planning on actually

 4      cross-examining any witnesses or doing direct examinations

 5      of any witnesses at this trial?

 6                    MR. BLUMENFELD:  I guess I would defer to

 7      Mr. Padmanabhan.

 8                    MR. PADMANABHAN:  I am sorry.  You were asking

 9      about whether?

10                    THE COURT:  Whether Delaware lawyers were going

11      to do something in addition to being Delaware lawyers, that

12      is, a witness.

13                    MR. PADMANABHAN:  Ms. Ying and Mr. Blumenfeld

14      have been an integral part of our team since day one, so I

15      suspect they'll have a significant role in the trial.

16                    THE COURT:  All right.

17                    MR. PADMANABHAN:  And I say that in all honesty,

18      Your Honor.

19                    THE COURT:  Okay.  No, that's fine.  I don't

20      want to discourage your thinking like that.

21                    All right.  Well, let me just go ahead here a

22      little bit more.  Yeah, so the problem is, just like

23      Ms. Ying and Mr. Blumenfeld, I have lots of trials

24      scheduled.  It's kind of hard to know which ones will fade

25      away.
```

1            All right.  How about August 18th or 19th which

2    would be no trial on Friday, August 21st, but we could have

3    trial starting on one of those days and running into the

4    following week?

5            MR. PADMANABHAN:  Sorry.  Go ahead.

6            MR. PETRSORIC:  That works from ChanBond, Your

7    Honor.

8            MS. YING:  Your Honor, to clarify, you're

9    starting either August 18th or 19th and running through the

10   week of the 24th; is that correct?

11           THE COURT:  Well, not running through the week.

12   Into the week.

13           MS. YING:  Into the week, I apologize.

14           THE COURT:  But no trial on the 21st because I

15   have to go somewhere.

16           MR. PADMANABHAN:  So I assume, obviously,

17   subject to our experts availability and other things?

18           THE COURT:  Yeah.  Yeah.  I mean, I do recognize

19   sometimes people have obligations, so I could start on

20   either the 18th or the 19th.  Why don't you all quickly

21   check among the people that you really have to have here.

22   You know, of course, there's some flexibility since there's

23   the week of the 18th or, you know, part of that week and

24   part of the next week.  You know, so if they weren't here

25   for one week, maybe they'd be here for the other week.

1           All right.  So why don't we say you'll get back

2    to my staff on August 18th or 19th for Cox.  And pretrial

3    conference, I would do that on June 26th.  No, actually

4    let's make it June 25th at 9:00 a.m.

5           I take it, Mr. Petrsoric, from the way you're

6    standing there, that that's okay with you?

7           MR. PETRSORIC:  Yes, Your Honor.  I'm sorry.

8           THE COURT:  No.  No.  No.  It just seems like

9    everybody on the defense side is busy checking computers and

10   things.  You seem to be -- it's good.

11          And then looking, at least as you look at your

12   calendar, that's all right, Mr. Padmanabhan?

13          MR. PADMANABHAN:  Your Honor, I'm probably less

14   important than a lot of people in the room, but I'll be

15   available.  But I'll check with --

16          THE COURT:  Well, you don't really need the rest

17   of them.  Okay.  So check that.

18          Well, think amongst yourselves, see if you can't

19   agree between yourselves as to a second trial to schedule.

20   Try to pick a week, or two, or three when you're available

21   sometime after Labor Day, and we'll see what we can do about

22   getting another trial scheduled.  Okay.

23          But it's probably not a good use of our time to

24   sit here and try to do that.  Okay.  So tentatively, Cox

25   either August 18th or 19th, and the pretrial June 25th at

1    9:00 a.m.  And see if you can't consult the people you need

2    to consult with, talk to each other.

3              And if it's good, submit a proposed order to

4    that effect.  Okay?

5              MR. PETRSORIC:  Your Honor, may I raise one last

6    point?  Understanding your resistance towards a large-scale

7    consolidation, would the Court still consider the first

8    trial to contain a consolidated invalidity trial?

9              THE COURT:  No.  I don't see how I can do that.

10   You know, the first trial is just going to be a straight-up

11   trial between you and Cox.  And you know, maybe part of the

12   reason why I wasn't in a hurry to schedule another trial

13   right after it was I might learn something during the course

14   of the trial, and that might give me more insight as to what

15   to do further down the road.  Though, I expect that, you

16   know, my sort of plan is to schedule a second trial, have

17   some time after that, and then after that just have the

18   other trials scheduled as close together as possible so that

19   we all decide whether that's really what you want to be

20   doing or not.

21             Okay?

22             MR. PETRSORIC:  Thank you, Your Honor.

23             MR. PADMANABHAN:  Thank you, Your Honor.

24             THE COURT:  All right.  Okay.  Well, we'll be in

25   recess.  Thank you to everybody.

1                    And Dr. Teece, thank you for being here.

2                    THE CLERK:  All rise.

3                    (Court was recessed at 4:31 p.m.)

4                    I hereby certify the foregoing is a true and

5       accurate transcript from my stenographic notes in the

6       proceeding.

7                              /s/ Heather M. Triozzi
                              Certified Merit and Real-Time Reporter
8                              U.S. District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25